IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| The State of KANSAS, the State of NORTH DAKOTA, the State of ALABAMA, the State of ARKANSAS, the State of FLORIDA , the State of IDAHO, the State of INDIANA, the State of IOWA, the Commonwealth of KENTUCKY, the State of MISSOURI, the State of MONTANA, the State of NEBRASKA, the State of NEW HAMPSHIRE, the State of OHIO, the State of SOUTH CAROLINA, the State of SOUTH DAKOTA, the State of TENNESSEE, the State of TEXAS, and the Commonwealth of VIRGINIA, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA and the CENTERS FOR MEDICARE & MEDICAID SERVICES, <br><br> Defendants. | Civil Action No. 1:24-cv-00150-DMT-CRH |

<u>FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

I.    INTRODUCTION AND NATURE OF THE ACTION

1.    Plaintiff States bring this civil action under the Administrative Procedure Act (APA) challenging the final administrative rule promulgated by the Centers for Medicare & Medicaid Services (CMS), which expands CMS' definition of individuals "lawfully present" in the United States to include aliens granted Deferred Action for Childhood Arrivals (DACA). This definition affects coverage under the Affordable Care Act (ACA).

2.    Congress has already limited eligibility for federal public benefits to certain

qualified aliens in the 1996 Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA).

3.      Aliens who have been granted deferred action under DACA are not included in the definition of such qualified aliens.

4.      Many categories of aliens who have been granted employment authorization under 8 C.F.R. § 274a.12(c) (2023) are also not included in the definition of such qualified aliens.

5.      Similarly, when it enacted the ACA, Congress limited eligibility to participate in a qualified health plan through a subsidized exchange to only "citizen[s] or national[s] of the United States [and] aliens lawfully present in the United States." 42 U.S.C. § 18032(f)(3).

6.      DACA recipients are, by definition, unlawfully present in the United States.

7.      Indeed, eligibility for DACA *requires* unlawful presence in the United States; DHS has merely deferred immigration enforcement action against DACA recipients based on its assertion of prosecutorial discretion. *See* Memorandum from Janet Napolitano, Sec'y of Homeland Sec., to David V. Aguilar, Acting Comm'r of U.S. Customs & Border Protection, et al. (June 15, 2021), *available at* https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf [hereinafter "DACA Memorandum"].

8.      The final rule challenged by this litigation is entitled "Clarifying the Eligibility of Deferred Action for Childhood Arrivals (DACA) Recipients and Certain Other NonCitizens for a Qualified Health Plan Through an Exchange, Advance Payments of the Premium Tax Credit, Cost-Sharing Reductions, a Basic Health Program" (the Final Rule). The Final Rule was published in the Federal Register at 89 Fed. Reg. 39,392 on May 8, 2024.

9.      The Final Rule amends CMS' definition of "lawfully present" for public healthcare benefits to now include unlawfully present aliens who have been granted deferred action under DACA. 89 Fed. Reg. at 39,395.

10.     The Final Rule also amends CMS' previous definition of "lawfully present" to include any alien granted employment authorization under § 274a.12(c), rather than the seven enumerated categories in § 274a.12(c) who had previously been eligible. 89 Fed. Reg. at 39,408.

11.     The Final Rule's new definition of "lawfully present" is both contrary to law and arbitrary and capricious because: (a) it contradicts the statutory definition of a "qualified alien" eligible for public benefits; and (b) because the action *deferred* under DACA (i.e., removal) is applicable only to aliens who *lack* lawful immigration status.

## II.     THE PARTIES

12.     Plaintiffs are all sovereign states of the United States of America, suing to vindicate their sovereign, quasi-sovereign, and proprietary interests; the financial condition of themselves and their individual citizens; and their citizens' health, safety, and welfare.

13.     Plaintiffs bring suit through their respective Attorneys General, who are each the chief legal officer of their state and have the authority to represent their state in federal court.

14.     CMS is a sub-agency of the Department of Health and Human Services (HHS).

15.     CMS issued the rule that is the subject of this litigation.

16.     CMS meets the definition of "agency" in 5 U.S.C. § 701(b)(1).

17.     Defendant United States of America is a proper party under 5 U.S.C. § 703.

## III.     JURISDICTION AND VENUE

18.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

19.     Under 5 U.S.C. § 702, the federal government has waived immunity from suits under the Administrative Procedure Act.

20.     The Court is authorized to postpone the effective date of the Final Rule and award the requested declaratory and injunctive relief under 5 U.S.C. §§ 705–06 and 28 U.S.C. §§ 1361, 2201–02.

21.     Venue lies in federal district courts generally pursuant to 5 U.S.C. § 703 because the ACA does not specify a special statutory review proceeding for this action.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1)(C) because Plaintiff North Dakota resides in the District and no real property is involved in this action.

