**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION**

| | |
|---|---|
| The State of KANSAS, *et al.*,<br><br>                          Plaintiffs,<br><br>                  v.<br><br>UNITED STATES of AMERICA and the<br>CENTERS FOR MEDICARE & MEDICAID<br>SERVICES,<br><br>                        Defendants. | Civil Action No. 1:24-cv-00150-DMT-CRH |

**PLAINTIFFS' MOTION FOR A STAY OF THE FINAL RULE AND PRELIMINARY
INJUNCTION**

TABLE OF CONTENTS

TABLE OF AUTHORITIES......................................................................................................ii

INTRODUCTION..................................................................................................................1

STATEMENT OF FACTS.......................................................................................................2

    I.    Statutory and Regulatory Framework....................................................................2

    II.   The Final Rule....................................................................................................4

    III.  DACA Recipients Reside in the Plaintiff States ..................................................6

    IV.  Plaintiff States' Involvement in the ACA ............................................................7

LEGAL STANDARD ...........................................................................................................8

ARGUMENT .......................................................................................................................9

    I.    Plaintiffs are likely to succeed on the merits........................................................9

        A.    The Final Rule is contrary to law..................................................................9

        B.    The Final Rule is arbitrary and capricious ..................................................13

    II.   Plaintiffs have standing and will suffer irreparable harm absent a stay................15

    III.  The equities overwhelmingly favor a stay of agency action...................................18

CONCLUSION ...................................................................................................................19

# TABLE OF AUTHORITIES

## Cases

*Affinity Healthcare Servs., Inc. v. Sebelius*, 720 F. Supp. 2d 12 (D.D.C. 2010) ...................................12

*Arizona Dream Act Coalition v. Brewer*, 855 F.3d 957 (9th Cir. 2017) ...............................................21

*California v. Texas*, 141 S. Ct. 2104 (2021) ....................................................................................... 6

*Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*, 815 F.2d 500 (8th Cir. 1987) .....................12, 13

*Campbell v. Minneapolis Pub. Hous. Auth. ex rel. City of Minneapolis*, 168 F.3d 1069 (8th Cir. 1999)........... 14

*City of Arlington v. FCC*, 569 U.S. 290 (2013) ....................................................................................13

*Cuomo v. Nuclear Regul. Comm'n*, 772 F.2d 972 (D.C. Cir. 1985) ....................................................12

*Dakotans for Health v. Noem*, 52 F.4th 381 (8th Cir. 2022) ...............................................................22

*Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109 (8th Cir. 1981) ....................................................12

*DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020) ...............................................................17

*Estrada v. Becker*, 917 F.3d 1298 (11th Cir. 2019) .............................................................................14

*Evanoff v. Minneapolis Pub. Sch., Special Sch. Dist. No. 1*, 11 F. App'x 670 (8th Cir. 2001) ..............22

*In re Operation of Mo. River Sys. Litig.*, 421 F.3d 618 (8th Cir. 2005) ...............................................17

*King v. Burwell*, 576 U.S. 473 (2015) ................................................................................................. 6

*Kroupa v. Nielsen*, 731 F.3d 813 (8th Cir. 2013) ................................................................................13

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ..........................................................................19

*Lyng v. Payne*, 476 U.S. 926 (1986) ...................................................................................................22

*Massachusetts v. E.P.A.*, 549 U.S. 497 (2007) ...................................................................................19

*Michigan v. EPA*, 576 U.S. 743 (2015) ..............................................................................................17

*Nken v. Holder*, 556 U.S. 418 (2009) ................................................................................................13

*PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137 (8th Cir. 2007) ...................................................13

*Plyler v. Doe*, 457 U.S. 202 (1982) ....................................................................................................21

*Poder in Action v. City of Phoenix*, 481 F. Supp. 3d 962 (D. Ariz. 2020) ...........................................15

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47 (2006). ........................20

*S&M Constructors, Inc. v. Foley Co.*, 959 F.2d 97 (8th Cir. 1992) ......................................................12

*Shawnee Tribe v. Mnuchin*, 984 F.3d 94 (D.C. Cir. 2021) .................................................................23

*Texas v. United States*, 50 F.4th 498 (5th Cir. 2022) ..........................................................................14

*Texas v. United States*, Civil Action No. 1:18–CV–00068, 2023 WL 5950808 (S.D. Tex. Sept. 13, 2023)....................................................................................................................................... 8

*United States v. Novak*, 476 F.3d 1041 (9th Cir. 2007) ......................................................................14

*Washington v. Reno*, 35 F.3d 1093 (6th Cir. 1994) ............................................................................22

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ...................................................................19

## Statutes

42 U.S.C. § 18032 ........................................................................................................................ 5, 15

42 U.S.C. § 18041 .............................................................................................................................. 11

42 U.S.C. § 18081 ...............................................................................................................................7

42 U.S.C. 18032 .................................................................................................................................17

42 U.S.C.§ 18032 ................................................................................................................................7

5 U.S.C. § 705 ....................................................................................................................................12

5 U.S.C. § 706 ...................................................................................................................13, 17, 18, 19

8 U.S.C. § 1182 ...................................................................................................................................13

8 U.S.C. § 1229a .................................................................................................................................14

8 U.S.C. § 1601 .......................................................................................................................... 6, 21, 22

8 U.S.C. § 1611 .................................................................................................... 5, 6, 16
8 U.S.C. § 1641 .................................................................................................. 6, 15, 16
8 U.S.C. 1641 .................................................................................................................16
Ind. Code 9-24-11-5(c) ...............................................................................................21
Iowa Code § 321.190(d) ..............................................................................................21
Iowa Code § 321.196(a) ...............................................................................................21
Kan. Stat. Ann. § 8-240(b)(2)(H) .............................................................................21
Kan. Stat. Ann. § 8-243(a) ..........................................................................................21
Mont. Code Ann. § 61-5-105(10) ..............................................................................21
Mont. Code Ann. § 61-5-110 ......................................................................................21
N.D.C.C. § 39-06-07.1. ................................................................................................21
N.H. Code Admin. R. Saf-C 1002.06 ........................................................................21
Neb. Rev. Stat. § 60-484.04 .........................................................................................21
Neb. Rev. Stat. § 60-484.05 .........................................................................................21
Pub. L. No. 111–148, 124 Stat. 119 .............................................................................. 6
SD ST § 32-2-1-1. ........................................................................................................21
Tenn. Code. Ann. § 4-58-102 ......................................................................................21
Va. Code § 46.2-328.3. ................................................................................................21

