IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| The State of KANSAS, *ET AL.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES OF AMERICA and the CENTERS FOR MEDICARE & MEDICAID SERVICES,<br><br>*Defendants*. | Civil Action No. 1:24-cv-00150 |

### Declaration of Adam M. Meier in Support of Plaintiffs' Motion for a Preliminary Injunction

1.   My name is Adam Michael Meier. I am a resident of Fort Thomas, Kentucky. I currently work as a Senior Fellow and Legal Counsel for a state-policy focused think tank. I also provide consulting services in the healthcare, technology, and public sectors.

2.   I formerly served in several high-ranking roles in the Kentucky State Government. First, I served as the Deputy Chief of Staff for Governor Matt Bevin

from December 2015 to May 2018. Subsequently, I served as the Cabinet Secretary for the Cabinet for Health and Family Services from May 2018 to December 2019.

3.    In both capacities, I was actively involved in the strategy, direction, and operations of the Kentucky Health Benefit Exchange, which facilitated the application and enrollment in Qualified Health Plans (QHPs) and associated subsidies in accordance with the Affordable Care Act.

4.    I have been requested to opine on whether the expansion of eligibility for QHPs and associated subsidies to certain non-citizens such as those under Deferred Action for Childhood Arrival (DACA) status will have any financial impact to Kentucky State Government.

5.    In short, based on my experience and knowledge, it is a near certainty that this expansion of eligibility will result in additional costs to the Commonwealth.

## Background

6.    The Affordable Care Act (ACA) introduced health insurance marketplaces, also known as exchanges, to provide individuals and families with a platform to compare and purchase affordable health insurance plans. These marketplaces offer a variety of plans that meet specific coverage standards, such as essential health benefits.

7.    There are three main types of marketplaces:

    a. **Federally Facilitated Marketplaces (FFMs):** These marketplaces are operated directly by the federal government, using

2

the Healthcare.gov platform. States without their own state-based exchanges typically use FFMs.

b. **State-Based Exchanges on the Federal Platform (SBE-FPs):** These exchanges are operated by states but utilize the federal platform (Healthcare.gov) for enrollment and other functions. This model allows states to have more control over their marketplaces while leveraging the federal government's infrastructure.

c. **State-Based Exchanges (SBE):** These exchanges are fully operated by States, using their own platforms and systems. States that choose this model have complete control over their marketplace operations, including enrollment, eligibility determination, and plan offerings.

8.     These marketplaces fulfill several critical functions of the enrollment process of ACA plans, also known as Qualified Health Plans (QHPs). They take application information and, utilizing a rules engine, make eligibility determinations for enrollment in QHPs (or referrals to Medicaid) based on applicant income as well as several non-financial factors such as citizenship, age, and disability. They also help to determine appropriate amounts for cost sharing reductions (CSR's) as well as advanced premium tax credits (APTC) and apply them to monthly premiums.

9.     The primary difference among these three types of marketplaces lies in the level of State involvement and control. FFMs have the least State involvement, while

3

SBEs have the most. SBE-FPs offer a middle ground, providing States some control over their marketplaces while relying on the federal platform for certain functions.

10.     Another difference is in the cost and funding method for operating the exchange. To use the federal platform (HealthCare.gov), a user fee is applied to help cover the cost of operating the website and technology, as well as other associated costs such as marketing and outreach. The user fees are a percentage of the premiums sold on the exchange. While the user fee has fluctuated over the years, it has always been highest for an FFM. The fee has been slightly lower for SBE-FPs, since States operating these marketplaces take on some of the cost of operations aside from utilizing the federal platform. SBE's are not charged a federal user fee, as they are responsible for bearing the cost of operating the exchange.

11.     FFM user fees have evolved as follows: 3.5% for plans years 2014 to 2019; 3% for plan years 2020 and 2021; 2.25% for plan year for 2022; 2.75% for plan year 2023; 2.2% for plan year 2024.

12.     SBE-FP user fees have evolved as follows: 1.5% for plan years 2017 to 2020; 2.5% for plan year 2021; 1.75% for plan year 2022; 2.25% for plan year 2023; 1.8% for plan year 2024.[1]

### Kentucky's Exchange

---

[1] *See* GetInsured, *User Fees for HealthCare.gov* (last visited, Aug. 29, 2024), https://perma.cc/Y4Y8-6W2.

