**UNITED STATES DISTRICT COURT**
**DISTRICT OF NORTH DAKOTA**
**WESTERN DIVISION**

| | |
|---|---|
| **The State of KANSAS, et al.,** | |
| **Plaintiffs,** | |
| **v.** | **CIVIL ACTION NO. 1:24-cv-00150-DMT-CRH** |
| **UNITED STATES OF AMERICA and the CENTERS FOR MEDICARE & MEDICAID SERVICES,** | |
| **Defendants.** | |

**PROPOSED INTERVENORS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION TO INTERVENE AS DEFENDANTS**

## <u>TABLE OF CONTENTS</u>

STATEMENT OF INTEREST ............................................................................................. 1

BACKGROUND ............................................................................................................... 2

    I.     CASA's Members And The Proposed Individual Intervenors Are DACA
          Recipients Who Wish To Purchase Health Insurance ........................................... 2

    II.    The Affordable Care Act Increases Access to Health Insurance .......................... 4

    III.   DHS Adopts DACA, But CMS Excludes DACA Recipients From
          Marketplaces ......................................................................................................... 5

    IV.   CMS Restores DACA Recipients' Access To Health Insurance
          Marketplaces ......................................................................................................... 7

ARGUMENT .................................................................................................................... 8

    I.     Proposed Intervenors Have Standing .................................................................... 8

    II.    Proposed Intervenors Are Entitled to Intervene as of Right ............................... 12

         A.    Proposed Intervenors' Motion Is Timely .................................................. 12

         B.    Proposed Intervenors Posses Legally Protectable Interests ..................... 13

         C.    Proposed Intervenors' Ability to Protect Their Interests May Be
             Impaired by the Court's Disposition of this Action .................................. 15

         D.    Existing Parties Inadequately Represent Intervenors' Interests ............... 15

    III.   Proposed Intervenors Also Meet the Permissive Intervention
          Requirements ....................................................................................................... 18

CONCLUSION ................................................................................................................ 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### Cases

*Am. Med. Ass'n v. Stenehjem*,
   2019 WL 10920631 (D.N.D. Nov. 26, 2019)....................................15, 16, 17, 19

*Ams. for Safe Access v. Drug Enf't Admin.*,
   706 F.3d 438 (D.C. Cir. 2013) ........................................................................13

*Ariz. Dream Act Coal. v. Brewer*,
   855 F.3d 957 (9th Cir. 2017)...........................................................................19

*Bost v. Ill. State Bd. of Elections*,
   75 F.4th 682 (7th Cir. 2023)............................................................................14

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ....................................................................................9, 10

*Crossroads Grassroots Pol'y Strategies v. Fed. Election Comm'n*,
   788 F.3d 312 (D.C. Cir. 2015) ..........................................................................9

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   591 U.S. 1 (2020)............................................................................................19

*Flynt v. Lombardi*,
   782 F.3d 963 (8th Cir. 2015)......................................................................18, 19

*Hardaway v. D.C. Hous. Auth.*,
   843 F.3d 973 (D.C. Cir. 2016) ........................................................................13

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) ........................................................................................11

*Kan. Pub. Emps. Ret. Sys. v. Reimer & Kroger Assocs. Inc.*,
   60 F.3d 1304 (8th Cir. 1995)...........................................................................15

*Kuehl v. Sellner*,
   887 F.3d 845 (8th Cir. 2018)...........................................................................10

*Lujan v. Def. of Wildlife*,
   504 U.S. 555 (1992) ........................................................................................10

*Mille Lacs Band of Chippewa Indians v. State of Minn.*,
   989 F.2d 994 (8th Cir. 1993).....................................................................13, 18

*Nat'l Fed'n of Blind of Mo. v. Cross*,
   184 F.3d 973 (8th Cir. 1999)...........................................................................11

*Nat'l Parks Conservation Ass'n v. U.S. E.P.A.*,
   759 F.3d 969 (8th Cir. 2014).................................8, 9, 10, 12, 13, 15, 18

**Page(s)**

*Pharm. Rsch. & Mfrs. of Am. v. Williams,*
  64 F.4th 932 (8th Cir. 2023)............................................................................................11

*Planned Parenthood Minn., N.D., S.D., v. Alpha Ctr.,*
  213 F. App'x 508 (8th Cir. 2007)...............................................................................15, 16

*Red River Freethinkers v. City of Fargo,*
  679 F.3d 1015 (8th Cir. 2012)...........................................................................................11

*State v. Council on Env't Quality,*
  2024 WL 3595252 (D.N.D. July 31, 2024).......................................................................13

*Texas v. United States,*
  2021 WL 411441 (S.D. Tex. Feb. 6, 2021).................................................................19, 20

*Texas v. United States,*
  2023 WL 3025080 (S.D. Tex. Apr. 20, 2023)............................................................19, 20

*Texas v. United States,*
  805 F.3d 653 (5th Cir. 2015).......................................................................................14, 16

*United States v. Metro. St. Louis Sewer Dist.,*
  569 F.3d 829 (8th Cir. 2009)..........................................................................................9, 10

*In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.,*
  716 F.3d 1057 (8th Cir. 2013)...........................................................................................12

*W. Virginia v. U.S. Env't Prot. Agency,*
  2023 WL 3624685 (D.N.D. Mar. 31, 2023).......................................................................15

**Statutes**

8 U.S.C. § 1611(b)(2)...............................................................................................................4

28 U.S.C. § 1331.....................................................................................................................18

42 U.S.C. § 18001.....................................................................................................................4

42 U.S.C. § 18022.....................................................................................................................4

42 U.S.C. § 18031.....................................................................................................................4

42 U.S.C. § 18032(f)(3).............................................................................................................4

42 U.S.C. § 18041.....................................................................................................................4

42 U.S.C. § 18071(e)(2).............................................................................................................4

Pub. L. No. 111-148, 124 Stat. 119 (2010)..............................................................................4

