**UNITED STATES DISTRICT COURT**
**DISTRICT OF NORTH DAKOTA**
**WESTERN DIVISION**

| | |
|---|---|
| **The State of KANSAS,** *et al.*, | |
| *Plaintiffs*, | |
| **v.** | **CIVIL ACTION NO. 1:24-cv-00150-DMT-CRH** |
| **UNITED STATES OF AMERICA and the CENTERS FOR MEDICARE & MEDICAID SERVICES,** | |
| *Defendants*. | |

## PROPOSED DEFENDANT-INTERVENORS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO TRANSFER FOR IMPROPER VENUE

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

BACKGROUND ........................................................................................................... 4

    I.      The Affordable Care Act ...................................................................... 4

    II.     DACA Recipients' Access to ACA Marketplaces................................... 5

    III.    Procedural History ............................................................................... 6

LEGAL STANDARD.................................................................................................... 7

ARGUMENT ............................................................................................................... 8

    I.      North Dakota Lacks Article III Standing ................................................ 8

         A.     North Dakota Cannot Establish Standing By Alleging That The
                Final Rule Will Cause Some Of Its 130 DACA Recipient
                Residents To Remain In The State And Impose Costs On The State ....... 10

         B.     Plaintiff States Fail To Plausibly Allege That The Final Rule Will
                Injure North Dakota Through Public Expenditures Related To An
                Influx Of Undocumented Immigrants........................................................ 16

         C.     The Court Owes North Dakota's Standing Claims No "Special
                Solicitude"................................................................................................ 17

    II.     Without North Dakota As A Plaintiff, Venue Is Improper................................. 19

    III.    This Court Should Transfer This Case To the District of Columbia .................... 19

CONCLUSION.............................................................................................................. 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Arizona v. Biden*,
   40 F.4th 375 (6th Cir. 2022) ...................................................................................11, 12, 18

*Arpaio v. Obama*,
   797 F.3d 11 (D.C. Cir. 2015) .....................................................................................17

*Associated Gen. Contractors of Am., Inc. v. Fed. Acquisition Regul. Council*,
   2024 WL 1078260 (W.D. La. Mar. 12, 2024) ...........................................................19

*Braitberg v. Charter Commc'ns, Inc.*,
   836 F.3d 925 (8th Cir. 2016) ..............................................................................13, 16

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ....................................................................................................9

*Cohen v. Newsweek, Inc.*,
   312 F.2d 76 (8th Cir. 1963) .........................................................................................8

*Ctr. for Biological Diversity v. Spellmon*,
   2022 WL 3541879 (D. Mont. Aug. 18, 2022) ...........................................................19

*Florida v. Mellon*,
   273 U.S. 12 (1927) ....................................................................................................16

*FTC v. BINT Operations LLC*,
   595 F. Supp. 3d 740 (E.D. Ark. 2022) ........................................................................8

*Hawse v. Page*,
   7 F.4th 685 (8th Cir. 2021) .........................................................................................9

*Inst. of Certified Pracs., Inc. v. Bentsen*,
   874 F. Supp. 1370 (N.D. Ga. 1994) .....................................................................9, 19

*Kaiser v. Imperial Oil of N.D., Inc.*,
   2023 WL 3626463 (D.N.D. May 24, 2023) ...........................................................7, 20

*King v. Burwell*,
   576 U.S. 473 (2015) ....................................................................................................4

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ........................................................................................9, 12, 18

*Massachusetts v. EPA*,
   549 U.S. 497 (2007) .............................................................................................17, 18

*Maybelline Co. v. Noxell Corp.*,
   813 F.2d 901 (8th Cir. 1987) .......................................................................................1

*Morehouse Enterprises, LLC v. ATF,*
  78 F.4th 1011 (8th Cir. 2023) ...................................................................................11

*Proctor & Gamble Co. v. Ranir, LLC,*
  2017 WL 3537197 (S.D. Ohio Aug. 17, 2017).........................................................7

*Spokeo, Inc. v. Robins,*
  578 U.S. 330 (2016)..............................................................................................8, 9

*State v. Biden,*
  52 F.4th 362 (8th Cir. 2022), *cert. denied,* 144 S. Ct. 278 (2023).....................2, 19

*In re SuperValu, Inc.,*
  870 F.3d 763 (8th Cir. 2017) ...................................................................................12

*Texas v. United States,*
  549 F. Supp. 3d 572 (S.D. Tex. 2021) .....................................................................12

*TransUnion LLC v. Ramirez,*
  594 U.S. 413 (2021) ...................................................................................................8

*United States v. Texas,*
  143 S. Ct. 1964 (2023)..................................................................................2, 11, 18

*Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas,*
  5 F.4th 997 (9th Cir. 2021) .................................................................................16, 17

*Woodke v. Dahm,*
  70 F.3d 983 (8th Cir. 1995) .......................................................................................7

**Statutes**

8 U.S.C. § 1611 ...............................................................................................................5

28 U.S.C. § 1391 .......................................................................................3, 8, 9, 19, 20

28 U.S.C. § 1406 ...............................................................................1, 3, 7, 8, 9, 19

42 U.S.C. § 18001 ...........................................................................................................4

42 U.S.C. § 18021 ...........................................................................................................4

42 U.S.C. § 18031 ...........................................................................................................4

42 U.S.C. § 18032 ...........................................................................................................5

42 U.S.C. § 18041 ...........................................................................................................4

42 U.S.C. § 18071 ...........................................................................................................5

**Other Authorities**

*Consideration of Deferred Action for Childhood Arrivals (DACA)*, USCIS,
  tinyurl.com/3y4m9dum..............................................................................................16

Federation for American Immigration Reform, *The Fiscal Burden of Illegal Immigration on United States Taxpayers 2023* (Mar. 8, 2023), tinyurl.com/yzdh3rvk ........................................................................................14

