**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**WESTERN DIVISION**

| |
|---|
| **STATE OF KANSAS**, *et al.*, |
| |
| *Plaintiffs*, |
| |
| **v.** |
| |
| **UNITED STATES OF AMERICA**, *et al.*, |
| |
| *Defendants.* |

Case No. 1:24-cv-00150-DMT-CRH

<u>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A STAY OF THE
FINAL RULE AND PRELIMINARY INJUNCTION**</u>

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 1

I.      Legal Background ................................................................................... 1

      A.      The Affordable Care Act ............................................................. 1

      B.      Deferred Action for Childhood Arrivals...................................... 4

      C.      The Final Rule ............................................................................. 5

II.     Litigation History ................................................................................... 8

LEGAL STANDARD .......................................................................................... 9

ARGUMENT ...................................................................................................... 9

I.      Plaintiffs Lack Standing And Fail To Demonstrate Irreparable Harm...................... 9

      A.      North Dakota and the other States cannot establish standing or
            irreparable harm based on alleged incidental effects of the Final Rule ......... 10

      B.      The States operating SBEs have not demonstrated standing or
            irreparable harm based on alleged administrative costs.............................. 16

II.     Venue Is Improper Because No Plaintiff With Standing Resides In North
      Dakota ................................................................................................... 20

III.    Plaintiffs Are Not Likely To Succeed On The Merits ............................ 21

      A.      The Final Rule is within CMS's rulemaking authority and lawful.............. 21

      B.      CMS properly explained its reasoning in the Final Rule ............................ 25

IV.     The Equities And Public Interest Do Not Favor Issuing A Stay Or An
      Injunction............................................................................................... 27

V.      Any Preliminary Relief Should Be Appropriately Limited..................... 29

CONCLUSION ................................................................................................. 30

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Action v. City of Phoenix*,
  481 F. Supp. 3d 962 (D. Ariz. 2020).............................................................. 24

*Adventist Health Sys./SunBelt, Inc. v. HHS*,
  17 F.4th 793 (8th Cir. 2021)......................................................................... 28

*Alaska Airlines, Inc. v. Brock*,
  480 U.S. 678 (1987)..................................................................................... 30

*Arizona v. Biden*,
  40 F.4th 375 (6th Cir. 2022)......................................................................... 11

*B&D Land & Livestock Co. v. Conner*,
  534 F. Supp. 2d 891 (N.D. Iowa 2008).......................................................... 9

*Biden v. Nebraska*,
  143 S. Ct. 2355 (2023) ................................................................................. 10

*Cacchillo v. Insmed, Inc.*,
  638 F.3d 401 (2d Cir. 2011) ......................................................................... 16

*California v. Texas*,
  593 U.S. 659 (2021)................................................................................12, 15

*Czyzewski v. Jevic Holding Corp.*,
  580 U.S. 451 (2017)..................................................................................... 18

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006)....................................................................................... 9

*Dataphase Sys., Inc. v. C L Sys., Inc.*,
  640 F.2d 109 (8th Cir. 1981) (en banc) ........................................................ 27

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)..................................................................................... 17

*Dayton Area Chamber of Comm. v. Becerra*,
  2024 WL 3741510 (S.D. Ohio Aug. 8, 2024)................................................ 20

*Democracy N.C. v. N.C. State Bd. of Elections*,
  2020 WL 4288103 (M.D.N.C. July 27, 2020)............................................... 16

*Dorsey v. United States*,
  567 U.S. 260 (2012)..................................................................................... 24

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016) ................................................................................. 25

*Estrada v. Becker*,
   917 F.3d 1298 (11th Cir. 2019) ............................................................. 23

*Evanoff v. Minneapolis Public Schools*,
   11 F. App'x 670 (8th Cir. 2001) .......................................................... 28

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ......................................................................... 25, 26

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021) ................................................................................. 25

*FDA v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024) ............................................................... 11, 14, 17

*Florida v. Mellon*,
   273 U.S. 12 (1927) ................................................................... 10, 11

*Ga. Republican Party v. SEC*,
   888 F.3d 1198 (11th Cir. 2018) ............................................................. 20

*Gill v. Whitford*,
   585 U.S. 48 (2018) ................................................................................. 29

*Glenwood Bridge, Inc. v. City of Minneapolis*,
   940 F.2d 367 (8th Cir. 1991) ................................................................... 9

*Henderson v. Stalder*,
   287 F.3d 374 (5th Cir. 2002) ................................................................. 19

*In re Am. River Transp. Co.*,
   800 F.3d 428 (8th Cir. 2015) ................................................................. 24

*Kansas v. Garland*,
   2024 WL 2384611 (E.D. Ark. May 23, 2024) ...................................... 20

*King v. Burwell*,
   576 U.S. 473 (2015) ............................................................................... 1, 2

*La. ex rel. La. Dep't of Wildlife & Fisheries v. NOAA*,
   70 F.4th 872 (5th Cir. 2023) ................................................................. 15

*Livonia Prop. Holdings, LLC v. 12840-12976 Farmington Road Holdings, LLC*,
   399 F. App'x 97 (6th Cir. 2010) .......................................................... 28

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ........................................................................ 10

*Lyng v. Payne,*
  476 U.S. 926 (1986) ........................................................................ 28

*Madsen v. Women's Health Ctr., Inc.,*
  512 U.S. 753 (1994) ........................................................................ 29

*Maine Cmty. Health Options v. United States,*
  590 U.S. 296 (2020) ........................................................................ 24

*Maryland v. King,*
  567 U.S. 1301 (2012) ....................................................................... 28

*Marzurek v. Armstrong,*
  520 U.S. 968 (1997) .......................................................................... 9

*Massachusetts v. EPA,*
  549 U.S. 497 (2007) ........................................................................ 15

*Massachusetts v. Laird,*
  400 U.S. 886 (1970) ................................................................... 10, 11

*Maybelline Co. v. Noxell Corp.,*
  813 F.2d 901 (8th Cir. 1987) ............................................................ 20

*MD/DC/DE Broad. Ass'n v. FCC,*
  236 F.3d 13 (D.C. Cir. 2001) ........................................................... 30

*Missouri v. Biden,*
  52 F.4th 362 (8th Cir. 2022) ...................................................... 11, 13

*Missouri v. Yellen,*
  39 F.4th 1063 (8th Cir. 2022) .......................................................... 15

*Morehouse Enter., LLC v. ATF,*
  78 F.4th 1011 (8th Cir. 2023) ............................................................ 9

*Murthy v. Missouri,*
  144 S. Ct. 1972 (2024) ................................................... 9, 11, 15, 18

*NFIB v. Sebelius,*
  567 U.S. 519 (2012) .......................................................................... 1

*Nken v. Holder,*
  556 U.S. 418 (2009) ........................................................................ 27

iv

*O'Neill v. Battisti*,
    472 F.2d 789 (6th Cir. 1972) ............................................................. 20

*Pennsylvania v. New Jersey*,
    426 U.S. 660 (1976) ................................................................. 14, 19

*Planned Parenthood Minn., N.D, S.D. v. Rounds*,
    530 F.3d 724 (8th Cir. 2008) ............................................................. 21

*Printz v. United States*,
    521 U.S. 898 (1997) ..................................................................... 11

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    566 U.S. 639 (2012) ..................................................................... 24

*Rare Breed Triggers, LLC v. Garland*,
    639 F. Supp. 3d 903 (D.N.D. 2022) ..................................................... 20

*Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020) ................................................................... 3, 5, 28

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    645 F.3d 978 (8th Cir. 2011) ............................................................. 29

*St. Louis Effort for AIDS v. Huff*,
    782 F.3d 1016 (8th Cir. 2015) ........................................................... 29

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ..................................................................... 13

*Texas v DHS*,
    --- F. Supp. 3d ---, 2024 WL 1021068 (S.D. Tex. Mar. 8, 2024) ................... 12, 14

*Texas v. United States*,
    549 F. Supp. 3d 572 (S.D. Tex. 2021) ................................................... 23

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) ............................................................. 19

*Texas v. United States*,
    2023 WL 5950808 (S.D. Tex. Sept. 13, 2023) ............................................. 5

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ................................................................. 11, 30

*United States v. Texas*,
    599 U.S. 670 (2023) ................................................................. 10, 15

*West Virginia v. EPA*,
   669 F. Supp. 3d 781 (D.N.D. 2023) .......................................................................... 29

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ........................................................................................................ 9

**STATUTES**

5 U.S.C. § 705 ........................................................................................................... 8, 9, 30

5 U.S.C. § 706 ................................................................................................................... 21

8 U.S.C. § 1611 ........................................................................................................... *passim*

26 U.S.C. § 36B ................................................................................................................... 3

28 U.S.C. § 1391 ................................................................................................................. 20

28 U.S.C. § 1406 ................................................................................................................. 20

42 U.S.C. § 18021 ................................................................................................................. 3

42 U.S.C. § 18031 ...................................................................................................... *passim*

42 U.S.C. § 18032 ...................................................................................................... *passim*

42 U.S.C. § 18041 ................................................................................................................. 2

42 U.S.C. § 18082 ................................................................................................................. 3

Idaho Code §49-303 ........................................................................................................... 22

Ind. Code § 9-13-2-92.3 ..................................................................................................... 22

Ind. Code § 9-24-11-5 ........................................................................................................ 22

Kan. Stat. Ann. § 8-237 ...................................................................................................... 22

Kan. Stat. Ann. § 8-240 ...................................................................................................... 22

Ky. Rev. Stat. § 186.4121 ................................................................................................... 23

Ky. Rev. Stat. § 304.17B-021 .............................................................................................. 2

Mont. Code Ann. § 61-5-105 ............................................................................................. 22

Neb. Rev. Stat. § 60-484.04 .........................................................................................23, 25

