**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION**

| | |
|---|---|
| The State of KANSAS, the State of NORTH DAKOTA, the State of ALABAMA, the State of ARKANSAS, the State of FLORIDA, the State of IDAHO, the State of INDIANA, the State of IOWA, the Commonwealth of KENTUCKY, the State of MISSOURI, the State of MONTANA, the State of NEBRASKA, the State of NEW HAMPSHIRE, the State of OHIO, the State of SOUTH CAROLINA, the State of SOUTH DAKOTA, the State of TENNESSEE, the State of TEXAS, and the Commonwealth of VIRGINIA,<br><br>Plaintiffs,<br>v.<br>UNITED STATES OF AMERICA and the CENTERS FOR MEDICARE & MEDICAID SERVICES,<br><br>Defendants. | CIVIL ACTION NO. 1:24-cv-00150-DMT-CRH |

**PROPOSED INTERVENOR-DEFENDANTS' MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFFS' MOTION FOR A STAY OF THE FINAL RULE
AND PRELIMINARY INJUNCTION**

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ............................................................................................................1

BACKGROUND .............................................................................................................3

I.    Congress Enacts The Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA), Which Specifies The Federal Public Benefits Available To "Qualified Aliens" And Other "Lawfully Present" Noncitizens .......................................3

II.    The Attorney General Defines "Lawfully Present" To Include Individuals Granted Deferred Action ..........................................................................................3

III.    In the Affordable Care Act (ACA), Congress Requires Lawfully Present Noncitizens To Purchase Health Insurance And Allows Them To Do So Through Newly Created Health Insurance Marketplaces .................................................4

IV.    DHS Adopts DACA, But CMS Excludes Recipients From ACA Marketplaces ..............5

V.    CMS Restores DACA Recipients' Access To Health Insurance Marketplaces .................7

ARGUMENT ..................................................................................................................7

I.    The Preliminary Injunction Motion Is Not Properly Before This Court ............................7

   A.    Venue Is Not Proper Because North Dakota Lacks Standing ......................................7

   B.    The Court Lacks Jurisdiction Because No State Has Article III Standing .....................8

II.    The Requirements For A Preliminary Injunction Are Not Satisfied ...............................10

   A.    The Plaintiff States Are Likely To Lose On The Merits .............................................10

     1.    PRWORA's Limitation of Benefits to Qualified Aliens Does Not Apply to the ACA Marketplaces ....................................................................11

     2.    DACA Recipients Are Lawfully Present .............................................................13

     3.    Final Rule Is Not Arbitrary And Capricious .......................................................16

   B.    The Final Rule Will Not Injure The Plaintiff States, Let Alone Irreparably .................17

   C.    The Balance Of Equities Weighs Against An Injunction Because Excluding DACA Recipients From ACA Marketplaces Will Irreparably Harm Them ..............................................................................................18

III.    If the Court Grants Relief, Injunction Should be Limited .............................................20

CONCLUSION ...............................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Arizona v. Biden*,
    40 F.4th 375 (6th Cir. 2022)...................................................................................9

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
    548 U.S. 291 (2006) .............................................................................................12

*Arpaio v. Obama*,
    797 F.3d 11 (D.C. Cir. 2015) ................................................................................9

*Ashley, Drew & N. Ry.Co. v. United Transp. Union*,
    625 F.2d 1357 (8th Cir. 1980)..............................................................................13

*Braitberg v. Charter Commc'ns, Inc.*,
    836 F.3d 925 (8th Cir. 2016)..................................................................................9

*California v. Texas*,
    593 U.S. 659 (2021) .........................................................................................12, 13

*Chevron U.S.A. Inc. v. EPA*,
    45 F.4th 380 (D.C. Cir. 2022) ...............................................................................8

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ...............................................................................................8

*Comm'r v. Keystone Consol. Indus., Inc.*,
    508 U.S. 152 (1993) .............................................................................................15

*J.D. ex rel. Devantier v. Sherman*,
    2006 WL 3163053 (W.D. Mo. Oct. 27, 2006) .....................................................19

*Dundon v. Kirchmeier*,
    2017 WL 5894552 (D.N.D. Feb. 7, 2017) ...........................................................10

*Encino Motorcars, LLC v. Navarro*,
    136 S. Ct. 2117 (2016).........................................................................................16

*Estrada v. Becker*,
    917 F.3d 1298 (11th Cir. 2019).............................................................................16

*FCC v. Fox Telev. Stations, Inc.*,
    556 U.S. 502 (2009) .............................................................................................16

*H&R Block, Inc. v. Block, Inc.*,
    58 F.4th 939 (8th Cir. 2023).................................................................................17

*Loper Bright Enterprises v. Raimondo*,
    144 S. Ct. 2244 (2024)......................................................................................... 13, 15

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (2019) ................................................................................................ 8

*Madsen v. Women's Health Ctr., Inc.*,
    512 U.S. 753 (1994) .............................................................................................. 20

*Maybelline Co. v. Noxell Corp.*,
    813 F.3d 901 (8th Cir. 1987)................................................................................. 7

*Medina Tovar v. Zuchowski*,
    982 F.3d 631 (9th Cir. 2020)............................................................................... 15

*Nemnich v. Stangler*,
    1992 WL 178963 (W.D. Mo. Jan. 7, 1992)........................................................ 19

*North Dakota v. EPA*,
    730 F.3d 750 (8th Cir. 2013)............................................................................... 17

*Pennsylvania v. New Jersey*,
    426 U.S. 660 (1976) ............................................................................................. 10

*Proctor & Gamble Co. v. Ranir, LLC*,
    2017 WL 3537197 (S.D. Ohio Aug. 17, 2017) .................................................... 7

*Quarles v. St. Clair*,
    711 F.2d 691 (5th Cir. 1983)............................................................................... 13

*Reno v. Am.-Arab Anti-Discrim. Comm.*,
    525 U.S. 471 (1999) ............................................................................................... 4

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ............................................................................................... 8

*St. Louis Effort for AIDS v. Huff*,
    782 F.3d 1016 (8th Cir. 2015).............................................................................. 20

*State v. Biden*,
    52 F.4th 362 (8th Cir. 2022).................................................................................. 9

*Strickland v. Comm'r, Me. Dep't of Hum. Servs.*,
    48 F.3d 12 (1st Cir. 1995).................................................................................... 15

*Taggart v. Lorenzen*,
    587 U.S. 554 (2019) ............................................................................................. 15

