**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**WESTERN DIVISION**

| | |
|---|---|
| STATE OF KANSAS, *et al*., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA, *et al*., <br><br> Defendants. | Civil Action No. 1:24-cv-150-DMT-CRH <br> Judge Daniel M. Traynor |

**BRIEF OF AMICI CURIAE NEW JERSEY, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAI'I, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW MEXICO, NEW YORK, OREGON, RHODE ISLAND, VERMONT, AND WASHINGTON IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A STAY OF THE FINAL RULE AND PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

**Pages**

INTRODUCTION AND INTERESTS OF *AMICI CURIAE* ..........................................................1

ARGUMENT ......................................................................................................................3

   I.  THE EQUITIES COMPEL DENIAL OF PRELIMINARY RELIEF, AND AT THE
      VERY LEAST COMPEL DENIAL OF NATIONWIDE RELIEF...................................3

     A.  The Equities Compel Denial Of Preliminary Relief ......................................................4

     B.  At The Very Least, The Equities Compel Denial Of Nationwide Relief....................12

  II.  THE FINAL RULE IS LAWFUL......................................................................................16

CONCLUSION.......................................................................................................................20

i

# TABLE OF AUTHORITIES

**Pages**

**CASES**

*Chaudhry v. Holder,*
  705 F.3d 289 (7th Cir. 2013) .................................................................. 17

*Dakotans For Health v. Noem,*
  52 F.4th 381 (8th Cir. 2022) .............................................................. 12, 14

*Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.,*
  108 F.4th 194 (3d Cir. 2024) .................................................................... 3

*Estate of Wood v. C.I.R.,*
  909 F.2d 1155 (8th Cir. 1990) ........................................................... 16, 18

*Florida v. Dep't of Health & Hum. Servs.,*
  19 F.4th 1271 (11th Cir. 2021) ................................................. 13, 14, 15, 16

*H&R Block, Inc. v. Block, Inc.,*
  58 F.4th 939 (8th Cir. 2023) ........................................................... passim

*Iowa Utils. Bd. v. FCC,*
  109 F.3d 418 (8th Cir. 1996) .................................................................... 9

*Kansas v. U.S. Dep't of Educ.,*
  ___ F. Supp. 3d ____, 2024 WL 3273285 (D. Kan. 2024)...................... 15

*Labrador v. Poe,*
  144 S. Ct. 921 (2024) ............................................................................. 13

*Madsen v. Women's Health Ctr., Inc.,*
  512 U.S. 753 (1994) ............................................................................... 12

*Minn. RFL Republican Farmer Labor Caucus v. Freeman,*
  486 F. Supp. 3d 1300 (D. Minn. 2020) ..................................................... 9

*Mississippi ex rel. Hood v. AU Optronics Corp.,*
  571 U.S. 161 (2014)............................................................................... 16

*Nat'l Mining Ass'n v. Jackson,*
  768 F. Supp. 2d 34 (D.D.C. 2011) .......................................................... 11

*Nebraska v. Biden,*
  52 F.4th 1044 (8th Cir. 2022) ................................................................. 13

*Novus Franchising, Inc. v. Dawson*,
  725 F.3d 885 (8th Cir. 2013) ................................................................. 9

*Padda v. Becerra*,
  37 F.4th 1376 (8th Cir. 2022) .............................................................. 9

*Pavek v. Simon*,
  467 F. Supp. 3d 718 (D. Minn. 2020) ................................................ 13

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
  525 U.S. 471 (1999) ............................................................................ 19

*Rodgers v. Bryant*,
  942 F.3d 451 (8th Cir. 2019) .............................................................. 13

*S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*,
  696 F.3d 771 (8th Cir. 2012) ................................................................ 9

*Sampson v. Murray*,
  415 U.S. 61 (1974) .............................................................................. 13

*St. Louis Effort for AIDS v. Huff*,
  782 F.3d 1016 (8th Cir. 2015) ....................................................... 13, 14

*Starbucks Corp. v. McKinney*,
  144 S. Ct. 1570 (2024) .......................................................................... 3

*Texas v. Becerra*,
  89 F.4th 529 (5th Cir. 2024) ............................................................... 13

*Texas v. United States*,
  328 F. Supp. 3d 662 (S.D. Tex. 2018) ................................................. 3

*United States of America, ex rel. Strubbe v. Crawford Cty. Memorial Hosp.*,
  915 F.3d 1158 (8th Cir. 2019) ............................................................ 16

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) .............................................................................. 3, 9

**STATUTES**

5 U.S.C. § 705 ........................................................................................ 13

8 U.S.C. § 1161 ...................................................................................... 18

8 U.S.C. § 1182 ...................................................................................... 17

iii

8 U.S.C. § 1611 ................................................................................................................ 17

42 U.S.C. § 18081 ..................................................................................................... 16, 18

**REGULATIONS**

8 C.F.R. § 1.3 .................................................................................................................. 18

8 U.S.C. § 1103 .............................................................................................................. 18

45 C.F.R. § 152 ............................................................................................................... 18

*Definition of the Term Lawfully Present in the U.S. for Purposes of Applying for*
  *Title II Benefits Under Section 401(b)(2) of P.L. 104-193*,
  61 Fed. Reg. 47,039, 47,040 (Sept. 6, 1996) ............................................................ 18

86 Fed. Reg. 53747-48 ................................................................................................... 19

*Deferred Action for Childhood Arrivals*,
  87 Fed. Reg. 53152, 53177 (Aug. 30, 2022) ................................................. 10, 17, 19

88 Fed. Reg. 25316-17 ................................................................................................... 18

*Clarifying the Eligibility of Deferred Action for Childhood Arrivals (DACA) Recipients*
  *and Certain Other Noncitizens for A Qualified Health Plan through an Exchange,*
  *Advance Payments of the Premium Tax Credit, Cost-Sharing Reductions, and a Basic*
  *Health Program*,
  89 Fed. Reg. 39392 (May 8, 2024) ..................................................................... passim


**COURT RULES**

D.N.D. Civ. L. R. 7.1 ....................................................................................................... 1