IV.     BACKGROUND

A.     **Statutory and Regulatory Framework**

23.     In PRWORA, Congress announced a "compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits." 8 U.S.C. § 1601(6).

24.     Congress thus provided that, "[n]othwithstanding any other provision of law," and subject to certain explicit exceptions, "an alien who is not a qualified alien . . . is not eligible for any Federal public benefit." 8 U.S.C. § 1611(a). Congress defined a "qualified alien" to include only lawful permanent residents, asylees, refugees, parolees granted parole for a period of at least one year, aliens granted withholding of removal under specifically identified subsections of the Immigration and Nationality Act (INA) (generally having to do with restrictions on removal to a country where the alien's life or freedom would be threatened), and certain battered aliens. *Id.* §§ 1641(b), (c).

25.     ACA benefits are not exempt from the definition of "any Federal benefit." And DACA recipients are not included in the definition of "qualified alien.".

26.     Similarly, under the ACA, an individual must be either a citizen or national of the United States or be "lawfully present" in the United States in order to be eligible to enroll in a Qualified Health Plan (QHP) through a subsidized health exchange. *See* 42 U.S.C. § 18032(f)(3).

27.     The ACA also requires CMS to verify that health exchange applicants are lawfully present in the United States. 42 U.S.C. § 18081(c)(2)(B).

28.     CMS has interpreted the phrase "lawfully residing" as synonymous with "lawfully present" since at least 2010.

29.     In August 2012—two years after the ACA was enacted, and after DHS first implemented its DACA program—CMS amended its regulatory definition of "lawfully present" at 45 C.F.R. § 152.2 to expressly state that an alien granted deferred action under DHS's DACA policy was not considered "lawfully present." *See* Pre-Existing Condition Insurance Plan Program, 77 Fed. Reg. 52,614, 52,615–16 (Aug. 30, 2012).

30.     In 2014, CMS issued regulations for Basic Health Programs (BHP), which also adopted the definition of "lawfully present" at 45 C.F.R. § 152.2, thereby aligning the definition of "lawfully present" for a BHP with the definition used for ACA exchanges.

31.     Accordingly, since the DACA program was created, DACA recipients have been ineligible to enroll in a QHP through an ACA exchange, ineligible for tax credits or premium cost sharing reductions in connection with such enrollment, and ineligible to enroll in a BHP because they are not considered "lawfully present" for purposes of these programs.

**B.     The Final Rule**

32.     Now, through the Final Rule, CMS reverses course and proclaims that DACA recipients are in fact "lawfully present" for purposes of receiving taxpayer-funded healthcare benefits through the ACA.

33.     Notwithstanding public comments pointing out that Congress has not included DACA recipients in the class of "qualified aliens" eligible for public benefits,[1] CMS's Final Rule includes both DACA recipients and employment-authorized aliens in its definition of those

---

[1] *E.g.*, Office of the Kan. Attorney Gen. et al, Comment on Docket ID No. CMS-9894-P (June 23, 2023), *available at* https://www.regulations.gov/comment/CMS-2023-0068-0525.

aliens "lawfully present" for purposes of ACA eligibility.

34.     CMS justified its change of position by citing "the broad aims of the ACA to in-crease access to health coverage" 89 Fed. Reg. at 39,395. According to CMS, the prior practice of excluding DACA recipients "failed to best effectuate congressional intent in the ACA." *Id*. Defin-ing DACA recipients as lawfully present, the agency claims, "aligns with the goals of the ACA—specifically, to lower the number of people who are uninsured in the United States and make af-fordable health insurance available to more people." 89 Fed. Reg. at 39,396.

35.     CMS also claims it was motivated by the national economic importance of DACA recipients, by their desire to support the DACA policy, and by the disproportionately high per-centage of uninsured DACA recipients. 89 Fed. Reg. at 39,395-6.

36.     In light of these justifications, CMS declared that they "see[] no reason to treat DACA recipients differently from other noncitizens who have been granted deferred action." 89 Fed. Reg. at 39,396.

37.     Last year, a federal district court enjoined and vacated DHS's DACA rule. *See Texas v. United States*, Civil Action No. 1:18-CV-00068, 2023 WL 5950808, at *1 (S.D. Tex. Sept. 13, 2023). The court's order allowed DHS to continue to administer the DACA program for individuals who registered prior to July 16, 2021.

38.     CMS acknowledged the *Texas* injunction in a footnote to the Final Rule, noting that "[c]urrent court orders prohibit DHS from fully administering the DACA final rule. However a partial stay permits DHS to continue processing DACA renewal requests and related applications for employment authorization documents." 89 Fed. Reg. at 39,395.