Regulations
45 C.F.R. § 152.2 ............................................................................................................ 7
77 Fed. Reg. 52,614 ........................................................................................................ 7
8 C.F.R. § 236.22 .....................................................................................................13, 16
8 C.F.R. § 274a.12(a) ....................................................................................................16
8 C.F.R. § 274a.12(c) ...............................................................................................9, 16
89 Fed. Reg. 39,392 ........................................................................................................ 5

Other Authorities
Kan. Dep't of Health and Env't, Medicaid Transformation 214 (Jan. 2009) .....................................22
Kan. State Dep't of Educ., Expenditures Per Pupil: 2020-2021 (Jan. 2021) .............................21
Memorandum from Janet Napolitano, Sec'y, DHS, to David Aguilar, Acting Comm'r, U.S.
   Customs & Border Prot., et al. (June 15, 2012) ............................................................... 7
North Dakota Dep't of Public Instruction, School Finance Facts (Feb. 2023) ...............................21
The Marketplace in Your State, https://www.healthcare.gov/marketplace-in-your-state/ ............ 11
U.S. Citizenship & Immigr. Servs., Office of Performance & Quality, Count of Active DACA
   Recipients by State or Territory as of December 31, 2023 ..............................................10
U.S. Citizenship and Immigration Services, *DACA Requestors with an IDENT Response: November 2019
   Update*, ...................................................................................................................19

## INTRODUCTION

Illegal aliens who have been granted deferred deportation under the Deferred Action for Childhood Arrivals (DACA) program are, by statute, ineligible for a range of federal public benefits, including subsidized health insurance under the Affordable Care Act (ACA). Congress explicitly limited eligibility to participate in such exchanges to citizens or nationals of the United States or to individuals "lawfully present" here. 42 U.S.C. § 18032(f)(3). Congress also excluded DACA recipients from the list of qualified aliens who are authorized to receive federally-funded benefits. *See* Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), Pub. L. 104-193, Title VI, 8 U.S.C. § 401, 110 Stat. 2105, 2112 (currently codified at 8 U.S.C. § 1611). This was done for good reason: to discourage illegal immigration and avoid draining taxpayer resources.

The Centers for Medicare and Medicaid Services (CMS) has nonetheless now chosen to ignore Congress and grant DACA recipients access to the ACA's subsidized health exchanges anyway. They are doing this through a Final Rule that claims DACA recipients are "lawfully present" under CMS regulations. *See* "Clarifying the Eligibility of Deferred Action for Childhood Arrivals (DACA) Recipients and Certain Other NonCitizens for a Qualified Health Plan Through an Exchange, Advance Payments of the Premium Tax Credit, Cost-Sharing Reductions, a Basic Health Program," 89 Fed. Reg. 39,392 (May 8, 2024). This action is both contrary to  law and arbitrary and capricious.

This Final Rule will encourage DACA recipients and other unlawfully present persons to illegally remain in the United States in the hope of receiving subsidized health insurance through the ACA, the very harm Congress sought to prevent. Their continued unlawful presence will require Plaintiff States to expend their limited resources on education, healthcare, law enforcement, public assistance, and other forms of public assistance diverted to support

unlawfully present aliens. It will also directly increase administrative and economic burdens on states like Kentucky who run their own ACA exchange. *See* Ex. 2, Decl. of Meier, para. 20. The Final Rule's effective date is November 1, 2024. Unless the court intervenes, Plaintiff States will suffer irreparable harm from the Rule's implementation.

Accordingly, Plaintiff states request that the Court prevent the Rule from imminently going into effect and enter an order either: (1) postponing the effective date of the Final Rule pending judicial review or (2) enjoining Defendants from implementing the Final Rule pending judicial review.

## STATEMENT OF FACTS

### I.      Statutory and Regulatory Framework

In the PRWORA,  Congress announced a "compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits." 8 U.S.C. § 1601(6). Congress therefore provided that, "[n]otwithstanding any other provision of law," any noncitizen who is not a "qualified alien" is ineligible for any federal public benefit. 8 U.S.C. § 1611(a). Only lawful permanent residents, asylees, refugees, parolees granted parole for a period of at least one year, aliens granted withholding of removal, and certain battered aliens count as "qualified aliens." 8 U.S.C. § 1641(b), (c).

Years later, when enacting the ACA, Congress took a similar tack: expressly limiting eligibility for Qualified Health Plans (QHPs)[1] to individuals who are either citizens or nationals

---

[1] The Patient Protection and Affordable Care Act (i.e., the ACA), Pub. L. No. 111–148, 124 Stat. 119, was enacted in 2010. Among other things, it "required most Americans to obtain minimum essential health insurance coverage and imposed a monetary penalty upon most individuals who failed to do so." *California v. Texas*, 141 S. Ct. 2104, 2108 (2021). The ACA "require[d] the creation of an 'Exchange' in each State—basically, a marketplace that allows people to compare and purchase insurance plans." *King v. Burwell*, 576 U.S. 473, 479 (2015). Under the ACA, each state may "establish its own Exchange, but [the ACA] provides that the Federal Government will establish the

of the United States or who are "lawfully present" here. 42 U.S.C.§ 18032(f)(3). The ACA further requires CMS to verify that health exchange applicants are lawfully present in the United States. 42 U.S.C. § 18081(c)(2)(B).