13.    The Commonwealth of Kentucky has never used the FFM model. From 2013 to 2016, it utilized an SBE model. *See* Ky. Cabinet for Health and Family Servs., *Update on Plans to Transition to a State Based Exchange* (July 29, 2020), https://perma.cc/3YLE-SU7A (CHFS PowerPoint). During this time, Kentucky funded the operation of the SBE through restricted funds generated from state assessments on insurance premiums that were repurposed from the Kentucky Access Program outlined in KRS 304.17B-021. It is my recollection that some federal funds were also available during ACA implementation to support certain activities and technology cost.

14.    Kentucky moved to an SBE-FP in 2017 in an effort to reduce State spending. At the time, the user fee for SBE-FP plans was only 1.5%. This meant that federal user fees supported the bulk of operational/technology cost, with a smaller share coming from the Kentucky Access Fund.

15.    The Commonwealth's SBE-FP was a hybrid model. It utilized the federal HealthCare.gov website for enrollment, but the Commonwealth managed policy and operations of the exchange. The Commonwealth's responsibilities included processing applications, managing contractors and applications assisters, and working with health plans offering products on the exchange.   Again, the federal government charges a premium surcharge on those plans sold on the marketplace to support operations of HealthCare.gov. In addition, Kentucky also had an assessment on

5

insurance premiums utilizing authority in KRS 304.17B-021. This assessment is utilized to support the cost of operating the state-based exchange functions.

16.    In 2021, however, the Commonwealth moved back to an SBE model. Based on a 2020 presentation given by the Cabinet for Health and family Services, it appears that the funding source to support both the technology changes and operations is coming from state restricted funds. These funds are most likely supported primarily from the Kentucky Access Fund, an assessment on state regulated insurance plans. *See supra* CHFS PowerPoint, Slide 8.

17.    This means that operations of the SBE are supported by a State revenue source generated by an assessment arising out of a State statute. Furthermore, the Commonwealth's operating budget provides that the Department for Community Based Services (DCBS) "provides eligibility determination services for health insurance premium assistance program via the state-based American Health Benefit Exchange (Kentucky Health Benefit Exchange)." 2024–2026 Budget of the Commonwealth at 247, https://perma.cc/3DXC-KU5F.

18.    This is because the DCBS division of family support has state workers located across the Commonwealth that assist with applications in Kentucky's integrated eligibility system known externally as "Kynect."  This integrated eligibility system utilizes an integrated application platform that collects information for a multitude of public assistance programs such as SNAP, TANF, Medicaid and, of relevance here, the ACA Exchange plans (QHPs).

6

19.    Based on my experience and knowledge, my understanding is that in order to allocate funding across the various programs, the Department studies a snapshot in time (known as a random moment time study) to determine what programs each worker is working on at that particular time. This data is then used to develop a cost-allocation methodology that can allocate programs funds from various sources to cover the proportional cost associated with each program. These allocation formulae are developed and used not only to allocate cost for staff time, but also technology costs.

20.    Given the above, there would almost certainly be a cost impact to expanding eligibility to those individuals with DACA status. First, they would not be initially accounted for in the time snapshot, resulting in an increase in staff time assisting with enrollment. Second, once the time study is conducted and updated, the increase in persons eligible for QHPs would be reflected and allocated to the health benefit exchange operations, which to the best of my knowledge is funded out of state restricted revenue from the Kentucky Access Assessment.

21.    Also, there would likely be at least some costs, even if minimal, for technology. First, these applications, associated personally identifiable information (PII), and advanced premium tax credit information, etc., must all be stored on State system or in the State cloud. Processing these applications takes bandwidth and electricity, all of which cost money.

22.    Even if Kentucky (or other states) utilized the FFP model, there would still be a nominal costs related to the expansion of DACA. This is because these

applications and materials move back and forth between State workers/systems and the FFP/HealthCare.gov. These systems must communicate information, check for minimum essential coverage, and check eligibility for other programs such as Medicaid, among other things. Additionally, there would likely need to be changes to State eligibility systems to update the rules engines and configuration to ensure these DACA individuals' applications are appropriately processed. These changes will likely require updates in the application intake process, such as in the consumer facing portal, through the entire determination and decision-making rules within the system. Such changes may be state funded or partially funded through a Medicaid match of 90% federal and 10% State, depending on the use case.

23.    Finally, there could also be downstream cost for services such handling appeals regarding eligibility or other components, fraud detection and enforcement, and customer service and call center activities.

## Conclusion

24.    In summary, given the discussion above and based on my personal knowledge and experience and publicly available information, it is my opinion that the expansion of eligibility for DACA plan enrollment would have a cost and resource impact to Kentucky state government.

25.    I declare under penalty of perjury that the foregoing is true and correct.

Executed on: August 30, 2024

_____
Adam M. Meier