**Page(s)**

## Other Authorities

Barker and Li, *The Cumulative Impact of Health Insurance on Health Status*, 55
    Health Services Research 815 (October 2020)........................................................................9

Liu, C., et al., *The Affordable Care Act's Insurance Marketplace Subsidies were
    Associated with Reduced Financial Burden for US Adults*, 40 Health Affairs,
    496 (March 2021)........................................................................10

Medha D. Makhlouf, *Interagency Dynamics in Matters of Health and
    Immigration*, 103 B.U. L. Rev. 1095 (2023)........................................................................5

National Immigration Law Center, *DACA Recipients' Access to Health Care:
    2023 Report* (May 2023), tinyurl.com/3hcyjtub........................................................................10

National Immigration Law Center, *DACA Recipients' Access to Health Care:
    2024 Report* (May 2024), tinyurl.com/yw6zw2y4 ........................................................................6

NILC and Immigration Advocacy Organizations, Comment Letter on to *Proposed
    Rule Clarifying Eligibility for a Qualified Health Plan through an Exchange*,
    Regulations.gov (June 26, 2023), tinyurl.com/362ce5n7 ........................................................................8

Scott KW, Scott JW, Sabbatini AK, et al., *Assessing Catastrophic Health
    Expenditures Among Uninsured People Who Seek Care in US Hospital-Based
    Emergency Departments*, JAMA Health (2021)........................................................................10

U.S. Citizenship and Immigration Services, *Frequently Asked Questions*,
    tinyurl.com/265wfp94 (last visited Sept. 16, 2024)........................................................................5

## Rules

Fed. R. Civ. P. 24........................................................................8, 12, 15, 18, 19

N.D. Civ. R. 7.1((B)........................................................................13

## Regulations

8 C.F.R. § 1.3(a)(4)(vi) (2011)........................................................................4, 5

45 C.F.R. § 152.2........................................................................5

77 Fed. Reg. 52614 (Aug. 30, 2012)........................................................................5

88 Fed. Reg. 25316 (Apr. 26, 2023)........................................................................7, 8, 18

89 Fed. Reg. 39392 (May 8, 2024)........................................................................8, 17, 18

## STATEMENT OF INTEREST

Claudia Moya Lopez, Dania Quezada Torres, and Hyun Kim, ("Proposed Individual Intervenors") and CASA, Inc. ("CASA") (together, "Proposed Intervenors") seek to intervene in this matter to defend a regulation that would help thousands of individuals purchase affordable health insurance.[1]  Proposed Individual Intervenors and CASA's members are noncitizens who came to the United States as children, have lived most of their lives here, and were granted deferred action through the Deferred Action for Childhood Arrivals ("DACA") program.[2]  Although DACA recipients grew up in this country, they lived under the constant threat of removal and lacked work authorization before DACA.  As a result, many lacked health insurance and could not afford basic medical services.  When the Department of Homeland Security ("DHS") created DACA, DACA recipients obtained protection from deportation and employment authorization, allowing them to fulfill their potential and continue contributing to their communities.  But for many DACA recipients, health insurance remained unattainable because of an arbitrary policy excluding them from purchasing health insurance through the marketplaces established under the Affordable Care Act ("ACA").

The ACA grants marketplace access to noncitizens who are "lawfully present."  Since 1996, DHS and its predecessors have interpreted this phrase in other, similar statutes to include deferred-action recipients.  When the ACA was enacted in 2010, the Centers for Medicare and Medicaid Services ("CMS") applied the same interpretation to the ACA, allowing deferred-action recipients to access the marketplaces.  But in 2012, when DACA was adopted, CMS amended its

---

[1]  Declarations from each of the Proposed Individual Intervenors appear as Exhibits A–C hereto (respectively, the "Kim Decl.," "Torres Decl.," and the "Moya Lopez Decl.").  A declaration from CASA's Chief of Programs and Services, George Escobar, appears as Ex. D hereto (the "Escobar Decl.").

[2]  *See* Kim Decl. ¶¶ 1-7; Torres Decl. ¶¶ 1-8; Moya Lopez Decl. ¶¶ 1-8.

regulation to arbitrarily exclude DACA recipients—but no other deferred action recipients—from the definition of "lawfully present," and thus from the ACA marketplaces, even while other agencies continued to treat DACA recipients as "lawfully present" for other purposes.

In April 2023, CMS issued a notice of proposed rulemaking to eliminate the exception that excluded DACA recipients from the marketplaces. CASA urged CMS to finalize the rule promptly before open enrollment in November 2023. But CMS waited more than a year to issue a Final Rule eliminating the exception.

Proposed Intervenors welcome CMS's decision to eliminate the arbitrary exception that has long excluded DACA recipients from the marketplaces. But those affected have waited too long for access to basic healthcare to rely on the government to pursue their interests. They wish to purchase health insurance on the marketplaces as soon as possible so they can access medical care and have financial security. The government, on the other hand, has its own policy and institutional interests that have delayed this policy change and may prevent the government from fully protecting Proposed Intervenors' interests in prompt relief.

Proposed Intervenors thus seek to intervene in this case to oppose the preliminary injunction sought by Plaintiffs and ensure the Final Rule goes into effect on November 1, 2024. Because Proposed Intervenors have standing and meet the requirements for both intervention as of right and permissive intervention, the Court should grant the motion to intervene.