*How long is a N.D. driver's license valid?*, N.D. Highway Patrol, tinyurl.com/3895pbhv ........................................................................................15

Memorandum to Field Leadership from Donald Neufeld, Acting Associate Director, USCIS Office of Domestic Operations, *Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act, at 42* (May 6, 2009)..........................................5

*Number of Form I-821D Requests by Intake and Case Status by Fiscal Year*, USCIS (Aug. 15, 2012 - Sept. 30, 2022), tinyurl.com/48up9w9v....................15

Off. of the Att'y Gen. of Kan., Comment Letter on Docket No. CMS-9894-P (June 23, 2023)..................................................................................................6

*State Health Insurance Marketplace Types, 2024*, Kaiser Family Found., tinyurl.com/36zxbbvn ..........................................................................................4

U.S. Citizenship and Immigration Services, Frequently Asked Questions, tinyurl.com/265wfp94 ..........................................................................................5

**Rules**

Fed. R. Civ. P. 12(b)(3)..........................................................................................7

**Treatises**

14D Wright & Miller, Federal Practice and Procedure, § 3826 (4th ed.)......................................8

14D Wright & Miller, Federal Practice & Procedure § 3815 (4th ed.) .........................................19

**Regulations**

8 C.F.R. § 1.3(a)(4)(vi) ..........................................................................................5

45 C.F.R. § 152.2(4)(vi)..........................................................................................5

77 Fed. Reg. 52,614 (Aug. 30, 2012)......................................................................5

88 Fed. Reg. 25,313 (April 26, 2023)......................................................................6

89 Fed. Reg. 39,392 (May 8, 2024) ...........................................................1, 6, 13, 15

**INTRODUCTION**

Plaintiff State of North Dakota joins eighteen other States (collectively, the "Plaintiff States") in bringing this lawsuit challenging a final rule, 89 Fed. Reg. 39392 (May 8, 2024) ("Final Rule"), that permits individuals granted deferred action, including Deferred Action for Childhood Arrivals ("DACA") recipients, to purchase health insurance through the marketplaces established under the Affordable Care Act ("ACA"). The Plaintiff States chose this Court—the District of North Dakota—as the venue for this litigation based upon North Dakota's participation in this lawsuit. But unlike several of the other Plaintiff States, North Dakota does not operate a state-based ACA health insurance marketplace—it uses the marketplace run by the federal government. *See* First Amended Complaint ("FAC"), ECF No. 27 ¶ 21. And as the Plaintiff States acknowledge, North Dakota has just 130 DACA recipients in the entire state—the fewest of any Plaintiff State except Montana. FAC ¶ 45. Because North Dakota cannot plausibly allege—much less prove—that it will suffer any injury whatsoever from allowing this miniscule number of its residents to purchase health insurance on the federal ACA marketplace, it lacks Article III standing and any possible legal interest in this case. Without Article III standing, Plaintiff States cannot rely on North Dakota's participation in this lawsuit to establish venue in this District. Therefore, pursuant to 28 U.S.C. § 1406(a), this case must either be dismissed or transferred to an appropriate venue.

As a preliminary matter, this issue must be decided *before* this Court rules on the Plaintiff States' pending motion to preliminarily enjoin the Final Rule, ECF No. 35. *See, e.g., Maybelline Co. v. Noxell Corp.*, 813 F.2d 901, 907 (8th Cir. 1987) (reversing preliminary injunction where district court erred in denying motion to dismiss or transfer for improper of venue). North Dakota's asserted interest in this lawsuit borders on the absurd. North Dakota does not administer its own

state-run ACA marketplace, so the Plaintiff States do not claim that the Final Rule requires North Dakota to do *anything* at all. Instead, their principal theory is that in the absence of the Final Rule, some untold number of DACA recipients might leave the state, sparing the state from the costs of certain services—like publicly funded education—that those individuals may or may not actually consume. That theory runs headlong into recent, controlling Supreme Court precedent recognizing that a federal policy's "indirect effects on state revenues or state spending" is far too "attenuated" of an injury to satisfy Article III. *United States v. Texas*, 143 S. Ct. 1964, 1972 n.3 (2023); *accord State v. Biden*, 52 F.4th 362, 369 (8th Cir. 2022), *cert. denied,* 144 S. Ct. 278 (2023) (finding states' monetary injury far too attenuated to establish standing to challenge federal action). Here, North Dakota fails to show that any alleged injuries are concrete or even caused by the Final Rule.

Plaintiff States have offered no proof whatsoever establishing that even a single additional DACA recipient in North Dakota who would otherwise have left the country will remain in North Dakota because of the Final Rule. Plaintiff States are thus left with generalized allegations—about the incentives the Final Rule might create for other noncitizens to enter the country—that courts repeatedly have rejected as a basis for establishing Article III standing.

The tenuousness of North Dakota's interest in the case raises serious questions about the Plaintiff States' motive for suing in this venue. Bismarck, North Dakota, where this Court sits, is 1,300 miles from Washington, D.C., where Defendants Centers for Medicare & Medicaid Services ("CMS") and the U.S. government maintain their principal offices, and is a nearly 600-mile journey from the addresses listed in the signature block for fourteen out of the eighteen Plaintiff States (excepting North Dakota itself). It is not centrally located among the Plaintiff States—and indeed is more than 1,440 miles from counsel's office for the farthest Plaintiff State, New Hampshire. Neither the parties' Joint Motion for Entry of Proposed Briefing Schedule and

Extension of Page Limits, *see* ECF No. 42, at 2, nor their Joint Notice of Availability and Motion for Oral Argument, *see* ECF No. 43, at 2, lists North Dakota's counsel as taking the lead in this litigation. These facts would support a discretionary transfer of venue to a different forum under 28 U.S.C. § 1404(a). But there is no need to invoke this Court's discretionary authority because North Dakota's lack of standing means that venue in this Court is improper under 28 U.S.C. § 1391(e), and dismissing this suit or transferring it to another venue is mandatory under 28 U.S.C. § 1406(a).