S.D. Stat. § 32-12-1.1 ......................................................................................................... 22

Tenn. Code Ann. § 55-50-331 ................................................................... 23

Tex. Transp. Code § 521.101 ................................................................... 23

Va. Code § 46.2.-328.1 ............................................................................ 23

**RULES**

Fed. R. Evid. 602 ..................................................................................... 17

**REGULATIONS**

8 C.F.R. § 1.3 .............................................................................. 7, 21, 26

8 C.F.R. § 274a.12 ............................................................................. *passim*

45 C.F.R. § 152.2 .................................................................................. 4, 5

45 C.F.R. § 155.20 ..................................................................................... 4

45 C.F.R. § 155.105 ................................................................................... 3

45 C.F.R. § 155.106 ................................................................................... 2

45 C.F.R. § 155.160 ............................................................................. 2, 19

45 C.F.R. § 155.305 ................................................................................. 19

45 C.F.R. § 155.310 ................................................................................. 19

45 C.F.R. § 155.410 ................................................................................... 2

45 C.F.R. § 156.110 ................................................................................... 3

61 Fed. Reg. 47,039 (Sept. 6, 1996) ....................................................... 21

75 Fed. Reg. 45,014 (July 30, 2010) ......................................................... 4

77 Fed. Reg. 18,310 (Mar. 27, 2012) ........................................................ 4

77 Fed. Reg. 52, 6134 (Aug. 30, 2012) ..................................................... 5

87 Fed. Reg. 53, 152 (Aug. 30, 2022) ............................................. *passim*

88 Fed. Reg. 25, 313 (Apr. 26, 2023) ....................................................... 5

89 Fed. Reg. 39, 392 (May 8, 2024) ................................................................*passim*

**OTHER AUTHORITIES**

CMS, *Key Dates for Calendar Year 2024*,
    https://perma.cc/B3UF-AC5U ........................................................... 3

CMS, *State-based Exchanges* (Sept. 10, 2024),
    https://perma.cc/WF4G-ZVDT ......................................................... 29

Cong. Res. Serv., *Analysis of June 15, 2012 DHS Memorandum* (2012),
    https://perma.cc/42DA-L8V6 ............................................................ 4

Idaho Driver's Handbook (July 2024),
    https://perma.cc/475W-EBV2 .......................................................... 25

KFF, *Marketplace Enrollment*,
    https://perma.cc/6RY3-XHBW .......................................................... 18

Ky. Cabinet for Health & Family Servs.,
    *Updates on Plans to Transition to a State Based Exchange* (July 29, 2020),
    https://perma.cc/3YLE-SU7A ........................................................... 19

Ky. Health Benefit Exch., Financial Statements (June 30, 2023),
    https://perma.cc/HH8B-SM6H ......................................................... 29

Ky. Health Benefit Exch., *Immigrant Population Health Coverage* (accessed Sept. 12, 2024),
    https://perma.cc/56GB-C4WN .......................................................... 18

Ky. Health Benefit Exch., *Programmatic Compliance Report* (June 30, 2023),
    https://perma.cc/D8E2-AF8M ........................................................... 17

Mem. from Sec'y Napolitano (June 15, 2012),
    https://perma.cc/PRR8-PBT7 ............................................................ 4

North Dakota Dep't of Public Instruction, *Financial Transparency*,
    https://perma.cc/QAM7-99CY .......................................................... 14

Off. Mgmt. & Budget, *Circular A-4* (Nov. 9, 2023),
    https://perma.cc/M9MW-TQGP ......................................................... 17

State of Kansas, Comment on Docket No. CMS-9894-P (June 23, 2023),
    https://perma.cc/9Q8V-K5M2 .......................................................... 15

USCIS Q3 Data,
    https://www.uscis.gov/sites/default/files/document/data/

active_daca_recipients_fy2024_q3.xlsx ........................................................................ 12

Va. Health Benefit Exch., *Informational Update July 2024*,
   https://perma.cc/SY5W-CGBX ............................................................................. 17

Your Health Iddaho, *DACA FAQ* (Aug. 29, 2024),
   https://perma.cc/5RCV-2GPC .............................................................................. 18

## INTRODUCTION

Nineteen States seek to stay or enjoin a final rule promulgated by the Centers for Medicare & Medicaid Services. *See* 89 Fed. Reg. 39,392 (May 8, 2024) (Final Rule). This rule revises CMS's definition of "lawfully present" in 42 U.S.C. § 18032(f)(3) and related provisions to stop singling out Deferred Action for Childhood Arrivals (DACA) recipients as the only individuals granted deferred action who are barred from enrolling in health insurance plans through Affordable Care Act exchanges. Plaintiffs do not challenge CMS's longstanding rule defining *non*-DACA deferred action recipients as "lawfully present." Indeed, many Plaintiff-States have interpreted "lawfully present" or analogous phrases in their own laws similarly to include those with deferred action status, including DACA recipients. They instead object to CMS aligning its definition more fully with theirs—and that of other federal agencies—to no longer exclude DACA recipients when it comes to exchange eligibility.

Plaintiffs' motion should be denied. The Final Rule is both consistent with the law and reasonably explained. But the Court need not even reach those issues, as Plaintiffs' efforts fail for more fundamental reasons: All Plaintiffs lack standing; at a minimum, North Dakota does, making venue improper. In any event, the sweeping injunction that Plaintiffs seek, which would deny much-needed health coverage based on unsubstantiated claims of minimal economic harm, runs counter to the equities and is profoundly contrary to the public interest.

## BACKGROUND

### I.    Legal Background

#### A.    The Affordable Care Act

Congress enacted the Patient Protection and Affordable Care Act, 124 Stat. 119 (2010), to increase access to affordable health care. *See NFIB v. Sebelius*, 567 U.S. 519, 538 (2012). To that end, it "requires the creation of an 'Exchange' in each State," *King v. Burwell*, 576 U.S. 473, 478 (2015), which "shall make available qualified health plans to qualified individuals," 42 U.S.C. § 18031(d)(2)(A). For individuals of more limited means, Congress also provided federal subsidies "to make insurance more affordable." *King*, 576 U.S. at 479.

An "exchange" is essentially "a marketplace that allows people to compare and purchase insurance plans." *Id.*; *see* 42 U.S.C. § 18031(d). Each State must have one, though they can take various forms. *See* 42 U.S.C. §§ 18031(b)(1), 18041(c). Some States operate their own State-based Exchanges (SBE). *See id.* § 18031(b)(1), (d)(4). They take responsibility for ensuring that the health care plans on offer meet federal guidelines, determining individuals' eligibility to purchase insurance and obtain subsidies, processing applications, assisting applicants, and handling other administrative tasks. *See, e.g., id.* § 18031(d)(4). Other States have left these responsibilities to the federal government, which then operates a Federally-facilitated Exchange (FFE) doing all of those things for residents of those States. *See id.* § 18041(c)(1). And a few States have chosen a hybrid approach of operating a State-based Exchange on the Federal Platform (SBE-FP), meaning generally that States certify health care plans but leave eligibility determinations to the federal platform. *See* 45 C.F.R. § 155.106(c).

A State that wishes to operate an SBE begins by submitting a declaration of intent and "an Exchange Blueprint" at least 15 months before it "proposes to begin open enrollment as a [SBE]." 45 C.F.R. § 155.106(a)(2); *see generally id*. §§ 155.105(a), 155.106(a).[1] In this blueprint, the State specifically commits to evaluate and certify health care plans, *see id.* §§ 155.1000-155.1050, apply eligibility standards to individuals enrolling in plans and receiving subsidies, *see id.* §§ 155.302-155.320, and assist consumers, *see id.* § 155.205, 155.210-155.220; *see also* 42 U.S.C. § 18031(d)(4) (outlining exchange functions). The exchange must be "self-sustaining," 42 U.S.C. § 18031(d)(5), in the sense that it has "sufficient funding" from sources other than the federal government "to support its ongoing operations, 45 C.F.R. § 155.160(b)(1), which many States raise by charging user fees to issuers, *see* 89 Fed. Reg. at 39,434; *see also* Ky. Rev. Stat. § 304.17B-021(1)(a)(4) (permitting 1% assessment). Once a State

---

[1] Open enrollment ordinarily begins each year on November 1 and runs until January 15 the next year. *See* 45 C.F.R. § 155.410(e)(4). This period is when eligible individuals may select a new plan or make enrollment changes. They may also be able to do so during a special enrollment period, which can open if someone experiences a "triggering event," such as giving birth or obtaining an eligible immigration status. *See id.* § 155.420.

demonstrates the exchange's financial stability and "operational readiness to execute its Exchange Blueprint," 45 C.F.R. § 155.105(c), CMS will grant approval.

Whether a State or the federal government runs the exchange, a primary responsibility is evaluating and certifying qualified health plans (QHPs). *See* 42 U.S.C. §§ 18021(a), 18031(d)(4)(A), (e). A QHP provides an "essential health benefits package" and is offered by a reputable issuer. *Id.* § 18021(a)(1). Essential health benefits include emergency services, maternity care, and preventative services, among other types of care. *Id.* § 18022(b); *see* 45 C.F.R. § 156.110(a). Evaluating plans and their proposed rates is time and labor intensive, and for that reason, insurance companies and exchanges start the certification process months before open enrollment begins. *See, e.g.*, CMS, *Key Dates for Calendar Year 2024*, https://perma.cc/B3UF-AC5U (CMS Key Dates).