*Texas v. U.S.*,
   945 F.3d 355 (5th Cir. 2019).................................................................................13

*Texas v. United States*,
   50 F.4th 498 (5th Cir. 2022)................................................................................16

*Texas v. United States*,
   549 F. Supp. 3d 572 (S.D. Tex. 2021) ..................................................................9

*Todd v. Sorrell*,
   841 F.2d 87 (4th Cir. 1988)..................................................................................19

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) .......................................................................................8, 20

*United States v. Fontaine*,
   697 F.3d 221 (3rd Cir. 2012) ...............................................................................13

*United States v. Kidd*,
   963 F.3d 742 (8th Cir. 2020)................................................................................12

*United States v. Sutton*,
   625 F.3d 526 (8th Cir. 2010)................................................................................11

*United States v. Texas*,
   143 S. Ct. 1964 (2023).........................................................................................9

*Watkins Inc. v. Lewis*,
   346 F.3d 841 (8th Cir. 2003)................................................................................10

*Whitewater Draw Nat. Res. Conserv. Dist. v. Mayorkas*,
   5 F.4th 997 (9th Cir. 2021) ...................................................................................9

*Winter v. NRDC, Inc.*,
   555 U.S. 7 (2008) ................................................................................................10

**Statutes**

5 U.S.C. § 706(2)(A)...............................................................................................17

8 U.S.C. § 1182(d)(5)(A) ..........................................................................................3

8 U.S.C. § 1231(b)(3)................................................................................................3

8 U.S.C. § 1611.......................................................................................1, 3, 4, 11, 12

8 U.S.C. § 1641.................................................................................................3, 15

26 U.S.C. § 5000A.......................................................................................2, 5, 12, 13

42 U.S.C. § 1436a ................................................................................................................15

42 U.S.C. § 18001 *et seq.* .....................................................................................................4

42 U.S.C. § 18031 .................................................................................................... 5, 10, 18

42 U.S.C. § 18032 ...................................................................................................1, 5, 11, 12

42 U.S.C. § 18041 ..................................................................................................................5

**Regulations**

8 C.F.R. § 1.3 (2011) .......................................................................................................4, 15

8 C.F.R. § 103.12 (1997) .......................................................................................................4

45 C.F.R. § 152.2 (2010) .....................................................................................................5, 6

61 Fed. Reg. 47,039 (September 6, 1996) ..........................................................................4, 15

77 Fed. Reg. 52,614 (Aug. 30, 2012) ...................................................................................6

89 Fed. Reg. 39,392 (May 8, 2024).................................................................1, 2, 7, 11, 17, 18, 19, 20

**Other Authorities**

163 Cong. Rec. S7672 (daily ed. Dec. 1, 2017) (statement of Sen. Toomey) ...........................13

Janet Napolitano, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children,* DHS (June 15, 2012), tinyurl.com/2nwmu6fb. ........................................................................................5, 6

Medha D. Makhlouf, *Interagency Dynamics in Matters of Health and Immigration*, 103 B.U. L. Rev. 1095 (2023) ..........................................................................6

National Immigration Law Center ("NILC"), DACA Recipients' Access to Health Care: 2024 Report (May 2024), tinyurl.com/yw6zw2y4. .................................................6, 7

Shambie Singer & Norman J. Singer, Sutherland Statutes and Statutory Construction § 51:04 (7th ed.)...........................................................................................13

Vanessa C. Forsberg, *Overview of Health Insurance Exchanges* 31 (Mar. 17, 2023), Congressional Research Service, tinyurl.com/2hps5aay ...........................................10

## INTRODUCTION

Recipients of Deferred Action for Childhood Arrivals ("DACA") like the three Proposed Individual Intervenors and members of Proposed Intervenor CASA, Inc. (together "Proposed Intervenors") have lived in this country for most of their lives and have been waiting for access to health insurance for more than a decade.  Earlier this year, the Centers for Medicare and Medicaid Services ("CMS") finally issued a rule that would allow DACA recipients to purchase affordable health insurance through the marketplaces established by the Affordable Care Act ("ACA").  89 Fed. Reg. 39,392 (May 8, 2024) ("Final Rule").  Yet the Plaintiff States now seek to preliminarily enjoin that rule based on a flawed legal theory that would irreparably harm DACA recipients like Proposed Intervenors.  This Court should deny that relief for numerous reasons.

To start, this Court has no authority to grant the motion.  The Plaintiff States strategically joined North Dakota so they could file in this Court.  But as explained in Proposed Intervenors' Motion to Transfer, North Dakota—which has only 130 DACA recipients and does not run its own ACA marketplace—lacks Article III standing, so venue is improper.  The other Plaintiff States that do not run their own marketplaces also lack standing for similar reasons.  And the three Plaintiff States that operate their own marketplaces are free to recoup any expenses from health insurers.

Injunctive relief is also unavailable because Plaintiffs' legal theories lack merit.  They invoke a provision of the Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA") that limits certain federal benefits to "qualified aliens."  8 U.S.C. § 1611(a).  But this provision does not apply to the ACA.  Instead, Congress superseded it in the ACA by specifying that all individuals who are "lawfully present in the United States" are "qualified individuals" who "may enroll" in and purchase qualified health plans under the ACA.  42 U.S.C. § 18032(d)(3), (f)(1), (3).  Indeed, the ACA expressly *mandates* that "lawfully present" individuals obtain health

insurance. 26 U.S.C. § 5000A(a), (d). "Lawfully present" individuals can thus access the ACA marketplace regardless of whether they are "qualified aliens" under PRWORA. Recipients of deferred action have been considered "lawfully present" under regulations governing benefit access since PRWORA first used that term in 1996, and Congress is presumed to have been aware of and incorporated that definition when it borrowed the term in the ACA.

The Plaintiff States also cannot show that they face irreparable harm from the Final Rule for the same reasons they cannot establish standing. At most, the Final Rule will cause the three Plaintiff States that operate their own ACA marketplaces (Idaho, Kentucky, and Virginia) to spend an estimated $42,291 *total* to update their administrative systems and process applications—all of which can be recovered from insurers. By contrast, the harms that DACA recipients like Proposed Intervenors will face without access to ACA marketplaces are dire and irreparable. For example, Claudia Moya Lopez may not be able to monitor for a potential recurrence of leukemia. ECF No. 49-4 ("Moya Lopez Decl.") ¶ 13. Dania Quezada Torres may need to continue rationing her medication. ECF No. 49-3 ("Torres Decl.") ¶ 13. And Hyun Kim will remain unable to get tested and seek preventive care for his family history of diabetes. ECF No. 49-2 ("Kim Decl.") ¶ 9. Such harms are shared by thousands of other DACA recipients who face significant health and financial injury if the Final Rule is enjoined, as well as the broader public, which will benefit from reduced public expenditures on uncompensated care, reduced costs as insurance risk pools expand, and increased economic productivity from a healthier populace. *See* 89 Fed. Reg. at 39,428-29.