**OTHER AUTHORITIES**

Ben Harrington, Congressional Research Service, *An Overview of Discretionary Reprieves*
  *from Removal: Deferred Action, DACA, TPS, and Others* (April 10, 2018),
  https://sgp.fas.org/crs/homesec/R45158.pdf .............................................................. 19

Bhashkar Mazumer & Sarah Miller, *The Effects of the Massachusetts Health Reform on*
  *Household Financial Distress*, 8(3) Am. Econ. J.: Econ. Pol'y 285-86, 305 (Aug. 2016),
  https://tinyurl.com/pjpw6e8x ........................................................................................ 7

iv

Ctr. on Budget & Pol'y Priorities, *Chart Book: The Far-Reaching Benefits of the Affordable Care Act's Medicaid Expansion*, at 2, 13 (Oct. 21, 2020), https://tinyurl.com/37t3xv62 ..................................................................................... 7, 8

Jennifer Tolbert et al., *Key Facts about the Uninsured Population*, Kaiser Family Foundation (Dec. 18, 2023), https://tinyurl.com/2s3jmmbm .......................................................... 6

Kat Lundie et al., *Tracking DACA Recipients' Access to Health Care*, Nat'l Immigr. Law Center (June 1, 2022), https://tinyurl.com/ypdmtrzw .............................................................. 4

Kenneth Brevoort, et al., *Medicaid and Financial Health*, National Bureau of Economic Research Working Paper 24002 (Nov. 2017), https://shorturl.at/PcC4r ...................... 6

Kyle J. Caswell & Timothy A. Waidmann, *The Affordable Care Act Medicaid Expansions and Personal Finance*, 76(5) Med. Care Res. & Rev. 538 (Sept. 16, 2017), https://tinyurl.com/52hspwf8 ............................................................................................. 7

*Marketplace Coverage and Economic Benefits: Key Issues and Evidence*, U.S. Dep't of Health & Hum. Servs., Assistant Sec'y for Planning & Evaluation, Office of Health Pol'y (July 20, 2022), https://tinyurl.com/3jd99azs ............................................................... 7

Nicole Prchal Svajlenka and Trinh Q. Truong, *The Demographic and Economic Impacts of ACA Recipients: Fall 2021 Edition* (Nov. 24, 2021), https://www.americanprogress.org/article/the-demographic-and-economic-impacts-of-daca-recipients-fall-2021-edition/ ................................................................................ 19

Raymond Kluender et al., Medical Debt in the US, 2009-2020, JAMA (July 2021), https://tinyurl.com/yfh96uks ............................................................................................. 7

Samantha Artiga & Anthony Damico, *Nearly 20 Million Children Live in Immigrant Families that Could Be Affected by Evolving Immigration Policies*, Kaiser Family Foundation (Apr. 18, 2018), https://tinyurl.com/37dwfce9 ......................................... 5

Skyler Korgel, *Celebrating a Decade of DACA in Texas*, Every Texan (Sept. 29, 2022), https://everytexan.org/2022/09/29/celebrating-a-decade-of-daca-in-texas/ .............................. 11

*The Importance of Health Coverage*, Am. Hosp. Ass'n (Oct. 2019), https://tinyurl.com/bp4t9mxu.......................................................................................... 4

Travis Campbell et al., *Exacerbation of COVID-19 mortality by the fragmented United States healthcare system: A retrospective observational study*, The Lancet Regional Health (May 12, 2022), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9098098/ ............................ 6

U.S. Dep't of Health and Human Servs., *Access to Health Services*, Office of Disease Prevention and Health Promotion, https://tinyurl.com/5n7s2cu7 ................................................ 5

## INTRODUCTION AND INTERESTS OF *AMICI CURIAE*

The States of New Jersey, California, Colorado, Connecticut, Delaware, District Of Columbia, Hawaiʻi, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Mexico, New York, Oregon, Rhode Island, Vermont, and Washington (collectively, "Amici States"), submit this brief in support of the United States of America and the Centers for Medicare & Medicaid Services (CMS) pursuant to D.N.D. Civ. L. R. 7.1(G). As sovereigns vested with the responsibility of safeguarding the health, safety, and welfare of their residents, Amici States have a significant interest in ensuring access to healthcare within their borders. That is particularly true here, where the requested relief would not only restrict access to health insurance within Plaintiff States' borders, but potentially extend to the many States that have declined to challenge, and in fact support, the Final Rule.

Insufficient insurance coverage represents a barrier both to improving health outcomes and reducing health care costs across the United States. As the U.S. Department of Health and Human Services (HHS) and CMS explained in the Final Rule, *Clarifying the Eligibility of Deferred Action for Childhood Arrivals (DACA) Recipients and Certain Other Noncitizens for a Qualified Health Plan through an Exchange, Advance Payments of the Premium Tax Credit, Cost-Sharing Reductions, and a Basic Health Program*, 89 Fed. Reg. 39392 (May 8, 2024), DACA recipients previously lacked access to the ACA exchanges, even though Congress extended access to ACA exchanges to all who are "lawfully present"—a specialized term that includes those whom the Department of Homeland Security (DHS) has temporarily allowed to remain without removal. That has meant that DACA recipients, including the two-thirds of DACA recipients who live outside the Plaintiff States, are less likely to (1) have health insurance for themselves and (2) enroll their U.S.-citizen children in health insurance programs. Further, they are both more reticent to

seek preventive and routine health screenings and more likely to delay necessary medical care. As Amici States' experience shows, the lack of insurance access harms not only DACA recipients and their children, but also the public health of the broader communities in which they live, and the States themselves. After all, as a general matter, the failure to seek preventative care means more expensive emergency room visits—costs that are often borne by state benefits programs or at state public hospitals. Increasing residents' access to insurance, Amici States' experience confirms, can therefore improve health outcomes and reduce state costs.