39.     CMS also proposed to add to the definition of "lawfully present," in addition to DACA recipients, any alien granted employment authorization under 8 C.F.R. § 274a.12(c). This expands the number of categories of aliens considered lawfully present from the seven

enumerated categories under the old definition[2] to all thirty-six categories covered under § 274a.12(c). 89 Fed. Reg. at 39,408. CMS' only justification for this change was that it would be easier to determine who was lawfully present if they could include anyone with DHS work authorization. 89 Fed. Reg. at 34,408.

40.     Even so, CMS implicitly acknowledged that this definition of "lawfully present" would include some noncitizens who were not lawfully present: "*Almost all* noncitizens granted employment authorization under 8 CFR § 274a.12(c) are already considered lawfully present under existing regulations." 89 Fed. Reg. at 34,408 (emphasis added). In other words, CMS's new definition of "lawfully present" includes some noncitizens that even CMS recognizes are *not* lawfully present.

41.     CMS also acknowledged in the Final Rule that individuals who are not qualified aliens under PRWORA, and who are therefore ineligible for federal and state benefits, may nonetheless qualify for work authorization under § 274a-12(c): *See* 89 Fed. Reg. at 39,409.

42.     CMS's justification for this result is a circular non-sequitur: "we believe it is appropriate to include all individuals with such [§ 274a.12(c)] employment authorization because DHS has made an affirmative determination that the individual has an underlying immigration status or category that authorizes them to work legally in the United States." *Id.*

## V.     IRREPARABLE HARM

43.     The Final Rule is expected to result in 200,000 DACA recipients becoming newly eligible for a subsidized health plan. *See* 88 Fed. Reg. at 25,325.

44.     As of December 31, 2023, there were approximately 530,110 active DACA

---

[2] Former § 152.2(4)(iii) defined "Lawfully present" to include "Aliens who have been granted employment authorization under 8 CFR § 274a.12(c)(9), (10), (16), (18), (20), (22), or (24)."

recipients distributed across the nation. U.S. Citizenship & Immigr. Servs., Office of Performance & Quality, Count of Active DACA Recipients By State or Territory As of December 31, 2023 (queried Aug. 2024), available at https://www.uscis.gov/sites/default/files/document/data/active_daca_recipients_fy2024_q1.xlsx [hereinafter "DACA Recipients by State"].

45.    According to U.S. Citizenship and Immigration Services, the (rounded) number of DACA recipients in each Plaintiff State is as follows:

| State | Recipients |
|---|---|
| Alabama | 3,460 |
| Arkansas | 3,680 |
| Florida | 21,080 |
| Idaho | 2,250 |
| Indiana | 7,450 |
| Iowa | 2,010 |
| Kansas | 4,350 |
| Kentucky | 2,230 |
| Missouri | 2,550 |
| Montana | 80 |
| Nebraska | 2,420 |
| New Hampshire | 220 |
| North Dakota | 130 |
| Ohio | 3,290 |
| South Carolina | 4,840 |
| South Dakota | 190 |
| Tennessee | 6,360 |

Texas                87,620

Virginia             7,810

*Id.*

46.     Plaintiff Idaho administers its own state-run ACA exchanges to handle QHP enrollment. Idaho's exchange is called "Your Health Idaho."

47.     Plaintiff Kentucky administers its own state-run ACA exchanges to handle QHP enrollment. Kentucky's exchange is called "Kynect."

48.     Plaintiff Virginia administers its own state-run ACA exchanges to handle QHP enrollment. Virginia's exchange is called "Virginia's Insurance Marketplace."

49.     Expanding eligibility for ACA coverage will impose additional administrative and resource burdens on states that have established their own ACA exchange by allowing additional persons to use such exchanges.

50.     The vast majority of exchange enrollees are receiving a federal subsidy to lower their monthly premium. *See*, *e.g.*, Sullivan, Orris & Lukens, Center on Budget and Policy Priorities, *Entering Their Second Decade, Affordable Care Act Coverage Expansions Have Helped Millions, Provide the Basis for Further Progress*, *available at:* https://www.cbpp.org/research/health/entering-their-second-decade-affordable-care-act-coverage-expansions-have-helped ("In February 2023, 91% of marketplace enrollees were receiving PTCs [premium tax credits]."); *see also* CMS Effectuated Enrollment: Early 2024 Snapshot and Full Year 2024 Average, available at: https://www.cms.gov/files/document/early-2024-and-full-year-2023-effectuated-enrollment-report.pdf ("In February 2024, 19.3 million Marketplace enrollees, or 93 percent of total Marketplace enrollees, received APTC") (last visited August 2, 2024).