In June 2012, the Department of Homeland Security created the DACA program, declaring that certain individuals who came to the United States illegally as children could request consideration of deferred action (i.e. the deferral of their required deportation) for a period of two years, subject to renewal. Memorandum from Janet Napolitano, Sec'y, DHS, to David Aguilar, Acting Comm'r, U.S. Customs & Border Prot., et al. (June 15, 2012), *available at* https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf. These individuals were also made eligible for DHS work authorization. *See* 8 C.F.R. § 274a.12(c)(33). The Department argued that this was merely an exercise of prosecutorial discretion to defer removal action for a period of time, and it expressly disclaimed providing anyone with lawful status. *See id.* ("This memorandum confers no substantive right, immigration status or pathway to citizenship. *Only the Congress, acting through its legislative authority, can confer these rights.*") (emphasis added).

Consequently, in August 2012, CMS amended its definition of "lawfully present"— located in 45 C.F.R. § 152.2—to take the exact same position Plaintiff States take today: DACA recipients are not lawfully present aliens. *See generally* "Pre-Existing Condition Insurance Plan Program," 77 Fed. Reg. 52,614 (Aug. 30, 2012). This definition extended to Medicaid, Children's Health Insurance Program (CHIP), and Basic Health Plan (BHP) eligibility. [2]

---

Exchange if the State does not." *Id.* The ACA requires all exchanges to "'make available qualified health plans to qualified individuals and qualified employers.'" 42 U.S.C. § 18031(d)(2)(A).

[2] CMS describes a BHP as "a health benefits coverage program for low-income residents who would otherwise be eligible to purchase coverage through the Health Insurance Marketplace."

The legality of the DACA program has been the subject of litigation since it was first promulgated. Last year, a federal district court enjoined and vacated DHS's DACA rule. *See Texas v. United States*, Civil Action No. 1:18-CV-00068, 2023 WL 5950808, at *1 (S.D. Tex. Sept. 13, 2023). The court's order allowed DHS to continue to administer the DACA program for individuals who registered prior to July 16, 2021.

## II.    The Final Rule

Now, CMS has changed its position for purely political ends to redefine both DACA recipients and employment-authorized aliens as "lawfully present" for purposes of the ACA. 89 Fed. Reg. 39,392. The agency justifies its 180-degree reversal by citing "the broad aims of the ACA to increase access to health coverage" 89 Fed. Reg. at 39,395. According to CMS, the prior practice of excluding DACA recipients "failed to best effectuate congressional intent in the ACA." *Id.* Defining DACA recipients as lawfully present, the agency claims, "aligns with the goals of the ACA—specifically, to lower the number of people who are uninsured in the United States and make affordable health insurance available to more people." 89 Fed. Reg. at 39,396. CMS also claims it was motivated by the national economic importance of DACA recipients, by the agency's desire to support the DACA policy, and by the disproportionately high percentage of uninsured DACA recipients. 89 Fed. Reg. at 39,395-96.

---

Basic Health Program, https://www.medicaid.gov/basic-health-program/index.html (last visited Aug. 27, 2024). Through a BHP, a state can

> provide coverage to individuals who are citizens or *lawfully present non-citizens*, who do not qualify for Medicaid, CHIP, or other minimum essential coverage and have income between 133 percent and 200 percent of the federal poverty level (FPL). People who are lawfully present non-citizens who have income that does not exceed 133 percent of FPL but who are unable to qualify for Medicaid due to such non-citizen status, are also eligible to enroll.

*Id.* (emphasis added).

In light of these justifications, CMS declared that it "s[aw] no reason to treat DACA recipients differently from other noncitizens who have been granted deferred action." 89 Fed. Reg. at 39,396. The Final Rule acknowledged the injunction against DACA (discussed above) in a footnote, saying that "[c]urrent court orders prohibit DHS from fully administering the DACA final rule. However a partial stay permits DHS to continue processing DACA renewal requests and related applications for employment authorization documents." 89 Fed. Reg. at 39,395.

Besides DACA recipients, the Final Rule also adds aliens granted employment authorization under 8 C.F.R. § 274a.12(c) into the definition of "lawfully present," for purposes of ACA eligibility. This expands the categories of aliens considered lawfully present from the seven enumerated categories under the former regulatory definition[3] to all thirty-six categories covered under 8 C.F.R. § 274a.12(c). *See* 89 Fed. Reg. at 39,408. CMS's only justification for this change was that it would make it easier to determine who was lawfully present if they could include anyone with DHS work authorization. *Id.* Even so, CMS acknowledged that its new definition of "lawfully present" might include noncitizens who were, in fact, not lawfully present. *See id.* ("*Almost all* noncitizens granted employment authorization under 8 CFR 274a.12(c) are already considered lawfully present under existing regulations.") (emphasis added); *see also* 89 Fed. Reg. at 39,409 ("We agree that a grant of employment authorization does not result in an individual being considered a "qualified alien" under [PRWORA]."). In other words, CMS's new definition of "lawfully present" knowingly includes noncitizens that even the agency recognizes are *not* here lawfully.

CMS's justification for this result is non-sequitur: "we believe it is appropriate to include

---

[3] The old version of 8 C.F.R. § 152.2(4)(iii) defined "Lawfully present" to include "Aliens who have been granted employment authorization under 8 CFR § 274a.12(c)(9), (10), (16), (18), (20), (22), or (24)."

all individuals with such [§ 274a.12(c)] employment authorization because DHS has made an affirmative determination that the individual has an underlying immigration status or category that authorizes them to work legally in the United States." *Id.*

### III.   DACA Recipients Reside in the Plaintiff States

As of December 31, 2023, the Federal government's own data confirms that there were approximately 530,110 active DACA recipients distributed across the nation. U.S. Citizenship & Immigr. Servs., Office of Performance & Quality, Count of Active DACA Recipients by State or Territory as of December 31, 2023, *available at* https://www.uscis.gov/sites/default/files/document/data/active_daca_recipients_fy2024_q1.xlsx [hereinafter "DACA Recipients by State"].