## BACKGROUND

### I. CASA's Members And The Proposed Individual Intervenors Are DACA Recipients Who Wish To Purchase Health Insurance

Proposed Intervenor CASA is a nonprofit organization headquartered in Maryland, with offices in Maryland, Virginia, and Pennsylvania. CASA is the largest membership-based immigrant rights organization in the mid-Atlantic region, with more than 100,000 members. CASA's

members include individuals like Proposed Individual Intervenors Claudia Moya Lopez and Hyun Kim. Moya Lopez Decl. ¶ 7; Kim Decl. ¶ 5. Claudia arrived from El Salvador when she was 11 years old, and she currently lives in Virginia. Moya Lopez Decl. ¶¶ 2-3. She is a small-business owner who operates a roofing company. *Id.* ¶¶ 4-5. As a small-business owner, she does not have access to employer-based health insurance and cannot afford to purchase insurance for herself. *Id.* ¶ 9. Last year, Claudia was diagnosed with leukemia and was hospitalized for five weeks. *Id.* ¶ 10. In that instance, Claudia was fortunate the hospital covered the cost of her treatment itself, yet cost remains a concern, as there is still a debt listed on her bill that is larger than her income and over half of her savings. *Id.* ¶¶ 11-12. Claudia also requires ongoing monitoring because of the risk of leukemia recurrence and has no reliable access to healthcare going forward. *Id.* ¶¶ 13-15.

Hyun Kim arrived in the United States with his mother when he was three years old. Kim Decl. ¶ 2. As a restaurant worker who has been saving up to attend college, he receives base pay and tips but no benefits like health insurance. *Id.* ¶ 4. Because of his lack of access to health insurance, Hyun has not had a physical in three years and has never seen a dentist. *Id.* ¶ 9. Under the Final Rule, he is eligible for credits and discounts in buying health insurance on the market-place, which will allow him to access consistent preventative care for the first time in his life. *Id.* ¶¶ 11-14, 16.

Dania Quezada Torres is a third-year law student at the University of Washington. Torres Decl. ¶ 7. She has lived in the United States since 2003. *Id.* ¶¶ 1-2. She currently receives extremely limited health benefits through her university, which she relies on to afford the medication she needs for her attention deficit hyperactivity disorder and obsessive-compulsive disorder. *Id.* ¶¶ 9-11. When Dania is unable to access her university health benefits, she has to ration her

medication.  *Id.* ¶ 13. Dania intends to purchase health insurance through Cascade Care (available through the Washington state health marketplace) and needs the insurance affordability credits that would be available only through the Final Rule to make coverage affordable on her student budget. *Id.* ¶ 17.

Each Proposed Intervenor has a direct interest in the implementation of the Final Rule and would be directly harmed by a preliminary injunction to stay the Final Rule, which would delay their access to important health insurance and care and lead to fear that they will have to choose between foregoing medical treatment and assuming crushing medical debt.  *See* Moya Lopez Decl. ¶¶ 14-15, 17-18; Torres Decl. ¶¶ 13-17; Kim Decl. ¶¶ 14-15.

## II.  The Affordable Care Act Increases Access to Health Insurance

Congress passed the ACA in 2010 with a goal of providing broad access to health insurance.  *See* Pub. L. No. 111-148, 124 Stat. 119 (2010) (codified as 42 U.S.C. § 18001 *et seq.*).  One of the most important ways the ACA did this was by establishing online health insurance marketplaces, where consumers can compare and buy approved health insurance plans.  42 U.S.C. §§ 18031, 18041.  Marketplace plans provide access to preventative medicine, which allows insureds to save money on future health expenses, make prescription drugs more affordable, and help pay for medical expenses and emergency services.  *See* 42 U.S.C. § 18022.

Importantly, the ACA facilitated this broad access by permitting any noncitizen who is "lawfully present" in the United States to purchase and enroll in a marketplace plan.  42 U.S.C. § 18032(f)(3).  The ACA does not define "lawfully present," aside from noting that individuals should be "reasonably expected to be [lawfully present] for the entire period of enrollment."  42 U.S.C. § 18071(e)(2); *accord* 42 U.S.C. § 18032(f)(3).  But before the ACA was adopted, DHS and its predecessors had interpreted the same phrase, in other statutes, *e.g.*, 8 U.S.C. § 1611(b)(2), to include all persons granted "deferred action," 8 C.F.R. § 1.3(a)(4)(vi) (2011) (originally at 8

C.F.R. § 103.12 (1996)).  From the outset of the ACA's implementation, CMS interpreted the phrase consistently with prior usage and thus provided by regulation that all persons granted "deferred action" were eligible to purchase health insurance through these marketplaces.  45 C.F.R. § 152.2(4)(vi) (2010).  That included persons with pending applications for classification as Special Immigrant Juveniles, along with persons granted humanitarian parole, and many others whose removal has been withheld.  45 C.F.R. § 152.2.  Although DACA had not been established as a policy when Congress enacted and CMS began to implement the ACA, all persons granted deferred action were considered lawfully present at that time.

### III. DHS Adopts DACA, But CMS Excludes DACA Recipients From Marketplaces

In 2012, DHS announced DACA, which was intended to allow immigration enforcement forbearance identical to other deferred action.  U.S. Citizenship and Immigration Services, *Frequently Asked Questions*, tinyurl.com/265wfp94 (last visited Sept. 16, 2024).  Because DACA recipients were granted "deferred action," they were treated as "lawfully present" under other regulations using that term.  *See*, *e.g.*, 8 C.F.R. § 1.3(a)(4)(vi).  Then-existing ACA regulations likewise would have treated them as "lawfully present" and thus eligible to purchase health insurance on the marketplaces.  But CMS arbitrary amended the ACA regulations to exclude DACA recipients from their definition of "lawfully present."  77 Fed. Reg. 52614 (Aug. 30, 2012) (codified at 45 C.F.R. pt. 152).  CMS's departure from its prior definition "was not based on health policy"— "rather, it relied on a desire not to interfere with 'immigration policymaking'" and to avoid appearing too lenient on immigration issues.  Medha D. Makhlouf, *Interagency Dynamics in Matters of Health and Immigration*, 103 B.U. L. Rev. 1095, 1126-27 (2023).  DACA recipients, unlike others granted deferred action, were thus denied the chance to purchase plans on the marketplaces.