That leaves the question of whether to dismiss or transfer. The better course here is to transfer to the U.S. District Court for the District of Columbia. There is no dispute that venue in that court would be proper under 28 U.S.C. § 1391(e)(1)(A) because both Defendants reside in Washington, D.C. By contrast, serious questions exist about whether any of the Plaintiff States has Article III standing and thus whether venue would be proper under § 1391(e) in any other district based solely on the residency of one of the Plaintiff States. Further, transferring to the District of Columbia would be particularly appropriate given its proximity to Virginia—the Plaintiff State with the largest DACA population among the three Plaintiff States that operate their own state-run ACA marketplaces and that at least purports to allege unique injuries distinct from the generalized and meritless injury theories pleaded by North Dakota. Finally, the District of Columbia is a convenient venue for all parties. Defendants both reside there. Two of the three Individual Intervenors—Claudia Moya Lopez and Hyun Kim—live in Virginia, and Intervenor CASA, Inc. has multiple locations in Maryland and Virginia. Counsel for Defendants and Intervenors reside and maintain offices there as well. Finally, the District of Columbia is also closer than this Court to a majority of the Plaintiff States. Accordingly, this Court should transfer this case to the U.S. District Court for the District of Columbia pursuant to 28 U.S.C. § 1406(a).

## BACKGROUND

### I.        The Affordable Care Act

Congress passed the ACA in 2010 with a goal of providing broad access to health insurance.  *See* 124 Stat. 119 (2010) (codified as 42 U.S.C. § 18001 *et seq.*).  One of the most important ways the ACA accomplished this goal was by establishing online health insurance marketplaces where consumers can compare and buy Qualified Health Plans.  42 U.S.C. §§ 18021, 18031, 18041.  Plans in the marketplace provide minimum essential coverage, which includes access to preventive medicine, makes prescription drugs more affordable, and helps to pay for covered medical expenses and emergency services.  *Id.* §§ 18021-22.

Under the ACA, each state is required to create a marketplace—sometimes called an "Exchange"—where qualifying individuals can compare and purchase insurance plans.  *See* 42 U.S.C. § 18031(b), (d); *King v. Burwell*, 576 U.S. 473, 473 (2015).  States have the option to create and operate their own marketplace.  *See* 42 U.S.C. § 18031(c)(1).  If they choose not to do so, the federal government will establish and operate "such Exchange" in their stead.  *See id.* §§ 18031, 18041.  The federal government funds subsidies available to income-qualifying individuals purchasing Qualified Health Plans on both state-based marketplaces and the federally-facilitated marketplace.  FAC ¶¶ 26, 85.

To date, twenty-one states have created their own state-based marketplaces, and twenty-nine have opted to use the federally-facilitated marketplace.  *See State Health Insurance Marketplace Types, 2024*, Kaiser Family Found., tinyurl.com/36zxbbvn (listing states in both categories).  Only three of the Plaintiff States—Virginia, Iowa, and Kentucky—run their own marketplaces.  *See id.*  The rest, by contrast—including North Dakota—use the federally-facilitated marketplace.  *See* FAC ¶¶ 46-48.

To achieve its goal of broad access to health insurance, the ACA permits nearly any noncitizen who is "lawfully present" in the United States to purchase and enroll in a marketplace plan.  42 U.S.C. § 18032(f)(3).  The ACA does not define "lawfully present," aside from noting that individuals should be "reasonably expected to be [lawfully present] for the entire period of enrollment."  *Id.* § 18071(e)(2); *accord id.* § 18032(f)(3).  Before the ACA was adopted, the Department of Homeland Security ("DHS") and its predecessors consistently interpreted the same phrase in other statutes, *e.g.*, 8 U.S.C. § 1611(b)(2), to include all persons granted "deferred action," 8 C.F.R. § 1.3(a)(4)(vi).  From the outset of the ACA's implementation, therefore, CMS interpreted the phrase consistently with prior usage and thus provided by regulation that all persons granted "deferred action" were eligible to purchase health insurance through these marketplaces under the ACA.  45 C.F.R. § 152.2(4)(vi) (2024).

## II.    DACA Recipients' Access to ACA Marketplaces

In 2012, DHS announced DACA, which was intended to allow immigration enforcement forbearance identical to other deferred action.  U.S. Citizenship and Immigration Services ("USCIS"), Frequently Asked Questions, tinyurl.com/265wfp94.  Because DACA recipients were granted "deferred action," they were treated as "lawfully present" in multiple contexts that define that term to include deferred action recipients.  *See, e.g.*, 8 C.F.R. § 1.3(a)(4)(vi) (Social Security benefits); Memorandum to Field Leadership from Donald Neufeld, Acting Associate Director, USCIS Office of Domestic Operations, *Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act, at 42* (May 6, 2009) (nonaccrual of unlawful presence for 8 U.S.C. § 1182(a)(9) inadmissibility).  In August 2012, however, CMS issued a regulation arbitrarily excluding only DACA recipients from the regulatory definition of "lawfully present."  *See* Pre-Existing Condition Insurance Plan Program, 77 Fed. Reg.

52,614 (Aug. 30, 2012). DACA recipients, unlike others granted deferred action, were thus denied the chance to purchase health insurance plans in ACA marketplaces.