The Affordable Care Act allows only "qualified individual[s]" to enroll in a QHP on the individual exchanges. 42 U.S.C. § 18032(a)(1). To be a qualified individual, a person must reside in the State serviced by the particular exchange and be "a citizen or national of the United States or [a noncitizen] lawfully present in the United States." *Id.* § 18032(f)(3). CMS must "establish a program" for determining eligibility, including lawful presence, *id.* § 18081(a), and the exchanges must verify each individual's qualifications, *see id.* § 18081(c)(2). If a qualified individual's household income is below certain thresholds, she may be eligible for "cost-sharing reductions," which result in lower out-of-pocket costs when obtaining care, *see id.* § 18071(b), (c), or refundable tax credits to assist with paying monthly premiums, *see id.* § 18081; 26 U.S.C. § 36B; *see also* 42 U.S.C. § 18082(c) (permitting advanced payment of tax credits). As with eligibility to enroll in coverage on the individual exchanges generally, these federal subsidies are limited to U.S. citizens and nationals and those "lawfully present in the United States." *Id.* §§ 18071(e)(2), 18082(d).

"Lawfully present" is a "specialized term of art that the Congress has used in other statutes" and that other agencies have interpreted differently depending on the context in which it is used. 89 Fed. Reg. at 39,395; *see DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 26

n.5 (2020) (noting different interpretations). The Affordable Care Act does not define the term, *see* 42 U.S.C. § 18032(f)(3), and CMS first established a regulatory definition of "lawfully present" in 2010, which was based on a prior Department of Health and Human Services interpretation of similar language and then-current Department of Homeland Security regulations, *see* 89 Fed. Reg. at 39,394. CMS defined the term to include, among others, "[noncitizens] in deferred action status." 75 Fed. Reg. 45,014, 45,030 (July 30, 2010) (codified at 45 C.F.R. § 152.2); *see* 8 C.F.R. § 274a.12(c)(14) (defining "deferred action" as "an act of administrative convenience to the government that gives some cases lower priority").[2] When CMS finalized its first rule implementing the Affordable Care Act's Exchange and QHP provisions, it adopted this definition. *See* 77 Fed. Reg. 18,310, 18,314 (Mar. 27, 2012) (codified at 45 C.F.R. § 155.20).

### B.     Deferred Action for Childhood Arrivals

In the summer of 2012, the Secretary of Homeland Security issued a memorandum establishing the DACA program. *See* Mem. from Sec'y Napolitano (June 15, 2012), https://perma.cc/PRR8-PBT7. This memorandum "confer[red] no substantive right, immigration status[,] or pathway to citizenship," but it set forth how DHS would exercise its prosecutorial discretion with respect to certain "low priority cases." *Id.* at 1, 3. Specifically, the memorandum allowed certain noncitizens to apply for a two-year renewable period of deferred action: individuals who (1) "came to the United States under the age of sixteen"; (2) had "continuously resided in the United States for a[t] least five years preceding" and were "present" in the United States on the date of the memorandum; (3) were in school, had graduated high school or earned a GED, or were honorably discharged veterans; and (4) were "not above the age of thirty." *Id.* at 1. If these noncitizens were granted deferred action, they

---

[2] DHS and its predecessors have implemented more than 20 policies granting deferred action or similar reprieves from removal since 1950. *See* Cong. Res. Serv., *Analysis of June 15, 2012 DHS Memorandum*, 20-23 (2012), https://perma.cc/42DA-L8V6. Congress has approved a number of these policies, *see* Immigration Act of 1990, 104 Stat. 4978, 5030, and recognized DHS's authority to grant deferred action. *See* REAL ID Act of 2005, 119 Stat. 302, 313.

generally would not be placed in removal proceedings or removed from the United States, and they could apply for employment authorization. *Id.* at 2-3.[3]

CMS amended its definition of "lawfully present" after the DACA memorandum issued. It understood the "DACA process" as being "designed to ensure that governmental resources for the removal of individuals are focused on high priority cases, … and not on low priority cases." 77 Fed. Reg. 52,614, 52,615 (Aug. 30, 2012). Because CMS believed that it "would not be consistent with the reasons offered for adopting the DACA process to extend health insurance subsidies … to these individuals," it crafted its lone "exception" to its prior definition of "lawfully present" and specifically excluded DACA recipients even though all other deferred action recipients were covered. *Id.*; *see* 45 C.F.R. § 152.2(8) ("***Exception.***").

### C.    The Final Rule

In April 2023, CMS issued a Notice of Proposed Rulemaking for a rule that would, among other things, remove the DACA exception from the definition of lawfully present at 45 C.F.R. § 152.2 (and the other regulations cross-referencing this definition). *See* 88 Fed. Reg. 25,313 (Apr. 26, 2023). CMS received "a large volume of comments" on the proposed definitional changes, and on May 8, 2024, the Final Rule was published in the Federal Register. 89 Fed. Reg. at 39,393. It is set to take effect on November 1, 2024 to coincide with the beginning of the open enrollment period. *See id.* at 39,415.

The rule revises CMS's definition of "lawfully present" as used in 42 U.S.C. § 18032(f)(3) and related provisions for determining eligibility for health insurance coverage through an exchange. *Id.* at 39,395-96.[4] As a result, following the rule's effective date, DACA

---

[3] In 2017, DHS rescinded the 2012 DACA memorandum. The Supreme Court held that that rescission was arbitrary and capricious under the APA. *Regents*, 591 U.S. at 24-36. In 2022, DHS issued a final DACA rule, 87 Fed. Reg. 53,152, 53,156 (Aug. 30, 2022), which is currently partially enjoined, *see Texas v. United States*, 2023 WL 5950808, at *1 (S.D. Tex. Sept. 13, 2023) (partially staying injunction), *appeal pending*, No. 23-40653 (5th Cir.).

[4] In the NPRM, CMS also proposed modifying its definition of "lawfully present" for purposes of determining DACA recipients' eligibility for Medicaid and CHIP. *See* 88 Fed. Reg. at 25,316-17. After "carefully consider[ing] the comments" related to this proposal, CMS

recipients will be eligible to enroll in a QHP through an exchange and, depending on their financial means and certain other criteria, to apply for federal subsidies. *Id.* The Final Rule also modified the definition of "lawfully present" to include all noncitizens granted employment authorization under 8 C.F.R. § 274a.12(c) and not just under certain subsections of that regulation. 89 Fed. Reg. at 39,408. CMS explained that it made this change for administrative efficiency because "[a]lmost all noncitizens granted employment authorization under [this regulation] [we]re already considered lawfully present under existing regulations," and the "two minor categories" added to the definition are "individuals [who] were previously eligible for insurance programs by virtue of their nonimmigrant status" and are transitioning to lawful permanent resident (LPR) status, and those individuals' spouses and children. *Id.*

In the Final Rule, CMS provided a detailed explanation of why it was modifying its definition of "lawfully present." *See id.* at 39,394-96. The Final Rule recognized that CMS's prior definition treated DACA recipients differently from other deferred action recipients for purposes of enrolling in a QHP through an exchange, and that CMS previously chose to do so based on its view that the original rationale offered by DHS for the DACA policy did not indicate that the "insurance affordability programs," such as QHP tax credits, should be extended to DACA recipients. *Id.* at 39,394. Based on further study, CMS concluded that this differential treatment was not required by the ACA and, in fact, "failed to best effectuate congressional intent" to lower the number of uninsured individuals in the country and make affordable health insurance more available. *Id.* at 39,395; *see id.* at 39,398 ("our prior policy did not fully align with the ACA's goal to expand access to affordable health coverage for the uninsured"). "[N]ew information" showed that DACA recipients were more likely to be uninsured and thus less likely to seek preventative care, which can lead to higher medical costs. *Id.* at 39,395-96. CMS found that that was particularly true during the COVID-19

---

determined not to finalize a definition for "lawful presence" for Medicaid and CHIP, in part due to the large volume of Medicaid changes required by the COVID-19 "unwinding" period. 89 Fed. Reg. at 39,393. Rather, it is continuing to evaluate that proposal's potential effects.

pandemic when thousands of DACA recipients served as essential workers, making them more likely to contract that illness, even though they lacked health insurance. *Id.* at 39,396. CMS explained that the new definition would provide all deferred action recipients access to health insurance, improve their health and well-being, and allow them to contribute more to their communities—better fulfilling the Affordable Care Act's goals. *Id.*

Additionally, "on further review and consideration," CMS determined that treating DACA recipients like other deferred action recipients was consistent with DHS's current articulation of DACA's goals and with how DHS has long interpreted "lawful presence." *Id.* at 39,395. The Final Rule noted that following DHS's promulgation of its 2022 DACA rule, CMS understood that "the DACA policy is intended to provide recipients with a degree of stability and assurance that would allow them to obtain education and lawful employment, including because recipients remain lower priorities for removal." *Id.* CMS determined that "[e]xtending eligibility" for enrolling in a QHP through an exchange "is consistent with those goals." *Id.* CMS also acknowledged that DHS has defined "lawfully present" to include someone "whose temporary presence in the United States the Government has chosen to tolerate for reasons of resource allocation, administrability, humanitarian concern, agency convenience, and other factors." *Id.* (quoting 87 Fed. Reg. at 53,156). CMS determined that the Final Rule's definition of "lawfully present" would align with DHS's longstanding definitions, *see* 8 C.F.R. § 1.3, and allow DACA recipients to contribute to their communities to the same extent as other deferred action recipients, 89 Fed. Reg. at 39,395. For these reasons, CMS concluded that the change in definition would best reflect the policies of the ACA specifically, as well as broader governmental efforts. *Id.* at 39,396.