The Court should therefore deny the Plaintiff States' request for a preliminary injunction. At a minimum, any relief should be limited to the States—if any—that have established Article III standing and irreparable harm sufficient to outweigh any harms to DACA recipients.

## BACKGROUND

I.    **Congress Enacts The Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA), Which Specifies The Federal Public Benefits Available To "Qualified Aliens" And Other "Lawfully Present" Noncitizens**

Since 1996, noncitizens' access to federal public benefits has been governed mainly by PRWORA.  *See* 8 U.S.C. § 1611.  PRWORA identifies two groups of noncitizens who may access those benefits.  For most benefits, only "qualified alien[s]" are eligible.  *Id.* § 1611(a).  But a broader group—any noncitizen who is "lawfully present in the United States as determined by the Attorney General"—is also eligible for certain benefits that they have earned by working or contributed to funding, even if they are not "qualified alien[s]."  *Id.* § 1611(b)(2)-(4).  Those benefits include Medicare, the Railroad Retirement Act, and Social Security.  *Id.*

The term "qualified alien" includes some noncitizens that meet the Immigration and Nationality Act ("INA") requirements for admission to the United States, such as lawful permanent residents and asylum recipients.  8 U.S.C. § 1641(b)(1)-(2).  But it also includes others who have been permitted to remain in the country solely as a result of the federal government's forbearance from removing them.  For example, it includes certain individuals granted parole, meaning they have been allowed to enter the United States without a full determination of their admissibility, but they may ultimately be determined to be inadmissible.  *Id.* §§ 1182(d)(5)(A), 1641(b)(4).  Another example is recipients of withholding of removal, which merely prevents the Department of Homeland Security ("DHS") from removing otherwise removable individuals to countries where they will face persecution of origin if their life or freedom would be threatened in that country.  *Id.* §§ 1231(b)(3), 1641(b)(5).

II.    **The Attorney General Defines "Lawfully Present" To Include Individuals Granted Deferred Action**

Unlike "qualified alien," PRWORA does not define "lawfully present."  Instead, it leaves

the definition to be "determined by the Attorney General"—and now, as his successor, DHS.  8 U.S.C. § 1611(b)(2)-(4).  Two weeks after PRWORA's enactment, the Attorney General exercised this authority through an interim Final Rule originally codified at 8 C.F.R. § 103.12 (1997), and now moved to 8 C.F.R. § 1.3 (2011).  61 Fed. Reg. 47,039 (September 6, 1996).  Recognizing that "Congress intended for qualified aliens … to be included in the definition of 'lawfully present,'" *id.* at 47,040/2, the rule defined "lawfully present" to include those individuals, plus individuals admitted with other status and short-term parolees, 8 C.F.R. § 103.12(a)(1); 8 C.F.R. § 1.3(a)(1)-(3).

The definition also included seven other groups who had been "permitted to remain in the United States either by an act of Congress or through some other policy determination affecting that class of aliens."  61 Fed. Reg. at 47,040/2.  One group was recipients of "deferred action," 8 C.F.R. § 103.12(a)(4)(vi) (1997); 8 C.F.R. § 1.3(a)(4)(vi)—"a regular practice" in which the government elects not to seek removal of individuals "for humanitarian reasons or simply for its own convenience."  *Reno v. Am.-Arab Anti-Discrim. Comm.*, 525 U.S. 471, 483-84 & n.8 (1999).

Together, these categories reflect a clear definition of "lawfully present": any individual whose "presence in the United States has been sanctioned by a policy determination that a particular class of aliens should be allowed to remain in the United States."  61 Fed. Reg. at 47,040/1.

## III.    In the Affordable Care Act (ACA), Congress Requires Lawfully Present Noncitizens To Purchase Health Insurance And Allows Them To Do So Through Newly Created Health Insurance Marketplaces

Against this background, Congress passed the ACA in 2010 with a goal of providing broad access to health insurance and reducing the number of uninsured and underinsured individuals in the United States.  *See* Pub. L. No. 111-148, 124 Stat. 119 (2010) (codified as 42 U.S.C. § 18001 *et seq.*).  To achieve that goal, the ACA included a provision (the "Individual Mandate") that required each U.S. citizen and each "alien lawfully present in the United States"—unless

incarcerated or exempt for religious reasons—to obtain a minimum level of health insurance. 26 U.S.C. § 5000A(a), (d). Although Congress later eliminated the penalty for violating the Individual Mandate, the mandate itself remains in the statute and informs its original meaning.

For individuals who cannot access health insurance through their employers or by other means, the ACA establishes online health insurance marketplaces where consumers can compare and buy approved health insurance plans. 42 U.S.C. §§ 18031, 18041. Most of the Plaintiff States here opted to use the federal government's centrally operated marketplaces. ECF No. 27 ("FAC") ¶¶ 46-48. Only three—Idaho, Kentucky, and Virginia—operate their own marketplaces. *Id*.

Consistent with the Individual Mandate's requirement that "lawfully present" noncitizens obtain health insurance, the ACA also permits them as "qualified individual[s]" authorized to access the health insurance marketplaces established by the Act. 42 U.S.C. § 18032(a)(1), (f)(1), (3). Congress accordingly chose to define the limits on marketplace access not by using PRWORA's category of "qualified alien[s]," but rather by using its other key term—"lawfully present"—which had consistently been interpreted to include recipients of deferred actions. *Id*.

CMS's initial regulation interpreting the ACA's reference to "lawfully present" thus closely tracked the regulation defining that term for purposes of PRWORA. In particular, it stated that all persons granted "deferred action" are "lawfully present." 45 C.F.R. § 152.2(4)(vi) (2010).