Against these benefits, Plaintiffs fail to justify the preliminary relief they seek. As this brief explains, Plaintiffs do not identify irreparable harm sufficient to justify the orders they seek, especially weighed against the tremendous benefits to residents, citizen children, and the States. And Plaintiffs have particularly failed to justify interim nationwide relief, where they have not identified any harms to them that nationwide relief would remedy. Plaintiffs speculate that enjoining the Final Rule would cause DACA recipients who have lived here for well over a decade to leave the country, that their departure in turn would avoid a purported drain on the Plaintiffs' resources, and that preliminary relief would also avoid operational costs on a few state-run exchanges. But those harms are too speculative or minor to justify preliminary relief in this case. And since it is simply impossible for the Final Rule to harm the Plaintiff States outside of their borders, nationwide relief would be entirely unsupported.

Amici States submit this brief to demonstrate that expanding access to affordable health insurance coverage provides significant benefits to state residents, local communities, and society as a whole and that the equities and public interest thus weigh against preliminary relief; that granting nationwide relief would be particularly inappropriate and unsupported under the circumstances presented in this case; and that the Final Rule is lawful in any event. This Court

should therefore deny Plaintiffs' motion so that the Final Rule may benefit people across the Nation, including in the many Amici States that embrace it.

## ARGUMENT

## I.   THE EQUITIES COMPEL DENIAL OF PRELIMINARY RELIEF, AND AT THE VERY LEAST COMPEL DENIAL OF NATIONWIDE RELIEF.

Plaintiffs ask that this Court "enter an order either: (1) postponing the effective date of the Final Rule pending judicial review or (2) enjoining Defendants from implementing the Final Rule pending judicial review." Pls.' Br. 2. To justify either form of preliminary relief, Plaintiffs "must make a clear showing that '[they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest.'" *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1576 (2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008)); *see also* Pls.' Br. 8 (acknowledging that this equitable framework also governs their requests for a stay under Section 705).

This Court can deny the demanded preliminary relief based solely on the equitable factors, *see, e.g.*, *Winter*, 555 U.S. at 23-24 (denying preliminary injunction solely based on the equities); *H&R Block, Inc. v. Block, Inc.*, 58 F.4th 939, 952 (8th Cir. 2023) (finding lack of irreparable harm sufficient to deny relief); *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 202, 206 (3d Cir. 2024); *Texas v. United States*, 328 F. Supp. 3d 662, 736-42 (S.D. Tex. 2018), and it should do so here. First, the equities compel denial of any preliminary relief, given the tremendous benefits of the Final Rule, the record evidence demonstrating that the benefits far outweigh any alleged costs, and the lack of irreparable harm. Second, at the very least, the equities compel denying relief beyond Plaintiffs' borders, since Plaintiffs do not identify *any* harms from the Final Rule's operation within the myriad States that do not challenge it.

3

A.      **The Equities Compel Denial Of Preliminary Relief.**

Preliminary relief "is an extraordinary remedy never awarded as of right." *H&R Block*, 58 F.4th at 946 (citation omitted). Here, the balance of the equities and public interest strongly weigh against preliminary relief and far outweigh any of Plaintiffs' unsubstantiated claims of irreparable harm.

1. As Amici States' experiences confirm, the Final Rule will advance crucial public health and economic equities, not just for DACA recipients, but as to the States themselves.

The Final Rule will reduce the particularly high rate of uninsured among DACA recipients. According to 2022 survey data cited in the Final Rule, 27 percent of DACA recipients do not have health insurance, and are "more than three times more likely to be uninsured than the general U.S. population." 89 Fed. Reg. at 39395. While the majority of DACA recipients have access to health insurance through employer-based plans, such coverage can be uncertain because it is tied to their employment status. *See id.* at 39402. During the COVID-19 pandemic, about 18 percent of DACA recipients lost their employer-provided health insurance when, for many, it was needed the most.[1] But through the Final Rule, 147,000 uninsured individuals will be eligible for coverage and about 100,000 recipients will likely enroll in a qualifying health plan (QHP) through an exchange or basic health program in 2025. *Id.* at 39424, 39428.

The evidence is clear that improved access to health insurance improves public health.[2] In a 2021 survey of over 1,000 DACA recipients, 61 percent of respondents identified their

---

[1] Kat Lundie et al., *Tracking DACA Recipients' Access to Health Care*, at 2, Nat'l Immigr. Law Center (June 1, 2022), https://tinyurl.com/ypdmtrzw.

[2] *See The Importance of Health Coverage*, Am. Hosp. Ass'n (Oct. 2019), https://tinyurl.com/bp4t9mxu.

immigration status as a "significant barrier" to receiving insurance and care, 47 percent reported delaying medical care, and 67 percent indicated that they or a family member were unable to pay medical bills or expenses. *Supra* at n.1. In general, "[i]ndividuals without health insurance are less likely to receive preventive or routine health screenings and may delay necessary medical care, incurring high costs and debts." *Final Rule*, 89 Fed. Reg. at 39396. That includes preventive services for chronic conditions like cardiovascular disease, cancer, and diabetes.[3] Conversely, the expansion of health insurance access for DACA recipients means they are more likely to access such services. Those benefits, the Final Rule noted (agreeing with a commenter), may be especially important "for those DACA recipients who may be victims of child abuse, domestic violence, sexual assault, and human trafficking." *Id.* at 39405. And the benefits would redound not only to DACA recipients but to their families: uninsured DACA recipients are also often hesitant to enroll their U.S.-born children in Medicaid and CHIP, resulting in decreased enrollment in those crucial programs relative to those with U.S.-born parents.[4] Real-world evidence confirms that a lack of insurance can result in uncompensated care costs, increased medical debt, reduced spending power, lost work productivity, absenteeism, and increased premature mortality—among other harms. *See id.* at 39396 (lack of insurance "can have downstream impacts that further disrupt individuals' health and financial stability, and therefore their ability to work or study. Delays in care can lead to negative health outcomes including longer hospital stays and increased mortality,

---

[3] U.S. Dep't of Health and Human Servs., *Access to Health Services*, Office of Disease Prevention and Health Promotion, https://tinyurl.com/5n7s2cu7 (last visited Oct. 1, 2024).