51.     For instance, Kansas had 102,303 enrollees in February 2022; of those, 92% received tax credits and 47% qualified for a cost sharing reduction. Similarly, 91% of the

enrollees in North Dakota received tax credits, with 26% qualifying for a cost sharing reduction. *Id.*

52.     Subsidized health insurance through the ACA is a valuable public benefit that encourages unlawfully present alien beneficiaries to remain in the United States.

53.     The vast majority of DACA recipients have limited access to subsidized health care in their countries of origin. Where subsidized health care is available in their countries of origin, necessary drugs and medical equipment are often in short supply or unavailable.

54.     The financial value of eligibility for ACA coverage providing access to superior medical care in the United States, when compared to limited or inadequate subsidized health care in an alien's country of origin, constitutes a significant financial incentive for the alien to remain in the United States.

55.     It is likely that aliens who would otherwise have returned to their countries of origin will instead remain in the United States because of the eligibility for ACA coverage provided by the Final Rule.

56.     Plaintiff States suffer fiscal costs through the continued presence of DACA recipients in their respective jurisdictions.  The Final Rule incentivizes DACA recipients, their children, and minors currently residing in Plaintiff States whose parents illegally entered the United States to remain in Plaintiff States and thereby causes Plaintiff States to expend additional education, healthcare, law enforcement, public assistance, and other limited resources.

57.     DACA recipients are able to obtain driver's licenses in Plaintiff States. *See, e.g.*, Tenn. Code Ann. § 4-58-103; Ark. Code Ann. 27-16-1105; *Arizona Dream Act Coalition v. Brewer*, 855 F.3d 957 (9th Cir. 2017), (cert denied 138 S.Ct. 1279) (2018) (enjoining Arizona's policy of refusing to issue driver's licenses to DACA recipients).

58.     And, for many of the Plaintiff States, at least some proportion of driver's licenses are issued at a net cost to the state, over and above the fee paid by the license applicant.

59.     Every Plaintiff State has a compulsory school-attendance law and incurs a substantial cost to educate school-aged children. *See* Ark. Code Ann. 6-18-201; Tenn. Code Ann. § 49-6-3001(c)(1); *Florida v. United States*, 660 F. Supp. 3d 1239, 1262 (N.D. Fla. 2023).

60.     Under current caselaw, states must allow minors who are not lawfully present in the United States to attend their schools. *Plyler v. Doe*, 457 U.S. 202, 223–30 (1982). Consequently, all the Plaintiff States incur costs through the provision of K–12 public education to DACA recipients and their children, since some portion of the DACA recipients are either the parents of K–12 school-age children or are themselves K–12 school-age children.

61.     DACA recipients also consume public benefits in the form of public-assistance, indigent legal defense, and emergency-care expenditures in Plaintiff States.

62.     States also bear the costs of the DACA program in the form of incarceration of DACA recipients who commit crimes. U.S. Citizenship and Immigration Services, *DACA Requestors with an IDENT Response: November 2019 Update*, at 1, available at: https://tinyurl.com/ytrrhwj7 (between 2012 and October 2019, nearly 80,000 illegal aliens with prior arrest records were granted DACA status).

63.     The current administration has signaled that it intends not only "to preserve and fortify" DACA, but also to continue to grant initial DACA requests (though it admits that it cannot do so because of an injunction in ongoing litigation). *See* Consideration of Deferred Action for Childhood Arrivals (DACA), https://www.uscis.gov/DACA (last visited Aug. 2, 2024). Thus DHS, under the present administration, intends to reopen the DACA program as soon as it can.

64.     If DACA were re-opened to new applicants, the aforementioned costs to Plaintiff

States would increase as new individuals register as DACA recipients.

65.     For example, focusing on Plaintiff State of Kansas, as of December 31, 2024,

approximately 4,350 DACA recipients reside in Kansas. DACA Recipients by State, *supra*. One

organization has estimated that, as of March 31, 2024, 9,000 individuals live in Kansas who are

part of the immediately eligible population (i.e., immediately eligible for DACA). Deferred

Action for Childhood Arrivals (DACA) Data Tools,

https://www.migrationpolicy.org/programs/data-hub/deferred-action-childhood-arrivals-daca-

profiles (last visited Aug. 2, 2024) (providing DACA recipients and eligible population by state).

66.     Furthermore, the availability of ACA coverage will encourage some amount of

additional illegal immigration by those believing they or their family members will be eligible for

DACA in the future.