According to U.S. Citizenship and Immigration Services, the (rounded) number of DACA recipients in each Plaintiff State is as follows:

| | |
|---|---|
| Alabama | 3,460 |
| Arkansas | 3,680 |
| Florida | 21,080 |
| Idaho | 2,250 |
| Indiana | 7,450 |
| Iowa | 2,010 |
| Kansas | 4,350 |
| Kentucky | 2,230 |
| Missouri | 2,550 |
| Montana | 80 |
| Nebraska | 2,420 |
| New Hampshire | 220 |

| | |
|---|---|
| North Dakota | 130 |
| Ohio | 3,290 |
| South Carolina | 4,840 |
| South Dakota | 190 |
| Tennessee | 6,360 |
| Texas | 87,620 |
| Virginia | 7,810 |

*Id.*

And according to CMS, the Final Rule is expected to result in 147,000 DACA recipients becoming newly eligible for a subsidized health plan. *See* 89 Fed. Reg. at 39,425. This includes 86,000 in Fiscal Year 2026 alone, at a cost of $305 million—$3,547 per DACA recipient per year. Ex. 1, Camarota Decl. para. 5. These benefits are significant, especially considering that DACA recipients tend to have modest levels of education and are more likely to have incomes below 200% of the federal poverty line. *Id.* at para. 6. DACA recipients are especially likely to have been born in countries where healthcare does not meet American standards. *Id.* at para. 10.

IV.     **Plaintiff States' Involvement in the ACA**

Under the ACA, states have the option to create an exchange program to handle QHP enrollment. 42 U.S.C. § 18041. Plaintiffs Idaho, Kentucky and Virginia administer their own state-run ACA exchanges to handle QHP enrollment. *See* The Marketplace in Your State, https://www.healthcare.gov/marketplace-in-your-state/ (last visited Aug. 28, 2024) [hereinafter "Marketplace"]. All states that run their own Exchange will incur significant costs. The Final Rule notes the following costs on the states: (1) $194,650 to develop and code changes to each states Exchange eligibility system, and (2) $624,142 in state application processing charges to

assist individuals impacted by the final rule. Final Rule, 89 Fed. Reg. at 39,426; *see also* Ex. 2, Decl. of Meier, para. 20-22.

## LEGAL STANDARD

The Administrative Procedure Act provides that:

> On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

5 U.S.C. § 705. This provision "authorizes reviewing courts to stay agency action pending judicial review." *Affinity Healthcare Servs., Inc. v. Sebelius*, 720 F. Supp. 2d 12, 15 n.4 (D.D.C. 2010) (citation omitted).

"Motions to stay agency action pursuant to these provisions are reviewed under the same standards used to evaluate requests for interim injunctive relief." *Id.* (citing *Cuomo v. Nuclear Regul. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985)). Preliminary injunctive relief is available to plaintiffs who demonstrate: (1) the probability or likelihood of success on the merits, (2) the real threat of irreparable harm or injury absent immediate relief, (3) that the balance of equities resulting from the issuance of the injunction against the order's effect on the defendant and third parties weighs in favor of plaintiffs, and (4) that the public interest favors immediate injunctive relief. *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc). While likelihood of success on the merits is generally the "most significant" factor, *S&M Constructors, Inc. v. Foley Co.*, 959 F.2d 97, 98 (8th Cir. 1992), "[n]o single factor in itself is dispositive," *Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*, 815 F.2d 500, 503 (8th Cir. 1987).

8

ARGUMENT

I.    **Plaintiffs are likely to succeed on the merits.**

"In considering the likelihood of the movant prevailing on the merits, a court does not decide whether the movant will ultimately win." *PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1143 (8th Cir. 2007). Rather, the plaintiff must show "a reasonable likelihood" at least one of the movant's claims will succeed on the merits. *Id.* In other words, the plaintiff must show more than a "possibility" he will succeed, but need not demonstrate to a mathematical certainty that there is "a greater than fifty per cent likelihood that he will prevail on the merits," *Id.* at 1143 (quoting *Dataphase*, 640 F.2d at 113); *accord Nken v. Holder*, 556 U.S. 418, 434–35 (2009); *Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013). To determine likelihood of success, "a court should flexibly weigh the case's particular circumstances to determine 'whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined.'" *Calvin Klein*, 815 F.2d at 503 (quoting *Dataphase*, 640 F.2d at 113). Plaintiffs meet this standard.

A.    **The Final Rule is contrary to law**

Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory . . . authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). An agency has acted in excess of statutory authority when it "has gone beyond what Congress has permitted it to do" either by assuming authority it does not have or by exercising the authority it does have in an impermissible way. *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013).

CMS's determination that DACA recipients are "lawfully present" is contrary to law, because the "action" that is deferred by the DACA program is enforcement action—i.e., deportation—on recipients' unlawful presence. *See* 8 C.F.R. § 236.22(b)(4) (limiting DACA

availability to aliens who lack lawful immigration status); *see also* 8 U.S.C. § 1182(a)(6)(A)(i) ("An alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible."); *id.* § 1229a(a)(2) (noting that inadmissible aliens are removable).

Several courts have recognized the obvious fact that DACA recipients are unlawfully present. As the Eleventh Circuit explained, DACA recipients are simply "given a reprieve from potential removal; that does not mean they are in any way 'lawfully present' under the [INA]." *Estrada v. Becker*, 917 F.3d 1298, 1305 (11th Cir. 2019) (citation omitted). Similarly, another court has stated that "the INA expressly and carefully provides legal designations allowing defined classes of aliens to be lawfully present, and Congress has not granted the Executive Branch free rein to grant lawful presence to persons outside the ambit of the statutory scheme." *Texas v. United States*, 549 F. Supp. 3d 572, 609–10 (S.D. Tex. 2021) (internal quotes omitted), *aff'd in relevant part*, 50 F.4th 498 (5th Cir. 2022). As the Fifth Circuit put it later in the same litigation:

> DACA creates a new class of otherwise removable aliens who may obtain lawful presence, work authorization, and associated benefits. Congress determined which aliens can receive these benefits, and it did not include DACA recipients among them. We agree with the district court's reasoning and its conclusions that the DACA Memorandum contravenes comprehensive statutory schemes for removal, allocation of lawful presence, and allocation of work authorization.