DACA recipients' inability to purchase health insurance coverage on the marketplaces has undermined the ACA's goal of providing broad access to healthcare and DACA's goal of

providing stability for recipients.  A recent survey of DACA recipients found that 20 percent of those surveyed were not covered by any kind of health insurance or healthcare plan, which is triple the national average of 7.7 percent.  National Immigration Law Center ("NILC"), *DACA Recipients' Access to Health Care: 2024 Report* 1 (May 2024), tinyurl.com/yw6zw2y4.  The same survey found that 36 percent of respondents skipped recommended medical tests or treatments due to the cost of care, and almost half (42 percent) skipped dental examinations or treatments.  *Id.* at 3.  The lack of affordable care also has financial implications, with 27 percent of respondents reporting they took on debt to afford a medical procedure and 12 percent taking on debt to afford medication. *Id.*

This has been the experience of the Proposed Individual Intervenors.  Claudia Moya Lopez requires regular checkups to monitor for a possible leukemia recurrence, but she does not know how she is going to pay for those visits.  Moya Lopez Decl. ¶¶ 13-14.  Instead of saving money to help her children go to college or reinvest in her small business, she is always saving up for health expenses and unexpected medical emergencies.  *Id.* ¶ 15.  Hyun Kim cannot currently afford health insurance and must pay high out-of-pocket costs for any medical care, including doctor's appointments.  Kim Decl. ¶ 8.  As a result, he has avoided going to care for regular appointments, preventative care, and dental exams, even though he has a family history of diabetes.  *Id.* ¶¶ 8-10.  Under Dania Quezada Torres' university-based insurance plan, even for a short visit to the school clinic, she has had to pay around $150.  Torres Decl. ¶ 11.  Thus, she tries to avoid visiting the clinic or seeing a doctor if and when she has health concerns, and she will ration her prescription medication even though she needs the medication to stay focused on her studies.  *Id.* ¶¶ 12-14.

Numerous other CASA members are similarly situated, in that access to healthcare coverage is a great concern in light of the financial stability it would bring them.  Escobar Decl. ¶¶ 15,

17. CASA's members routinely report the financial hardships they experience due to the gap in access to affordable health insurance for DACA recipients. *Id.* ¶ 11. Many have even made personal and financial decisions in reliance on the Final Rule taking effect, and a preliminary injunction would irreparably harm those who have planned their financial goals around it.

## IV. CMS Restores DACA Recipients' Access To Health Insurance Marketplaces

In April 2023, CMS announced a proposed rule to better "effectuate congressional intent in the ACA" to increase health coverage access. 88 Fed. Reg. 253134, 25316 (Apr. 26, 2023) (codified at 42 C.F.R. pts. 435, 457, 600; 45 C.F.R. pts. 152, 155) ("Proposed Rule"). The Proposed Rule sought to restore access to the marketplaces to all noncitizens "lawfully present" in the United States, including all those granted deferred action like DACA recipients, given "there [is] no statutory mandate to distinguish between recipients of deferred action under the DACA policy and other deferred action recipients." *Id.* at 25316. CMS proposed a target effective date of November 1, 2023—the start of the annual enrollment period for plans effective in calendar year 2024—and called for public comments to be submitted by June 23, 2023. *Id.* at 25313-14. CASA submitted two comments, including one urging CMS to act urgently to allow DACA recipients access to the marketplaces, including no later than November 1, 2023. NILC and Immigration Advocacy Organizations, Comment Letter to *Proposed Rule Clarifying Eligibility for a Qualified Health Plan through an Exchange*, Regulations.gov (June 26, 2023), tinyurl.com/362ce5n7.

Nearly a year after the comment period closed, CMS finally published a final rule in May 2024, eliminating the arbitrary DACA carveout for the healthcare marketplaces. 89 Fed. Reg. 39392 (May 8, 2024) (codified at 42 C.F.R. pts. 435, 457, 600; 45 C.F.R. pts. 152, 155) ("Final Rule"). The delay pushed the Final Rule's effective date back a full year. The Final Rule provides that DACA recipients will be eligible to purchase health insurance plans on the marketplaces during the upcoming enrollment period for 2025, which begins November 1, 2024. *Id.* at 39393.

After the Final Rule was issued, multiple states (the "States") challenged it through this lawsuit. On August 30, 2024, the States moved for a stay of the Final Rule and a preliminary injunction. ECF 35. The opposition to the motion for a preliminary injunction is due September 25, 2024, and there will be a hearing on that motion on October 15, 2024. ECF 44.

## ARGUMENT

The Court should permit Proposed Intervenors to intervene because they have actual, concrete, and individualized interests in the subject matter of this action that will be gravely impaired if the States prevail in this case. The States seek to enjoin a rule that would allow Proposed Individual Intervenors and other CASA members to purchase health insurance from already established healthcare marketplaces. Defendants—CMS and the U.S. government—will not adequately represent Proposed Intervenors' interests because CMS's interests in this matter are largely institutional in nature. Proposed Individual Intervenors and CASA's members, by contrast, simply want to purchase health insurance and access preventative healthcare and other insurance benefits as soon as possible. CASA also has its own organizational interests in supporting its members and expending fewer funds to help its members obtain medical care. Proposed Intervenors thus have Article III standing and are entitled to intervene as a matter of right under Federal Rule of Civil Procedure Rule 24(a). At minimum, they should be granted permissive intervention under Rule 24(b).

## I. Proposed Intervenors Have Standing

"In the Eighth Circuit, a prospective intervenor must 'establish Article III standing,'" which requires showing injury, causation, and redressability. *Nat'l Parks Conservation Ass'n v. U.S. E.P.A.*, 759 F.3d 969, 974 (8th Cir. 2014) ("*National Parks*"). Proposed Individual Intervenors satisfy each of these requirements. CASA also has both associational standing to represent the interests of its members and organizational standing based on its own interests.