In April 2023, CMS announced a proposed rule to better "effectuate congressional intent in the ACA" to increase access to health coverage. *See* 88 Fed. Reg. 25,313, 25,316/2 (April 26, 2023) ("Proposed Rule"). The Proposed Rule sought to restore the original understanding and intent of the ACA by restoring access to the ACA marketplaces to all noncitizens "lawfully present" in the United States, including all those subject to deferred action like DACA recipients, noting that "there was no statutory mandate to distinguish between recipients of deferred action under the DACA policy and other deferred action recipients." Proposed Rule, 88 Fed. Reg. at 25316/3. The Attorneys General of several States, including thirteen Plaintiff States, filed a comment letter opposing the Proposed Rule, but North Dakota did not sign on. *See* Off. of the Att'y Gen. of Kan., Comment Letter on Docket No. CMS-9894-P (June 23, 2023). CMS published the Final Rule on May 8, 2024, providing that DACA recipients will be eligible to purchase health insurance plans on ACA marketplaces during the upcoming enrollment period for 2025, which begins November 1, 2024. *See* Final Rule, 89 Fed. Reg. at 39,392-93.

## III.   Procedural History

After the Final Rule was issued, North Dakota and fourteen other Plaintiff States filed this lawsuit on August 8, 2024, to challenge the Final Rule. ECF No. 1. On August 28, Plaintiff States filed an Amended Complaint, naming four additional states as plaintiffs (Arkansas, Florida, Kentucky, Texas). ECF No. 27. In the Amended Complaint, the three States that operate their own state-run ACA marketplaces (Virginia, Idaho, and Kentucky) claimed Article III standing based on the supposed "additional administrative and resource burdens" of accommodating DACA recipients in the marketplaces they operate. FAC ¶ 49. The remaining Plaintiff States, by contrast, based their Article III standing primarily on speculation that they will face greater costs associated

with providing public services to undocumented individuals generally, without specifying costs specifically or directly incurred by or linked to DACA recipients, if the Final Rule somehow dissuades some unspecified number of those individuals from leaving the United States.  FAC ¶¶ 52-66.

On August 30, 2024, Plaintiff States, led by counsel for Kansas, moved for a stay of the proposed rule and a preliminary injunction.  ECF No. 35.  In support of their preliminary injunction motion, Plaintiff States included two declarations—one from a former Kentucky official who explained the purported burdens of allowing DACA recipients to use the state-run marketplace, ECF No. 35-2, and one from a purported expert on "the fiscal, economic, and demographic impact of immigration in the United States," ECF No. 35-1, ¶ 1.  On September 9, 2024, counsel for Kansas and Defendants' counsel filed a joint motion for oral argument on the preliminary injunction, ECF No. 43, which the Court granted and scheduled for October 15, ECF No. 44.

## LEGAL STANDARD

Under 28 U.S.C. § 1406(a), if venue is improper, the Court must either dismiss the case or, "if it be in the interest of justice," transfer the case to a district in which it could have been brought originally.  28 U.S.C. § 1406(a); Fed. R. Civ. P. 12(b)(3).  "[G]enerally the interest of justice requires a transfer of venue instead of dismissal."  *Kaiser v. Imperial Oil of N.D., Inc.*, 2023 WL 3626463, at *5 (D.N.D. May 24, 2023).

The question of improper venue must be decided "prior to addressing the merits of any claim, including a preliminary injunction."  *Proctor & Gamble Co. v. Ranir, LLC*, 2017 WL 3537197, at *4 (S.D. Ohio Aug. 17, 2017) (collecting authorities).  "One of the central purposes of statutory venue is to ensure that a defendant is not 'haled into a remote district, having no real relationship to the dispute.'"  *Woodke v. Dahm*, 70 F.3d 983, 985 (8th Cir. 1995).  The plaintiff, upon a motion by defendant challenging venue, bears the burden to establish that venue is proper.

*See FTC v. BINT Operations LLC*, 595 F. Supp. 3d 740, 754 (E.D. Ark. 2022) (citing *Cohen v. Newsweek, Inc.*, 312 F.2d 76, 78 (8th Cir. 1963)); *see also* 14D Wright & Miller, Federal Practice and Procedure, § 3826 (4th ed.) ("when the defendant has made a proper objection, the burden is on the plaintiff to establish that the chosen district is a proper venue").

## ARGUMENT

This Court should transfer this case to the U.S. District Court for the District of Columbia pursuant to 28 U.S.C. § 1406(a). As the Plaintiff States recognize, venue in this action is governed by 28 U.S.C. § 1391(e). FAC ¶ 22. That statute provides that a civil action in which the defendant is an agency of the United States or an official acting in his official capacity may be brought "in any judicial district in which (A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated, or (C) the plaintiff resides if no real property is involved in the action." 28 U.S.C. § 1391(e). Here, Plaintiff States rely on Plaintiff North Dakota's residency in this District as the basis for venue. *See* FAC ¶ 22. But because North Dakota lacks Article III standing to bring its claims, venue is accordingly improper, and this Court must either dismiss this case or transfer it to a proper venue. 28 U.S.C. § 1406(a). Here, because venue is clearest in the District of Columbia and litigating the case in that district would be most convenient for the parties, the Court should transfer this case to the U.S. District Court for the District of Columbia.

## I.     North Dakota Lacks Article III Standing

"As the party invoking federal jurisdiction, the plaintiffs bear the burden of demonstrating that they have standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430-31 (2021). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). A plaintiff must demonstrate its standing "in

the same way as any other matter on which the plaintiff bears the burden of proof." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  At the pleadings stage, a plaintiff thus must allege facts sufficient to establish "a concrete and particularized, actual or imminent invasion of a legally protected interest." *Id.* at 555.  "[T]o survive a motion to dismiss for lack of jurisdiction, a plaintiff must allege sufficient factual matter, accepted as true, to support a reasonable and plausible inference that she satisfies the elements of Article III standing." *Hawse v. Page*, 7 F.4th 685, 688-89 (8th Cir. 2021).  Similarly, to oppose a § 1406(a) motion to dismiss or transfer based on a resident plaintiff, *see* 28 U.S.C. § 1391(e)(3), a plaintiff must plausibly allege Article III standing for at least one resident plaintiff because it "cannot manufacture venue by adding [an individual without Article III standing] as a party." *Inst. of Certified Pracs., Inc. v. Bentsen*, 874 F. Supp. 1370, 1372 (N.D. Ga. 1994).