CMS further evaluated the regulatory impact of the estimated 145,000 DACA recipients expected to enroll in QHPs through an exchange. *See id.* at 39,424. It identified many benefits for the recipients, their families, the States in which they reside, and society more broadly. Most directly, CMS noted that increased access to health insurance will likely lead to better health outcomes for the DACA recipients, particularly those who are victims of

domestic violence, sexual assault, and human trafficking, *id.* at 39,396, 39,405, and increased coverage for their U.S.-citizen family members, *see id.* at 39,402. With better health care, CMS noted, these individuals can be more productive; one cited study found that "a worker with health insurance is estimated to miss 77 percent fewer days than an uninsured worker." *Id.* at 39,396. Federal, State, and local governments would receive increased tax contributions as a result. *Id.* at 39,399. SBEs "may see an increase in the user fees they collect from insurers," *id.* at 39,429, and the exchange risk pools "may have a positive effect" due to DACA recipients' age and general good health, leading to lower premiums, *id.* at 39,398. At a minimum, the overall health care system would experience less strain by reducing the need for emergency care. *Id.* at 39,406. On the other side of the ledger, CMS considered various potential costs, including the cost of updating exchange eligibility engines and processing applications. *Id.* at 39,429-30. Ultimately, CMS concluded that the rule's benefits outweighed the "potential negative impacts." *Id.* at 39,430.

## II.    Litigation History

On August 8, 2024, three months after the Final Rule issued, Alabama, Idaho, Indiana, Iowa, Kansas, Missouri, Montana, Nebraska, New Hampshire, North Dakota, Ohio, South Carolina, South Dakota, Tennessee, and Virginia filed this suit. Compl., ECF No. 1. They did not immediately serve the United States or CMS. Rather, on August 28, they added Arkansas, Florida, Kentucky, and Texas as plaintiffs. Am. Compl., ECF No. 27.

The amended complaint includes two counts: Count I alleges that the Final Rule conflicts with the Affordable Care Act's limitations on exchange eligibility, *see* 42 U.S.C. § 18032(f)(3), and with the Personal Responsibility and Work Opportunity Reconciliation Act of 1996's limitations on noncitizens' eligibility to obtain public benefits, *see* 8 U.S.C. § 1611(a) (PRWORA). *See* Am. Compl. ¶¶ 86-99. Count II alleges that the Final Rule is arbitrary and capricious because it does not adequately explain its departure from prior practice or consider costs to the States. *See id.* ¶¶ 100-10. On August 30, Plaintiffs moved for a stay of the Final Rule under 5 U.S.C. § 705 and a preliminary injunction. ECF No. 35 (Mot.).

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The movant bears the burden of establishing an injunction is proper, and to do so, it must make a "clear showing" "[1] that [it] is likely to succeed on the merits, [2] that [it] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest," *Marzurek v. Armstrong*, 520 U.S. 968, 972 (1997); *see Winter*, 555 U.S. at 20. This multi-factor test governs relief under 5 U.S.C. § 705 as well. *See B&D Land & Livestock Co. v. Conner*, 534 F. Supp. 2d 891, 905 (N.D. Iowa 2008); *accord* Mot. at 8.

## ARGUMENT

## I.    Plaintiffs Lack Standing And Fail To Demonstrate Irreparable Harm

A "plaintiff bears the burden of establishing standing as of the time [it] brought the lawsuit and maintaining it thereafter." *Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024). "At the preliminary injunction stage," that means "the plaintiff must make a 'clear showing' that [it] is 'likely' to establish each element of standing": "that [it] [1] has suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent; [2] fairly traceable to the challenged action; and [3] redressable by a favorable ruling." *Id.*

Independent of standing, a plaintiff seeking a preliminary injunction must also show that, in the absence of equitable relief, it will "likely" suffer irreparable harm—"harm [that] is certain and great and of such imminence that there is a clear and present need" for the requested relief. *Morehouse Enter., LLC v. ATF*, 78 F.4th 1011, 1016-17 (8th Cir. 2023). If a movant cannot "sustain [this] burden," the inquiry ends, and "denial of the injunctive [relief] is warranted." *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 371 (8th Cir. 1991).

Ordinarily, a party is not injured by, and thus lacks standing to challenge, the provision of benefits to a third party. *See, e.g.*, *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342-46 (2006). Plaintiffs nevertheless claim that the Final Rule harms them in two ways. *See* Mot. at 16-18. Neither is sufficient to establish standing or irreparable harm.

9

A.     **North Dakota and the other States cannot establish standing or irreparable harm based on alleged incidental effects of the Final Rule**

The only standing argument that North Dakota and most of the other States make is that more noncitizens will remain in the United States (or more noncitizens will enter) due to the Final Rule and that the States will, as a result, spend more money on social services. Mot. at 16-18; *see* Am. Compl. ¶¶ 43-85. These speculative claims of harm are not judicially cognizable, and in any event, Plaintiffs have not shown that they are likely to occur, fairly traceable to the Final Rule, or redressable by the requested relief.

1.     North Dakota and the other States have not asserted "an invasion of a legally protected interest," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), that is, an injury "traditionally redressable in federal court," *United States v. Texas*, 599 U.S. 670, 676 (2023) (*Immigration Priorities*). Plaintiffs do not claim that the Final Rule causes them direct injury by, for example, requiring them to act or refrain from acting, determining their federal funding, or depriving them of a legal right. *Cf. Biden v. Nebraska*, 143 S. Ct. 2355, 2366 (2023) ("The Secretary's plan will cut … revenues," which is "necessarily a direct injury."). Rather, they contend that the Final Rule will have the incidental effect of making the States' population greater in number, to which the States will respond with additional expenditures on social services. Mot. at 16-17. That is the same theory advanced and rejected in *Immigration Priorities*. *Compare* Mot. at 16-18, *with Immigration Priorities*, 599 U.S. at 674, 680 n.3.

In that case, the Supreme Court explained that "in our system of dual federal and state sovereignty, federal policies frequently generate indirect effects on state revenues or state spending," so when a State claims "that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated." *Immigration Priorities*, 599 U.S. at 680 n.3 (citing *Massachusetts v. Laird*, 400 U.S. 886 (1970); *Florida v. Mellon*, 273 U.S. 12, 16-18 (1927)). It then held that "none of the various theories of standing asserted by the States … overcomes the fundamental Article III problem." *Id.* Similarly, in *Florida v. Mellon*, a State alleged that a federal tax would result in "withdrawal of property"

and diminished "revenues of the state." 273 U.S. at 18. The Supreme Court concluded that the State had not "suffered a wrong furnishing ground for judicial redress." *Id.* at 16-17. The State's alleged injury was "purely speculative, and, at most, only remote and indirect"; there was accordingly "no substance in the contention that the state has sustained, or is immediately in danger of sustaining, any direct injury" because of federal action. *Id.* at 18. North Dakota's and the other States' indirect-costs theory has the same flaws and should also be rejected for failure to allege a cognizable injury.

Accepting the States' theory would have jarring implications for our federal system. The federal and State governments "exercise concurrent authority over the people" within each State. *Printz v. United States*, 521 U.S. 898, 920 (1997). Nearly any federal regulation of individuals will "impose[] peripheral costs on a State." *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022). If those downstream costs are sufficient to state a cognizable injury, "what limits on state standing remain?" *Id.* On Plaintiffs' view, it would mean that any federal action that increased—or *decreased*—a State's population and thus affected social-services spending or tax revenue could be challenged in federal court. It would mean that Justice Douglas was correct in *Laird* and that a State can sue to enjoin military action if it would result in lost tax revenue or other indirect costs. *See* 400 U.S. at 887-91 (Douglas, J., dissenting); *see also id.* at 886 (summarily rejecting suit to enjoin Vietnam War). Such a boundless theory is inconsistent with the separation of powers. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024).

2.      Even if their purported injuries were cognizable, no Plaintiff has made a "clear showing" that such harms are "certainly impending." *Murthy*, 144 S. Ct. at 1986. As plaintiffs seeking prospective relief," they "must establish a sufficient likelihood of future injury," *All. for Hippocratic Med.*, 602 U.S. at 381, and show that their alleged future injuries are not "speculative" or "reli[ant] on a highly attenuated chain of possibilities," *Missouri v. Biden*, 52 F.4th 362, 368 (8th Cir. 2022)); *see TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("standing is not dispensed in gross"). No State has shown that, but for the Final Rule, DACA recipients in their jurisdictions are likely to depart or that the State's social-services

expenditures would be higher if they stayed. Without doing both, Plaintiffs cannot establish injury in fact or irreparable harm. *See California v. Texas*, 593 U.S. 659, 675 (2021) (rejecting standing where State could not demonstrate "factual premise of their claim"); *Texas v. DHS*, --- F. Supp. 3d --- 2024 WL 1021068, at *17 (S.D. Tex. Mar. 8, 2024) (rejecting standing where State could not show social-services spending rose after implementation of federal policy).

Starting with the first step in the States' theory: no State has presented evidence that DACA recipients residing in its territory would likely leave if not for the exchange eligibility provided by the Final Rule. North Dakota, for instance, has approximately 130 resident DACA recipients. *See* Am. Compl. ¶ 45.[5] To be eligible for DACA, these individuals have necessarily lived in the United States since 2007. *See* 87 Fed. Reg. at 53,153. "[N]either logic nor intuition" suggests that, after nearly two decades in the United States, during which they have not been able to obtain insurance through an exchange, any of these individuals is likely to leave imminently, or that they will remain because they can now enroll in a QHP. *California*, 593 U.S. at 676. North Dakota has not shown otherwise, and indeed, no State has submitted any evidence regarding DACA recipients' immigration decisions or motivations. Nor has any shown that the rule would, contrary to CMS's findings, 89 Fed. Reg. at 39,399, encourage future irregular migration by allowing participants in a program limited to individuals who have been in the United States for nearly two decades to enroll in QHPs.

The declaration of Steven Camarota, on which Plaintiffs rely exclusively for their claim that "the Final Rule is highly likely to reduce the number of DACA recipients who leave the United States," Mot. at 18 (citing Camarota Decl., ECF No. 35-1), does not fill this evidentiary gap. Camarota, a think-tank researcher, does not cite any academic study of

---

[5] Plaintiffs cite to the publicly available United States Citizenship and Immigration Services data from the first quarter of Fiscal Year 2024 in their amended complaint. USCIS has released more recent data from this fiscal year's third quarter. *Available at* https://www.uscis.gov/sites/default/files/document/data/active_daca_recipients_fy2024_q3.xlsx (USCIS Q3 Data). In the six months between December 31, 2023 and June 30, 2024, the number of DACA recipients residing in North Dakota did not change.