## IV.    DHS Adopts DACA, But CMS Excludes Recipients From ACA Marketplaces

In 2012, DHS announced DACA, which allowed persons who had arrived as children, with generally good records and proof of educational attainment, attendance, or military service, to seek deferred action and work authorization. Janet Napolitano, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children*, DHS, 2 (June 15, 2012), tinyurl.com/2nwmu6fb. DHS's goal was to prevent "low [enforcement] priority individuals" who had "already contributed to our country in significant ways" "from being removed." *Id*.

Although then-existing ACA regulations likewise would have treated DACA recipients as "lawfully present" and thus eligible to purchase health insurance on the marketplaces, CMS arbitrarily amended those regulations to exclude them from the definition of "lawfully present," while continuing to treat all other deferred action recipients as lawfully present. 77 Fed. Reg. 52,614, 52,615 (Aug. 30, 2012) (adding 45 C.F.R. § 152.2(8)). This change "was not based on health policy"—"rather, it relied on a desire not to interfere with immigration policymaking" or to appear too lenient on immigration issues. Medha D. Makhlouf, *Interagency Dynamics in Matters of Health and Immigration*, 103 B.U. L. Rev. 1095, 1126-27 (2023); 77 Fed. Reg. at 52,614-15 ("HHS is amending its definition of 'lawfully present' in the PCIP program … [to] not inadvertently expand the scope of [DHS's] DACA process.").

Without marketplace access, DACA recipients have had few options if employment-based coverage is unavailable or unaffordable. A recent survey found 20% were not covered by any health insurance or health plan—nearly triple the national average. National Immigration Law Center ("NILC"), DACA Recipients' Access to Health Care: 2024 Report, 1 (May 2024) ("NILC Report"), tinyurl.com/yw6zw2y4. And 36% skipped recommended medical tests or treatments due to the cost of care. *Id*. at 3. Proposed Intervenors share this experience. For example, Dania Quezada Torres tried to treat a bacterial infection on her own because she had already used the single school-clinic doctor's visit she gets through coverage provided by her university. Torres Decl. ¶ 14. The pain continued to worsen until she was forced to go to urgent care. *Id*. She also has had to ration her prescription medication. *Id*. ¶ 13. Hyun Kim has not had a physical in three years and has not been tested for diabetes despite a family history of the illness. Kim Decl. ¶ 9. The lack of affordable care also has financial implications, with 27% reporting they took on debt to afford a medical procedure and 12% taking on debt to afford medication. NILC Report at 3.

6

## V.    CMS Restores DACA Recipients' Access To Health Insurance Marketplaces

In May 2024, after a period of notice and public comment, CMS issued the Final Rule eliminating the arbitrary DACA carve out from marketplace eligibility.  CMS explained that it was "reconsider[ing] its position" and "chang[ing] its interpretation of the statutory phrase 'lawfully present'" to once again treat *all* deferred action recipients as "lawfully present" for ACA purposes because it recognized that it had "no statutory mandate to distinguish" DACA recipients from "other deferred action recipients."  89 Fed. Reg. at 39,395/1.  Under the Final Rule, DACA recipients will be eligible to purchase health insurance plans in the ACA marketplace during the upcoming enrollment period for 2025, which begins November 1, 2024.  *Id*. at 39,392/1.

## ARGUMENT

## I.    The Preliminary Injunction Motion Is Not Properly Before This Court

The Plaintiff States' motion for a preliminary injunction fails at the threshold because this Court lacks authority to grant it.  The Plaintiff States' attempt to establish venue in this Court by joining North Dakota as a plaintiff fails because North Dakota lacks Article III standing.  And even if that were not dispositive, the remaining Plaintiff States lack standing for similar reasons.

### A.    Venue Is Not Proper Because North Dakota Lacks Standing

As an initial matter, the Court cannot consider the Plaintiff States' motion for a preliminary injunction before determining venue is proper.  "Courts faced with an argument that venue is improper must resolve that issue prior to addressing the merits of any claim, including a preliminary injunction."  *Proctor & Gamble Co. v. Ranir, LLC*, 2017 WL 3537197, at *4 (S.D. Ohio Aug. 17, 2017); *see*, *e.g.*, *Maybelline Co. v. Noxell Corp.*, 813 F.3d 901 (8th Cir. 1987) (vacating preliminary injunction where district court failed to first assess venue).  Here, as explained in Proposed Intervenors' Motion to Transfer Venue, ECF No. 50-1, North Dakota is an improper venue because it lacks any cognizable injury from the Final Rule and thus lacks standing to participate.  *Id*. at 7-

20.  This Court should transfer this action to a proper venue, *id.* at 19-20, which can then consider the preliminary injunction motion to the extent it remains timely despite any delay resulting from the Plaintiff States' strategic decision to file in an obviously improper venue, *id*. at 2-3.

### B.    The Court Lacks Jurisdiction Because No State Has Article III Standing

Because North Dakota's lack of standing defeats venue, this Court need not decide whether the remaining Plaintiff States have Article III standing.  *See Chevron U.S.A. Inc. v. EPA*, 45 F.4th 380, 385 (D.C. Cir. 2022) (courts may decide "threshold, nonjurisdictional issue[s]" like venue before standing).  But should it reach the issue, it should hold that they do not.  The Court thus lacks jurisdiction to issue a preliminary injunction.

"As the party invoking federal jurisdiction, the plaintiffs bear the burden of demonstrating that they have standing."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430-31 (2021).  "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  An "injury in fact" requires "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Id.* at 339.  And the "imminence" requirement, in turn, requires "that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).  When "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation" of a third party, it is "substantially more difficult to establish" standing because "causation and redressability ordinarily hinge on the response of the regulated … third party."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (2019).

Here, the majority of the Plaintiff States do not operate their own health care marketplaces. Instead, they assert standing based only on the Final Rule's supposed effect on immigration.  Specifically, they claim the Final Rule makes it more likely that "aliens who would otherwise have

returned to their countries of origin" instead will remain in the United States, imposing "fiscal costs" on each Plaintiff State. FAC ¶¶ 55-56. But that theory fails for many of the same reasons it fails for North Dakota. *See* ECF No. 50-1 at 10-13. A federal policy's "indirect effects on state revenues or state spending" is far too "attenuated" of an injury to satisfy Article III. *United States v. Texas*, 143 S. Ct. 1964, 1972 n.3 (2023); *see also Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022) (rejecting standing based on immigration policy's "peripheral costs on a State"); *State v. Biden*, 52 F.4th 362, 369 (8th Cir. 2022) (states' monetary injury too attenuated to establish standing). And the theory depends on the dubious, and at best speculative, assumption that DACA recipients—who have already chosen to remain in the country for at least the past 17 years without access to the ACA marketplaces, ECF No. 50-1, at 12—will leave the country imminently unless granted the right to access the marketplace for the first time. Such a "speculative or hypothetical risk is insufficient." *Braitberg v. Charter Commc'ns, Inc.*, 836 F.3d 925, 930 (8th Cir. 2016).