[4] Samantha Artiga & Anthony Damico, *Nearly 20 Million Children Live in Immigrant Families that Could Be Affected by Evolving Immigration Policies*, Kaiser Family Foundation (Apr. 18, 2018), https://tinyurl.com/37dwfce9.

whereas being unable to pay medical bills puts individuals at higher risk of food and housing insecurity.").

The harms arising from a lack of insurance affects not only DACA recipients and their U.S.-citizen children, but also the broader communities in their home States. One study found that "wider insurance gaps exacerbated local COVID-19 outbreaks and resulted in more cases, hospitalizations, and death than experienced by jurisdictions with better coverage," meaning that "[r]educing the number of [individuals] without health insurance is a crucial and underappreciated component of pandemic preparedness."[5] Moreover, individuals without health insurance are less likely to have access to regular outpatient care, leading to greater rates of hospitalization. This can cause particularly acute problems in smaller communities with fewer resources to address these higher hospitalization rates, where "[h]igh uninsured rates contribute to rural hospital closures and greater financial challenges for rural hospitals, leaving individuals living in rural areas at an even greater disadvantage to accessing care."[6] Simply put, high rates of uninsured individuals threaten the public health of the greater community. *See id.*

The history of insurance expansion under the ACA substantiates the importance of health insurance access. States participating in Medicaid expansion experienced a reduction in unpaid medical bills sent to collection by $3.4 billion in its first two years,[7] and between 2013 and 2020,

---

[5] Travis Campbell et al., *Exacerbation of COVID-19 mortality by the fragmented United States healthcare system: A retrospective observational study*, The Lancet Regional Health (May 12, 2022), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9098098/.

[6] Jennifer Tolbert et al., *Key Facts about the Uninsured Population*, Kaiser Family Foundation (Dec. 18, 2023), https://tinyurl.com/2s3jmmbm.

[7] Kenneth Brevoort, et al., *Medicaid and Financial Health*, National Bureau of Economic Research Working Paper 24002 (Nov. 2017), https://shorturl.at/PcC4r.

new medical debt within those States dropped by 34 percent more than in the States that did not expand Medicaid.[8] States that expanded Medicaid saw a per-enrollee reduction in medical debt of more than $1,100, fewer bankruptcy filings, and improved access to credit.[9] Moreover, States that expanded Medicaid saw a greater utilization of preventative care and improved health outcomes, including fewer premature deaths, with at least 19,000 lives saved from 2014 to 2017 alone.[10] And the ACA insurance marketplace itself has also resulted in a range of health and financial benefits, including lower healthcare costs for small businesses and reduced uninsured rates for self-employed individuals.[11] Expanding access to the ACA marketplace to DACA recipients will increase those benefits.

Beyond improving health and financial outcomes for DACA recipients and the health of their overall communities, the Final Rule offers benefits for the fiscal well-being of the States too. Crucially, the Final Rule explains "that uninsured individuals might delay seeking vital care, which can result in [emergency department (ED)] use." 89 Fed. Reg. at 39406. That is significant: "emergency care tends to be more costly and complex," which means the Final Rule "could help

---

[8] Raymond Kluender et al., *Medical Debt in the US, 2009-2020*, JAMA (July 2021), https://tinyurl.com/yfh96uks.

[9] Ctr. on Budget & Pol'y Priorities, *Chart Book: The Far-Reaching Benefits of the Affordable Care Act's Medicaid Expansion*, at 2, 13 (Oct. 21, 2020), https://tinyurl.com/37t3xv62; *see also* Kyle J. Caswell & Timothy A. Waidmann, *The Affordable Care Act Medicaid Expansions and Personal Finance*, 76(5) Med. Care Res. & Rev. 538 (Sept. 16, 2017), https://tinyurl.com/52hspwf8.

[10] Ctr. on Budget & Pol'y Priorities, *supra* n.9, at 2, 10.

[11] *See Marketplace Coverage and Economic Benefits: Key Issues and Evidence*, U.S. Dep't of Health & Hum. Servs., Assistant Sec'y for Planning & Evaluation, Office of Health Pol'y (July 20, 2022), https://tinyurl.com/3jd99azs; *cf.* Bhashkar Mazumer & Sarah Miller, *The Effects of the Massachusetts Health Reform on Household Financial Distress*, 8(3) Am. Econ. J.: Econ. Pol'y 285-86, 305 (Aug. 2016), https://tinyurl.com/pjpw6e8x.

decrease the amount of uncompensated care that EDs provide which could lead to better financial sustainability for emergency care safety net providers," and thus "promote a lower cost and more efficient health care system by reducing high-cost emergency care, increasing lower-cost preventive care, and ultimately decreasing the number of DACA recipients and other impacted noncitizens who qualify only for the treatment of an emergency medical condition under Medicaid." *Id.* (Indeed, States that expanded Medicaid likewise saw a drop in uncompensated medical care, which improved hospital budgets.[12]) The reduction in such costs directly benefits the States and their public hospitals.

Additionally, for the States that operate exchanges, the inclusion of DACA recipients may improve their risk pools: "it is reasonable to predict that allowing DACA recipients to enroll in Exchange coverage may have a positive impact. DACA recipients, whose average age is now 30, are younger than the existing population of Exchange enrollees, of whom 64 percent are age 35 or older." *Final Rule*, 89 Fed. Reg. at 39398.

Finally, DACA recipients "could be even more productive and better economic contributors to their communities and society at large" than they already are "with improved access to health care. A 2016 study found that a worker with health insurance is estimated to miss 77 percent fewer days than an uninsured worker." *Id.* at 39396. Improving DACA recipients' access to health care would thus benefit States that employ DACA recipients in their public agencies and universities. And it would likely benefit States through increased tax revenue because "only DACA recipients who attest that they will file a Federal income tax return will be eligible for APTCs for Exchange coverage." *Id.* at 39399. Given these salutary impacts, it is no surprise most States have declined to challenge the Final Rule.

---

[12] *See Ctr. on Budget & Pol'y Priorities, supra* n.9, at 2.