67.     Some number of those aliens will make their way to Plaintiff States. Kansas

already has between 69,000 and 140,000 illegal aliens residing in it, many of whom are uninsured

and a sizable proportion of whom have incomes below the poverty line. Federation for American

Immigration Reform, *The Fiscal Burden of Illegal Immigration on United States Taxpayers*, at 40 (Mar. 8,

2023), https://tinyurl.com/yzdh3rvk (between 104,000 and 140,000) ["FAIR Report"]; Profile of

the Unauthorized Population: Kansas, Migration Policy Institute,

https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state /KS (last

visited Aug. 23, 2023) (69,000); *U.S. Unauthorized Immigrant Population Estimates by State, 2016*, Pew

Research Ctr. (Feb. 5, 2019), https://www.pewresearch.org/hispanic/interactives/u-s-

unauthorized-immigrant s-by-state/ (75,000). This costs Kansas taxpayers between $447

million and $603 million per year. FAIR Report at 40.

68.     In North Dakota, it is estimated that there are approximately 6,000 to 9,000

illegal aliens residing in the State, including their children, costing taxpayers between

approximately $27 million and $36 million per year. FAIR Report at 40.

69.     In Alabama, it is estimated that there are approximately 91,000 to 122,000 illegal aliens residing in the State, including their children, costing taxpayers between approximately $391 million and $524 million per year. *Id.*

70.     In Arkansas, it is estimated that there are approximately 97,000 to 131,000 illegal aliens residing in the State, including their children, costing taxpayers between approximately $434 million and $586 million per year.

71.     In Florida, it is estimated that there are approximately 1,185,000 to 1,595,000 illegal aliens residing in the State, including their children, costing taxpayers between approximately $5.9 billion and $8 billion per year. *Id.*

72.     In Idaho, it is estimated that there are approximately 62,000 to 83,000 illegal aliens residing in the State, including their children, costing taxpayers between approximately $302 million and $405 million per year. *Id.*

73.     In Indiana, it is estimated that there are approximately 154,000 to 207,000 illegal aliens residing in the State, including their children, costing taxpayers between approximately $685 million and $921 million per year. *Id.*

74.     In Iowa, it is estimated that there are approximately 55,000 to 74,000 illegal aliens residing in the State, including their children, costing taxpayers between approximately $239 million and $322 million per year. *Id.*

75.     In Kentucky, it is estimated that there are approximately 69,000 to 94,000 illegal aliens residing in the State, including their children, costing taxpayers between approximately $315 million and $430 million per year. *Id.*

76.     In Missouri, it is estimated that there are approximately 77,000 to 104,000 illegal aliens residing in the State, including their children, costing taxpayers between approximately

$342 million and $462 million per year. *Id.*

77.     In Montana, it is estimated that there are approximately 8,000 to 10,000 illegal aliens residing in the State, including their children, costing taxpayers between approximately $29 million and $39 million per year. *Id.*

78.     In Nebraska, it is estimated that there are approximately 56,000 to 75,000 illegal aliens residing in the State, including their children, costing taxpayers between approximately $251 million and $337 million per year. *Id.*

79.     In New Hampshire, it is estimated that there are approximately 14,000 to 19,000 illegal aliens residing in the State, including their children, costing taxpayers between approximately $79 million and $107 million per year. *Id.*

80.     In Ohio, it is estimated that there are approximately 132,000 to 178,000  illegal aliens residing in the State, including their children, costing taxpayers between approximately $582 and $785 million per year. *Id.*

81.     In South Carolina, it is estimated that there are approximately 117,000 to 157,000 illegal aliens residing in the State, including their children, costing taxpayers between approximately $555 million and $746 million per year. *Id.*

82.     In South Dakota, it is estimated that there are approximately 9,000 to 12,000 illegal aliens residing in the State, including their children, costing taxpayers between approximately $26 million and $35 million per year. *Id.*

83.     In Tennessee, it is estimated that there are approximately 162,000 to 218,000 illegal aliens residing in the State, including their children, costing taxpayers between approximately $721 million and $971 million per year. *Id.*

84.     In Texas, it is estimated that there are approximately 2,226,000 to 2,992,000 illegal aliens residing in the State, including their children, costing taxpayers between

14

approximately $9.9 billion and $13.3 billion per year. *Id.*

85.     In Virginia, it is estimated that there are approximately 419,000 to 563,000 illegal aliens residing in the State, including their children, costing taxpayers between approximately $2.1 billion and $2.8 billion per year. *Id.*

VI.     **CLAIMS FOR RELIEF**

<u>COUNT I</u>

**Administrative Procedure Act – Agency action not in accordance with the law**

86.     Plaintiffs incorporate by reference all preceding paragraphs.

87.     Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory . . . authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C) (2018).

88.     The provision of ACA public healthcare benefits to DACA recipients violates two separate provisions of federal law: (1) the PRWORA prohibition against providing ineligible aliens public benefits; and (2) the exclusion of unlawfully present aliens found in the ACA itself.