50 F.4th at 526.

Since DACA recipients *are not* lawfully present, they cannot receive federal benefits that are statutorily limited to individuals who *are* lawfully present. This is not a close or particularly difficult question of statutory interpretation.

In the PRWORA, Congress broadly prohibited non-qualified aliens from receiving any federal public benefit "[n]otwithstanding any other provision of law," 8 U.S.C. § 1611(a). Phrases such as this "broadly sweep aside potentially conflicting laws." *United States v. Novak*, 476 F.3d

10

1041, 1046 (9th Cir. 2007); *see also Campbell v. Minneapolis Pub. Hous. Auth. ex rel. City of Minneapolis*, 168 F.3d 1069, 1075 (8th Cir. 1999) ("The phrase, 'notwithstanding any other provision of law,' signals that the [statute] supersedes other statutes that might interfere with or hinder the attainment of this objective." (citations omitted)).

Nothing in the text of the ACA gives CMS the authority to act beyond the bounds of the PRWORA. In fact, the ACA's plain language, limiting eligibility to lawfully present individuals, aligns with PRWORA's restriction on the provision of federal benefits. *See* 42 U.S.C. § 18032(f)(3). Therefore, the PRWORA controls. *See Poder in Action v. City of Phoenix*, 481 F. Supp. 3d 962, 972 (D. Ariz. 2020) (when law was "utterly silent as to who should receive [] funds" and did not "provide a clear expression of congressional intent concerning whether certain aliens should be excluded from receiving [] funds," PRWORA controlled).

And the PRWORA's definition of qualified alien does not apply to DACA recipients. "Qualified aliens" must be lawfully admitted under the Immigration and Nationality Act (INA), or otherwise granted lawful status under a specific provision of United State immigration law. *See* 8 U.S.C. § 1641. No part of the definition of "qualified alien" contemplates someone whose unlawful presence is temporarily tolerated due to the executive branch's unlawful program of prosecutorial discretion. Since DACA recipients do not fall within the definition of "qualified alien" set forth in the PRWORA, they are ineligible for ACA benefits, full stop.[4]

---

[4] Nothing in the ACA itself gives CMS the authority to extend any federal benefit to a class of people if Congress has deemed that class to be unqualified, therefore PRWORA controls. *See Poder in Action v. City of Phoenix*, 481 F. Supp. 3d 962, 972 (D. Ariz. 2020) (when the CARES Act was "utterly silent as to who should receive [] funds" and did not "provide a clear expression of congressional intent concerning whether certain aliens should be excluded from receiving [] funds," the court turned to PRWORA to determine eligibility).

Nonetheless, the Final Rule runs counter to the PRWORA by making aliens granted deferred action under DACA, or anyone DHS has granted employment authorization, eligible to enroll in QHPs through a subsidized Exchange. 89 Fed. Reg. 39,436. Aliens granted deferred action, including those in the DACA program, are not included within Congress's definition of "qualified alien," 8 U.S.C. § 1641, nor do they fall within an exception to the prohibition on public benefits. *See* 8 U.S.C. § 1611(b)(1) (providing exceptions to the prohibition against federal public benefits for certain public benefits, including emergency medical care, assistance for immunizations, certain non-cash, in-kind services, and other specific federal programs under certain circumstances).

In addition, aliens granted employment authorization under 8 C.F.R. § 274a.12(c) do not automatically fall within the definition of "qualified alien" under the PRWORA either. "Qualified aliens" are generally eligible for employment authorization. *See generally* 8 C.F.R. § 274a.12(a) (making aliens with certain immigration statuses eligible for employment authorization, including lawful permanent residents and refugees). But not all those granted employment authorization are qualified aliens. *See* 89 Fed. Reg. 39,408 ("Almost all noncitizens granted employment authorization under 8 CFR 274a.12(c) are already considered lawfully present under existing regulations"); *id.* at 39,409 ("We agree that a grant of employment authorization does not result in an individual being considered a 'qualified alien' under 8 U.S.C. 1641(b) or (c) [PRWORA]"). So a mere grant of employment authorization cannot confer lawful presence under either the INA or PRWORA.

By making both DACA recipients and employment-authorized aliens eligible to enroll in a QHP through an Exchange, the Final Rule runs contrary to law because subsidies provided to QHP enrollees constitute a federal public benefit under PRWORA. *See* 8 U.S.C. § 1611(c)(1)(B) (defining "federal public benefit" to include any health benefit "for which payments or assistance

are proved to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States."). The Final Rule, by including in its definition of aliens "lawfully present" in the United States both DACA enrollees and aliens granted work authorization, is thus both not in accordance with the PRWORA and in excess of CMS' statutory authority.

###### B.    The Final Rule is arbitrary and capricious

Under the APA, a court must also "hold unlawful and set aside agency action" that is "arbitrary, capricious [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). An agency acts arbitrarily and capriciously when it departs sharply from prior practice without reasonable explanation or fails to consider either alternatives to its action or the affected communities' reliance on the prior rule. *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020); *see also In re Operation of Mo. River Sys. Litig.*, 421 F.3d 618, 628 (8th Cir. 2005) (agency action is arbitrary and capricious when agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise"). An agency also acts arbitrarily and capriciously when it fails to consider costs, which are a "centrally relevant factor when deciding whether to regulate." *Michigan v. EPA*, 576 U.S. 743, 752–53 (2015).

The ACA does not allow federal healthcare subsidies or coverage for aliens who are not lawfully present in the United States. 42 U.S.C. 18032(f)(3). As discussed above, DACA recipients are not lawfully present. Prior to the Final Rule, CMS policy recognized this fact. *See, e.g.*, 77 Fed. Reg. at 52,615 ("As it also would not be consistent with the reasons offered for adopting the DACA process to extend health insurance subsidies under the [ACA] to these individuals, HHS is amending its definition of 'lawfully present' in the [Pre-existing Condition

Insurance Plan Program], so that the [] program interim final rule does not inadvertently expand the scope of the DACA process."). In the Final Rule, CMS reversed its prior policy without explanation and did not consider the full scope of costs to States in doing so.