Proposed Individual Intervenors satisfy the "injury in fact" requirement because they have an "injury to a legally protected interest that is 'concrete, particularized, and either actual or imminent.'" *United States v. Metro. St. Louis Sewer Dist.*, 569 F.3d 829, 834 (8th Cir. 2009). If the States succeed in enjoining the Final Rule, denying Proposed Individual Intervenors the ability to purchase health insurance on the marketplaces, Proposed Individual Intervenors will face financial injuries when they seek to obtain preventive or routine health screenings or regular primary care and treatment for any health conditions. Moya Lopez Decl. ¶¶ 16-17; Torres Decl. ¶¶ 17-18; Kim Decl. ¶¶ 14-15; *see also* Barker and Li, *The Cumulative Impact of Health Insurance on Health Status,* 55 Health Services Research 815, 820 (October 2020). Just as a plaintiff is not required to wait for a regulation to go into effect to challenge it as long as the injury it faces under the regulation is "certainly impending," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013), proposed intervenors need not wait to defend a regulation when eliminating that regulation would subject them to "direct financial harm." *National Parks*, 759 F.3d at 975.[3]

The harms to the Proposed Individual Intervenors from not being able to access the marketplaces are not "speculative." *Clapper*, 568 U.S. at 409. Health insurance ensures people are not required to pay full healthcare costs out-of-pocket—they simply pay the member obligation (such as a copay). Access to health insurance reduces the risk an individual or family will suffer a "catastrophic health expenditure" that consumes a significant portion of their income.[4] Accordingly, vacating or enjoining the Final Rule, as the States seek in this lawsuit, would harm Proposed

---

[3] *See also Crossroads Grassroots Pol'y Strategies v. Fed. Election Comm'n*, 788 F.3d 312, 317 (D.C. Cir. 2015) ("Our cases have generally found a sufficient injury in fact where a party benefits from agency action, the action is then challenged in court, and an unfavorable decision would remove the party's benefit.").

[4] Scott KW, Scott JW, Sabbatini AK, et al., *Assessing Catastrophic Health Expenditures Among Uninsured People Who Seek Care in US Hospital-Based Emergency Departments*, JAMA Health (2021); Liu, C., et al., *The Affordable Care Act's Insurance Marketplace Subsidies were Associated with Reduced Financial Burden for US Adults*, 40 Health Affairs, 496 (March 2021).

Individual Intervenors by cutting off access to affordable health insurance coverage options on ACA marketplaces and requiring them to pay a higher price for medical care. A recent survey of DACA recipients shows that 48 percent of respondents experienced a delay in their medical care, and 71 percent of respondents stated they were unable to pay medical bills or expenses. NILC, *DACA Recipients' Access to Health Care: 2023 Report* 2 (May 2023), tinyurl.com/3hcyjtub. This "[r]isk of direct financial harm" from foreclosing of Proposed Individual Intervenors' access to marketplaces easily "establishes injury in fact." *National Parks*, 759 F.3d at 975.

Proposed Individual Intervenors also straightforwardly satisfy the other requirements for individual standing—"a causal connection between the injury and the conduct complained of," *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560 (1992), and proof that a "favorable decision will likely redress the injury," *Metro. St. Louis Sewer Dist.*, 569 F.3d at 834—because the source of the injury is the lawsuit itself, and dismissing the lawsuit or denying relief would fully prevent that injury by ensuring the Final Rule goes into effect on November 1, 2024. *See Clapper*, 568 U.S. at 409; *see also National Parks*, 759 F.3d at 975 (proposed intervenor could trace injury to the plaintiffs' relief being granted and injury could be redressed by proposed intervenor prevailing in the litigation).

As to CASA, an organization has "associational" standing when (1) its members would otherwise have standing to sue in their own right, (2) the interests it seeks to protect are germane to the organization's purpose, and (3) the legal claims do not require the participation in the suit of each individual member. *See Kuehl v. Sellner*, 887 F.3d 845, 851 (8th Cir. 2018). For the reasons just explained, Proposed Individual Intervenors Claudia Moya Lopez and Hyun Kim satisfy the first requirement because they are CASA members and have standing to sue in their own right. Moya Lopez Decl. ¶ 7; Kim Decl. ¶ 5.

CASA also meets the other requirements for associational standing. One of CASA's core

10

missions is to support its members in improving their physical and mental health while also increasing their social stability.  Escobar Decl. ¶¶ 4-5.  If CASA's members were able to purchase health insurance, it would help them secure access to essential health services, such as primary and preventative care; obtain timely diagnosis of health concerns; and manage any chronic conditions. Finally, because the harm would be the same to all members wishing to purchase health insurance on the marketplaces—and would be equally addressed by dismissing the States' suit—individual members need not participate in this lawsuit.  *Id.* ¶¶ 17-18.  CASA's relief sought is simply the dismissal of the States' suit or judgment against the States on the merits, allowing the Final Rule to go into effect.  This outcome is not particularized to any member, does not require individualized proof, and consequently does not require participation in this suit of individual members.  *See Red River Freethinkers v. City of Fargo*, 679 F.3d 1015, 1022 (8th Cir. 2012); *Pharm. Rsch. & Mfrs. of Am. v. Williams*, 64 F.4th 932, 948 (8th Cir. 2023).

CASA also has standing on its own as an organization because delaying or preventing implementation of the Final Rule will injure CASA too, and its injuries satisfy the same elements applicable to individuals—injury, causation, and redressability.  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982).  An organization satisfies the injury requirement when there is a "concrete and demonstrable injury to [the] organization's activities which drains its resources and is more than simply a setback to its abstract social interests."  *Nat'l Fed'n of Blind of Mo. v. Cross*, 184 F.3d 973, 979 (8th Cir. 1999).  CASA's mission relates to the wellbeing of immigrant communities.  Escobar Decl. ¶¶ 4-5.  To fulfill its mission, CASA regularly conducts educational campaigns to inform members of those communities of their rights and assists individuals in applying for immigration relief.  *Id.* ¶¶ 5-11.  CASA also helps its members understand their eligibility for affordable healthcare options; helps facilitate access to healthcare in hosting clinics, like vaccine

clinics; and has held clinics to help its members understand their options under the ACA and the Final Rule. *Id.* Such efforts have consumed time and resources that could have otherwise been spent providing direct services to CASA's members. *Id.* ¶¶ 14-16. If the States succeed in challenging the Final Rule, CASA will need to continue to divert these resources from other programs—requiring staff to devote up to 33 percent of their time (an equivalent of $33,000) to helping eligible DACA recipients secure alternative healthcare options—and this harm would be redressed by allowing the Final Rule to go into effect as scheduled. *Id.* ¶¶ 14, 16.