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339.  "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).  When "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation," it is "substantially more difficult to establish" standing because "causation and redressability ordinary hinge on the response of the regulated … third party." *Lujan*, 504 U.S. at 562.  At the pleadings stage, "it becomes the burden of the plaintiff to [plead] facts showing that [the] choices [made by the third party in response to the regulation] have been or will be made in such manner as to produce causation and permit redressability of injury." *Lujan*, 504 U.S. at 562.

Here, Plaintiff States allege two theories of alleged injury for States that, like North Dakota, do not run their own ACA marketplaces, *see* FAC ¶¶ 46-48.  ***First***, Plaintiff States allege that, because subsidized health insurance through ACA marketplaces is "a valuable public benefit," the Final Rule will "encourage[]" DACA recipients "to remain in the United States" and, consequently, force States like North Dakota "to expend additional education, healthcare, law enforcement, public assistance, and other limited resources."  *Id.* ¶¶  52, 56.  In particular, Plaintiff States claim that DACA recipients are entitled to receive driver's licenses, and that issuing those licenses can come "at a net cost to the State."  *Id.* at ¶¶ 57-58.  ***Second***, Plaintiff States allege that the mere "availability of ACA coverage" for DACA recipients "will encourage some amount of additional illegal immigration by those believing they or their family members will be eligible for DACA in the future," which will impose costs on Plaintiff States as those "illegal aliens" settle in their States.  *Id.* ¶¶ 66-85.  Neither theory provides a valid basis for North Dakota to establish Article III standing.

## A. North Dakota Cannot Establish Standing By Alleging That The Final Rule Will Cause Some Of Its 130 DACA Recipient Residents To Remain In The State And Impose Costs On The State

The Plaintiff States first allege that the Final Rule will injure North Dakota by making it more likely that "aliens who would otherwise have returned to their countries of origin" instead will remain in North Dakota.  FAC ¶ 55.  They further claim that this will thus lead North Dakota to "suffer fiscal costs" that it otherwise may have saved had the DACA recipients not decided to remain in the United States to receive health insurance.  *Id.* ¶ 56.  Among these costs, the Amended Complaint lists "education, healthcare, law enforcement, [and] public assistance."  *Id.* ¶¶ 56-62.  But these alleged injuries are too diffuse and generalized to satisfy the injury-in-fact element of Article III standing for *any* State.  And that is especially true for North Dakota because—by its own admission—only 130 DACA recipients even reside in the State.

1.      As the Supreme Court recently warned, "federal policies frequently generate indirect effects on state revenues or state spending," but such generalized impacts are too "attenuated" to provide standing to sue. *Texas*, 143 S. Ct. at 1972 n.3. After all, were such "peripheral costs on a State" sufficient to create Article III standing, "what limits on state standing [would] remain?" *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022). As Judge Sutton explained in evaluating several States' challenge to DHS's immigration enforcement priorities, "the States' boundless theory of standing—in which all peripheral costs imposed on States by actions of the President create a cognizable Article III injury—would allow them to challenge a 'disagreeable war.'" *Id.* That is not the law, so the Plaintiff States are wrong to rely on these peripheral costs.

The Eighth Circuit has similarly rejected "vague and speculative" injuries as insufficient to confer Plaintiff States with Article III standing to challenge a regulation. In *Morehouse Enterprises, LLC v. ATF*, for example, it held that several States lacked Article III standing to challenge a gun regulation because their alleged harms—"fewer firearms in circulation and therefore less crime deterrence," frustration of "state firearm policy," and a decrease in "state tax revenue" from firearm dealers closing—were "vague and speculative." 78 F.4th 1011, 1017 n.5 (8th Cir. 2023). The harms alleged here are the same type of downstream generalized costs that proved too "vague and speculative" to establish standing in *Morehouse*.

Moreover, even if the harms alleged by Plaintiff States were legally cognizable, they cannot establish causation or an imminent injury in fact. In other words, the Supreme Court has explained, "[w]hen, ... as in this case, a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*"—here, DACA recipients residing in North Dakota—standing is "'substantially more difficult' to establish" because, "[i]n that circumstance, causation and redressability ordinarily hinge on the response of the ... third party to

the government action or inaction." *Lujan*, 504 U.S. at 562; *see Arizona*, 40 F.4th at 383.  To meet this high bar, plaintiffs bear the burden to "adduce facts showing that those [third party] choices [in response to the government action or inaction] have been or will be made in such manner as to produce causation and permit redressability of injury." *Lujan*, 504 U.S. at 562.  And, "a mere possibility is not enough for standing"—the Eighth Circuit has explained that plaintiffs must provide "detailed factual support for plaintiffs' allegations of future injury," such as that alleged here. *In re SuperValu, Inc.*, 870 F.3d 763, 769, 771 (8th Cir. 2017); *see also id.* at 770 (concluding that plaintiff's allegation that his financial information was involved in a data breach is not sufficient to establish a substantial risk of identity theft for purposes of Article III standing).

Here, the Plaintiff States have failed to allege facts sufficient to demonstrate that North Dakota will incur any injury at all.  They merely offer the conclusory assertion that "[i]t is likely that aliens who would otherwise have returned to their countries of origin will instead remain in the United States because of the eligibility for ACA coverage provided by the Final Rule." FAC ¶ 55.  But this theory of harm based upon a speculative decrease in the attrition rate of DACA recipients ignores the reality of the policy.  DACA has been in place since 2012, but new applications have been frozen since July 16, 2021, by order of the Southern District of Texas. *Texas v. United States*, 549 F. Supp. 3d 572, 624 (S.D. Tex. 2021).  Current DACA recipients thus all received DACA before 2021.  Because eligibility for DACA, in turn, requires an individual to have resided in the country for at least five years prior to June 5, 2012, *id.* at 578, every current DACA recipient in the country must have resided in the country continuously since at least 2007, even though none of those DACA recipients has been permitted to purchase health care on the ACA marketplaces to date.