DACA recipients or their migration patterns, *see* Camarota Decl. ¶¶ 8-9, and he admits that undocumented noncitizens' decision "to leave the country reflects many factors," *id.* ¶ 11. To the extent his review of research concerning the behavior of undocumented noncitizens generally, or migrants on other continents or from other times, is relevant,[6] it could support only a probabilistic approach to standing that the Supreme Court has soundly rejected. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 498-99 (2009). Some DACA recipients may depart the country for any number of reasons, but based on the current record, it is speculation that DACA recipients in North Dakota—or any other State—would imminently do so but for the Final Rule. *See Missouri v. Biden*, 52 F.4th 362, 368 (8th Cir. 2022) ("the mere statistical likelihood that the regulations would harm the plaintiffs in the future [is] insufficient").

Further, North Dakota and the other States have failed to demonstrate that the continued presence of DACA recipients in their jurisdictions would be a net negative for their budgets. "According to one estimate, as of 2020, DACA recipients and their households pay … about $3.1 billion in annual State and local taxes." 87 Fed. Reg. at 53,154. The States do not show that there are marginal social-services expenditures due to DACA recipients' presence or that any spending will likely exceed the amount the DACA recipients pay in taxes. On education, for instance, North Dakota asserts that it spends $14,174 annually per pupil, *see* Mot. at 17, but it makes no showing that even one of the 130 DACA recipients in the State is in public school or among the 0.16 percent of DACA recipients nationwide under 21 years old, *see* USCIS Q3 Data. Nor has it shown that any of those 130 DACA recipients has a child in a North Dakota school who costs the State more than it receives in revenue. *See*

---

[6] The so-called "most extensive research" on undocumented noncitizens who "leave the country on their own each year" does not mention DACA, except as a means to evaluate how many undocumented noncitizens are *in* the country altogether. Camarota Decl. ¶ 8; Warren, *Reverse Migration to Mexico Led to US Undocumented Population Decline 2010-2018*, 8 J. on Migration & Hum. Sec. 32, 39 (2020). The research supposedly showing that public benefits "impact the migration decision[s] of immigrants" studied European migration and United States data from before 1992—at least twenty years prior to DACA's existence. Camarota Decl. ¶ 9; Borjas, *Immigration and Welfare Magnets*, 17 J. of Labor Econ. 607, 609 (1999).

North Dakota Dep't of Public Instruction, *Financial Transparency*, https://perma.cc/QAM7-99CY (showing revenue per pupil exceeding costs per pupil by nearly $3,000). As to the rest, North Dakota asserts (at 18 & n.5) that its interpretation of "legal presence" under State law requires it to issue licenses to DACA recipients, but it has not shown it does so at a loss, *cf. Texas*, 2024 WL 1021068 at *9-10 (finding Texas profits from issuing licenses to noncitizens), or explain why, if that is the case, its injury is not self-inflicted, *see Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) ("No State can be heard to complain about damage inflicted by its own hand."). The record is otherwise bare,[7] and North Dakota—and the other States—have failed to make a clear showing that they will suffer imminent injury absent an injunction.

3.       The States have also failed to demonstrate that any harm is fairly traceable to the Final Rule—rather than the actions of others—and redressable by the Court. Even if the States could show harm, they would not be permitted to rely on a "chain of causation [that] is simply too attenuated." *All. for Hippocratic Med.*, 602 U.S. at 392. Establishing causation in this case is "substantially more difficult" for Plaintiffs because they challenge the "regulation … of *someone else*." *Id.* at 382. They "cannot rely on speculation about the unfettered choices made by independent actors not before the courts"; instead, the States "must show that the third parties will likely react in predictable ways that in turn will likely injure [them]." *Id.* at 383 (cleaned up). Thus, the Supreme Court has rejected an approach to standing under which, for example, "[t]eachers in border states could sue to challenge allegedly lax immigration policies that lead to overcrowded classrooms." *Id.* at 392. For redressability, they must show that their requested relief would alleviate their purported injuries. *See id.* at 381. No State has made an adequate showing on either factor.

North Dakota and the other States have not presented evidence that the DACA

---

[7] Kansas's effort (at 18) to establish injury based on increased emergency-care expenditures is deeply ironic and fails to advance its claim to standing. The cited 2009 report attributes undocumented noncitizens' high use of emergency services to being "uninsured," Kan. Dep't of Health & Env't, *Medicaid Transformation* 214 (2009), yet Kansas seeks to prevent DACA recipients from obtaining insurance that would pay for such health care.

recipients will react in predictable ways to the Final Rule that would harm them. Plaintiffs argue that, but for the allure of affordable health care, some unknown number of DACA recipients would leave their jurisdictions, *see* Mot. at 16, but they ignore that DACA recipients have never been eligible to purchase insurance on the exchanges, and yet the recipients have stayed. The States have provided no reason to suspect that DACA recipients would make a different decision if the Final Rule were enjoined, particularly when the pull of family, steady employment, community, religious freedom, and relative safety could easily lead them to stay, as they have for many years. Moreover, Plaintiffs have not shown any connection between the Final Rule and a DACA recipient's choice of where to live, nor between the rule and a State's choices regarding revenue collection and spending on social services, *see California*, 141 593 U.S. at 679. Plaintiffs must rely on "guesswork" to fill the gaps in this causal chain, *Murthy*, 144 S. Ct. at 1986, and they therefore have not made a clear showing that they will likely be able to satisfy the second or third elements of standing either.

4.     Plaintiffs' invocation (at 15) of "procedural rights" and *Massachusetts v. EPA*, 549 U.S. 497 (2007), does not remedy the defects in this standing theory. First off, Plaintiffs raise substantive—not procedural—claims. *See Immigration Priorities*, 599 U.S. at 685 n.6 (distinguishing between "a challenge to the denial of a statutorily authorized petition for rulemaking" and a substantive challenge to "exercise of … enforcement discretion"). Here, Plaintiffs availed themselves of their procedural right to comment on the NPRM. *See* State of Kansas, Comment on Docket No. CMS-9894-P (June 23, 2023), https://perma.cc/9Q8V-K5M2. Even if Plaintiffs were making a procedural claim, *Massachusetts* did "not eliminate[] the basic requirements for standing just because a state is the plaintiff." *Missouri v. Yellen*, 39 F.4th 1063, 1070 n.7 (8th Cir. 2022); *accord La. ex rel. La. Dep't of Wildlife & Fisheries v. NOAA*, 70 F.4th 872, 882 (5th Cir. 2023). *Immigration Priorities* rejected the application of *Massachusetts* to save a nearly identical standing claim. 599 U.S. at 685 n.6. And Justice Gorsuch cautioned "lower courts [to] just leave that idea" of special solicitude for State standing "on the shelf in future [cases]." *Id.* at 689 (Gorsuch, J., concurring). The Court should take that advice.

**B.** **The States operating SBEs have not demonstrated standing or irreparable harm based on alleged administrative costs**

Three Plaintiff-States that operate SBEs—Idaho, Kentucky, and Virginia—claim (at 16) that they also have standing because they will incur "administrative and resource" costs due to the Final Rule. Idaho and Virginia have not submitted any evidence of actual expenditures, and they have thus failed to carry their burden at this stage of the proceedings. *See, e.g.*, *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) ("[T]o establish standing for a preliminary injunction, a plaintiff cannot rest on … mere allegations, as would be appropriate at the pleading stage." (cleaned up)). Kentucky has introduced a declaration, *see* Meier Decl., ECF No. 45-2, but even then, it too has failed to make a "clear showing" that it will suffer financial harm or that the Final Rule would be the cause of any future harm.

1.      Kentucky identifies two sets of costs—those related to updating its systems to evaluate and verify eligibility correctly (eligibility costs) and those related to assisting additional applicants and processing their applications once open enrollment begins (enrollment costs). Mot. at 16. Neither passes muster for standing or irreparable harm.

As an initial matter, the Meier declaration is not appropriate evidence. Meier is the former Cabinet Secretary for Kentucky's Cabinet for Health and Family Services, *see* Meier Decl. ¶ 2, who left government service with the change in governors in 2019 before Kentucky reestablished its SBE, *see id.* To the extent that he submits this declaration as a fact witness, Meier's hedged statements in the critical paragraphs signal that he lacks firsthand knowledge regarding how the Kentucky Health Benefit Exchange has responded (or will respond) to the Final Rule and whether Kentucky will in fact suffer financial loss as a result. *See* Meier Decl. ¶¶ 20 ("would almost certainly"; "to the best of my knowledge"), 21 ("would likely be"), 22 ("would likely need to be"; "will likely require updates"; "[s]uch changes may be state funded"; "depending on the use case"). Because he has not demonstrated that he has sufficient personal knowledge of these matters, his declaration should not be given "evidentiary weight and may be struck." *Democracy N.C. v. N.C. State Bd. of Elections*, 2020 WL 4288103, at *7

16

(M.D.N.C. July 27, 2020); *see* Fed. R. Evid. 602. The same is true to the extent that Meier submits his declaration as an expert. What matters for Kentucky's theory of injury is what it has done (or will do) in response to the Rule—facts that would be within the knowledge of its *current* officers and employees. The speculative opinion of a *former* official as to how he thinks Kentucky will or should respond is not relevant or helpful, particularly when Meier has not demonstrated any "specialized knowledge" regarding the current workings of Kentucky's SBE. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993). His declaration therefore does not comply with Rule 702 and should disregarded.