Plaintiffs' alternate theory—that "the availability of ACA coverage will encourage … additional illegal immigration by those believing they or their family members will be eligible for DACA in the future," FAC ¶¶ 66-68—fares no better. ECF No. 50-1, at 16-17. By its terms, DACA is limited to people who arrived in this country before 2007, and it has been frozen to new applicants by court order since 2021, *Texas v. United States*, 549 F. Supp. 3d 572, 578, 624 (S.D. Tex. 2021). No one living abroad has any reason to believe they will benefit from DACA. Article III "does not confer standing to complain of harms by third parties the plaintiff expects will act in unreasonable reliance on current governmental policies that concededly cannot benefit those third parties." *Arpaio v. Obama*, 797 F.3d 11, 20 (D.C. Cir. 2015). Courts thus regularly reject this "enticement theory" of standing "in the context of a challenge to DACA." *Whitewater Draw Nat. Res. Conserv. Dist. v. Mayorkas*, 5 F.4th 997, 1014 (9th Cir. 2021); *see Arpaio*, 797 F.3d at 14.

That leaves the three Plaintiff States that run their own ACA marketplaces, who allege additional purported injuries from having to accommodate DACA recipients on their state-run marketplaces. FAC ¶ 56-67. But the ACA permits states to "finance their exchanges by collecting user fees from participating insurers." Vanessa C. Forsberg, *Overview of Health Insurance Exchanges* 31 (Mar. 17, 2023), Congressional Research Service, tinyurl.com/2hps5aay; *see* 42 U.S.C. § 18031(d)(5)(A). The States that operate their own marketplaces have not indicated whether they collect these fees. But any injury from costs they choose not to recover would be self-inflicted, and "[n]o State can be heard to complain about damage inflicted by its own hand." *Pennsylvania v. New Jersey*, 426 U.S. 660 (1976) (*per curiam*).

## II.    The Requirements For A Preliminary Injunction Are Not Satisfied

Plaintiff States also fail to satisfy their "difficult burden," *Dundon v. Kirchmeier*, 2017 WL 5894552, at *20 (D.N.D. Feb. 7, 2017), to justify the "extraordinary remedy" of a preliminary injunction, *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). They "must establish" that: (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm" absent preliminary relief; (3) "the balance of equities tips in [their] favor"; and (4) "an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). None of these requirements is met.

### A.    The Plaintiff States Are Likely To Lose On The Merits

The Plaintiff States cannot meet the initial requirement—a likelihood of success—because venue is improper, they lack standing, *supra* at 8-10, and their claims lack merit. Notwithstanding PRWORA, the ACA is explicit that any "lawfully present" individual "may enroll," 42 U.S.C. § 18032(d)(3), (f)(1), (3) in—and under the Individual Mandate, originally could be fined for failing to enroll in—an ACA marketplace health plan. Deferred action recipients have been treated as "lawfully present" for purposes of federal programs for nearly three decades, and Congress is presumed to have followed that longstanding interpretation when it explicitly used that phrase in

the ACA.  Given the statute's clear meaning, excluding DACA recipients from the ACA market-place was arbitrary and capricious.  Restoring their access, by contrast, was eminently reasonable.

### 1.    PRWORA's Limitation of Benefits to Qualified Aliens Does Not Apply to the ACA Marketplaces

Eligibility to purchase health insurance through the ACA marketplace is governed by the ACA, not PRWORA.  Under 42 U.S.C. § 18032(d)(3), anyone who meets the ACA's definition of "qualified individual may enroll in any qualified health plan."  And § 18032(f) treats all state residents as "qualified individual[s]" if they "reside in [a] State," "seek to enroll in a qualified health plan," are not incarcerated, and are either citizens, nationals, or "lawfully present."  *Id.* § 18032(f)(1), (3).  Any lawfully present state resident who is not incarcerated thus "may" partic-ipate in that state's ACA marketplace.  *Id.* § 18032(d)(3).

The Plaintiff States argue that PRWORA bars DACA recipients from the ACA market-places because it limits federal benefits to noncitizens that meet PRWORA's definition of "quali-fied aliens."  ECF No. 35 ("Mot.") at 11 (quoting 8 U.S.C. § 1611(a)).  But as CMS explained, this restriction does not "appl[y] to the ACA," 89 Fed. Reg. at 39,413/1-2, for several reasons.

*First*, if PRWORA limited ACA marketplace access to "qualified aliens," as the Plaintiff States contend, it would conflict with § 18032's instruction that all "lawfully present" individuals are "qualified individuals" who "may enroll" in ACA plans.  42 U.S.C. § 18032(d)(3), (f)(1), (3).  "[W]here tension exists between a specific statute and a more general statute, the specific statute governs."  *United States v. Sutton*, 625 F.3d 526, 529 (8th Cir. 2010); *United States v. Kidd*, 963 F.3d 742, 748-49 (8th Cir. 2020).  And § 18032 is the more specific statute because it governs eligibility solely for the ACA marketplace, and it specifically addresses which noncitizens are eligible.  PRWORA, by contrast, governs "*any* Federal public benefit" generally—including a wide array of "retirement, welfare, health, disability, public or assisted housing, postsecondary

education, food assistance, unemployment benefit[s]," and "other similar benefit[s]."  8 U.S.C. § 1611(a), (c) (emphasis added).  Section 18032's grant of marketplace eligibility to *all* lawfully present noncitizens thus supersedes PRWORA.

*Second*, a contrary reading would render § 18032(f)(3) superfluous.  If PRWORA already limited marketplace access to "qualified aliens"—all of whom are necessarily considered "lawfully present," *see supra* at 3-4—a separate provision limiting access to "lawfully present" individuals, as § 18032(f)(3) does, would be unnecessary and inconsequential.  The Plaintiff States' interpretation would thus violate the general "presum[ption] that statutory language is not superfluous." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 299 n.1 (2006).