2. Against these overwhelming equities, Plaintiffs' claimed irreparable harms fall far short. First, Plaintiffs argue that the Final Rule "is highly likely to reduce the number of DACA recipients who leave the United States," Pls.' Br. 18, and that the States will incur financial burdens from the DACA recipients who now elect to remain, *id.* 16-18. But as the Eighth Circuit has reiterated time and again, irreparable harm must be "certain and great and of such imminence that there is a clear and present need for equitable relief." *H&R Block*, 58 F.4th at 951 (quoting *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013)); *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996).[13] Said another way, "the harm must not only be 'more than the mere possibility' of irreparable harm, it also 'must be more than mere speculation.'" *H&R Block*, 58 F.4th at 951 (quoting *Padda v. Becerra*, 37 F.4th 1376, 1384 (8th Cir. 2022)); *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 779 (8th Cir. 2012) (same). Indeed, Plaintiffs acknowledge that they "must make a 'clear showing'" of non-speculative irreparable harm. Pls.' Br. 15 (quoting *Winter*, 555 U.S. at 21-22), Yet they have offered nothing more than mere speculation that a DACA recipient who would otherwise have left a given State would now remain in light of the Final Rule—and their sole certification includes *no evidence* suggesting this will actually occur in any case, let alone to any substantial degree. *See Padda*, 37 F.4th at 1384-85 (rejecting alleged irreparable harms where supportive statements "are vague and speculative").

Nor is this the sort of harm that can "go[] without saying" because it is allegedly obvious that a migrant's "immigration decision-making is heavily influenced by the availability of welfare

---

[13] Plaintiffs erroneously conflate the minimal quantum of harm necessary to establish Article III injury-in-fact with the irreparable harm necessary to justify preliminary relief, *see* Pls.' Br. 15-16, but the latter burden is greater than the former. *See, e.g.*, *Minn. RFL Republican Farmer Labor Caucus v. Freeman*, 486 F. Supp. 3d 1300, 1306, 1311 (D. Minn. 2020), *aff'd*, 33 F.4th 985 (8th Cir. 2022) (after finding plaintiffs had "shown Article III injury-in-fact," finding plaintiffs had "not shown irreparable harm").

and other public benefits." Pls.' Br. 16. Far from a certain fact, this claim is contrary to the record and real-world experience. Today's population of DACA recipients have necessarily been residing in the United States for at least *seventeen years*. and have been ineligible to participate in the ACA exchanges since those began in 2014. *See* DHS, *Deferred Action for Childhood Arrivals*, 87 Fed. Reg. 53152, 53177 (Aug. 30, 2022). As HHS noted, it is not "reasonable to conclude" that individuals who have chosen to remain in the United States since 2007 without access to an ACA exchange would suddenly leave unless the Final Rule enables such access—let alone in any meaningful number sufficient to establish irreparable harm. *Final Rule*, 89 Fed. Reg. at 39399. Because Plaintiffs' claim is based on sheer conjecture rather than evidence, it fails to pass muster as irreparable harm.

And even if Plaintiffs could do more than speculate that some DACA recipients would leave the United States if this Court prevents the Final Rule from taking effect, their claim that such departures would present a net gain for them is untenable. Plaintiffs' one-sided narrative about DACA recipients ignores concrete data, including that DACA recipients today attend public and private universities; are employed by companies, nonprofit organizations, and government agencies and institutions; work in crucial roles in the medical profession and the U.S. military; and have even started their own businesses that employ other residents, including U.S. citizens. They help grow the economy and contribute an estimated $6.2 billion in federal taxes and $3.3 billion in State and local taxes each year. *Id.* at 39399. In fact, a recent 2022 study demonstrated that Plaintiff Texas's DACA recipients have a collective spending power of $3.7 billion, and that Texas would stand to lose around $139.7 million in annual state and local taxes without their

contributions.[14] That hardly suggests Plaintiffs would avoid net harms, let alone irreparable ones, even *if* enjoining the Final Rule would inexplicably cause some number of DACA recipients to leave the country during the pendency of this litigation.

Plaintiffs get no further in claiming that, absent a preliminary injunction, they will suffer irreparable harm from "administrative and resource" costs. Pls.' Br. 16. To justify the relief Plaintiffs seek, they must identify a harm that is sufficiently "great," *H&R Block*, 58 F.4th at 951. Courts have required plaintiffs to prove that their "losses are certain, great and actual," even when sovereign immunity may bar later monetary recovery. *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 52-53 (D.D.C. 2011) (citations omitted). But Plaintiffs only identify administrative and system costs for *three* of the States—those that administer their own ACA exchanges. *See* Pls.' Br. 16 (discussing Idaho, Kentucky, and Virginia). They do not cite (let alone substantiate or even describe with specificity) administrative costs for any other Plaintiff State, including any in the Eighth Circuit. Instead, as the Final Rule explains, for the States that participate in federal exchanges, the administrative costs are borne by the Federal Government. *See* 89 Fed. Reg. at 39424.[15] Moreover, as to Idaho, Kentucky, and Virginia, the claimed costs are not irreparable or substantial; they are simply administrative costs associated with updating health care codes in their ACA exchanges and processing applications,  which are far outweighed by the significant economic and public health benefits of the Final Rule. *See supra* at 4-8; 89 Fed. Reg. at 39430

---

[14] Skyler Korgel, *Celebrating a Decade of DACA in Texas*, Every Texan (Sept. 29, 2022), https://everytexan.org/2022/09/29/celebrating-a-decade-of-daca-in-texas/.

[15] Plaintiffs erroneously claim that the Final Rule will cause them to spend "$194,650 to develop and code changes to each state[']s Exchange eligibility system." Pls.' Br. 7-8 (citing 89 Fed. Reg. at 39426). Not only have Plaintiffs mistakenly multiplied it by a factor of ten (the relevant figure is $19,465), *see* 89 Fed. Reg. at 39426, but that number refers to costs incurred only by states that operate BHPs—and none of the Plaintiffs do. *Compare* 89 Fed. Reg. at 39423 ("The impact of completing the necessary changes to the BHP application is with regards to the two States that will operate BHPs as of the effective date of this rule—Minnesota and Oregon.").