89.     First, the Final Rule violates the PRWORA. Aliens granted deferred action from deportation—including those in the DACA program—are not included within Congress' definition of "qualified alien," nor do they fall within an exception to the prohibition on public benefits.

90.     Subsidies provided to newly eligible QHP enrollees in an ACA exchange as a result of the Final Rule constitute a federal public benefit under PRWORA.

91.     However, in PRWORA, Congress broadly and expressly prohibited non-qualified aliens from receiving any federal public benefit "[n]otwithstanding any other provision of law," 8 U.S.C. § 1611(a).

92.     Phrases such as "notwithstanding any other provision of law" "broadly sweep

15

aside potentially conflicting laws." *United States v. Novak*, 476 F.3d 1041, 1046 (9th Cir. 2007).

93.     Because DACA recipients do not fall within the definition of "qualified alien" as set forth by Congress, they are statutorily ineligible for ACA benefits.

94.     CMS' Final Rule, by including aliens granted deferred action under DACA and aliens granted work authorization in its definition of aliens "lawfully present" in the United States, is both "not in accordance" with the PRWORA and "in excess of statutory . . . authority," 5 U.S.C. § 706(2)(A), (C), and should be postponed pending judicial review, vacated, and enjoined under the APA (5 U.S.C. §§ 705 & 706).

95.     Second, the Final Rule violates the plain text of the ACA itself.  In the ACA, Congress limited eligibility to participate in a qualified health plan through a subsidized health exchange to citizens or nationals of the United States and individuals "lawfully present" in the United States. 42 U.S.C. § 18032(f)(3).

96.     DACA recipients are, by definition, not lawfully present in the United States. The DACA Memorandum merely "provides that an illegal alien qualifies for relief from removal." *Texas v. United States*, 50 F.4th 498, 508 (2022).  *See* 8 C.F.R. § 236.22(b)(4) (limiting DACA availability to aliens who lack lawful immigration status); *see also* 8 U.S.C. § 1182(a)(6)(A)(i) ("An alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible."); *id.* § 1229a(a)(2) (noting that inadmissible aliens are removable).

97.     DACA recipients are therefore legally ineligible to receive ACA benefits.

98.     So is every unlawfully present alien with a DHS employment authorization.

99.     The Final Rule, by including aliens granted deferred action under DACA and aliens granted work authorization in its definition of aliens "lawfully present," is both "not in accordance" with the PRWORA and the ACA, and "in excess of statutory . . . authority," 5

U.S.C. § 706(2)(A), (C), and should therefore be postponed pending judicial review, vacated, and enjoined under the APA (5 U.S.C. §§ 705 & 706).

<div align="center">COUNT II</div>

<div align="center">APA – Arbitrary and Capricious</div>

100.    Plaintiffs incorporate by reference all preceding paragraphs.

101.    Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

102.    An agency acts arbitrarily and capriciously under the APA when it departs sharply from prior practice without reasonable explanation; or fails to consider costs or affected communities' reliance on the prior rule.

103.    In promulgating the Final Rule, Defendants failed to provide a reasonable explanation for the complete reversal from past practice.

104.    CMS' decision to bestow DACA recipients with the status of being "lawfully present" is illogical on its face, because the "action" that is deferred in DACA is the unlawfully present alien's removal. *See* 8 C.F.R. § 236.22(b)(4) (limiting DACA availability to aliens who lack lawful immigration status); *see also* 8 U.S.C. § 1182(a)(6)(A)(i) ("An alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible."); *id.* § 1229a(a)(2) (noting that inadmissible aliens are removable). CMS's determination that deferred action recipients are lawfully present is obviously a self-contradiction: it defines as "lawfully present" the class of individuals whom DHS is deferring removal action based on their *unlawful* presence.

105.    As the Eleventh Circuit explained, DACA recipients are simply "given a reprieve from potential removal; that does not mean they are in any way 'lawfully present' under the

<div align="center">17</div>

[INA]." *Estrada v. Becker*, 917 F.3d 1298, 1305 (11th Cir. 2019).

106.    Similarly, the Southern District of Texas has explained that "the INA expressly and carefully provides legal designations allowing defined classes of aliens to be lawfully present, and Congress has not granted the Executive Branch free rein to grant lawful presence to persons outside the ambit of the statutory scheme." *Texas v. United States*, 549 F. Supp. 3d 572, 609-10 (S.D. Tex. 2021) (internal quote omitted), *aff'd in relevant part*, 50 F.4th 498 (5th Cir. 2022). As the Fifth Circuit put it later in the same litigation:

> DACA creates a new class of otherwise removable aliens who may obtain lawful presence, work authorization, and associated benefits. Congress determined which aliens can receive these benefits, and it did not include DACA recipients among them. We agree with the district court's reasoning and its conclusions that the DACA Memorandum contravenes comprehensive statutory schemes for removal, allocation of lawful presence, and allocation of work authorization.