In promulgating the Final Rule, Defendants failed to provide a reasonable explanation for the sharp departure from CMS' own its own past practice and prior assertions. The Final Rule does not attempt to explain why the agency's about-face is now consistent with the "reasons offered for adopting the DACA process." Nor does it explain why the reasons for adopting the DACA process are in any way related to the conditions for ACA eligibility. And while CMS offers conclusory statement that the Final Rule is consistent with the goals of the ACA (*see* 89 Fed. Reg. at 39,396), the ACA does not give CMS authority to expand a federal benefit program to those to whom Congress has expressly denied benefits.

Further, CMS's redefinition of DACA recipients as "lawfully present" is facially irrational. The self-contradictory nature of Defendants' determination that deferred action recipients are lawfully present is obvious when it is spelled out in full: those aliens on whose *unlawful presence* DHS is deferring action are *lawfully present*. Defendants' Final Rule treating such aliens as "lawfully present" is unreasonable, arbitrary, and capricious, and should be enjoined under 5 U.S.C. § 706.

Defendants also failed to consider the costs States would incur as a result of the Final Rule. States which operate their own exchanges will see operating costs increase and premiums rise. These include technology and staffing expenses, funded from state revenues. *See* Ex. 2, Decl. of Kentucky, paras. 20-22. And every Plaintiff State will experience decreased emigration by illegal aliens, as expanded eligibility for ACA coverage and subsidies encourages more illegal aliens to remain in the country. *See* Ex. 1, Camarota Decl. With more illegal aliens residing in Plaintiff States, the States will foreseeably incur additional costs as they provide driver's

14

licenses, public education, and emergency services to illegal aliens. And all the States bear the costs of the DACA program in the form of incarceration of DACA recipients who commit crimes. *See* U.S. Citizenship and Immigration Services, *DACA Requestors with an IDENT Response: November 2019 Update*, at 1, *available at* https://tinyurl.com/ytrrhwj7 (between 2012 and October 2019, nearly 80,000 illegal aliens with prior arrest records were granted DACA status).

Defendants did not consider any of these costs when promulgating the Final Rule. Instead, the only costs to States Defendants' accounted for were "system changes" to ACA exchanges in order to comply with the Final Rule's new eligibility requirements. *See* 89 Fed. Reg. at 39,434 ("States that do not have a BHP and do not operate their own Exchange... are not expected to incur any costs as a result of this rule."). This failure to consider, at all, the foreseeable and substantial costs the Final Rule will impose on the States arbitrary and capricious, and provides another reason why Plaintiffs are likely to succeed on the merits of their challenge.

II.   **Plaintiffs have standing and will suffer irreparable harm absent a stay and preliminary injunction.**

"[P]laintiffs seeking preliminary relief [must] demonstrate that irreparable injury is likely in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis omitted). A party must make a "clear showing" that harm is more than simply a "possibility" and is not merely "speculative." *Id.* at 21–22. As demonstrated below—and as admitted by Defendants in the proposed rule—the likelihood Plaintiff States will suffer irreparable harm is more than a possibility—it is a near certainty.  Here, Plaintiffs are asserting "procedural right[s] to protect [their] concrete interests." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7 (1992). The States can thus assert their procedural rights under the APA "without

meeting all the normal standards for redressability and immediacy.'" *Massachusetts v. E.P.A.*, 549 U.S. 497, 498 (2007) (quoting *Lujan*, 504 U.S. at 572 n.7).

CMS itself admits that the Final Rule will make 147,000 uninsured DACA recipients newly eligible for subsidized health insurance. 89 Fed. Reg. at 39,425. Expanding eligibility for ACA coverage will impose additional administrative and resource burdens on states that have established their own ACA exchange by allowing additional persons to use such exchanges. *See* 89 Fed. Reg. at 39,424, 39,426; *see also* Ex. 2, Decl. of Meier, paras. 20-22. Plaintiffs Idaho, Kentucky, and Virginia administer their own state-run ACA exchange to handle QHP enrollment. Marketplace, *supra*. These states will face increased administrative and system costs when they are forced to distribute ACA exchange subsidies to a new class of illegal aliens who are disproportionately lower-income. The Final Rule expressly acknowledges these costs will be incurred by the Plaintiff States. *See* 89 Fed. Reg. at 39,424, 39,426. Those Plaintiff States' standing cannot seriously be disputed, and "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006).

Moreover, in addition to the financial and administrative burdens the Final Rule puts on Plaintiff States who run their own ACA exchanges, subsidized health insurance through the ACA is a valuable public benefit, worth an average of $3,547 per year to each DACA recipient. This public benefit foreseeably encourages alien beneficiaries who are unlawfully present in the United States to remain in the United States. *See* Ex. 1, Camarota Decl. paras. 5-6. It goes without saying that aliens' immigration decision-making is heavily influenced by the availability of welfare and other public benefits. *Id.* para 9. And for the majority of DACA recipients, who come from countries with healthcare systems that are inferior to what is offered in the United States, ACA eligibility is an even greater inducement to remain. *Id.* para. 10.

16

Therefore, the Final Rule will foreseeably cause all the Plaintiff States to expend more of their limited education, healthcare, law enforcement, public assistance, and other resources on illegally present aliens. *Id.* This harm is far from remote or speculative. Congress itself concluded that "the availability of public benefits" provides an "incentive for illegal immigration," 8 U.S.C. § 1601(5), hence the need to limit the availability of such benefits to those Congress has authorized to be here—that's why PRWORA was enacted. *See id.* § 1601(2)(B).

As an example, every Plaintiff State must allow minors who are not lawfully present in the United States to attend their schools. *Plyler v. Doe*, 457 U.S. 202, 223–30 (1982). Each incurs a substantial cost to educate school aged children. *E.g.*, Kan. State Dep't of Educ., Expenditures Per Pupil: 2020-2021 at 8 (Jan. 2021), available at https://shorturl.at/bIUXY (noting 2020-2021 school year expenditures per pupil were approximately $15,869); North Dakota Dep't of Public Instruction, School Finance Facts, at 4 (Feb. 2023), available at https://www.nd.gov/dpi/sites/www/files/documents/SFO/2023FinFacts.pdf (2021-2022 expenditure of $14,174 per pupil). Consequently, all the Plaintiff States incur fiscal costs through the provision of free K–12 public education to DACA recipients and their children (as well to as other unlawfully present persons), since some portion of the DACA recipients are either the parents of K–12 school-age children or are themselves K–12 school-age children.