## II.   Proposed Intervenors Are Entitled to Intervene as of Right

Under Rule 24(a), "a court must permit anyone to intervene who: (1) files a timely motion to intervene; (2) claims an interest relating to the property or transaction that is the subject of the action; (3) is situated so that disposing of the action may, as a practical matter, impair or impede the movant's ability to protect that interest; and (4) is not adequately represented by the existing parties." *National Parks*, 759 F.3d at 975 (cleaned up). In this Circuit, Rule 24 "should be construed liberally, with all 'doubts resolved in favor of the proposed intervenor.'" *Id.* at 975. Proposed Intervenors satisfy each of these requirements.

### A.   Proposed Intervenors' Motion Is Timely

Given the early stage of this litigation, this motion is timely. In determining whether a motion to intervene is timely, courts consider four factors: "(1) the extent the litigation has progressed at the time of the motion to intervene; (2) the prospective intervenor's knowledge of the litigation; (3) the reason for the delay in seeking intervention; and (4) whether the delay in seeking intervention may prejudice the existing parties." *In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*, 716 F.3d 1057, 1065 (8th Cir. 2013). Each factor favors intervention.

Proposed Intervenors filed this motion only 23 days after the States filed the amended complaint and 21 days after their motion for preliminary injunction. The parties are also still

12

briefing the States' preliminary injunction motion, and Proposed Intervenors intend to respect the existing schedule on that motion by submitting a proposed brief on that motion concurrently with the deadline for CMS's brief. Proposed Intervenors' counsel is also available for oral argument on the date currently scheduled for that motion (October 15, 2024, ECF 44). Proposed Intervenors also plan to file concurrently with this motion a motion to transfer venue. Under this Court's rules for non-dispositive motions, briefing on the motion to transfer and on this motion to intervene can be completed concurrently within 21 days, by October 11, four days before oral argument on the preliminary injunction is scheduled. N.D. Civ. R. 7.1((B).

Courts routinely find motions to intervene timely and not prejudicial in cases like this one where the matter is "still in its infancy." *State v. Council on Env't Quality*, 2024 WL 3595252, at *3 (D.N.D. July 31, 2024); *Mille Lacs Band of Chippewa Indians v. State of Minn.*, 989 F.2d 994, 999 (8th Cir. 1993).

### B. Proposed Intervenors Posses Legally Protectable Interests

The same interests that give Proposed Intervenors Article III standing also satisfy the requirement of a "recognized interest in the subject matter of the litigation." *National Parks*, 759 F.3d at 975. Their interest in purchasing health insurance on the marketplaces plainly satisfies this requirement because the lawsuit seeks to prevent them from doing exactly that.

The Final Rule grants DACA recipients a right to participate in the health insurance marketplaces. As a result, the Proposed Individual Intervenors have a legal right under the ACA this lawsuit seeks to eliminate. It is hard to imagine a more directly applicable interest in this lawsuit's subject matter. Those who have been stripped of a public good "have long been empowered to challenge the rescission" of such an interest in federal court. *See Hardaway v. Dist. of Columbia Housing Authority*, 843 F.3d 973 (D.C. Cir. 2016); *see also Americans for Safe Access v. Drug Enforcement Admin.*, 706 F.4d 438, 446 (D.C. Cir. 2013) (being forced to pay more out-of-pocket

13

for health insurance is a legally protected interest).  Furthermore, accessing the marketplaces is not just an end in itself; rather Proposed Individual Intervenors want the significant benefits of the health insurance the marketplaces make available.  For example, Claudia Moya Lopez seeks coverage for ongoing monitoring of a potentially life-threatening disease, Moya Lopez Decl. ¶ 13; Hyun Kim seeks preventative care and to discuss chronic disease concerns with a physician, Kim Decl. ¶ 9; and Dania Quezada Torres seeks affordable access to her prescription medication, Torres Decl. ¶¶ 11, 13.

These interests are similar to those found to be adequate in *Texas v. United States*, 805 F.3d 653 (5th Cir. 2015).  There, 26 states challenged DHS's Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) program, and 3 would-be beneficiaries of the program moved to intervene.  The court held the intervenors satisfied the "interest" requirement because they were the "intended beneficiaries of the challenged federal policy."  *Id.* at 660.  The same is true of the Proposed Individual Intervenors here.  Because they are "the intended beneficiaries of the program being challenged," they have "interests that are sufficiently concrete and specific to support their intervention by right."  *Id.* at 661.

Beyond CASA's associational interest in its members' access to marketplaces, CASA also has separate organizational interests in its members' stable and affordable access to preventative healthcare, which will save CASA the considerable resources it expends helping its members find healthcare services.  *See Bost v. Illinois State Bd. of Elections*, 75 F.4th 682, 687 (7th Cir. 2023) (intervention permitted when organization had an "associational interest on behalf of its members" and would have to spend resources due to plaintiff's claim).  As explained above, *supra* at pp. 11, 14, CASA's staff has devoted significant resources to preparing DACA recipients to enroll in marketplace plans and if the Final Rule were paused or enjoined, CASA would need to expend funds

14

to educate the community about the change to their eligibility for the marketplaces and help DACA recipients enroll and secure alternative healthcare options.   Escobar Decl. ¶¶ 12-17.