The Plaintiff States' attrition theory thus depends on the dubious, and at best speculative, assumption that DACA recipients who have already chosen to remain in the country for at least the past seventeen years without access to the ACA marketplaces will leave the country imminently unless granted the right to access the marketplace for the first time. Not only that, but the theory further presumes that these individuals will leave the country in sufficient numbers to materially alter the Plaintiff States' spending on public services. In support of this far-fetched theory, the Plaintiff States offer nothing but speculation. But such "a speculative or hypothetical risk is insufficient." *Braitberg v. Charter Commc'ns, Inc.*, 836 F.3d 925, 930 (8th Cir. 2016).

**2.** Even if the Plaintiff States' attrition theory were legally cognizable in theory, it makes no sense as applied to North Dakota given the vanishingly small size of its population of DACA recipients. Only 130 DACA recipients reside in North Dakota. FAC ¶ 45. And only a fraction of these DACA recipients may benefit from the Final Rule, if at all. According to the Final Rule, 27% of DACA recipients nationally are uninsured. 89 Fed. Reg. at 39,425/2. The Final Rule further assumes that only "70 percent of this group will opt to enroll in the Exchanges," *id.* at 39,428/1, meaning that CMS assumes 19% of DACA recipients will enroll. This is only an assumption, made by CMS for purposes of preparing a rough estimate of the Final Rule's costs. *Id.* And Plaintiff States have not made any allegation—much less offered evidence—about the percentage of DACA recipients nationwide or in North Dakota specifically that will purchase health insurance on the ACA marketplaces if the Final Rule is allowed to take effect. But even assuming *arguendo* that 19% of North Dakota's 130 DACA recipients will enroll in the ACA marketplace, that amounts to fewer than 25 enrollees across the State.

There is no evidence whatsoever that a single one of those 25 hypothetical enrollees would have left North Dakota in the absence of the Final Rule. If anything, the Plaintiff States' own

evidence suggests otherwise.  A study linked in the Amended Complaint asserts that 15.5 million of what the study disparagingly calls "illegal alien[s]" were present in the United States as of 2022. *See* Federation for American Immigration Reform, *The Fiscal Burden of Illegal Immigration on United States Taxpayers 2023*, at 5 (Mar. 8, 2023), tinyurl.com/yzdh3rvk; *see also* FAC ¶ 67.  Of those 15.5 million, a declaration submitted in support of the Plaintiff States' preliminary injunction motion asserts that from 2010 to 2018, just 305,000—or less than 5%—left the country voluntarily. Dkt. 35-1, at 4.  Even assuming that the same departure rate applies to DACA recipients, that would amount to approximately ***one*** departure by a DACA recipient from North Dakota ***per decade***.  And in reality, the departure rate is likely lower for DACA recipients given that:  (1) they are better situated than other noncitizens who the Plaintiff States' sources characterize as "illegal" because DACA recipients have been granted deferred action and, in many cases, also work authorization; (2) DACA recipients have resided in the United States since childhood and have deep ties to this country; and (3) every DACA recipient already in the United States has already been present for at least the past seventeen years, and thus shown an intention to remain in the United States for an extended period of time.  It is doubtful, therefore, that even a single DACA recipient in North Dakota intends to leave the country in the next decade, much less imminently. And it is even more speculative that any DACA recipient in North Dakota who intends to leave the country imminently would be deterred from doing so by the promise of health insurance— especially when the absence of health insurance to date has not been a sufficient deterrent.

Not only that, it is also speculative whether any additional DACA recipient's presence in North Dakota will impose any cost on the State.  For example, Plaintiff States allege that North Dakota incurs costs issuing driver's licenses to DACA recipients.  FAC ¶¶ 57-58.  But as Plaintiff States acknowledge, DACA recipients are already eligible for driver's licenses, *id.* ¶ 57, meaning

most recipients that would apply for health insurance through an ACA marketplace likely already have a license.  North Dakota requires renewal for noncommercial licenses only every four or six years, *How long is a N.D. driver's license valid?*, N.D. Highway Patrol, tinyurl.com/3895pbhv, and there is no allegation that these rare renewals cost the State anything beyond the fees they then charge drivers for renewal.  North Dakota's other alleged savings—including funding public education, indigent legal defense, and emergency care for DACA recipients, FAC ¶¶ 59-61—are equally speculative given the miniscule population of uninsured DACA recipients at issue and the lack of evidence that any of them will use any of these services any time soon.

Perhaps recognizing this problem, the Plaintiff States also suggest that these numbers may increase if the Biden Administration were to expand the DACA program and begin accepting new applicants.  FAC ¶¶ 63-64.  But as the Amended Complaint acknowledges, DACA is currently enjoined "in ongoing litigation," *id.* ¶ 63.  North Dakota cannot base its standing on the possibility that this injunction, in wholly separate legal proceedings, will be lifted.  And, even if the injunction were lifted, there is a limited population of DACA-eligible individuals.  According to USCIS, as of September 2022, there were 94,655 initial DACA applications pending, *see Number of Form I-821D Requests by Intake and Case Status by Fiscal Year* (Aug. 15, 2012 – Sept. 30, 2022), USCIS, tinyurl.com/48up9w9v, which amounts to less than 20% of the current 545,000 active DACA recipients as of 2023, *see* 89 Fed. Reg. at 39,425/2—equivalent to 26 new DACA recipients in North Dakota, of whom on average (based on the government's estimate), perhaps 5 would benefit from the Final Rule.  Moreover, the number of individuals eligible for DACA who have not yet applied is limited.  Among other things, such individuals would need to have arrived in the United States before the age of 16; continuously resided in the United States since June 15, 2007; and been physically present in the United States on June 15, 2012.  *See Consideration of Deferred*

*Action for Childhood Arrivals (DACA)*, USCIS, tinyurl.com/3y4m9dum.  It is implausible for Plaintiff States to suggest that the number of individuals satisfying these requirements, but who have not yet applied for DACA, is sufficient to significantly impact their public resources.