Regardless, Kentucky has not made a clear showing—in the Meier declaration or otherwise—that it will incur eligibility costs in the future. The States cite (at 16) the Final Rule's estimate that there will be a roughly $10,000 burden associated with updating eligibility systems. *See* 89 Fed. Reg. at 39,423. But that estimate takes a broad view of "costs," *see* Off. Mgmt. & Budget, *Circular A-4* at 28-31 (Nov. 9, 2023), https://perma.cc/M9MW-TQGP, and does not consider a particular State's circumstances. Kentucky has not shown those predicted costs have been realized. It appears that Kentucky contracts with an "IT Vendor/System Integrator" to address its eligibility systems. Ky. Health Benefit Exch., *Programmatic Compliance Report* 7-8 (June 30, 2023), https://perma.cc/D8E2-AF8M. Kentucky has not shown that any rule-related eligibility updates were not already covered by the existing contract or that, to the extent updates are handled in-house, it has had to pay existing staff more, hire additional staff, or forgo other work. *Cf. All. for Hippocratic Med.*, 602 U.S. at 390 (doctors failed to show increase in patients and "diversion of doctors' time and resources").

However the updates are performed, Kentucky has also not demonstrated that it is likely to incur rule-related eligibility costs in the near future such that an injunction would redress its asserted future injuries. Open enrollment begins in about five weeks; exchanges build out updates well in advance so they can be pressure-tested, *see* CMS Key Dates, *supra*. Virginia, for example, purports to release its "[l]atest [p]latform [u]pdates" in "Late September" or "Early October," Va. Health Benefit Exch., *Informational Update July 2024* at

4, https://perma.cc/SY5W-CGBX, and all three SBE States have started informing DACA recipients that they can enroll on the SBEs starting November 1, *see id.* at 20; Your Health Idaho, *DACA FAQ* (Aug. 29, 2024), https://perma.cc/5RCV-2GPC; Ky. Health Benefit Exch., *Immigrant Population Health Coverage* (accessed Sept. 12, 2024), https://perma.cc/56GB-C4WN. Prior injuries on their own cannot supply standing for future relief. *See Murthy*, 144 S. Ct. at 1987 ("[b]ecause the plaintiffs are seeking only forward-looking relief, the past injuries are relevant only for their predictive value"). And Kentucky has not shown that there is a real risk that it will incur further eligibility costs, particularly given these States' public-facing statements and the realities of operating an SBE.

Enrollment costs do not provide a stronger foundation. The Final Rule estimated that SBEs would spend on average 10 minutes assisting each eligible DACA recipient and processing their applications, at a cost of $8.22 per person. 89 Fed. Reg. at 39,424. The SBE States claim these "costs … cannot seriously be disputed," Mot. at 16, but as with eligibility costs, there is no evidence in the record that Kentucky or another State will have to pay employees more, hire new employees, or forgo other opportunities to process the small number of DACA recipient applications they would likely receive.[8] More fundamentally, these States confuse costs with harm. *See Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) ("For standing purposes, a *loss* of even a small amount of money is ordinarily an 'injury.'") (emphasis added). Every State operating an SBE must have sufficient funding to carry out its obligations under the Affordable Care Act, 42 U.S.C. § 18031(d)(5)(A), and for that reason, States like Kentucky assess a fee to users or issuers (based on pre-subsidy premiums) to cover the cost of determining eligibility, certifying QHPs, and so on, *see, e.g.,*

---

[8] The Final Rule estimates that 27 percent of DACA recipients will seek to enroll in a QHP through an exchange. 89 Fed. Reg. at 39,425. Using the third quarter data from fiscal year 2024, Idaho would thus expect to process about 630 applications; Kentucky would see 621; and Virginia would receive 2,117. *See* USCIS Q3 Data. For comparison's sake, approximately 100,000, 75,000, and 400,000 individuals selected plans on those States' respective exchanges in 2024. *See* KFF, *Marketplace Enrollment*, https://perma.cc/6RY3-XHBW.

Ky. Rev. Stat. § 304.17B-021(1)(a)(4). Such additional revenue from assessments must be considered alongside any enrollment costs, particularly when such revenue is "of the same type and arise[s] from the same transaction as the [enrollment] costs." *Texas v. United States*, 809 F.3d 134, 155 (5th Cir. 2015). Even without considering the many other benefits that Kentucky receives from having more insured residents, this assessment revenue more than offsets the time value of ten minutes. Plaintiffs' purported injury is accordingly insufficient to establish standing. *See Henderson v. Stalder*, 287 F.3d 374, 379-80 (5th Cir. 2002).

　　**2.**　　Kentucky has also not shown causation or redressability. The reason that SBE States must update their eligibility engines and process any applications is because they elected to operate their own exchanges rather than rely on the federal platform. *See* 89 Fed. Reg. at 39,423. Kentucky transitioned back to operating its own exchange because it determined it would realize millions of dollars in savings. *See* Ky. Cabinet for Health & Family Servs., *Updates on Plans to Transition to a State Based Exchange* at 2 (July 29, 2020), https://perma.cc/3YLE-SU7A. As part of that bargain, Kentucky agreed to evaluate and verify applicants' eligibility, *see* 45 C.F.R. §§ 155.305-155.310, and bear the costs of doing so. *See* 42 U.S.C. § 18031(d)(5)(A); 45 C.F.R. § 155.160(b). Kentucky's choice to take on those burdens and abide by its obligations—not the Final Rule itself—accounts for any financial burden, and such voluntary actions sever any causal link. *See Pennsylvania*, 426 U.S. at 664.

***

　　Both standing and irreparable harm require Plaintiffs to demonstrate a real-world injury that they will imminently suffer absent injunctive relief. The States' indirect-costs theory is foreclosed by Supreme Court precedent and relies entirely on speculation. Idaho, Kentucky, and Virginia's SBE-related theory fails for lack of competent evidence and, at any rate, fails to account for corresponding benefits and is self-inflicted. Because Plaintiffs have not demonstrated standing or irreparable harm on either theory, the motion should be denied.

## II.     Venue Is Improper Because No Plaintiff With Standing Resides In North Dakota

Even if the Court determines that the States operating SBEs have standing, Plaintiffs cannot establish that venue is proper in this district and therefore the motion must be denied.

Plaintiffs bear the burden of demonstrating that "the chosen district is a proper venue." *Rare Breed Triggers, LLC v. Garland*, 639 F. Supp. 3d 903, 907 (D.N.D. 2022). When the United States or its agencies are a defendant, venue is proper "in any judicial district in which (A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (C) the plaintiff resides if no real property is involved in the action." 28 U.S.C. § 1391(e)(1).

To date, Plaintiffs have relied entirely on North Dakota's residence to establish venue under § 1391(e)(1)(C). *See* Am. Compl. ¶ 22. However, as shown above (at Part I.A), North Dakota lacks standing and therefore cannot create venue where it would not otherwise exist. *See, e.g.*, *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1205 (11th Cir. 2018); *Kansas v. Garland*, 2024 WL 2384611, at *1 (E.D. Ark. May 23, 2024) ("Because no plaintiff with standing resides in this district, venue is improper."); *Dayton Area Chamber of Comm. v. Becerra*, 2024 WL 3741510, at *8 (S.D. Ohio Aug. 8, 2024) (similar).

No other basis for venue exists. Defendants reside in the District of Columbia and Baltimore, Maryland. *See* 28 U.S.C. § 1391(c)(2), (e)(1)(A). The Final Rule was promulgated in the District of Columbia. *See id.* § 1391(e)(1)(B). And the other States maintain their principal places of business in their capitals—not within the State of North Dakota. *See, e.g.*, *id.* § 1391(c)(2), (e)(1)(C); *O'Neill v. Battisti*, 472 F.2d 789, 791 (6th Cir. 1972). Because venue is improper, the Court cannot grant Plaintiffs' requested relief for this alternative reason. *See Maybelline Co. v. Noxell Corp.*, 813 F.2d 901, 907 (8th Cir. 1987) (reversing grant of preliminary injunction because district was improper venue).[9]

---

[9] Where venue is improper, a district court "shall dismiss, or if it be in the interest of justice, transfer such case to any district … in which it could have been brought." 28 U.S.C. § 1406(a). Defendants respectfully submit that dismissal would be appropriate here; alternatively, the case should be directed to the District of Columbia or Maryland district courts.

### III.  Plaintiffs Are Not Likely To Succeed On The Merits

The States seek to enjoin the Final Rule for being (1) not in accordance with law or in excess of CMS's statutory authority, *see* 5 U.S.C. § 706(2)(A), (C), and (2) arbitrary and capricious, *see id.* § 706(2)(A). However, Plaintiffs have not shown that they are likely to prevail on the merits of their claims. *See Planned Parenthood Minn., N.D, S.D. v. Rounds*, 530 F.3d 724, 732 & n.6 (8th Cir. 2008) (en banc). The motion should be denied.

### A.  The Final Rule is within CMS's rulemaking authority and lawful

The Affordable Care Act establishes specific eligibility criteria for who may enroll in QHPs through an exchange and obtain federal subsidies. *See, e.g.*, 42 U.S.C. § 18032(f)(3). Congress empowered the agency to define this provision by issuing regulations "setting standards" for "establish[ing] and operat[ing]" exchanges, *id.* § 18041(a)(1), and "establish[ing] a program … for determining" whether a noncitizen applicant is "lawfully present" for purposes of exchange eligibility, *id.* § 18081(a). CMS has reasonably exercised that authority to define "lawfully present" in a manner that is consistent not only with the statute and other agencies' definitions of this term in other statutes—but also with how numerous Plaintiffs interpret the same or a similar phrase in State law. *See* 89 Fed. Reg. at 39,397, 39,399-401. Plaintiffs' contentions that this definition is contrary to law are meritless.