*Third*, it is clear as day that Congress intended to allow *all* lawfully present noncitizens— whether qualified aliens or not—to purchase health insurance on the ACA marketplaces because it *required* them to do so if they could not acquire insurance elsewhere.  The Individual Mandate applies to anyone who meets the definition of "applicable individual," 26 U.S.C. § 5000A(a), which includes *any* "individual" in the United States—where a citizen or not—unless one of three exceptions applies, *id.* § 5000A(d)(1).  One exception exempted anyone who "is not a citizen or national of the United States or an alien lawfully present in the United States." *Id*. § 5000A(d)(3).  The other exceptions (for religious reasons and incarcerated individuals, *id.* § 5000A(d)(2), (4)) are not relevant.  No exception exempted lawfully present individuals who are not qualified aliens.

When the ACA was first enacted, therefore, all lawfully present individuals were subject to the Individual Mandate and faced a potentially steep tax penalty if they failed to obtain health insurance.  *California v. Texas*, 593 U.S. 659, 665 (2021).  It is thus simply inconceivable that Congress meant to prohibit them from doing what the federal statute required.  Courts do not tolerate interpretations that "engende[r] absurd consequences," *Ashley, Drew & N. Ry.Co. v. United*

*Transp. Union*, 625 F.2d 1357, 1365 (8th Cir. 1980), and reading a statute to require "compliance with a regulatory regime" when compliance is "an impossibility" is as "absurd" as it gets, *United States v. Fontaine*, 697 F.3d 221, 230 (3rd Cir. 2012).  The ACA cannot be read to put lawfully present individuals who are not qualified aliens in the "impossible position" where "they could not comply with the statute."  *Quarles v. St. Clair*, 711 F.2d 691, 712 (5th Cir. 1983).

To be sure, Congress effectively eliminated the Individual Mandate when it zeroed out the penalty.  *California*, 593 U.S. at 665.  But that change was driven by opposition to the mandate—it had nothing to do with altering eligibility for the ACA marketplace.  *See* 163 Cong. Rec. S7672 (daily ed. Dec. 1, 2017) (statement of Sen. Toomey) ("We don't change eligibility.").[1]

*Fourth*, CMS's longstanding regulations confirm its current interpretation.  Although *Loper Bright Enterprises v. Raimondo* eliminated judicial "deference" to agency interpretations, it nonetheless reaffirmed the centuries-old principle that "respect to Executive Branch interpreta-tions" is "especially warranted" when the interpretation "was issued roughly contemporaneously with enactment of the statute and remained consistent over time."  144 S. Ct. 2244, 2257-58 (2024). Here, CMS regulations have allowed all individuals that CMS considered "lawfully present" to access the ACA marketplaces since it first implemented those marketplaces.  That "longstanding," "contemporaneou[s]," and "consistent" interpretation warrants "'great respect.'"  *Id.*

## 2.    DACA Recipients Are Lawfully Present

DACA recipients meet the ACA's eligibility standard because DACA is a deferred action policy, and recipients of deferred action have long been considered "lawfully present" for purposes

---

[1] *Texas v. U.S.*, 945 F. 3d 355 (5th Cir. 2019), which held the Individual Mandate unconstitutional but was vacated for lack of jurisdiction, *California*, 593 U.S. at 680, does not change the ACA's meaning.  A statute "need not be … valid … to be construed *in pari materia* with an ambiguous act in order to help determine its meaning," Shambie Singer & Norman J. Singer, Sutherland Stat-utes and Statutory Construction § 51:04 (7th ed.).

of benefits statutes using that term. The Plaintiff States' facile claim that DACA recipients are not "lawfully present" because they are "inadmissible," Mot. 9, fails at the threshold. The Plaintiff States argue that DACA recipients are not lawfully present because "the 'action' that is being deferred is enforcement action … based on recipients' unlawful presence." Mot. 9. But this is precisely the point. DACA recipients' presence *becomes* lawful when the government formally forbears from removing them—and this withholding of removal is required because they are otherwise inadmissible and when they receive that relief (deferral of removal) they are no longer unlawfully present. But even setting that aside, the Plaintiff States' narrow interpretation of "lawfully present" divorces that term from statutory context and contravenes multiple rules of statutory construction.

To start, the Plaintiff States' argument proves too much. If admissibility were a prerequisite to lawful presence, multiple categories of "qualified aliens" who can receive federal public benefits under PRWORA would not be "lawfully present," and could not access the ACA marketplace. As explained, *supra* at 3-4, some persons granted parole are merely allowed to enter the United States temporarily without having been "admitted," and withholding of removal merely prevents DHS from removing otherwise removable individuals to specific countries. Yet recipients of both forms of relief are included in PRWORA's statutory definition of "qualified alien," 8 U.S.C. § 1641(b)(4)-(5), and "Congress intended for 'qualified aliens' ... to be included in the definition of lawfully present." 61 Fed. Reg. at 47,040/2. Indeed, separate statutes governing eligibility for housing assistance expressly refer to recipients of parole, 42 U.S.C. § 1436a(a)(4), and withholding of removal, *id*. § 1436a(a)(5), as "lawfully present in the United States." Lawful presence thus necessarily includes individuals who—like some parole recipients and all recipients of withholding of removal or deferred action—are not admissible and have been permitted to

remain in the country solely as a result of the federal government forbearing from removing them.

Given this context, the Attorney General and DHS have consistently interpreted the term "lawfully present" since it was used in PRWORA 30 years ago to include other classes—including recipients of deferred action—who "have been permitted to remain in the United States either by an act of Congress or through some other policy determination affecting that class of aliens." 61 Fed. Reg. at 47,040/2; *see* 8 C.F.R. § 1.3(a)(4)(vi). Because that "longstanding" interpretation arose "contemporaneously" with PRWORA's enactment and has remained "consistent" ever since, it warrants "'very great respect.'" *Loper Bright*, 144 S. Ct. at 2257-58.

Whatever significance these regulations may have in interpreting PRWORA, moreover, they are dispositive as to the ACA because Congress—in borrowing the term "lawfully present"— presumptively borrowed its longstanding interpretation as well. "When a statutory term is 'obviously transplanted from another legal source,' it 'brings the old soil with it.'" *Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019). Accordingly, "[w]hen Congress codifies language that has already been given meaning in a regulatory context, there is a presumption that the meaning remains the same." *Strickland v. Comm'r, Me. Dep't of Hum. Servs.*, 48 F.3d 12, 20 (1st Cir. 1995). Congress is "presum[ed]" to be "aware" that the language "ha[s] acquired a settled … administrative interpretation," and courts thus "accept the already settled meaning" when construing the phrase. *Comm'r v. Keystone Consol. Indus., Inc.*, 508 U.S. 152, 159 (1993); *see also Medina Tovar v. Zuchowski*, 982 F.3d 631, 636-37 (9th Cir. 2020) (relying on settled administrative interpretation of term).