(estimating anticipated compliance costs, and concluding that they are far outweighed by the benefits of the Final Rule, including to public agencies).

In short, this Court should not award the "extraordinary remedy," *see H&R Block*, 58 F.4th at 946, that Plaintiffs seek based on speculative or limited harms, especially when considering the dramatic impacts on uninsured DACA recipients and other States that declined to challenge the Final Rule by delaying the Final Rule's effective date or otherwise preliminarily enjoining it.

**B.      At The Very Least, The Equities Compel Denial Of Nationwide Relief.**

To the extent that Plaintiffs seek relief beyond their borders, they have failed to justify such a demand based on the facts of this case. As explained above, Plaintiffs seek a preliminary injunction and stay of the Final Rule, but do not specify the geographic scope of their request. To the degree their request would prevent the Final Rule from taking effect in States that are not plaintiffs to this suit, the circumstances of this case establish that such an order is unwarranted under longstanding equitable principles. *See supra* at 3; Pls.' Br. 8.

Under foundational principles of equity, this Court may not issue nationwide preliminary relief that prevents Defendants from implementing the Final Rule outside of the Plaintiff States unless this Court determines that such broad relief is necessary to avert demonstrated irreparable harm. After all, as a general matter, preliminary relief is warranted only to the extent necessary to prevent the litigants' irreparable harm. *See Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (such relief "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs" (citation omitted)); *Dakotans For Health v. Noem*, 52 F.4th 381, 392-93 (8th Cir. 2022) (such relief "must be narrowly tailored ... to remedy only the specific harms shown by the plaintiffs" (quoting *St. Louis Effort for AIDS v. Huff*, 782 F.3d 1016, 1022-23 (8th

Cir. 2015))); *Pavek v. Simon*, 467 F. Supp. 3d 718, 763 (D. Minn. 2020) (purpose of such relief is to "prevent the identified irreparable harm").

That principle limits when preliminary nationwide relief is appropriate. Courts have observed that a nationwide remedy can be appropriate, for example, where it is necessary to redress the plaintiffs' harm; if there is "no workable path … for narrowing the scope of relief," *Nebraska v. Biden*, 52 F.4th 1044, 1048 (8th Cir. 2022); or when "a plaintiff brings a facial challenge to a statute under the First Amendment" and asserts "a serious chill upon protected speech" absent such broad relief. *Rodgers v. Bryant*, 942 F.3d 451, 459 (8th Cir. 2019) (citation omitted). But nationwide relief is inappropriate when the "case raises no concerns that a non-nationwide preliminary injunction wouldn't provide the plaintiffs with complete relief." *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1282 (11th Cir. 2021); *see also Labrador v. Poe*, 144 S. Ct. 921 (2024) (staying preliminary injunction to extent it provided relief beyond that necessary to prevent irreparable harm shown by plaintiffs); *Texas v. Becerra*, 89 F.4th 529, 546 (5th Cir. 2024) (commending district court for "tailoring [its] injunction based on the parties, issues, and evidence before it" such that enforcement was only enjoined in "the State of Texas and against the plaintiff organizations"); *see also* 5 U.S.C. § 705 (courts may "postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings" only "*to the extent necessary to prevent irreparable injury*" (emphasis added)); *Sampson v. Murray*, 415 U.S. 61, 68 n.15 (1974) (Congress intended Section 705 to "reflect existing law" rather than displace traditional equity).

Plaintiffs have identified *no* irreparable harm that requires a nationwide order to remedy, and there are equitable reasons to avoid such an order. As explained above, the only irreparable harms Plaintiffs even mention are (1) "administrative and system costs" associated with processing

benefits applications from DACA recipients, Pls.' Br. 16; *see also id.* at 7-8, and (2) the putative

additional cost of providing public benefits to DACA recipients who would not remain in these

States but for the Final Rule, *see id.* at 16-18. While these two asserted harms cannot support

preliminary relief at all, *see supra* at 9-10, they certainly fail to justify relief beyond Plaintiffs'

borders. As to administrative costs, Plaintiffs do not process applications of DACA recipients

residing in other States, so there are *no* costs to the Plaintiffs (let alone irreparable costs) of this

Final Rule applying outside the borders of three of their members. Moreover, even assuming—

contrary to experience and reason—Plaintiffs' premise that enjoining the Final Rule would cause

DACA recipients to leave during the pendency of this litigation, that logic undermines a demand

for nationwide relief: if insurance is available only outside of the Plaintiffs' borders, that would

incentivize undocumented immigrants to settle in those other States—imposing no costs on

Plaintiffs. Plaintiffs' own theories of irreparable harm thus vitiate any demand for nationwide

relief. In other words, they have failed to demonstrate how preventing the Final Rule from taking

effect outside of their borders is "narrowly tailored" to addressing "only the specific harms shown

by the plaintiffs." *Dakotans For Health*, 52 F.4th at 392-93 (quoting *Huff*, 782 F.3d at 1022-23).

Nor does the fact that the Final Rule concerns benefits for non-citizens justify nationwide

relief in this particular case. Although some courts have "found that a nationwide injunction can

be warranted in the immigration law context," that reasoning is "based on the need for uniformity

in the enforcement of immigration law," *Florida*, 19 F.4th at 1282, a concern not present here. The

Final Rule is about health insurance; it does not implicate "Rule[s] of Naturalization," *id.* at 1284,

nor does it affect immigration status, entry, or deportation. There is no need for national uniformity

in whether non-citizens access a particular State's ACA exchange, which—unlike rules concerning

who may enter and remain in this country—can already vary depending on state and local laws.

And Plaintiffs have provided "no reason why" a rule extending eligibility for subsidized health insurance "cannot be in effect in some states but not others." *Id.* at 1284. Simply put, state laws governing health care access already differ substantially from State to State.