*Texas*, 50 F.4th at 526.

107.    CMS also acted arbitrarily and capriciously because it inadequately considered costs to the states outlined in ¶¶ 43–85.

108.    CMS also acted arbitrarily and capriciously because it did not take into account States' reliance interests on the previous definitions. States established insurance exchanges in a regulatory environment that did not include thousands of unlawfully present DACA recipients as an eligible population.

109.    As the various laws relating to driver's licenses and other benefits available for DACA recipients attest, States have made specific choices regarding the benefits to DACA recipients. CMS, however, is expanding huge programs to the DACA population independent of the States' reliance interests and the choices States have made regarding when and when not to include DACA recipients in state benefits.

110.    Defendants' Final Rule treating such aliens as "lawfully present" is unreasonable,

arbitrary, and capricious and should be enjoined under the APA, 5 U.S.C. § 706.

VII.   PRAYER FOR RELIEF

For the foregoing reasons, Plaintiffs ask this Court to:

a.   Postpone the effective date of the Final Rule pending judicial review;

b.   Vacate the Final Rule as both contrary to law and unreasonable, arbitrary, and

capricious;

c.   Enjoin Defendants from implementing the Final Rule;

d.   Award Plaintiffs their costs and reasonable attorney's fees under 28 U.S.C. § 2412

or other applicable law; and

e.   Award such other and further relief as this Court deems equitable and just.


Respectfully submitted, this 28th day of August, 2024,

<div style="margin-left: 40%;">

KRIS W. KOBACH
**Attorney General of Kansas**

*/s/ Abhishek S. Kambli*
Abhishek S. Kambli, Kan. SC No. 29788
*Deputy Attorney General*
James R. Rodriguez, Kan. SC No. 29172
*Assistant Attorney General*
Kansas Office of the Attorney General
Topeka, Kansas 66612-1597
Phone: (785) 296-7109
Email: abhishek.kambli@ag.ks.gov
jay.rodriguez@ag.ks.gov
*Counsel for the State of Kansas*

</div>

**DREW H. WRIGLEY**
**North Dakota Attorney General**

/s/ Philip Axt
Philip Axt
*Solicitor General*
Office of Attorney General
600 E. Boulevard Ave Dept. 125
Bismarck, North Dakota 58505
Phone: (701) 328-2210
Email: pjaxt@nd.gov
*Counsel for the State of North Dakota*


**TIM GRIFFIN**
**Arkansas Attorney General**

/s/ Nicholas J. Bronni
Nicholas J. Bronni
 *Solicitor General*
Dylan L. Jacobs
 *Deputy Solicitor General*
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
Telephone: (501) 682-2007
Nicholas.bronni@arkansasag.gov
*Counsel for the State of Arkansas*


**RAÚL R. LABRADOR**
**Attorney General of Idaho**

/s/ Alan Hurst
Alan Hurst
*Solicitor General*
Matthew L. Maurer*
*Deputy Attorney General*
Office of the Attorney General
PO Box 83720,
Boise, Idaho 83720
Phone: (208) 334-2400
Email: Alan.Hurst@ag.idaho.gov
Matthew.Maurer@ag.idaho.gov
*Counsel for the State of Idaho*


**STEVE MARSHALL**
**Alabama Attorney General**

/s/ Robert M. Overing
Robert M. Overing
*Deputy Solicitor General*
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Phone: (334) 242-7300
Fax: (334) 353-8400
Email: Robert.Overing@alabamaag.gov
*Counsel for the State of Alabama*


**ASHLEY MOODY**
**Florida Attorney General**

/s/ Natalie Christmas
Natalie Christmas
*Senior Counselor*
Florida Attorney General's Office
PL-01 The Capitol
Tallahassee, FL 32399
Phone: (850) 414-3300
Fax: (850) 487-2564
Natalie.christmas@myfloridalegal.com
*Counsel for the State of Florida*


**THEODORE E. ROKITA**
**Attorney General of Indiana**

/s/ James A. Barta
JAMES A. BARTA
*Solicitor General*
Indiana Attorney General's Office
IGCS – 5th Floor
302 W. Washington St.
Indianapolis, IN 46204
Phone: (317) 232-0709
Email: james.barta@atg.in.gov
*Counsel for the State of Indiana*

BRENNA BIRD
**Attorney General of Iowa**

*/s/ Eric H. Wessan*
Eric H. Wessan
*Solicitor General*
1305 E. Walnut Street
Des Moines, Iowa 50319
Phone: (515) 823-9117
Email: Eric.Wessan@ag.iowa.gov
*Counsel for the State of Iowa*