Additionally, most of the Plaintiff States incur costs through the issuance of driver's licenses to DACA recipients. *E.g.*, Ind. Code 9-24-11-5(c); Iowa Code §§ 321.190(d) and 321.196(a); Kan. Stat. Ann. §§ 8-240(b)(2)(H), 8-243(a) (2022); Mont. Code Ann. §§ 61-5-110, 61-5-105(10); Neb. Rev. Stat. §§ 60-484.04, 60-484.05; N.H. Code Admin. R. Saf-C 1002.06; SD ST §

17

32-2-1-1;  Tenn. Code. Ann. § 4-58-102; Va. Code § 46.2-328.3.[5] *See also Arizona Dream Act Coalition v. Brewer*, 855 F.3d 957 (9th Cir. 2017), cert denied 138 S.Ct. 1279 (2018) (enjoining Arizona's policy of refusing to issue driver's licenses to DACA recipients).

And DACA recipients also consume public benefits in the form of emergency care and other public assistance expenditures in Plaintiff States. *See* Kan. Dep't of Health and Env't, Medicaid Transformation 214 (Jan. 2009), available at https://www.kdhe.ks.gov/253/Medicaid-Transformation (noting "[illegal aliens] have been found to use hospital and emergency services at over twice the rate of the overall U.S. population," and observing that there is a "large number of" "uninsured" illegal aliens). States also incur additional costs when they incarcerate DACA recipients and are required to fund their legal defense. Since the Final Rule is highly likely to reduce the number of DACA recipients who leave the United States (*see* Ex. 1, Camarota Decl.), the Final Rule will increase the costs imposed on Plaintiff States.

## III.    The equities overwhelmingly favor a stay of agency action and preliminary injunction

The two final prongs of the stay/preliminary injunction inquiry overwhelmingly favor granting relief. The government Defendants will suffer no harm if the Final Rule is stayed are enjoined from enforcing the Final Rule. *See Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994) (agency suffers no harm when it is prohibited from acting "in violation of applicable statutory restraints"); *cf. Dakotans for Health v. Noem*, 52 F.4th 381, 392 (8th Cir. 2022) (state "has no interest in enforcing overbroad restrictions that likely violate the Constitution").

---

[5] In North Dakota, licenses can be issued to non-citizens that give proof of "legal presence" which can be proven through Employment Authorization Cards given to DACA recipients. *See* N.D.C.C. § 39-06-07.1 (requiring license applicant to verify legal presence); N.D. Dept. of Transp., *Noncommerical Drivers License Manual*, at 5 (2021)* (listing an Employment Authorization Card as a valid proof of legal presence).

In fact, quite the opposite is true. Congress has already conclusively declared that the nation's "compelling" interest lies in "remov[ing] the incentive for illegal immigration provided by the availability of public benefits," 8 U.S.C. § 1601(6). To *not* suspend the Final Rule would empower CMS to *harm* the federal government's interests. In addition, third-party DACA recipients' have no legally cognizable interest in obtaining public benefits for which they are statutorily ineligible. *See Evanoff v. Minneapolis Pub. Sch., Special Sch. Dist. No. 1*, 11 F. App'x 670, 670–71 (8th Cir. 2001); *cf. Lyng v. Payne*, 476 U.S. 926 (1986) ("We have never held that applicants for benefits, as distinct from those already receiving them, have a legitimate claim of entitlement protected by the Due Process Clause of the Fifth or Fourteenth Amendment.").

Finally, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021). To the contrary, where, as here, a party has demonstrated a strong likelihood of success on the merits, it is "a strong indicat[ion] that a preliminary injunction would serve the public interest." *Id.* As established above, the Plaintiff States and the public at large have a compelling interest in preventing the expenditure of public funds to those who are not eligible. Because the Final Rule extends public benefits to classes of aliens beyond those identified by Congress, it is contrary to the public interest.

## CONCLUSION

For the foregoing reasons, Plaintiff States asks this Court to postpone the effective date of the Final Rule and preliminarily enjoin Defendants from implementing the Final Rule pending judicial review.

Respectfully submitted,

KRIS W. KOBACH
**Attorney General of Kansas**

*/s/ Abhishek S. Kambli*
Abhishek S. Kambli, Kan. SC No. 29788
*Deputy Attorney General*
James R. Rodriguez, Kan. SC No. 29172
*Assistant Attorney General*
Kansas Office of the Attorney General
Topeka, Kansas 66612-1597
Phone: (785) 296-7109
Email: abhishek.kambli@ag.ks.gov
jay.rodriguez@ag.ks.gov
*Counsel for the State of Kansas*

**DREW H. WRIGLEY**
**North Dakota Attorney General**

*/s/ Philip Axt*
Philip Axt
*Solicitor General*
Office of Attorney General
600 E. Boulevard Ave Dept. 125
Bismarck, North Dakota 58505
Phone: (701) 328-2210
Email: pjaxt@nd.gov
*Counsel for the State of North Dakota*

**STEVE MARSHALL**
**Alabama Attorney General**

/s/ Robert M. Overing
Robert M. Overing
*Deputy Solicitor General*
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Phone: (334) 242-7300
Fax: (334) 353-8400
Email: Robert.Overing@alabamaag.gov
*Counsel for the State of Alabama*

**TIM GRIFFIN**
**Arkansas Attorney General**

*/s/ Nicholas J. Bronni*
Nicholas J. Bronni
*Solicitor General*
Dylan L. Jacobs
*Deputy Solicitor General*
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
Phone: (501) 682-2007
Email: Nicholas.bronni@arkansasag.gov
*Counsel for the State of Arkansas*