### C.     Proposed Intervenors' Ability to Protect Their Interests May Be Impaired by the Court's Disposition of this Action

Proposed Intervenors also meet the third requirement of Rule 24—an unfavorable disposition of this lawsuit would "'as a practical matter impair or impede' [their] ability to protect [their] interest[s]." *National Parks*, 759 F.3d at 976.  A proposed intervenor can meet this requirement if he may be "directly impacted by [a] court order" granting plaintiff's requested relief, *id.*, or "an unfavorable ruling may impair" the potential movant's interests.  *Am. Med. Ass'n v. Stenehjem*, 2019 WL 10920631, at *5 (D.N.D. Nov. 26, 2019).  Here, Proposed Intervenors would be "directly impacted" if the States are successful in enjoining the Final Rule because it would impair DACA recipients' ability to purchase insurance through the marketplaces and force CASA to spend resources attempting to help its members access other forms of healthcare.

### D.     Existing Parties Inadequately Represent Intervenors' Interests

Finally, Proposed Intervenors cannot rely on the U.S. government to adequately represent their interests.  This requirement is met by a "minimal showing that representation '*may be*' inadequate."  *Kan. Pub. Emps. Ret. Sys. v. Reimer & Kroger Assocs. Inc.*, 60 F.3d 1304, 1308 (8th Cir. 1995) (emphasis added).  A government entity can represent the interests of its citizens only "to the extent the proposed intervenor's interests coincide with the public interest."  *National Parks*, 759 F.3d at 976-77 (cleaned up).  In short, only a minimal showing is required when the proposed intervenors' interests "are *not identical* to those which the [government] seeks to protect."  *Planned Parenthood Minn., N.D., S.D., v. Alpha Ctr.*, 213 F. App'x 508, 510 (8th Cir. 2007) (emphasis added); *see also W. Virginia v. U.S. Env't Prot. Agency*, 2023 WL 3624685, at *3 (D.N.D. Mar. 31, 2023) (proposed intervenor's interests are not adequately protected by the federal government

where their interests are "not entirely aligned"). Proposed Intervenors easily meet this standard.

Courts have found the government to be an inadequate representative—and have thus granted intervention—even where the intervenors and the government "share the common legal goal of protecting" a certain law or regulation. *Stenehjem*, 2019 WL 10920631, at *5; *see also Texas*, 805 F.3d at 663. For example, in *Texas*, the Fifth Circuit held that "[a]lthough both the Government and the [immigrant intervenors] seek to uphold DAPA," there was inadequate representation because the government's broader institutional interests were distinct from the immigrant intervenors' interests in remaining in their home state; retaining custody of their U.S. citizen children; and obtaining work authorization, a driver's license, and lawful employment required to provide for their families. 805 F.3d at 662-63. In *Stenehjem*, the court similarly found that although the state government and the intervenors "share the common legal goal of protecting" a North Dakota law requiring doctors to inform patients seeking medication abortions that the procedure can be reversed, "their interests in the law are different." 2019 WL 10920631, at *5. The court explained that while the state has a "broad interest" in protecting its laws and "must represent the varied interests of all its citizens," the intervenors (pregnancy help centers) had "potential reputational and financial interests at stake" which were "narrower than the public interest." *Id.*

For many of the reasons discussed in those cases, the interests of the U.S. government and Proposed Intervenors are "not identical." *Alpha Ctr.*, 213 F. App'x at 510. The government's interests include "securing an expansive interpretation of executive authority." *Texas*, 805 F.3d at 663. The government also represents the interests of federal agencies, including those that assist in enforcing immigration laws. For example, the Final Rule is rooted in broad, institutional interests in "resource allocation, administrability, humanitarian concern, [and] agency convenience." 89 Fed. Reg. at 39395. The government also has an interest in preserving and maximizing its

16

authority in other areas of law. As a result, it may choose not to make certain arguments that could implicate other programs that turn on who is considered lawfully present or certain statutory interpretation arguments in order to avoid bad precedent or avoid being held to certain positions in future lawsuits. And, as occurred with the initial DACA carveout, there may be political considerations entirely unrelated to the ACA or to DACA that may animate the government's legal positions. *See supra* at p. 5 (discussing Makhlouf, *supra*, at 1126-27).

Proposed Intervenors do not share these governmental interests and are instead narrowly focused on securing affordable health insurance in a timely way. Proposed Intervenors seek to defend the Final Rule because of the direct, specific benefit they could realize from it, such as insurance that provides coverage for preventative care, prescription medication, and medical intervention regardless of availability of employer-sponsored plans. Moya Lopez Decl. ¶¶ 15-18; Kim Decl. ¶¶ 14-15; Torres Decl. ¶¶ 16-18. Their interests are thus "narrower than the public interest and cannot be subsumed within the broad public interest" represented by the government. *Stenehjem*, 2019 WL 10920631, at *5.

Critically, Proposed Intervenors have a far greater interest than the government in this matters' expeditious resolution. While DACA has been in place for over a decade, Proposed Individual Intervenors and CASA's members are still waiting for affordable healthcare access, as they have been long excluded from purchasing plans on the marketplaces. Moya Lopez Decl. ¶¶ 16-19; Kim Decl. ¶¶ 14-16; Torres Decl. ¶¶ 16-17. Whereas the government is burdened by political and strategic considerations that could impact its timing for seeking various relief in the litigation, Proposed Individual Intervenors' and CASA's members' interest is to move as expeditiously as possible because of their urgent need for affordable healthcare. This delay has already hurt DACA recipients. Escobar Decl. ¶ 11. The Proposed Rule set November 1, 2023, as the target effective

date so DACA recipients could have enrolled in plans that went into effect as early as December 2023. Proposed Rule at 25314. But the government did not even publish the Final Rule until May 2024, and DACA recipients' coverage will not take effect until January 1, 2025. Final Rule at 39393. Simply put, given the different natures of their respective interests, Proposed Intervenors have inadequate "assurance that the [government] will continue to support all the positions taken in" the Final Rule with the same sense of urgency Proposed Intervenors have in the interests at stake. *Mille Lacs*, 989 F.2d at 1001.