The remote risk that the Final Rule will cause perhaps one of these DACA recipients to remain in North Dakota and perhaps impose costs on the State is wildly insufficient to establish Article III standing.  *See Florida v. Mellon*, 273 U.S. 12, 18 (1927) (state suffered no judicially cognizable injury where the "anticipated result" of the challenged federal action was "purely speculative, and, at most, only remote and indirect").

### B. Plaintiff States Fail To Plausibly Allege That The Final Rule Will Injure North Dakota Through Public Expenditures Related To An Influx Of Undocumented Immigrants

Plaintiff States' other theory of harm for North Dakota fails for many of the same reasons. Plaintiff States allege that extending access to ACA marketplaces to DACA recipients may increase the number of DACA recipients (or undocumented immigrants seeking DACA) who come to North Dakota, thus increasing the State's public service costs.  FAC ¶¶ 63-66.  But once again, these are "speculative or hypothetical risk[s]" for which North Dakota provides no specific factual support.  *Braitberg*, 836 F.3d at 930.

Courts across the country have thus repeatedly rejected this "enticement theory" of standing "in the context of a challenge to DACA."  *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1014 (9th Cir. 2021).  In *Whitewater Draw*, the Ninth Circuit concluded that several organizations lacked standing to challenge immigration programs, including DACA, for their purported "detrimental effect on the environment."  *Id.* at 1003, 1014.  Plaintiffs argued that they had standing to challenge DACA because it "entices future unlawful entry," leading to population growth and a negative impact on the environment.  *Id.* at 1012, 1014.  The Ninth Circuit rejected this standing theory as overly attenuated and "worthy of Rube Goldberg" because it

"hinge[d] on the unreasonable response of third parties to DACA" without any supporting factual allegations "that DACA caused illegal immigration and … not merely one of the 'myriad economic, social, and political realities' that might influence an alien's decision to 'risk[] life and limb' to come to the United States." *Id.* at 1014-15.

Similarly, the D.C. Circuit rejected Maricopa County Sherrif Joseph Arpaio's suit to enjoin DACA, wherein he argued that he had standing because "deferred action will act as a magnet drawing more undocumented aliens than would otherwise come across the Mexican border into Maricopa County, where they will commit crimes." *Arpaio v. Obama*, 797 F.3d 11, 14 (D.C. Cir. 2015). The D.C. Circuit concluded that, "[e]ven if the causal links in that attenuated chain were adequately alleged …. the law … does not confer standing to complain of harms by third parties the plaintiff expects will act in unreasonable reliance on current governmental policies that concededly cannot benefit those third parties." *Id.* at 20. Indeed, the court noted that it was aware of "no decision recognizing such an attenuated basis for standing." *Id.*

The same issues doom Plaintiff States' "enticement theory" of standing here. Plaintiff States allege that "the availability of ACA coverage will encourage some amount of additional illegal immigration by those believing they or their family members will be eligible for DACA in the future," resulting in increased costs for states like North Dakota. FAC ¶¶ 66-68. But, as in *Whitewater Draw*, this standing theory is too attenuated because it "rest[s] on the assumption that aliens outside of the United States would learn of [DACA], mistakenly believe they might benefit from [DACA] in the future, and then, relying on their own conjectures, enter the United States unlawfully." 5 F.4th at 1014.

### C. The Court Owes North Dakota's Standing Claims No "Special Solicitude"

Finally, Plaintiff States may argue that, despite the *de minimis* and attenuated nature of their alleged injuries, their claims of standing deserves "special solicitude." *Massachusetts v. EPA*,

549 U.S. 497, 520 (2007).  In *Massachusetts v. EPA*, the Supreme Court held that "States are not normal litigants for the purposes of invoking federal jurisdiction."  549 U.S. at 518.  Rather, where a state seeks to "preserve its sovereign territory"—as Massachusetts did in trying to compel EPA to regulate greenhouse gas emissions—it is "entitled to special solicitude in [the Article III] standing analysis."  *Id.* at 519-20.

This doctrine is a narrow one, however, and since *Massachusetts*, the Supreme Court has never again recognized a State's Article III standing based on "special solicitude."  *Texas*, 143 S. Ct. at 1977 (Gorsuch, J., concurring).  There is good reason for the doctrine's limited adoption.  As Justice Gorsuch explained in *Texas*, "the notion that States enjoy relaxed standing rules has no basis in [the Supreme Court's] jurisprudence," *id.*, and even *Massachusetts* lacked a full analysis of the origin of this doctrine, 549 U.S. at 536 (Roberts, C.J., dissenting) ("support for any such 'special solicitude' is conspicuously absent from the Court's opinion").

Even if this Court were to apply the doctrine here, neither of the key factors that weighed in favor of "special solicitude" for Massachusetts there apply in this case.  *Massachusetts* involved a threatened loss of territory owned and governed by the State, 549 U.S. at 518-19, and attached "critical importance" to the State's "procedural right" under the Clean Air Act to challenge the denial of a petition for a rulemaking, *id.* at 516, 518; *see also Lujan*, 504 U.S. at 572 n.7 ("The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy").  This case, by contrast, involve alleged "indirect fiscal burdens" flowing from the Final Rule, a "humdrum feature of a regulation" that no more affects a sovereign State than a citizen and, thus, not meriting "special solicitude."  *Arizona*, 40 F.4th at 386.  In any event, "even if the States as sovereigns are entitled to some undefined 'special solicitude' in the standing analysis, they still must satisfy the

basic requirements of Article III standing," and as detailed above, like the Plaintiff States in *Biden*, 52 F.4th at 369, North Dakota and Plaintiff States here abjectly fail to do so.