**1.** Despite Plaintiffs' arguments otherwise, *see* Mot. at 9-10, the Final Rule's definition of "lawfully present" to include DACA recipients is consistent with the Affordable Care Act. The Act itself does not define "lawfully present," but the term is not without relevant history. In 1996, Congress distinguished between "qualified [noncitizens]" and "[noncitizens] who [are] lawfully present" for purposes of Social Security benefits, *see* 8 U.S.C. § 1611(a), (b)(2), with the former being strictly defined, *see id.* § 1641, and the latter being left to the determination of the Attorney General (and now the Secretary of Homeland Security). The Executive Branch has always provided that "lawfully present" noncitizens in this context include those "in deferred action status." 61 Fed. Reg. 47,039, 47,040 (Sept. 6, 1996); *see* 8 C.F.R. § 1.3. Far from overruling this interpretation, Congress has since expanded

the Secretary of Homeland Security's discretion to decide whether noncitizens are lawfully present for purposes of receiving certain other benefits too. *See* 8 U.S.C. § 1611(b)(3)-(4).

Being granted deferred action and thus being considered lawfully present for purposes of Social Security benefits does not itself give a noncitizen lawful immigration status or even mean that one is "lawfully in the United States for all purposes." 87 Fed Reg. at 53,209. Lawful presence in this context, however, "is reasonably understood to include someone who is (under the law as enacted by Congress) subject to removal, and whose immigration status affords no protection from removal, but whose temporary presence in the United States the Government has chosen to tolerate, including for reasons of resource allocation, administrability, humanitarian concern, agency convenience, and other factors." *Id.* It can allow a noncitizen to obtain employment authorization, and importantly, DHS does not consider such noncitizens to be "unlawfully present" for purposes of applying limitations on admissibility for individuals who have been unlawfully present in the United States for specified periods of time under 8 U.S.C. § 1182(a)(9)(B)(i). *See* 87 Fed. Reg. at 53,209. The Final Rule's definition of "lawfully present" to cover all deferred action recipients, including DACA recipients, is thus consistent with DHS's longstanding interpretation of the term.

It is also consistent with how many Plaintiffs interpret similar terms in State law. Kansas, for instance, bars the "division of vehicles" from issuing a driver's license "to any person … [w]hose presence in the United States is in violation of federal immigration laws," Kan. Stat. Ann. § 8-237(i), and yet an applicant can prove he is "lawfully present in the United States" by presenting evidence that he "has approved deferred action status," *id.* § 8-240(b)(2)(H). Indiana and South Dakota equate "lawful status" with having "approved deferred action status." Ind. Code §§ 9-13-2-92.3(a)(2)(G), 9-24-11-5(c)(4); S.D. Stat. § 32-12-1.1(7). Montana and Idaho prohibit the issuance of a license to, respectively, a person "whose presence in the United States is not authorized under federal law," Mont. Code Ann. § 61-5-105(10), and someone "not lawfully present," Idaho Code § 49-303(14). At least Kentucky, Nebraska, Tennessee, Texas, and Virginia limit licenses to those with "lawful status" or

"authorization" to be in the United States. *See* Ky. Rev. Stat. § 186.4121(e); Neb. Rev. Stat. § 60.484.04; Tenn. Code Ann. § 55-50-331(g); Tex. Transp. Code § 521.101(f-2); Va. Code § 46.2.-328.1(B).   Yet all of them issue licenses to DACA recipients. *See* Mot. at 17. CMS's definition of "lawfully present" to similarly cover deferred action recipients, including DACA recipients, is no more "facially irrational" or "self-contradictory" than Plaintiffs' statutes or their interpretations of them. *Id.* at 14.

Plaintiffs and the cases on which they rely err in conflating immigration status or admissibility with lawful presence. *See* Mot. at 9-10 (citing *Estrada v. Becker*, 917 F.3d 1298 (11th Cir. 2019); *Texas v. United States*, 549 F. Supp. 3d 572 (S.D. Tex. 2021)).   These terms have separate, established meanings, particularly within immigration law. *See* 87 Fed. Reg. at 53,209. What matters for purposes of the Final Rule is that DHS has granted deferred action to DACA recipients—that the federal government has indicated it will "tolerate" these individuals' presence for a time. Considering the Affordable Care Act's goals of expanding health coverage to improve health outcomes within the country and reduce costs, it is reasonable for CMS to conclude in similar fashion that DACA recipients should no longer be excluded from eligibility to enroll in QHPs offered through the exchanges given their sustained presence in the United States. That position is consistent with CMS's grant of eligibility to others with deferred action status, with the broader historical interpretation of "lawful presence," and with Plaintiffs' own approaches to similar language in their own laws.

Second, Plaintiffs are incorrect that PRWORA bars the Final Rule's treatment of DACA recipients as "lawfully present." *See* Mot. at 10-12. PRWORA generally limits "Federal public benefits" to "qualified [noncitizens]"—a term that does not include DACA recipients—"[n]otwithstanding any other provision of law." 8 U.S.C. § 1611(a). However, Congress made a separate, more specific, and broader eligibility decision in the more recent Affordable Care Act by permitting those "lawfully present"—and not just "qualified [noncitizens]"—to enroll in QHPs through exchanges. *See* 42 U.S.C. § 18032(f)(3). PRWORA itself recognizes that the term "[noncitizen] who is lawfully present" is broader

than "qualified [noncitizen]." *See* 8 U.S.C. § 1611(a), (b)(2). Therefore, to the extent that Plaintiffs claim that PRWORA limits exchange eligibility, there is a conflict between 8 U.S.C. § 1611(a) and 42 U.S.C. § 18032(f)(3).[10]

Under bedrock statutory-interpretation principles, the Court's role in such a situation is to give effect to both by construing the more specific statute (§ 18032(f)(3)) as an exception to the general (PRWORA), *see RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012), or the more recent Affordable Care Act as modifying the older PRWORA, *see In re Am. River Transp. Co.*, 800 F.3d 428, 433 (8th Cir. 2015). Either way, the Affordable Care Act's particular criteria control in this case, *cf. Dorsey v. United States*, 567 U.S. 260, 274 (2012) ("Congress … remains free to repeal the earlier statute, to exempt the current statute from the earlier statute, to modify the earlier statute, or to apply the earlier statute but as modified … either expressly or by implication."). As shown above, the Final Rule is consistent with the Affordable Care Act. Adopting Plaintiffs' position, on the other hand, would at least partially nullify Congress's deliberate choice to expand eligibility in the Affordable Care Act, a strongly disfavored outcome at odds with Congress's clear intent. *See Maine Cmty. Health Options v. United States*, 590 U.S. 296, 315 (2020). There is no need to take such a drastic step.

Third, the Final Rule's definition of "lawfully present" to include those noncitizens granted employment authorization under 8 C.F.R. § 274a.12(c) is permissible. *See* Mot. at 12-13. As an initial matter, Plaintiffs have not shown that the additional individuals considered "lawfully present" based solely on employment authorization harm them; they therefore lack standing to challenge the Final Rule on this ground. *See* Part I.A, *supra*. Regardless, this argument fails for the reasons above related to DACA recipients: Congress intended "lawfully present" to include more individuals than the term "qualified [noncitizens]" and granted

---

[10] Unlike in the portion of the CARES Act at issue in *Poder in Action v. City of Phoenix*, 481 F. Supp. 3d 962, 972 (D. Ariz. 2020), 42 U.S.C. § 18032(f)(3) is not silent as to who is eligible to enroll in QHPs through an exchange. Rather, it "specifically identifies the universe of eligible recipients" and, in doing so, establishes its own "immigration-related eligibility restriction," *Poder*, 481 F. Supp. 3d at 972, which the Final Rule respects.

CMS authority to define "lawfully present" reasonably. CMS's definition is in harmony with other federal agencies' construction of the term and many Plaintiffs' acceptance of employment authorization as evidence of lawful presence or status. *See, e.g.*, Mot. at 18 n.5 (discussing North Dakota); Neb. Rev. Stat. 60-484.04(e); Idaho Driver's Handbook at 23 (July 2024), https://perma.cc/475W-EBV2 (accepting "Employment Authorization Card" as evidence of "lawful presence"). Plaintiffs' statutory arguments accordingly lack merit.

> **B.     CMS properly explained its reasoning in the Final Rule**

Plaintiffs' second merits claim fails as well. *See* Mot. at 13-15. They contend that the Final Rule is arbitrary and capricious because CMS allegedly failed to (1) explain its reasons for adopting a different interpretation of "lawfully present" or (2) consider the "foreseeable" costs to the States of the Final Rule. *Id.* at 14-15. When reviewing an arbitrary-and-capricious claim, "a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Its role is "simply [to] ensure[] that the agency acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Id.* Under that "deferential" standard, *id.*, Plaintiffs are not likely to succeed on their claim.