Here, the ACA's term "lawfully present" is obviously borrowed from PRWORA because the two statutes address a similar subject—the eligibility for federal programs of noncitizens who are not "qualified aliens." Congress was thus presumptively aware of the Attorney General and DHS's longstanding interpretation that deferred action recipients are "lawfully present" for

purposes of determining access to benefits, and presumptively intended the same meaning.[2]

### 3.    Final Rule Is Not Arbitrary And Capricious

Because deferred action recipients meet the ACA's requirements for marketplace access, permitting DACA recipients to do so was not arbitrary and capricious.  Mot. 13.  Indeed, there was never any basis for excluding them in the first place.  Nothing in the statute distinguishes DACA recipients from other deferred action recipients, so treating them differently was always "arbitrary and capricious" and "not in accordance with law."  5 U.S.C. § 706(2)(A).  Correcting that error was thus not only reasonable; it was required by the Administrative Procedure Act.  *Id.*

The Plaintiff States mainly complain that CMS "departed … from prior practice."  Mot. 13.  But "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change."  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016).  No "heightened scrutiny" is required when an agency changes positions, and the agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one."  *FCC v. Fox Telev. Stations, Inc.*, 556 U.S. 502, 515, 525 (2009).  Instead, it need only "display awareness that it is changing position," offer "good reasons for the new policy," and account for any "serious reliance interests."  *Encino Motorcars*, 136 S. Ct. at 2126.

CMS met each of these requirements.   The Final Rule acknowledged that CMS was

---

[2] *Texas v. United States*, 50 F.4th 498 (5th Cir. 2022), and *Estrada v. Becker*, 917 F.3d 1298 (11th Cir. 2019), are not to the contrary.  Instead, *Texas* expressly *acknowledged* that under "pre-existing federal regulations," DACA recipients "may obtain lawful presence … and associated benefits." 50 F.4th at 509, 526.  Those regulations were not challenged in *Texas*—instead, unlike here, Texas challenged DACA itself.  In *Estrada*, meanwhile, the Eleventh Circuit interpreted a *state* policy that limited admissions to certain colleges to "lawfully present" individuals.  917 F.3d at 1301. The court did not interpret PRWORA, the ACA, or any federal immigration provision using that term.  The closest it came was dismissing as irrelevant a statute using the term "*un*lawfully present," which the court did not interpret because it "d[id] not … apply" to the plaintiffs anyway. *Id.* at 1305 (emphasis added).  The Plaintiff States' reliance on *Estrada* thus exemplifies their vain attempt to divorce the term "lawfully present" from its statutory context.

"reconsider[ing] its position" and "chang[ing] its interpretation," 89 Fed. Reg. at 39,395/1. It gave multiple reasons for the change, including that DHS had "no statutory mandate to distinguish" DACA recipients from "other deferred action recipients," and excluding DACA recipients from the ACA marketplaces "was not mandated by the ACA." *Id*. And the Plaintiff States identify no reliance interests that CMS failed to consider. Though they now complain that CMS failed to consider several "costs" of its rule, Mot. 14, these supposed costs were not "raised during the period for public comment"—*see, e.g.*, Letter from K. Kobach to HHS & CMS (June 23, 2023)— so they may not "be raised during judicial review." *North Dakota v. EPA*, 730 F.3d 750, 758 (8th Cir. 2013). CMS cannot be faulted for failing to respond to comments that no one ever made.

## B. The Final Rule Will Not Injure The Plaintiff States, Let Alone Irreparably

The Plaintiff States also cannot meet the requirement of irreparable harm. "To demonstrate irreparable harm, [a plaintiff] must show harm that 'is certain and great and of such imminence that there is a clear and present need for equitable relief.'" *H&R Block, Inc. v. Block, Inc.*, 58 F.4th 939, 951 (8th Cir. 2023). States with ACA marketplaces operated by the federal government cannot show irreparable harm for the same reason they lack an Article III injury: Their claimed injuries are too speculative and attenuated. And the remaining States cannot rely on the costs of operating their own exchanges because the ACA permits them to recoup those costs from participating insurers. 42 U.S.C. §18031(d)(5)(A). Any injury is thus reparable.

Even if the Plaintiff States could establish irreparable harm, any harm would be too small to justify the extraordinary remedy of enjoining a federal regulation. The Plaintiff States allege that 162,020 DACA recipients reside in their States, including 12,290 in the States that operate their own exchanges (Idaho, Kentucky, and Virginia). FAC ¶ 45. And CMS estimates that under the Final Rule, 27% of DACA recipients will apply for ACA marketplace access, and 70% of those will enroll. 89 Fed. Reg. at 39,428/1. Even assuming these estimates are accurate and consistent

across states—which the Plaintiff States have not attempted to prove for establishing standing or irreparable harm—that works out to roughly just 43,745 new applicants and 30,622 enrollees in the Plaintiff States, and 3,318 applicants and 2,322 enrollees in Idaho, Kentucky, and Virginia.

Meanwhile, as Proposed Intervenors have explained, the Plaintiff States' own sources suggest that roughly 5% of what they pejoratively call "illegal immigrants" in the United States depart the country each decade, ECF No. 50-1, at 13-14—equivalent to 0.5% per year. Even assuming that same rate applies to DACA recipients—which the Plaintiff States have not shown—that would amount to roughly 153 departures in the Plaintiff States and 12 in Idaho, Kentucky, and Virginia by potential beneficiaries of the Final Rule per year. And the departure rate is likely lower for DACA recipients given their deep ties to this country and their long tenure despite lack of access to health care. *Id.* at 14. Even if the Final Rule dissuaded a handful of these individuals from leaving the country, the number would be insignificant, and any fiscal cost to the States *de minimis*.