Not only would a nationwide order be unnecessary to remedy the purported irreparable harm Plaintiffs sought to substantiate, but it would be especially inappropriate considering the tremendous benefits of the Final Rule to the States that did not challenge it. Notably, more than two-thirds of DACA recipients live in States that have not objected to the Final Rule, including Amici States—many of whom strongly support the Rule and object to the remedial relief Plaintiffs seek here. *See* Pls.' Br. 6-7 (noting that of the 530,110 active DACA recipients in the country, only 162,010 live in the Plaintiff States). As another court recently put it when rejecting a similar request in another context, "[i]ssuing a nationwide injunction in this case would result in the court ordering Defendants to stop the Final Rule from taking effect for *everyone*, including States which clearly do not want such relief as evidenced in the amicus brief." *Kansas v. U.S. Dep't of Educ.*, ___ F. Supp. 3d ____, 2024 WL 3273285, *19-20 (D. Kan. 2024). Indeed, enjoining the Final Rule nationwide would have the perverse effect of forcing non-plaintiff States—that do not object to the Final Rule and have already made changes to prepare for its scheduled implementation in just one month—to expend resources reversing those changes. For example, California has already reconfigured its exchange's enrollment system to treat DACA recipients as eligible and to verify their status.[16] Amici States welcome the significant health and economic benefits the Final Rule will bring, and there is no basis to deprive them of such benefits—and even burden them with the

---

[16] *Deferred Action for Childhood Arrivals,* Covered California, https://tinyurl.com/3b3mde5b (last visited Oct. 1, 2024).

costs of halting preparatory steps already taken—because some other States believe they may be harmed from the Final Rule operating within their borders.

In sum, nationwide preliminary relief would be inappropriate here because this "case raises no concerns that a non-nationwide preliminary injunction wouldn't provide the plaintiffs with complete relief." *Florida*, 19 F.4th at 1282. Plaintiffs have made no showing implementation of the Final Rule beyond their borders would actually irreparably harm them, and the impacts of such a broad order would be harmful in amici States. That is conclusive, and the motion should be denied in its entirety.

## II.   THE FINAL RULE IS LAWFUL.

In adopting the ACA, Congress clarified that access to a qualified health plan on the federal or state exchanges would be available to any "citizen or national of the United States or an alien *lawfully present* in the United States." 42 U.S.C.A. § 18081(a)(1) (emphasis added). Congress did not define which noncitizens are "lawfully present." The Final Rule correctly identifies that individuals who have received revocable grants of deferred action fit that specialized term.

History and background interpretive principles are instructive. As the Eight Circuit has reasoned, "it is proper to consider that Congress acts with knowledge of existing law, and that 'absent a clear manifestation of contrary intent, a newly-enacted or revised statute is presumed to be harmonious with existing law and its judicial construction.'" *Estate of Wood v. C.I.R.*, 909 F.2d 1155, 1160 (8th Cir. 1990); *see also*, *e.g.*, *United States of America, ex rel. Strubbe v. Crawford Cty. Memorial Hosp.*, 915 F.3d 1158, 1167 (8th Cir. 2019) (same); *Mississippi ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 169 (2014) (stating that "Congress is aware of existing law when it passes legislation" and relying on preexisting use of same term in federal rule). That matters here, where the meaning of "lawful presence" was well established before the enactment of the

ACA. *See* Final Rule, 89 Fed. Reg. 39394 (explaining that "lawfully present" "is a specialized term of art" in this context).

Indeed, Congress has long directed that those who are "lawfully present" in the country are not just those with lawful status, but those whom DHS has temporarily allowed to remain without removal. *See*, *e.g.*, 8 U.S.C. § 1182(a)(9)(B)(ii) (Congress explaining that "an alien is deemed to be unlawfully present in the United States if the alien is present in the United States after the expiration of *the period of stay authorized* by the [Secretary of DHS] or is present in the United States without being admitted or paroled"); *Chaudhry v. Holder*, 705 F.3d 289, 292 (7th Cir. 2013) (agreeing that it is "entirely possible for aliens to be lawfully present (*i.e.*, in a 'period of stay authorized by the Attorney General')" even though they lack any lawful status that would offer a defense from removal under the INA); *Deferred Action for Childhood Arrivals*, 87 Fed. Reg. 53152, 53209 (2022) (DHS explaining that the term "lawfully present" has consistently been used in federal law to include a noncitizen who is "subject to removal, and whose immigration status affords no protection from removal, but whose temporary presence in the United States the Government has chosen to tolerate, including for reasons of resource allocation, administrability, humanitarian concern, agency convenience, and other factors").

The backdrop could hardly be clearer. In 1996, Congress adopted a law that restricted any access to federal public benefits for "an alien who is not a qualified alien," 8 U.S.C. § 1611(a), but clarified that certain public benefits (such as social security benefits) would be available "to an alien who is lawfully present in the United States as determined by the [Secretary of DHS]," *id.* § 1611(b)(2)-(4). Immediately thereafter, the Federal Government adopted a regulation confirming that "lawfully present" noncitizens included those noncitizens who had received "deferred action." *Definition of the Term Lawfully Present in the U.S. for Purposes of Applying for Title II Benefits*

*Under Section 401(b)(2) of P.L. 104-193*, 61 Fed. Reg. 47039, 47040 (Sept. 6, 1996); 8 C.F.R. §

1.3(a)(4)(vi) ("For the purposes of 8 § U.S.C. 1611(b)(2) only, an 'alien who is lawfully present

in the United States' means: … Aliens currently in deferred action status."). That definition was

never superseded by Congress or questioned by any court. Instead, for the fourteen years before

Congress adopted the ACA, it was well established that the use of "lawful presence" in this federal

benefits statute included those who had received revocable grants of deferred action. When it

enacted the ACA, Congress did not clearly manifest any contrary intent to exclude individuals who

received deferred action, *Wood*, 909 F.2d at 1160; instead, Congress used the precise language

from Section 1611 that already brought with it this established approach.

The longstanding regulations implementing the ACA point the same way. Adopted shortly

after the ACA itself, HHS has long acknowledged that noncitizens who are "currently in deferred

action status" as "lawfully present" for purposes of ACA eligibility. 45 C.F.R. § 152.2. Although

CMS had previously carved out DACA recipients from the definition of "lawfully present" despite

maintaining eligibility for other types of deferred action recipients, HHS properly explained why

that distinction was untenable. It makes little sense that DACA recipients would be excluded from

ACA exchanges when other individuals with deferred action would be eligible for participation.