RUSSELL COLEMAN
**Attorney General of Kentucky**

*/s/ Zachary M. Zimmerer*
Zachary M. Zimmerer**
*Assistant Attorney General*
Kentucky Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky
Tel: (502) 696-5617
Email: Zachary.zimmerer@ky.gov
*Counsel for the Commonwealth of Kentucky*
**pro hac vice forthcoming*

ANDREW BAILEY
**Attorney General of Missouri**

*/s/ Joshua M. Divine*
Joshua M. Divine
*Solicitor General*
Office of the Missouri Attorney General
Supreme Court Building
207 West High Street
Jefferson City, Missouri 65102
Phone: (573) 751-8870
Email: Josh.Divine@ago.mo.gov
*Counsel for the State of Missouri*

AUSTIN KNUDSEN
**Attorney General of Montana**

*/s/ Peter M. Torstensen, Jr.*
Peter M. Torstensen, Jr.
*Deputy Solicitor General*
Christian B. Corrigan
*Solicitor General*
Montana Department of Justice
215 North Sanders
P.O. Box 201401
Helena, Montana 59620-1401
Phone: (406) 444.2026
Email: peter.torstensen@mt.gov
*Counsel for the State of Montana*

MICHAEL T. HILGERS
**Attorney General of Nebraska**

*/s/ Zachary B. Pohlman*
Zachary B. Pohlman
*Assistant Solicitor General*
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, Nebraska 68509
Phone: (402) 471-2682
Email: Zachary.Pohlman@Nebraska.gov
*Counsel for the State of Nebraska*

JOHN M. FORMELLA
**Attorney General of New Hampshire**

*/s/ Brandon F. Chase*
Brandon F. Chase
Assistant Attorney General
New Hampshire Department of Justice
1 Granite Place – South
Concord, New Hampshire 03301
Phone: (603) 271-3650
Email: brandon.f.chase@doj.nh.gov
*Counsel for the State of New Hampshire*

DAVE YOST
**Attorney General of Ohio**

*/s/ T. Elliot Gaiser*
T. Elliot Gaiser
Ohio Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614.466.8980
614.466.5087 fax
thomas.gaiser@ohioago.gov
*Counsel for the State of Ohio*

MARTY J. JACKLEY
**Attorney General of South Dakota**

*/s/ Clifton Katz*
Clifton Katz
*Assistant Attorney General*
Office of the Attorney General
State of South Dakota
1302 E. Hwy. 14, Suite #1
Pierre, South Dakota 57501
Phone: (605) 773-3215
Email: Clifton.katz@state.sd.us
*Counsel for the State of South Dakota*

ALAN WILSON
**Attorney General of South Carolina**

*/s/ Joseph D. Spate*
Joseph D. Spate
Assistant Deputy Solicitor General
Office of the South Carolina Attorney General
1000 Assembly Street
Columbia, South Carolina 29201
Phone: (803) 734-3371
Email: josephspate@scag.gov
*Counsel for the State of South Carolina*

JONATHAN SKRMETTI
**Attorney General and Reporter of Tennessee**

*/s/ Brian Daniel Mounce*
Brian Daniel Mounce
Strategic Litigation Counsel &
Assistant Solicitor General
Office of Tennessee Attorney General
Mailing Address:
P.O. Box 20207
Nashville, Tennessee  37202
Phone: 615-741-1400
Email: Brian.mounce@ag.tn.gov
*Counsel for the State of Tennessee*

KEN PAXTON
**Attorney General of Texas**

Brent Webster
*First Assistant Attorney General*
Ralph Molina
*Deputy First Assistant Attorney General*
Austin Kinghorn
*Deputy Attorney General, Legal Strategy*
Ryan D. Walters
*Chief, Special Litigation Division*

*/s/ David Bryant*
**David Bryant**
*Senior Special Counsel*
*\*Pro Hac Vice forthcoming*

Munera Al-Fuhaid
Special Counsel
*\*Pro Hac Vice forthcoming*
Office of Attorney General of Texas
<u>Mailing Address</u>:
P.O. Box 12548
Austin, Texas 78711
Phone: (512) 936-1700
Email: David.Bryant@oag.texas.gov
       Munera.Al-Fuhaid@oag.texas.gov
*Counsel for the State of Texas*

JASON S. MIYARES
**Attorney General of Virginia**

*/s/ Kevin M. Gallagher*
Kevin M. Gallagher
*Principal Deputy Solicitor General*
Virginia Office of the Attorney General
202 North 9th Street
Richmond, Virginia 23219
Phone: (804) 786-2071
Fax: (804) 786-1991
Email: kgallagher@oag.state.va.us
*Counsel for the Commonwealth of Virginia*