**ASHLEY MOODY**
**Florida Attorney General**

*/s/ Natalie Christmas*
Natalie Christmas
*Senior Counselor*
Florida Attorney General's Office
PL-01 The Capitol
Tallahassee, FL 32399
Phone: (850) 414-3300
Fax: (850) 487-2564
Natalie.christmas@myfloridalegal.com
*Counsel for the State of Florida*

20

**RAÚL R. LABRADOR**
**Attorney General of Idaho**

/s/ Alan Hurst
Alan Hurst
*Solicitor General*
Matthew L. Maurer*
*Deputy Attorney General*
Office of the Attorney General
PO Box 83720,
Boise, Idaho 83720
Phone: (208) 334-2400
Email: Alan.Hurst@ag.idaho.gov
Matthew.Maurer@ag.idaho.gov
*Counsel for the State of Idaho*

**THEODORE E. ROKITA**
**Attorney General of Indiana**

/s/ James A. Barta
James A. Barta
*Solicitor General*
Indiana Attorney General's Office
IGCS – 5th Floor
302 W. Washington St.
Indianapolis, IN 46204
Phone: (317) 232-0709
Email: james.barta@atg.in.gov
*Counsel for the State of Indiana*

**BRENNA BIRD**
**Attorney General of Iowa**

/s/ Eric H. Wessan
Eric H. Wessan
*Solicitor General*
1305 E. Walnut Street
Des Moines, Iowa 50319
Phone: (515) 823-9117
Email: Eric.Wessan@ag.iowa.gov
*Counsel for the State of Iowa*

**RUSSELL COLEMAN**
**Attorney General of Kentucky**

/s/ Zachary M. Zimmerer
Zachary M. Zimmerer
*Assistant Attorney General*
Kentucky Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky
Phone: (502) 696-5617
Email: Zachary.zimmerer@ky.gov
*Counsel for the Commonwealth of Kentucky*

**ANDREW BAILEY**
**Attorney General of Missouri**

/s/ Joshua M. Divine
Joshua M. Divine
*Solicitor General*
Office of the Missouri Attorney General
Supreme Court Building
207 West High Street
Jefferson City, Missouri 65102
Phone: (573) 751-8870
Email: Josh.Divine@ago.mo.gov
*Counsel for the State of Missouri*

**AUSTIN KNUDSEN**
**Attorney General of Montana**

/s/ Peter M. Torstensen, Jr.
Peter M. Torstensen, Jr.
*Deputy Solicitor General*
Christian B. Corrigan
*Solicitor General*
Montana Department of Justice
215 North Sanders
P.O. Box 201401
Helena, Montana 59620-1401
Phone: (406) 444.2026
Email: peter.torstensen@mt.gov
*Counsel for the State of Montana*

**MICHAEL T. HILGERS**
**Attorney General of Nebraska**

/s/ *Zachary B. Pohlman*
Zachary B. Pohlman
*Assistant Solicitor General*
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, Nebraska 68509
Phone: (402) 471-2682
Email: Zachary.Pohlman@Nebraska.gov
*Counsel for the State of Nebraska*

**DAVE YOST**
**Attorney General of Ohio**

/s/ *T. Elliot Gaiser*
T. Elliot Gaiser
*Ohio Solicitor General*
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
Phone: (614)466-8980
Fax: (614) 466-5087
Email: thomas.gaiser@ohioago.gov
*Counsel for the State of Ohio*

**MARTY J. JACKLEY**
**Attorney General of South Dakota**

/s/ *Clifton Katz*
Clifton Katz
*Assistant Attorney General*
Office of the Attorney General
State of South Dakota
1302 E. Hwy. 14, Suite #1
Pierre, South Dakota 57501
Phone: (605) 773-3215
Email: Clifton.katz@state.sd.us
*Counsel for the State of South Dakota*

**JOHN M. FORMELLA**
**Attorney General of New Hampshire**

/s/*Brandon F. Chase*
Brandon F. Chase
*Assistant Attorney General*
New Hampshire Department of Justice
1 Granite Place – South
Concord, New Hampshire 03301
Phone: (603) 271-3650
Email: brandon.f.chase@doj.nh.gov
*Counsel for the State of New Hampshire*

**ALAN WILSON**
**Attorney General of South Carolina**

/s/ *Joseph D. Spate*
Joseph D. Spate
*Assistant Deputy Solicitor General*
Office of the South Carolina Attorney General
1000 Assembly Street
Columbia, South Carolina 29201
Phone: (803) 734-3371
Email: josephspate@scag.gov
*Counsel for the State of South Carolina*

**JONATHAN SKRMETTI**
**Attorney General and Reporter of Tennessee**

/s/ *Brian Daniel Mounce*
Brian Daniel Mounce
*Strategic Litigation Counsel &*
*Assistant Solicitor General*
Office of Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee  37202
Phone: 615-741-1400
Email: Brian.mounce@ag.tn.gov
*Counsel for the State of Tennessee*

**KEN PAXTON**
**Attorney General of Texas**

Brent Webster
*First Assistant Attorney General*
Ralph Molina
*Deputy First Assistant Attorney General*
Austin Kinghorn
*Deputy Attorney General, Legal Strategy*
Ryan D. Walters
*Chief, Special Litigation Division*

*/s/ David Bryant*
David Bryant
*Senior Special Counsel*
Munera Al-Fuhaid
*Special Counsel*
Office of Attorney General of Texas
P.O. Box 12548
Austin, Texas 78711
Phone: (512) 936-1700
Email: David.Bryant@oag.texas.gov
          Munera.Al-Fuhaid@oag.texas.gov
*Counsel for the State of Texas*

**JASON S. MIYARES**
**Attorney General of Virginia**

*/s/ Kevin M. Gallagher*
Kevin M. Gallagher
*Principal Deputy Solicitor General*
Virginia Office of the Attorney General
202 North 9th Street
Richmond, Virginia 23219
Phone: (804) 786-2071
Fax: (804) 786-1991
Email: kgallagher@oag.state.va.us
*Counsel for the Commonwealth of Virginia*