Finally, the adequate representation of Proposed Intervenors' interests is particularly vulnerable at this moment because the impending presidential election means they "cannot be assured" the government's current position "will remain static or unaffected by unanticipated policy shifts." *National Parks*, 759 F.3d at 977.

### III.    Proposed Intervenors Also Meet the Permissive Intervention Requirements

Because Proposed Intervenors meet the standard for mandatory intervention, this Court need not consider permissive intervention under Rule 24(b). Nonetheless, to the extent this Court reaches that issue, the Court should allow intervention under Rule 24(b). This Court may utilize its discretion to grant permissive intervention when the proposed intervenor can show "(1) an independent ground for jurisdiction, (2) timeliness of the motion, and (3) that the applicant's claim or defense and the main action have a question of law or fact in common." *Flynt v. Lombardi*, 782 F.3d 963, 966 (8th Cir. 2015). The "principal consideration" is whether the proposed intervention would unduly delay or prejudice the adjudication of the original parties' rights. *Stenehjem*, 2019 WL 10920631, at *6; *see also* Fed. R. Civ. P. 24(b)(3).

These factors are easily met because Proposed Intervenors have standing, *see supra* at pp. 8-12, and the case involves a federal question, 28 U.S.C. § 1331. Further, there is no danger of prejudice, *see supra* at pp. 12-13. And because Proposed Intervenors seek to defend the lawfulness

of the Final Rule against the States' challenge, their defense plainly has a "question of law or fact in common" with the "main action."  *Flynt*, 782 F.3d at 966.

The Court should use its discretion to permit intervention here because Proposed Intervenors will significantly contribute to the full development of the relevant facts at issue, including the need for, and resulting public benefit of, the Final Rule.  *Texas v. United States,* 2023 WL 3025080, at *4 (S.D. Tex. Apr. 20, 2023) (proposed intervenors who were direct participants in the challenged program would bring important perspectives and substantial expertise).  Proposed Individual Intervenors will help explain what it has meant for DACA recipients not to be able to access the health insurance marketplaces—which is directly relevant to the equitable factors this Court must consider in deciding the pending motion for a preliminary injunction.  And CASA will also "bring a wealth of experience in observing the direct impact of immigration regulations on individuals as opposed to political entities," since its members and clients are the individuals subject to the challenged policy.  *Texas v. United States*, 2021 WL 411441, at *4 (S.D. Tex. Feb. 6, 2021) (granting intervention of membership and legal services organization).  CASA's deep familiarity with the issues at the heart of this lawsuit is precisely the type of unique expertise that would aid the Court in developing the factual record.  Counsel for Proposed Intervenors has significant experience in this area as well.  For example, Gibson Dunn represented intervenors before the Supreme Court in *Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1 (2020), where the Supreme Court held DHS' decision to rescind DACA was arbitrary and capricious, and NILC represented DACA recipients in *Arizona Dream Act Coalition v. Brewer*, 855 F.3d 957 (9th Cir. 2017), which involved questions about the status of DACA recipients under federal law.

In a recent challenge to another immigration policy, the court granted permissive

intervention where (1) the motion, filed early in the case months before the trial date, was timely; (2) proposed intervenors' defense of the challenged immigration program shared questions of law and fact with the main action; (3) there was no undue prejudice or delay where the matter was still in the early stages of litigation and intervention would not disrupt the briefing schedule; and (4) proposed intervenors' interests were not adequately represented by the federal government defendants, who despite sharing a goal of maintaining the at-issue program, had to balance that against the federal government's interest in its immigration enforcement measures. *Texas*, 2023 WL 3025080 at *2-4. The relevant factors in this case are materially indistinguishable. *See also Texas*, 2021 WL 411441 at *2-4 (another materially similar grant of permissive intervention).

Thus, to the extent the Court does not grant mandatory intervention, it can and should grant Proposed Intervenors' request for permissive intervention.

## CONCLUSION

Proposed Intervenors respectfully request that the Court grant them intervention.

Date: September 20, 2024                    Respectfully submitted,

                                           /s/ Matthew S. Rozen

Nicholas Espiritu*                         Matthew S. Rozen (VA Bar No. 85871)
espiritu@nilc.org                          John Matthew Butler (D.C. Bar No.
Gabrielle Lessard*                         1721350)
Lessard@nilc.org                           GIBSON, DUNN & CRUTCHER LLP
Tanya Broder*                              1050 Connecticut Avenue, N.W.,
broder@nilc.org                            Washington, D.C. 20036
NATIONAL IMMIGRATION LAW                   mrozen@gibsondunn.com
CENTER                                     mbutler@gibsondunn.com
3450 Wilshire Blvd.                        Telephone: 202.955.8500
Suite 108 – 62                             Facsimile: 202.467.0539
Los Angeles, CA 90010
Telephone: 213.639.3900                    Betty X. Yang (TX Bar No. 24088690)
Facsimile: 213.639.3911                    byang@gibsondunn.com
                                           GIBSON, DUNN & CRUTCHER LLP
Joanna E. Cuevas Ingram*                   2001 Ross Avenue Suite 2100
cuevasingram@nilc.org                      Dallas, Texas 75201
Hilda Bonilla*                             Telephone: 214.698.3100
bonilla@nilc.org                           Facsimile: 214.571.2900
NATIONAL IMMIGRATION LAW
CENTER
P.O. Box 34573
Washington, DC 20043
Telephone: 202.216.0261
Facsimile: 202.216.0266
                                           *Pro hac vice forthcoming

                                           Attorneys for Proposed Intervenors

## CERTIFICATE OF SERVICE

I hereby certify that on September 20, 2024, I filed the foregoing memorandum of law using the Court's CM/ECF system, which will send a notice of the filing to counsel for all parties.

/s/   *Matthew S. Rozen*
Matthew S. Rozen