## II.        Without North Dakota As A Plaintiff, Venue Is Improper

Section 1391(e) allows venue for suits against the government only where (A) a defendant resides, (B) the events underlying the claim occurred, or (C) the plaintiff resides.  28 U.S.C. § 1391(e).  Plaintiff States allege that venue is proper in this Court based solely on the third option, that "Plaintiff North Dakota resides in the District."  FAC ¶ 22.  But given that North Dakota does not have Article III standing to bring its claims, it cannot provide a basis for venue.

"When venue is based a plaintiff's residence, that particular plaintiff must have standing to bring the claims asserted."  *Ctr. for Biological Diversity v. Spellmon*, 2022 WL 3541879, at *3 (D. Mont. Aug. 18, 2022); *see also Associated Gen. Contractors of Am., Inc. v. Fed. Acquisition Regul. Council*, 2024 WL 1078260, at *7 (W.D. La. Mar. 12, 2024) (gathering cases).  That well-established rule ensures that "plaintiff cannot manufacture venue by adding … as a party" an entity "lack[ing] standing to bring th[e] action."  *Bentsen*, 874 F. Supp. at 1372.  Otherwise, plaintiffs could easily skirt the venue requirements and engage in forum shopping in every case by arbitrarily naming co-plaintiffs with no Article III standing or interest in the case, just as the Plaintiff States have attempted to do with North Dakota.  Because "venue cannot be based on the joinder of a plaintiff" that has been added "for the purpose of creating venue in the district," 14D Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 3815 (4th ed.), North Dakota's participation here cannot support venue in this Court.

## III.        This Court Should Transfer This Case To the District of Columbia

Because the District of North Dakota is the improper venue for this litigation, this Court must either dismiss this case for improper venue or, "in the interest of justice," transfer it to a proper venue.  *See* 28 U.S.C. § 1406(a).  As this Court has previously recognized, "generally the

interest of justice requires a transfer of venue instead of dismissal." *Kaiser*, 2023 WL 3626463, at *5. Defendants respectfully submit that transfer to the U.S. District Court for the District of Columbia would best promote "[j]ustice and economy," while avoiding the "redundancy of requiring [Plaintiff States] to refile the entire action." *Id.*

The District of Columbia is the only federal court where there is no dispute that venue is proper. Section 1391(e)(1)(A) permits venue in any court where "a defendant in the action resides," 28 U.S.C. § 1391(e)(1)(A), and both Defendants—CMS and the United States—reside in Washington, D.C., where CMS has an office and "is subject to the court's personal jurisdiction" in this matter, *id.* § 1391(c)(2), and the United States has its capital. By contrast, transferring this case to any other venue simply because it lies within one of the other Plaintiff States would simply bog the federal courts down with further litigation over the standing of that State.

Transferring this case to the District of Columbia would also promote judicial efficiency and efficiency for the Parties. Both Defendants reside in Washington, D.C., and three of the four Intervenors are based in either Maryland or Virginia, as are counsel for both Defendants and Intervenors. The District of Columbia is also close to Virginia—the Plaintiff State with the largest DACA population among the three Plaintiff States that operate their own state-run ACA marketplace, FAC ¶ 45, and thus at least purport to allege unique injuries distinct from the meritless injury theories pleaded by North Dakota. What is more, the District of Columbia is closer to ten Plaintiff States and is where the events giving rise to this litigation took place.

The U.S. District Court for the District of Columbia thus provides the most stable and logical venue for this litigation.

## CONCLUSION

For the foregoing reasons, the Court should transfer this action to the U.S. District Court for the District of Columbia.

20

Date: September 20, 2024                    Respectfully submitted,

_____
/s/ Matthew S. Rozen

Nicholas Espiritu (*pro hac vice*             Matthew S. Rozen
*forthcoming*)                               John Matthew Butler
Gabrielle Lessard (*pro hac vice*             GIBSON, DUNN & CRUTCHER LLP
*forthcoming*)                               1700 M Street, N.W.,
Tanya Broder (*pro hac vice forthcoming*)     Washington, D.C. 20036
NATIONAL IMMIGRATION LAW                      mrozen@gibsondunn.com
CENTER                                        mbutler@gibsondunn.com
3450 Wilshire Blvd.                           Telephone: 202.955.8500
Suite 108 – 62                                Facsimile: 202.467.0539
Los Angeles, CA 90010
espiritu@nilc.org                             Betty X. Yang
lessard@nilc.org                              GIBSON, DUNN & CRUTCHER LLP
broder@nilc.org                               2001 Ross Avenue Suite 2100
Telephone: 213.639.3900                       Dallas, Texas 75201
Facsimile: 213.639.3911                       byang@gibsondunn.com
                                              Telephone: 214.698.3100
                                              Facsimile: 214.571.2900
Joanna E. Cuevas Ingram (*pro hac vice*
*forthcoming*)
Hilda Bonilla (*pro hac vice forthcoming*)
NATIONAL IMMIGRATION LAW
CENTER
P.O. Box 34573
Washington, DC 20043
cuevasingram@nilc.org
bonilla@nilc.org
Telephone: 202.216.0261
Facsimile: 202.216.0266

*Attorneys for Proposed Defendant-Intervenors*

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 20, 2024, a true and correct copy of the foregoing

memorandum of law was served via electronic service on counsel for all parties.


     /s/     *Matthew S. Rozen*
                Matthew S. Rozen