**1.**     It is well established that "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). The agency must "display awareness that it *is* changing position," and it "must show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). "But it need not demonstrate … that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better." *Id.*

CMS more than met these metrics. It did not "depart from [its] prior policy *sub silentio* or simply disregard rules that are still on the books." *Id.* Rather, it acknowledged the prior policy several times, *see* 89 Fed. Reg. at 39,392, 39,394, 39,407, and recounted the regulatory history associated with CMS's treatment of DACA recipients and others included in the

updated definition, *see, e.g., id.* at 39,392-95, 39,407. It identified the assumptions on which the prior definition excluding DACA recipients was based, including that extending "eligibility for insurance affordability programs" was inconsistent with DHS's purposes in adopting its DACA policy and that other agencies' interpretations of "lawfully present" should not be considered unless the "program in question" had the "explicit objective of expanding access to health insurance affordability programs." *Id.* at 39,395. In the Final Rule, CMS explained that, after "further review and consideration," it now assessed that DHS intended DACA to create stability for noncitizens brought to the United States as children and that allowing those individuals to enroll in QHPs through an exchange was consistent with that goal. *Id.* CMS also determined that limiting its consideration of other agencies' views as before was not statutorily required or the best way to effectuate Congress's intent in enacting the Affordable Care Act. *Id.*

Further, CMS identified many reasons why its new interpretation was preferable. Most importantly, CMS found that eliminating the exclusion of DACA recipients would "better effectuate the goals of the [Affordable Care Act] by expanding access to affordable health insurance coverage" and end the disparate treatment of DACA recipients compared to others granted deferred action. *Id.* at 39,395-98. CMS also concluded that the Final Rule would align CMS's interpretation of "lawfully present" with DHS's in the DACA rule and in determining Social Security benefits eligibility. *See id.* at 39,395 (citing 8 C.F.R. § 1.3). In addition, CMS noted the numerous positive effects of the Final Rule—from increased health coverage for DACA recipients and their children to less absenteeism in the workplace; from more resilience to pandemics to declining strain on the health care system. *See, e.g., id.* at 39,395-98, 39,402. It found that including all noncitizens granted employment authorization under 8 C.F.R. § 274a.12(c) would "streamline and expedite verification." *Id.* at 39,408. Under *Prometheus Radio* and *Fox Television*, the agency need not do more; Plaintiffs' objections to CMS's change in position are unavailing.

**2.**     The Final Rule's test refutes Plaintiffs' claim (at 14-15) that CMS failed to

consider costs to the States. The agency conducted a full analysis of the rule's estimated costs and benefits, which the three States operating SBEs expressly rely upon in their effort to establish standing and irreparable harm. *See* Mot. at 16 (citing 89 Fed. Reg. at 39,424-26). Those costs include not only eligibility costs or costs attributable to "system changes," *id.* at 15, but also potential costs related to processing applications and operating costs more broadly, *see* 89 Fed. Reg. at 39,423-24. Contrary to Plaintiffs' contentions (at 14), CMS also considered potential premium increases; however, the agency determined that including DACA recipients would, if anything, have a positive impact on individual market risk pools because they are younger and generally healthy, likely resulting in decreased premiums, *see* 89 Fed. Reg. at 39,428-29. And as to Plaintiffs' claim that CMS ignored the incidental effects the rule would have on State social-services spending (at 14-15), there was no need for CMS to address the issue. Plaintiffs to date have not presented evidence establishing the factual predicate that States will experience decreased emigration or increased immigration due to the rule, *see* Mot. at 14, and Plaintiffs failed to raise this issue in their comments on the NPRM. *See* Kansas, Comment on Docket No. CMS-9894-P, *supra*. They can hardly complain now that the agency failed to address an issue that they failed to identify when they had the opportunity. Plaintiffs are therefore also unlikely to succeed on this version of their claim.

## IV.   The Equities And Public Interest Do Not Favor Issuing A Stay Or An Injunction

Plaintiffs have the burden of demonstrating "the balance of equities [and the public interest] so favors [them] that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc); *see Nken v. Holder*, 556 U.S. 418, 435 (2009) (third and fourth preliminary-injunction factors merge when the government is the defendant). Plaintiffs have fallen short.

Congress passed the Affordable Care Act—and CMS promulgated the Final Rule—to expand access to affordable health insurance and thereby improve individuals' health and well-being. 89 Fed. Reg. at 39,396. Plaintiffs seek to enjoin that effort, for which the government has determined the benefits outweigh the costs. *See id.* at 39,430. Contrary to

27

Plaintiffs' contention (at 18), when the government "is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).

Plaintiffs' requested relief would also impose significant, unnecessary costs on the public. Thousands of DACA recipients—unlike others granted deferred action—would remain without access to health insurance even though many are essential workers. *See* 89 Fed. Reg. at 39,395-96.[11] Employers as a result would have more absentee workers, *id.* at 39,396, more U.S. citizen children of DACA recipients would continue to be uninsured, *id.* at 39,402, and the health care system would still experience strain on more expensive emergency services, *id.* at 39,406. Further, the FFE and SBEs, including Idaho, Kentucky, and Virginia, would now have to unwind any changes already made to their eligibility systems days before open enrollment begins, potentially doubling the costs about which Plaintiffs complain—in no small part because of Plaintiffs' delay in bringing this challenge, *see Adventist Health Sys./SunBelt, Inc. v. HHS*, 17 F.4th 793, 806 (8th Cir. 2021)—and jeopardizing otherwise-eligible individuals' ability to enroll in affordable health insurance.

Conversely, the only potentially cognizable harm that Plaintiffs claim they will suffer without an injunction is paying some small amount to update their exchange eligibility engines. *See* Mot. at 16. The SBE States volunteered to take on those administrative costs, including responsibility for verifying eligibility, in exchange for control and cost savings. *See* 42 U.S.C. § 18031(b); *Updates to Plans*, *supra* at 2, 5-6. Granting injunctive relief based on the foreseeable consequences of that choice would be inequitable. *See, e.g.*, *Livonia Prop. Holdings, LLC v. 12840-12976 Farmington Road Holdings, LLC*, 399 F. App'x 97, 104 (6th Cir. 2010); *cf. Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 996-97 (8th Cir. 2011).

---

[11] Plaintiffs' suggestion (at 19) that DACA recipients' interests should not be considered in evaluating the equities is meritless. *See Regents*, 591 U.S. at 29-33 (considering DACA recipients' interests). DACA recipients are part of the public, as are the hundreds of thousands of U.S.-citizen children who depend on them. Neither *Lyng v. Payne*, 476 U.S. 926, 942 (1986), nor *Evanoff v. Minneapolis Public Schools*, 11 F. App'x 670 (8th Cir. 2001), suggests otherwise.

Any such costs are a rounding error in the SBEs' budgets. *See, e.g.*, Ky. Health Ben. Exch., Financial Statements at 8 (June 30, 2023), https://perma.cc/HH8B-SM6H (total operating expenses greater than $14 million). Even then, Plaintiffs have not presented evidence that they have spent more to update their systems or that an injunction would save Idaho, Kentucky, or Virginia from any future spending. *See* Part I.B, *supra*. The only other harms that Plaintiffs cite are generalized concerns with immigration policy, which is not affected by the Final Rule, are likely offset by the rule's benefits, and are ultimately insufficient to tip the scale in Plaintiffs' favor. The final factors strongly disfavor granting injunctive relief.

## V.     Any Preliminary Relief Should Be Appropriately Limited

As explained above, no relief is warranted in this case. However, if the Court disagrees, any relief awarded should be no broader than necessary to remedy the precise harms that the Court finds Plaintiffs have demonstrated in this case.

The Supreme Court has held that "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 585 U.S. 48, 73 (2018), and "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). A preliminary injunction in particular "must be narrowly tailored … to remedy only the specific harms shown by the plaintiffs," rather than "all possible breaches of the law." *St. Louis Effort for AIDS v. Huff*, 782 F.3d 1016, 1022-23 (8th Cir. 2015). Broad relief is particularly improper here.

First, the Court should decline to enjoin the Final Rule nationwide. "[P]rinciples of judicial restraint warrant against a nationwide injunction." *West Virginia v. EPA*, 669 F. Supp. 3d 781, 819 (D.N.D. 2023). In this case, 31 States and the District of Columbia, including the vast majority of States operating SBEs, have not filed suit. *See* CMS, *State-based Exchanges* (Sept. 10, 2024), https://perma.cc/WF4G-ZVDT (listing States operating SBEs). Extending any injunction to require them to make more changes to their eligibility systems will potentially jeopardize their start to open enrollment.

That Plaintiffs also seek a stay of the Final Rule under 5 U.S.C. § 705 does not make

a universal remedy any more advisable. Section 705 authorizes courts to "issue all necessary and appropriate process to postpone the effective date" of a rule "to the extent necessary to prevent irreparable injury." In doing so, the statute directs courts to apply traditional equitable principles, including as to the scope of relief. *See* H.R. Rep. No. 79-1980 at 277 (1946) ("[t]he authority granted is equitable"). And the same rules therefore apply to a § 705 stay.

Second, any relief should extend only to Plaintiffs that the Court concludes have demonstrated both standing and irreparable harm. "Article III does not give federal courts the power to order relief to any uninjured plaintiff." *TransUnion LLC*, 594 U.S. at 431; *see* H.R. Rep. No. 79-1980 at 277 (relief under § 705 should "normally, if not always, be limited to the parties complainant"). If the Court concludes that only some Plaintiffs have demonstrated standing and irreparable harm, it should (and must) exclude the others from any relief.

Third, any stay or injunction should be limited to the provisions or aspects of the Final Rule that the Court holds to be likely unlawful. The Final Rule contains a severability section, expressing CMS's intent that "if a court were to stay or invalidate the inclusion of one provision in the definition of 'lawfully present,'" the "remaining features" would stand "to the extent possible." 89 Fed. Reg. at 39,421. Ordinarily, whether a regulation is severable depends on "the intent of the agency" and "whether the remainder of the regulation could function sensibly without the stricken provision." *MD/DC/DE Broad. Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001). The Final Rule's severability section demonstrates CMS's intent, and as CMS explained, "individual portions of th[e] [Final Rule] have significant benefits and would be worthwhile in themselves" and can function separately. 89 Fed. Reg. at 39,421. Therefore, only "objectionable provision[s]" should be temporarily enjoined while the others remain in place. *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987).

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion should be denied.

Dated: September 25, 2024                Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ERIC B. BECKENHAUER
Assistant Branch Director
Federal Programs Branch

*/s/ Christopher A. Eiswerth*
Christopher A. Eiswerth (D.C. Bar No. 1029490)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 305-0568
Email: christopher.a.eiswerth@usdoj.gov

*Counsel for Defendants*