The cost to Idaho, Kentucky, and Virginia from operating exchanges are similarly minimal. To support their tenuous standing arguments, Plaintiffs quote CMS's estimate of the *total* cost to *all* states that operate exchanges. Mot. 7-8. But each State that runs its own marketplace will bear only a fraction of those costs. CMS estimates $9,733 per state to update eligibility and enrollment platforms, and $8.22 per application in processing, 48% of which will be borne by the states, amounting to approximately ***$42,291 total*** ($9,733 x 3 + $8.22 x 3,318 x 48%) for these three States. And all of that can be recovered from insurers. *See supra* at 10.

### C.    The Balance Of Equities Weighs Against An Injunction Because Excluding DACA Recipients From ACA Marketplaces Will Irreparably Harm Them

In contrast to the Plaintiff States' minimal alleged costs, enjoining the Final Rule would have serious consequences for DACA recipients like Proposed Intervenors. Without access to affordable coverage, DACA recipients are "less likely to receive preventive or routine health

screenings and may delay necessary medical care, incurring high costs and debts." 89 Fed. Reg. at 39,428/3. An injunction would thus threaten irreparable health and financial impacts to Proposed Intervenors and other DACA recipients. Claudia Moya Lopez, for example, was treated for leukemia last year and needs regular blood tests to monitor for potential recurrence. Moya Lopez Decl. ¶ 10. While she was fortunate that the hospital agreed to cover the costs of her treatment and for one year of monitoring, she does not know how she will afford ongoing medical care. *Id*. ¶ 13. Dania Quezada Torres has been diagnosed with attention deficit disorder and obsessive-compulsive disorder. Torres Decl. ¶ 10. Because she does not have reliable health insurance, she sometimes has to ration her medication even though she needs it to study and apply for jobs. *Id*. ¶ 13. Hyun Kim has not had a physical in three years and even though he has a family history of diabetes, he has not gotten bloodwork to check his diabetes risk. Kim Decl. ¶ 9. Without insurance, DACA recipients like Proposed Intervenors will continue to ration care and face potential financial hardships if they need emergency care while the Final Rule is enjoined. This threatened "harm to the plaintiffs' life and health clearly outweighs any fiscal harm the state may suffer." *Nemnich v. Stangler*, 1992 WL 178963, at *3 (W.D. Mo. Jan. 7, 1992).[3]

The broader public interest weighs against an injunction as well. The public has an interest in "improv[ing] health outcomes for communities that have faced historical inequities." 89 Fed. Reg. at 39,402/2. And DACA recipients who can purchase health insurance will be "even more productive and better economic contributors to their communities and society at large." *Id*. at 39,396/2. "[W]orkers with health insurance are estimated to miss 77 percent fewer workdays than

---

[3] *See also Todd v. Sorrell*, 841 F.2d 87, 88 (4th Cir. 1988) (financial harm to state was negligible compared to potentially fatal harm to plaintiff); *J.D. ex rel. Devantier v. Sherman*, 2006 WL 3163053, at *8 (W.D. Mo. Oct. 27, 2006) (harm from "not receiv[ing] a liver transplant" outweighed "fiscal harm" to "Missouri Medicaid").

uninsured workers." *Id.* at 39,428/3. But without the Final Rule, these benefits will be lost. The balance of equities favors leaving the Final Rule in place until its legality is definitively decided.

## III.    If the Court Grants Relief, Injunction Should be Limited

Even if *some* of the Plaintiff States could satisfy the requirements for injunctive relief, that relief should be limited to those States only. "Article III does not give federal courts the power to order relief to any uninjured plaintiff." *TransUnion*, 594 U.S. at 431. And "a preliminary injunction 'must be narrowly tailored to remedy only the specific harms shown by the plaintiffs.'" *St. Louis Effort for AIDS v. Huff*, 782 F.3d 1016, 1022-23 (8th Cir. 2015). This Court thus cannot grant any relief *to* any State—or *based* on the harm to any state—that lacks a cognizable injury.

Nor has any Plaintiff State justified an injunction that extends beyond its own borders. Injunctive relief "'should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.'" *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). But no Plaintiff State has even attempted to explain why "preliminarily enjoin[ing] Defendants from implementing the Final Rule" nationwide is necessary to remedy its asserted injuries. Mot. 19. An injunction limited to Idaho, for example, would spare Idaho from any costs associated with operating its exchange. And an injunction limited to Kansas would eliminate any incentive the Final Rule purportedly creates for DACA recipients to remain in Kansas.

By the Plaintiff States' numbers, FAC ¶¶ 44-45, nearly 70% of DACA recipients—including Proposed Intervenor Dania Quezada Torres, Torres Decl. ¶ 5, and many CASA members, ECF No. 49-5 ¶ 3—live in states that have not objected to them accessing the ACA marketplace. The Plaintiff States have no interest in denying health insurance to DACA recipients from those states. Any injunction should thus be tailored to those states that have individually justified relief.

## CONCLUSION

The Court should deny the Plaintiff States' motion for a preliminary injunction.

Date: September 25, 2024

Respectfully submitted,

*/s/ Matthew S. Rozen*

Nicholas Espiritu (*pro hac vice*)
espiritu@nilc.org
Gabrielle Lessard (*pro hac vice*)
Lessard@nilc.org
Tanya Broder (*pro hac vice*)
broder@nilc.org
NATIONAL IMMIGRATION LAW CENTER
3450 Wilshire Blvd.
Suite 108 – 62
Los Angeles, CA 90010
Telephone: 213.639.3900
Facsimile: 213.639.3911

Joanna E. Cuevas Ingram (*pro hac vice*)
cuevasingram@nilc.org
Hilda Bonilla (*pro hac vice*)
bonilla@nilc.org
NATIONAL IMMIGRATION LAW CENTER
P.O. Box 34573
Washington, DC 20043
Telephone: 202.216.0261
Facsimile: 202.216.0266

Matthew S. Rozen (VA Bar No. 85871)
John Matthew Butler (D.C. Bar No.
1721350)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.,
Washington, D.C. 20036
mrozen@gibsondunn.com
mbutler@gibsondunn.com
Telephone: 202.955.8500
Facsimile: 202.467.0539

Betty X. Yang (TX Bar No. 24088690)
byang@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue Suite 2100
Dallas, Texas 75201
Telephone: 214.698.3100
Facsimile: 214.571.2900

*Attorneys for Proposed Intervenors*

21

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 25, 2024, I filed the foregoing Opposition to the Motion for a Preliminary Injunction using the Court's CM/ECF system, which will send a notice of the filing to counsel for all parties.

/s/   *Matthew S. Rozen*
　　　Matthew S. Rozen