*Compare* 45 C.F.R. § 152.2(4)(vi) *with id.* § 152.2(8); *see also Final Rule*, 89 Fed. Reg. at 39395

(noting "no statutory mandate to distinguish" DACA recipients and any "other deferred action

recipients"). And it was incongruous that DACA recipients were "lawfully present" for eligibility

for Social Security and Medicare benefits, but not for the ACA, despite the use of the same term

in both laws. *See* 88 Fed. Reg. 25316-17. The Final Rule appropriately corrects that longstanding

error by harmonizing the definition of a single statutory phrase across agencies and applications,

*see* 8 U.S.C. § 1103(a)(1), §§ 1161(b)(2), (3); 42 U.S.C. § 18081(c)(2)(B), and by treating DACA

recipients as deferred action recipients like any other, consistent with the history of deferred action policies throughout the Nation's history.[17] *See* 86 Fed. Reg. 53747-48 (discussing the history); *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483-84 (1999) (same).

The Final Rule also corrects a significant practical problem, and does so in a reasonable— and reasonably explained—way. The DACA policy determined certain productive young people who came to the United States years earlier as children were generally low enforcement priorities for removal. *See* 87 Fed. Reg. at 53152. These are individuals who have lived in this country since 2007, arrived as young children and often know no other country as home, built lives and jobs for themselves and their loved ones in the United States; have over 250,000 U.S.-citizen children; post no public safety or national security threat; and have contributed billions in federal, State, and local taxes, as well as Medicare and Social Security, *id.* at 53153-54, 70, meaning that DACA recipients have been paying into the very same benefits programs from which they were previously barred.[18] *See* 87 Fed. Reg. at 53153 (DHS noting that DACA recipients' average age at arrival was 6 years old). By recognizing that the definition of lawfully present sweeps in those with deferred action, as it did in 1996, the Final Rule properly "eliminate[s] the discrepancy" between DACA recipients and other recipients of deferred action, 89 Fed. Reg. at 39397, in a way that improves health outcomes for this population and their communities, and that likely improves the strength of the

---

[17] *See* Ben Harrington, Congressional Research Service, *An Overview of Discretionary Reprieves from Removal: Deferred Action, DACA, TPS, and Others* (April 10, 2018), https://sgp.fas.org/crs/homesec/R45158.pdf.

[18] Nicole Prchal Svajlenka and Trinh Q. Truong, *The Demographic and Economic Impacts of DACA Recipients: Fall 2021 Edition* (Nov. 24, 2021), https://www.americanprogress.org/article/the-demographic-and-economic-impacts-of-daca-recipients-fall-2021-edition/.

overall ACA exchange risk pools, *id.* at 39396. Plaintiffs have given no basis to justify staying or preliminarily enjoining the Final Rule.

## **CONCLUSION**

This Court should deny Plaintiffs' motion for a stay and a preliminary injunction. Should the Court determine to grant Plaintiffs' motion for a stay or preliminary injunction, the scope of the stay or injunction should be limited to the irreparable harm established.

Dated: October 2, 2024                   Respectfully submitted,

**MATTHEW J. PLATKIN**
*Attorney General, State of New Jersey*

*/s/ Joshua P. Bohn*

JOSHUA P. BOHN (NJ Bar No. 164922015)
JESSICA L. PALMER
ANDREW H. YANG
VIVIANA M. HANLEY
BRYCE K. HURST
AMANDA I. MOREJÓN
Deputy Attorneys General
New Jersey Attorney General's Office
25 Market Street
Trenton, NJ 08625
(609) 376-3377
Joshua.Bohn@law.njoag.gov

*Attorneys for Amicus Curiae State of New Jersey*

*[additional counsel listed on subsequent pages]*

## ADDITIONAL COUNSEL

ROB BONTA
*Attorney General*
*State of California*
1300 I Street
Sacramento, CA 95814-2919

PHILIP J. WEISER
*Attorney General*
*State of Colorado*
1300 Broadway, 10th Floor
Denver, CO 80203

WILLIAM TONG
*Attorney General*
*State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*
820 N. French Street
Wilmington, DE 19801

BRIAN L. SCHWALB
*Attorney General*
*District of Columbia*
400 6th Street N.W.
Washington, DC 20001

ANNE E. LOPEZ
*Attorney General*
*State of Hawai'i*
425 Queen Street
Honolulu, Hawai'i, 96813

KWAME RAOUL
*Attorney General*
*State of Illinois*
115 South LaSalle Street
Chicago, IL 60603

AARON M. FREY
Attorney General
*State of Maine*
6 State House Station
Augusta, ME 04333-0006

ANTHONY G. BROWN
*Attorney General*
*State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

ANDREA JOY CAMPBELL
*Attorney General*
*Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA  02108

DANA NESSEL
Attorney General
*State of Michigan*
P.O. Box 30212
Lansing, Michigan 48909

KEITH ELLISON
*Attorney General*
*State of Minnesota*
102 State Capitol
75 Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

AARON D. FORD
*Attorney General*
*State of Nevada*
100 North Carson Street
Carson City, NV 89701

RAÚL TORREZ
*Attorney General*
*State of New Mexico*
408 Galisteo Street
Santa Fe, NM 87501

LETITIA JAMES
*Attorney General*
*State of New York*
28 Liberty Street
New York, NY 10005

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Main Street
Providence, RI 02903

ROBERT W. FERGUSON
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504

ELLEN F. ROSENBLUM
*Attorney General*
*State of Oregon*
1162 Court Street NE
Salem, OR 97301

CHARITY R. CLARK
*Attorney General*
*State of Vermont*
109 State Street
Montpelier, Vermont 05609-1001

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing Amicus Brief in Support of Defendants' Opposition to Plaintiffs' Motion for a Stay of the Final Rule and Preliminary Injunction was filed with the Court's CM/ECF system, which provides notice to all parties, on this 2nd day of October 2024.

/s/ Joshua P. Bohn
Joshua P. Bohn