# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA
## WESTERN DIVISION

STATE OF KANSAS, *et al.*,

        Plaintiffs,

    v.

UNITED STATES OF AMERICA, *et al.*,

        Defendants.

Case No. 1:24-cv-00150-DMT-CRH

**BRIEF OF THE AMERICAN CANCER SOCIETY CANCER ACTION NETWORK, AMERICAN LUNG ASSOCIATION, EPILEPSY FOUNDATION OF AMERICA, LEUKEMIA & LYMPHOMA SOCIETY, AND MUSCULAR DYSTROPHY ASSOCIATION AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR STAY OF THE FINAL RULE AND PRELIMINARY INJUNCTION**

Benjamin Seel*
Robin F. Thurston*
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C.
(202) 448-9090
bseel@democracyforward.org
rthurston@democracyforward.org

*Counsel for* Amici Curiae

* Application for admission *pro hac vice* pending

# TABLE OF CONTENTS

**Page**

Table of Authorities ........................................................................................ ii

Identity and Interests of *Amici Curiae* ....................................................... 1

Introduction ..................................................................................................... 2

Argument .......................................................................................................... 4

      I.    Access to affordable health care ensures that individuals can prevent, detect, and treat serious illnesses........................................................... 4

            A.    Access to affordable, high quality health insurance through the Affordable Care Act increases access to health care and improves patient outcomes......................................................... 4

            B.    DACA recipients lack access to quality, affordable health care at disproportionate rates. ................................................................ 12

      II.    Contrary to Plaintiffs' assertions, removing barriers to health care access for DACA recipients will produce substantial economic benefits to individuals and their communities, including by reducing the cost of uncompensated care. ................................................................ 15

Conclusion ...................................................................................................... 20

Certificate of Compliance ............................................................................ 21

Certificate of Service..................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bureau of Alcohol, Tobacco & Firearms v. Fed. Lab. Rels. Auth.*, 464 U.S. 89 (1983) ...................................................................................................... 14

*Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024) ........................................ 14

*Me. Cmty. Health Options v. United States*, 590 U.S. 296 (2020) ............................... 2

## Statutes, Rules & Regulations

Clarifying the Eligibility of Deferred Action for Childhood Arrivals (DACA) Recipients and Certain Other Noncitizens for a Qualified Health Plan through an Exchange, Advance Payments of the Premium Tax Credit, Cost-Sharing Reductions, and a Basic Health Program, 89 Fed. Reg. 39392 (May 8, 2024) (to be codified at 42 C.F.R. pts. 435, 457, 600) ...................................................... passim

D.N.D. Local Civ. R. 7.1(G)(1) .................................................................................... 1

## Other Authorities

Allan Dizioli & Roberto Pinheiro, *Health Insurance as a Productive Factor*, Lab. Econ., June 2016, https://doi.org/10.1016/j.labeco.2016.03.002 ......................... 4, 17

Kyle J. Caswell & Timothy A. Waidmann, *The Affordable Care Act Medicaid Expansions and Personal Finance*, 76 Med. Care Rsch. & Rev. 538 (2019), https://doi.org/10.1177%2F1077558717725164 ....................................................... 16

Benjamin D. Sommers et al., *Three-Year Impacts of the Affordable Care Act: Improved Medical Care and Health Among Low-Income Adults*, 36 Health Affs. 1119 (2017), https://doi.org/10.1377/hlthaff.2017.0293 .................................... 7

Bryce Ward, *Issue Brief: The Impact of Medicaid Expansion on States' Budgets*, The Commonwealth Fund (2020), https://www.commonwealthfund.org/sites/default/files/2020-05/Ward_impact_Medicaid_expansion_state_budgets_ib_final.pdf ...................... 19

CDC, *Social Determinants of Health (SDOH)* (Jan. 17, 2024), https://www.cdc.gov/about/priorities/why-is-addressing-sdoh-important.html ..... 16

Daniela Alulema, Ctr. for Migration Stud., *DACA Recipients are Essential Workers and Part of the Front-line Response to the COVID-19 Pandemic, as Supreme Court Decision Looms* (Mar. 30, 2020), https://cmsny.org/daca-essential-workers-covid/ .............................................................................. 18

David M. Levine et al., *Association of the Patient Protection and Affordable Care Act With Ambulatory Quality, Patient Experience, Utilization, and Cost, 2014-2016*, 5 JAMA Network Open, June 2022, https://doi.org/10.1001/jamanetworkopen.2022.18167 ............................................ 6

David U. Himmelstein et al., *Prevalence and Risk Factors for Medical Debt and Subsequent Changes in Social Determinants of Health in the US*, JAMA Network Open, Sept. 2022, https://doi.org/10.1001/jamanetworkopen.2022.31898 ........................................... 16

Edwin Park et al., *Jeopardizing a Sound Investment: Why Short-Term Cuts to Medicaid Coverage During Pregnancy and Childhood Could Result in Long-Term Harm*, The Commonwealth Fund (2020), https://www.commonwealthfund.org/sites/default/files/2020-12/Park_Medicaid_short_term_cuts_long-term-effects_ib_v2.pdf ........................... 7

Erica L. Eliason, *Adoption of Medicaid Expansion Is Associated with Lower Maternal Mortality*, 30 Women's Health Issues 147 (2020), https://doi.org/10.1016/j.whi.2020.01.005 ................................................................. 8

Heidi L. Allen et al., *Can Medicaid Expansion Prevent Housing Evictions?*, 38 Health Affs. 1451 (2019), https://doi.org/10.1377/hlthaff.2018.05071 ................. 16

Heidi L. Allen et al., *Early Medicaid Expansion Associated with Reduced Payday Borrowing in California*, 36 Health Affs. 1769 (2017), https://doi.org/10.1377/hlthaff.2017.0369 ............................................................... 16

Howard K. Koh & Kathleen G. Sebelius, *Promoting Prevention Through the Affordable Care Act*, 363 N.E. J. Med. 1296 (2010), https://doi.org/10.1056/nejmp1008560 ...................................................................... 2

Ivette Gomez et al., *Medicaid Coverage for Women*, Kaiser Fam. Found. (Feb. 17, 2023), https://www.kff.org/womens-health-policy/issue-brief/medicaid-coverage-for-women/ .................................................................................................... 8

Jingxuan Zhao et al., *Association of State Medicaid Income Eligibility Limits and Long-Term Survival After Cancer Diagnosis in the United States*, 18 J. Clinical Oncology 988 (2022), https://doi.org/10.1200/op.21.00631 .......................... 8

Jingxuan Zhao et al., *Health Insurance Status and Cancer Stage at Diagnosis and Survival in the United States*, 72 CA: Cancer J. for Clinicians 542 (2022), https://doi.org/10.3322/caac.21732 ............................................................... 10, 11

Jon M. Jachimowicz, *The Business Case for Providing Health Insurance to Low-Income Employees*, Harv. Bus. Rev. (Apr. 25, 2017), https://hbr.org/2017/04/the-business-case-for-providing-health-insurance-to-low-income-employees ............................................................................................ 17, 18

Jusung Lee et al., *The Impact of Medicaid Expansion on Diabetes Management*, 43 Diabetes Care 1094 (2020), https://doi.org/10.2337/dc19-1173 ........................ 7

K. Robin Yabroff et al., *Association of Medical Financial Hardship and Mortality Among Cancer Survivors in the United States*, 114 J. Nat'l Cancer Inst. 863 (2022), https://doi.org/10.1093/jnci/djac044 ............................................................... 3

Karina Wagnerman et al., *Medicaid Is a Smart Investment in Children*, Georgetown Univ. Health Pol'y Inst. (2017), https://ccf.georgetown.edu/wp-content/uploads/2017/03/MedicaidSmartInvestment.pdf..........................................7

Katriina Whitaker, *Earlier Diagnosis: The Importance of Cancer Symptoms*, 21 Lancet Oncology 6 (2020), https://doi.org/10.1016/S1470-2045(19)30658-8 .......... 11

Kenneth Brevoort et al., *Medicaid and Financial Health* (Nat'l Bureau of Econ. Rsch., Working Paper No. 24002, 2017), https://www.nber.org/system/files/working_papers/w24002/w24002.pdf ........ 15, 16

Kevin Griffith et al., *The Affordable Care Act Reduced Socioeconomic Disparities in Health Care Access*, 36 Health Affs. 1503 (2017), https://doi.org/10.1377/hlthaff.2017.0083................................................................. 15

Krystin Racine, *More Evidence that Medicaid Expansion Linked to Employment and Education Gains*, Georgetown Univ. Health Pol'y Inst., Ctr. for Child. & Fams. (Mar. 3, 2021), https://ccf.georgetown.edu/2021/03/03/more-evidence-that-medicaid-expansion-linked-to-employment-and-education-gains/ ................ 16

Laura Harker & Breanna Sharer, *Medicaid Expansion: Frequently Asked Questions*, Ctr. on Budget & Pol'y Priorities, https://www.cbpp.org/sites/default/files/6-16-21health_series3-18-24.pdf (last updated June 14, 2024)................................................................................. 6

Leticia Nogueira et al., *Association of Medicaid Expansion Under the Affordable Care Act and Early Mortality Following Lung Cancer Surgery*, 39 J. Clinical Oncology 76 (2021), https://doi.org/10.1001/jamanetworkopen.2023.51529 ........... 9

Madeline Guth & Meghana Ammula, *Building on the Evidence Base: Studies on the Effects of Medicaid Expansion, February 2020 to March 2021*, Kaiser Fam. Found. (2021), https://files.kff.org/attachment/Report-Building-on-the-Evidence-Base-Studies-on-the-Effects-of-Medicaid-Expansion.pdf .............. passim

Nat'l Immigr. L. Ctr., *Tracking DACA Recipients' Access to Health Care: 2023 Report* (2023), https://www.nilc.org/wp-content/uploads/2023/05/NILC_DACA-Report_2023.pdf ............................ 3, 12, 13

Nat'l Immigr. L. Ctr., *Tracking DACA Recipients' Access to Health Care* (2022), https://www.nilc.org/wp-content/uploads/2022/06/NILC_DACA-Report_060122.pdf ................................................................. 3, 13

Nicolas Ajkay et al., *Early Impact of Medicaid Expansion and Quality of Breast Cancer Care in Kentucky*, 226 J. Am. Coll. Surgeons 498 (2018), https://doi.org/10.1016/j.jamcollsurg.2017.12.041.................................................. 8

Off. of the Assistant Sec'y for Plan. & Evaluation, *Impacts of the Affordable Care Act's Medicaid Expansion on Insurance Coverage and Access to Care*, U.S. Dep't Health & Hum. Servs. (2017), https://aspe.hhs.gov/sites/default/files/migrated_legacy_files//172051/medicaidexpansion.pdf ................................................................................ 6

Press Release, U.S. Dep't of Health & Hum. Servs., *In Celebration of 10 Years of ACA Marketplaces, the Biden-Harris Administration Releases Historic Enrollment Data* (Mar. 22, 2024), https://www.hhs.gov/about/news/2024/03/22/celebration-10-years-aca-marketplaces-biden-harris-administration-releases-historic-enrollment-data.html#:~:text=ASPE%20analysis%20shows%20that%20today,Act%E2%80%99s%20Marketplaces%20and%20Medicaid%20expansion .............................. 2

Press Release, U.S. Dep't of Health & Hum. Servs., *New HHS Report Shows National Uninsured Rate Reached All-Time Low in 2023 After Record-Breaking ACA Enrollment Period* (Aug. 3, 2023), https://www.hhs.gov/about/news/2023/08/03/new-hhs-report-shows-national-uninsured-rate-reached-all-time-low-2023-after-record-breaking-aca-enrollment-period.html .......................................................................... 2

Priscilla Novak et al., *Changes in Health Insurance Coverage and Barriers to Health Care Access Among Individuals with Serious Psychological Distress Following the Affordable Care Act*, 45 Admin. & Pol'y Mental Health & Mental Health Servs. Rsch. 924 (2018), https://doi.org/10.1007%2Fs10488-018-0875-9 ........................................................................................................ 7

Sameed Khatana et al., *Association of Medicaid Expansion with Cardiovascular Mortality*, 4 JAMA Cardiology 671 (2019), https://doi.org/10.1001/jamacardio.2019.1651 ....................................... 8

Sarah Miller et al., *Medicaid and Mortality: New Evidence from Linked Survey and Administrative Data* (Nat'l Bureau of Econ. Rsch., Working Paper No. 26081, 2019), https://www.nber.org/system/files/working_papers/w26081/w26081.pdf ............... 8

Sherry Glied et al., *Issue Brief: Effect of the Affordable Care Act on Health Care Access*, The Commonwealth Fund (2017), https://www.commonwealthfund.org/sites/default/files/documents/___media_files_publications_issue_brief_2017_may_glied_effect_of_aca_on_hlt_care_access_ib.pdf ................................................................................ 5

Stacey A. Fedewa et al., *Changes in Breast and Colorectal Cancer Screening After Medicaid Expansion Under the Affordable Care Act*, 57 Am. J. Preventive Med. 3 (2019), https://doi.org/10.1016/j.amepre.2019.02.015 ............... 8

The White House, *Record Marketplace Coverage in 2024: A Banner Year for Coverage* (Jan. 24, 2024), https://www.whitehouse.gov/cea/written-materials/2024/01/24/record-marketplace-coverage-in-2024-a-banner-year-for-coverage/#:~:text=This%20trend%20has%20occurred%20in,in%20the%20most%20recent%20data ................................................................. 5

Timothy P. Hanna et al., *Mortality Due to Cancer Treatment Delay: Systematic Review and Meta-analysis*, BMJ Open, Nov. 2020, https://doi.org/10.1136/bmj.m4087 ................................................................... 9, 10

U.S. Citizenship & Immigr. Servs., *Count of Active DACA Recipients By Month of Current DACA Expiration* (Sept. 30, 2023), https://www.uscis.gov/sites/default/files/document/data/active_daca_recipients_fy23_q4.pdf.............................................................................................. 19

U.S. Dep't of Health & Hum. Servs., *About the Affordable Care Act* (Mar. 17, 2022), https://www.hhs.gov/healthcare/about-the-aca/index.html.......................... 5

Xu Ji et al., *Survival in Young Adults with Cancer Is Associated with Medicaid Expansion Through the Affordable Care Act*, 41 J. Clinical Oncology 1909 (2023), https://doi.org/10.1200/jco.22.01742 .......................................... 8

Xuesong Han et al., *Association Between Medicaid Expansion Under the Affordable Care Act and Survival Among Newly Diagnosed Cancer Patients*, 114 J. Nat'l Cancer Inst. 1176 (2022), https://doi.org/10.1093/jnci/djac077 ........... 9

Xuesong Han et al., *Comparison of Insurance Status and Diagnosis Stage Among Patients with Newly Diagnosed Cancer Before vs After Implementation of the Patient Protection and Affordable Care Act*, 4 JAMA Oncology 1713 (2018), https://doi.org/10.1001/jamaoncol.2018.3467................................................ 8

Yoshiko Toyoda et al., *Affordable Care Act State-Specific Medicaid Expansion: Impact on Health Insurance Coverage and Breast Cancer Screening Rates*, 230 J. Am. Coll. Surgeons 775 (2020), https://doi.org/10.1016/j.jamcollsurg.2020.01.031.................................................... 8

## IDENTITY AND INTERESTS OF *AMICI CURIAE*

*Amici* American Cancer Society Cancer Action Network, American Lung Association, Epilepsy Foundation of America, Leukemia & Lymphoma Society, and the Muscular Dystrophy Association represent millions of patients facing serious diseases and health conditions.[1] They explain below how the rule challenged here, Clarifying the Eligibility of Deferred Action for Childhood Arrivals (DACA) Recipients and Certain Other Noncitizens for a Qualified Health Plan through an Exchange, Advance Payments of the Premium Tax Credit, Cost-Sharing Reductions, and a Basic Health Program (the "Final Rule")[2], is consistent with Congress' intent in passing the Affordable Care Act (ACA) because it will improve patient outcomes and public health and drive down uncompensated care costs by further reducing the number of uninsured individuals. Moreover, by expanding access to quality, affordable health coverage to DACA recipients, the Final Rule will help ensure that the more than 500,000 "dreamers"—who have only ever called the United States home—have access to the medical care they need to lead healthy and productive, tax-paying lives.

---

[1] Counsel for *Amici* conferred with counsel for Plaintiffs, Defendants, and Proposed Intervenor-Defendants, all of whom consent to the filing of this brief. *Amici* thus submit this brief without an accompanying motion for leave. *See* D.N.D. Local Civ. R. 7.1(G)(1) ("Any other *amicus* curiae may file a brief only by leave of court or if the brief states that all parties have consented to its filing.").

[2] 89 Fed. Reg. 39392 (May 8, 2024) (to be codified at 42 C.F.R. pts. 435, 457, 600).

## INTRODUCTION

Congress passed the Patient Protection and Affordable Care Act (ACA) in 2010 "to improve national health-insurance markets and extend coverage to millions of people without adequate (or any) health insurance." *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 301 (2020). At the time of passage, Americans were "receiv[ing] only about half of the preventive services that are recommended."[3] The ACA "respond[ed] to this need with a vibrant emphasis on disease prevention" and "a wide array of new initiatives and funding" to achieve its goals of expanding access to affordable, quality health care.[4]

By any objective measure, the ACA has had tremendous success meeting these goals. Since it took effect, "over 45 million people have coverage thanks to the Affordable Care Act's Marketplaces and Medicaid expansion,"[5] and the rate of uninsured individuals is at an all-time low.[6] And yet, DACA recipients—who work

---

[3] Howard K. Koh & Kathleen G. Sebelius, *Promoting Prevention Through the Affordable Care Act*, 363 N.E. J. Med. 1296, 1296 (2010), https://doi.org/10.1056/nejmp1008560.

[4] *Id.*

[5] *See* Press Release, U.S. Dep't of Health & Hum. Servs., *In Celebration of 10 Years of ACA Marketplaces, the Biden-Harris Administration Releases Historic Enrollment Data* (Mar. 22, 2024), https://www.hhs.gov/about/news/2024/03/22/celebration-10-years-aca-marketplaces-biden-harris-administration-releases-historic-enrollment-data.html#:~:text=ASPE%20analysis%20shows%20that%20today,Act%E2%80%99s %20Marketplaces%20and%20Medicaid%20expansion.

[6] *See* Press Release, U.S. Dep't of Health & Hum. Servs., *New HHS Report Shows National Uninsured Rate Reached All-Time Low in 2023 After Record-Breaking ACA Enrollment Period* (Aug. 3, 2023), https://www.hhs.gov/about/news/2023/08/03/new-hhs-report-shows-national-uninsured-rate-reached-all-time-low-2023-after-record-breaking-aca-enrollment-period.html.

and pay taxes to support the ACA's benefits[7]—have not shared in these coverage gains[8] and, accordingly, lack timely access to health care at disproportionate rates.[9] Lack of access to coverage subjects DACA recipients to a host of "downstream impacts," including "negative health outcomes" with "longer hospital stays and increased mortality," and unsustainable medical debt, which "puts individuals at higher risk of food and housing insecurity";[10] financial hardship has even been associated with higher adjusted mortality rates.[11] Collectively, persistent exposure to

---

[7] *See* Clarifying the Eligibility of DACA Recipients, 89 Fed. Reg. at 39399 (noting that DACA recipients contribute an estimated "$6.2 billion in Federal taxes and $3.3 billion in State and local taxes each year" and "that only DACA recipients who attest that they will file a Federal income tax return will be eligible for [Advanced Premium Tax Credits] for Exchange coverage").

[8] *See* Nat'l Immigr. L. Ctr. (NILC), *Tracking DACA Recipients' Access to Health Care: 2023 Report* (2023), https://www.nilc.org/wp-content/uploads/2023/05/NILC_DACA-Report_2023.pdf [hereinafter NILC 2023 Report]; *see also* Clarifying the Eligibility of DACA Recipients, 89 Fed. Reg. at 39395 ("DACA recipients are still more than three times more likely to be uninsured than the general U.S. population, which had a national uninsured rate of 7.7 percent.").

[9] *See* NILC, *Tracking DACA Recipients' Access to Health Care* (2022), https://www.nilc.org/wp-content/uploads/2022/06/NILC_DACA-Report_060122.pdf [hereinafter NILC 2022 Report]; *see also* Clarifying the Eligibility of DACA Recipients, 89 Fed. Reg. at 39396 (finding that "48 percent of respondents experienc[ed] a delay in medical care due to their [DACA] status, and 71 percent of respondents unable to pay medical bills or expenses") (citing NILC 2022 Report).

[10] Clarifying the Eligibility of DACA Recipients, 89 Fed. Reg. at 39396 n. 32-34 (first citing Jennifer Tolbert et al., *Key Facts About the Uninsured Population*, Kaiser Fam. Found. (Dec. 18, 2023), https://www.kff.org/uninsured/issue-brief/key-facts-about-the-uninsured-population/; then citing NILC 2022 Report; and then citing NILC 2023 Report).

[11] K. Robin Yabroff et al., *Association of Medical Financial Hardship and Mortality Among Cancer Survivors in the United States*, 114 J. Nat'l Cancer Inst. 863, 863 (2022), https://doi.org/10.1093/jnci/djac044.

those destabilizing forces disrupts the "health and financial stability" of DACA recipients, which impedes "their ability to work or study."[12]

Through the Final Rule, the Centers for Medicare & Medicaid Services (CMS) has unlocked access to the ACA's benefits for DACA recipients, a decision that is legally sound precisely because it animates Congress' intent in passing the ACA to increase access to quality, affordable health care. Moreover, the Final Rule contains substantial benefits for states in which DACA recipients live (including Plaintiffs' states) because it will add to insurance pools a population that is, on average, younger and healthier; reduce the number of individuals who rely on expensive, emergency services for health care; and, overall, provide these residents with access to the care they need to "be even more productive and better economic contributors to their communities and society at large."[13]

Because the Final Rule correctly implements the ACA, Plaintiffs are unlikely to succeed on the merits of their challenge and the Court should, accordingly, deny their motion for a stay of the Final Rule and preliminary injunction.

## ARGUMENT

**I. Access to affordable health care ensures that individuals can prevent, detect, and treat serious illnesses.**

**A. Access to affordable, high quality health insurance through the Affordable Care Act increases access to health care and improves patient outcomes.**

---

[12] Clarifying the Eligibility of DACA Recipients, 89 Fed. Reg. at 39396.

[13] *See id.* (finding that "a worker with health insurance is estimated to miss 77 percent fewer days than an uninsured worker") (citing Allan Dizioli & Roberto Pinheiro, *Health Insurance as a Productive Factor*, Lab. Econ., June 2016, https://doi.org/10.1016/j.labeco.2016.03.002).

Simply put, "[p]eople without insurance coverage have lower access to care than people who are insured," "are more likely to delay or forgo care due to costs," and "are less likely than those with insurance to receive preventive care and services for major health conditions and chronic diseases."[14] The ACA sought to close those gaps in access to care, especially preventive care, by reducing the cost of purchasing insurance.[15] It is succeeding in that goal, as shown by the rate of uninsured individuals in America, which has decreased "from 16 percent in 2010, prior to ACA implementation, to 7.2 percent" in 2023, the most recent year for which data is available.[16] Moreover, those who gained insurance through the ACA's expansion provisions have been able to access the health care they need and establish a regular location for their care.[17] This expanded access has also been "associated with more

---

[14] Tolbert et al., *supra* note 10.

[15] *See* U.S. Dep't of Health & Hum. Servs., *About the Affordable Care Act* (Mar. 17, 2022), https://www.hhs.gov/healthcare/about-the-aca/index.html (noting that making "affordable health insurance available to more people" is a "primary goal[]" of the ACA).

[16] The White House, *Record Marketplace Coverage in 2024: A Banner Year for Coverage* (Jan. 24, 2024), https://www.whitehouse.gov/cea/written-materials/2024/01/24/record-marketplace-coverage-in-2024-a-banner-year-for-coverage/#:~:text=This%20trend%20has%20occurred%20in,in%20the%20most%20recent%20data.

[17] Sherry Glied et al., *Issue Brief: Effect of the Affordable Care Act on Health Care Access*, The Commonwealth Fund, at 1 (2017), https://www.commonwealthfund.org/sites/default/files/documents/___media_files_publications_issue_brief_2017_may_glied_effect_of_aca_on_hlt_care_access_ib.pdf (analyzing data from the National Health Interview Survey and Behavioral Risk Factor Surveillance System and finding "that gaining insurance coverage through the expansions decreased the probability of not receiving medical care by between 20.9 percent and 25 percent" and "increased the probability of having a usual place of care by between 47.1 percent and 86.5 percent").

high-value diagnostic and preventive testing, improved patient experience and access, and decreased out-of-pocket expenditures for lower income US individuals."[18]

The benefits of expanded access to quality, affordable health insurance are further demonstrated by studies of states that expanded Medicaid eligibility through the ACA, which "dramatically lowered their uninsured rates."[19] Studies analyzing the effect of Medicaid expansion are worth considering, even though the Final Rule does not make DACA recipients eligible for Medicaid,[20] because they provide clear evidence of the positive effects of expanded access to quality health coverage–results the Final Rule can reasonably be expected to achieve for DACA recipients and the states in which they live.

For instance, studies show that Medicaid expansion has encouraged greater use of preventive health services; controlled costs, including uncompensated care costs; and, overall, improved public health and patient outcomes.[21] Indeed, because

---

[18] David M. Levine et al., *Association of the Patient Protection and Affordable Care Act With Ambulatory Quality, Patient Experience, Utilization, and Cost, 2014-2016*, 5 JAMA Network Open, June 2022, at 1, https://doi.org/10.1001/jamanetworkopen.2022.18167.

[19] Laura Harker & Breanna Sharer, *Medicaid Expansion: Frequently Asked Questions*, Ctr. on Budget & Pol'y Priorities 1, https://www.cbpp.org/sites/default/files/6-16-21health_series3-18-24.pdf (last updated June 14, 2024).

[20] *See* Clarifying the Eligibility of DACA Recipients, 89 Fed. Reg. at 39393.

[21] *See* Madeline Guth & Meghana Ammula, *Building on the Evidence Base: Studies on the Effects of Medicaid Expansion, February 2020 to March 2021*, Kaiser Fam. Found. 2 (2021), https://files.kff.org/attachment/Report-Building-on-the-Evidence-Base-Studies-on-the-Effects-of-Medicaid-Expansion.pdf; Off. of the Assistant Sec'y for Plan. & Evaluation, *Impacts of the Affordable Care Act's Medicaid Expansion on Insurance Coverage and Access to Care*, U.S. Dep't Health & Hum. Servs. 2 (2017), https://aspe.hhs.gov/sites/default/files/migrated_legacy_files//172051/medicaidexpansion.pdf.

access to health care increases the likelihood that patients will seek preventive care, including screenings and immunizations, illnesses are prevented or diagnosed at an earlier stage, when treatment is cheaper and more effective.[22] These gains are especially pronounced for those seeking treatment for cancer, chronic disease, or a disability, as well as for non-citizens and those in mixed-status households.[23] Access to Medicaid has meant, for instance, that patients with diabetes are seeking earlier treatment and experiencing better outcomes,[24] and those with mental health issues are less likely to delay or forgo seeking care because of cost.[25] Medicaid access also benefits children, even if their parent is the beneficiary, putting them on a path to lifelong health.[26]

A substantial and crystalizing benefit of this uptick in health care access and

---

[22] *See, e.g.*, Guth & Ammula, *supra* note 21, at 5-6, 10; Benjamin D. Sommers et al., *Three-Year Impacts of the Affordable Care Act: Improved Medical Care and Health Among Low-Income Adults*, 36 Health Affs. 1119, 1124 (2017), https://doi.org/10.1377/hlthaff.2017.0293.

[23] *See* Guth & Ammula, *supra* note 21, at 5-6.

[24] *See* Jusung Lee et al., *The Impact of Medicaid Expansion on Diabetes Management*, 43 Diabetes Care 1094, 1097-98 (2020), https://doi.org/10.2337/dc19-1173.

[25] Priscilla Novak et al., *Changes in Health Insurance Coverage and Barriers to Health Care Access Among Individuals with Serious Psychological Distress Following the Affordable Care Act*, 45 Admin. & Pol'y Mental Health & Mental Health Servs. Rsch. 924, 924 (2018), https://doi.org/10.1007%2Fs10488-018-0875-9.

[26] Edwin Park et al., *Jeopardizing a Sound Investment: Why Short-Term Cuts to Medicaid Coverage During Pregnancy and Childhood Could Result in Long-Term Harm,* The Commonwealth Fund, at 1 (2020), https://www.commonwealthfund.org/sites/default/files/2020-12/Park_Medicaid_short_term_cuts_long-term-effects_ib_v2.pdf; *see also* Karina Wagnerman et al., *Medicaid Is a Smart Investment in Children*, Georgetown Univ. Health Pol'y Inst. (2017), https://ccf.georgetown.edu/wp-content/uploads/2017/03/MedicaidSmartInvestment.pdf.

utilization is the reduction of "overall mortality rates," as well as mortality rates for the conditions most relevant to *Amici*'s work, including cancer, cardiovascular disease, and liver disease.[27] The rates of maternal mortality and morbidity have also improved in states that expanded Medicaid eligibility.[28]

With respect to cancer treatment and prevention, in particular, increased health care access in Medicaid expansion states has led to higher screening rates for colorectal and breast cancer,[29] earlier cancer diagnoses,[30] better survival rates for

---

[27] *See* Guth & Ammula, *supra* note 21, at 5; Sarah Miller et al., *Medicaid and Mortality: New Evidence from Linked Survey and Administrative Data* 3 (Nat'l Bureau of Econ. Rsch., Working Paper No. 26081, 2019), https://www.nber.org/system/files/working_papers/w26081/w26081.pdf; Sameed Khatana et al., *Association of Medicaid Expansion with Cardiovascular Mortality*, 4 JAMA Cardiology 671, 675 (2019), https://doi.org/10.1001/jamacardio.2019.1651.

[28] Ivette Gomez et al., *Medicaid Coverage for Women*, Kaiser Fam. Found. (Feb. 17, 2023), https://www.kff.org/womens-health-policy/issue-brief/medicaid-coverage-for-women/. One study found that Medicaid expansion-driven reductions in maternal mortality were "concentrated among non-Hispanic Black mothers, suggesting that expansion could be contributing to decreasing racial disparities in maternal mortality." *See* Erica L. Eliason, *Adoption of Medicaid Expansion Is Associated with Lower Maternal Mortality*, 30 Women's Health Issues 147, 147 (2020), https://doi.org/10.1016/j.whi.2020.01.005.

[29] *See* Nicolas Ajkay et al., *Early Impact of Medicaid Expansion and Quality of Breast Cancer Care in Kentucky*, 226 J. Am. Coll. Surgeons 498, 498 (2018), https://doi.org/10.1016/j.jamcollsurg.2017.12.041; Stacey A. Fedewa et al., *Changes in Breast and Colorectal Cancer Screening After Medicaid Expansion Under the Affordable Care Act*, 57 Am. J. Preventive Med. 3, 6 (2019), https://doi.org/10.1016/j.amepre.2019.02.015; Yoshiko Toyoda et al., *Affordable Care Act State-Specific Medicaid Expansion: Impact on Health Insurance Coverage and Breast Cancer Screening Rates*, 230 J. Am. Coll. Surgeons 775, 780 (2020), https://doi.org/10.1016/j.jamcollsurg.2020.01.031.

[30] *See, e.g.*, Xuesong Han et al., *Comparison of Insurance Status and Diagnosis Stage Among Patients with Newly Diagnosed Cancer Before vs After Implementation of the Patient Protection and Affordable Care Act*, 4 JAMA Oncology 1713, 1713 (2018), https://doi.org/10.1001/jamaoncol.2018.3467.

patients with newly diagnosed cancer ages 18-64,[31] and improved post-operative survival rates for lung cancer patients.[32] Studies have also found that "Medicaid expansion was associated with greater increase in 2-year overall survival," especially "among non-Hispanic Blacks and in rural areas."[33]

The measurable improvements for cancer patients in Medicaid expansion states should come as no surprise because, fundamentally, Medicaid expansion is a policy intended to remove cost-based barriers that separate patients from the care they need. Although advances in medicine and science have produced a range of new therapies, which have been successfully deployed to treat even aggressive forms of cancer, early detection and treatment remain essential. As one study observed, "the survival gained by minimizing the time to initiation of treatment is of similar (and perhaps greater) magnitude of benefit as that seen with some novel therapeutic agents."[34] Indeed, for a range of cancers, "[e]ven a four week delay of cancer treatment is associated with increased mortality across surgical, systemic treatment, and

---

[31] Jingxuan Zhao et al., *Association of State Medicaid Income Eligibility Limits and Long-Term Survival After Cancer Diagnosis in the United States*, 18 J. Clinical Oncology 988, 988 (2022), https://doi.org/10.1200/op.21.00631; Xu Ji et al., *Survival in Young Adults with Cancer Is Associated with Medicaid Expansion Through the Affordable Care Act*, 41 J. Clinical Oncology 1909, 1909 (2023), https://doi.org/10.1200/jco.22.01742.

[32] Leticia Nogueira et al., *Association of Medicaid Expansion Under the Affordable Care Act and Early Mortality Following Lung Cancer Surgery*, 39 J. Clinical Oncology 76, 76 (2021), https://doi.org/10.1001/jamanetworkopen.2023.51529.

[33] Xuesong Han et al., *Association Between Medicaid Expansion Under the Affordable Care Act and Survival Among Newly Diagnosed Cancer Patients*, 114 J. Nat'l Cancer Inst. 1176, 1176 (2022), https://doi.org/10.1093/jnci/djac077.

[34] Timothy P. Hanna et al., *Mortality Due to Cancer Treatment Delay: Systematic Review and Meta-analysis*, BMJ Open, Nov. 2020, at 5, https://doi.org/10.1136/bmj.m4087.

radiotherapy."[35] Short delays are costly, too. One study's "results suggest a 4% increased risk of death for a two week delay for breast cancer surgery."[36]

A proven method for reducing the amount of time between diagnosis and treatment is to ensure that patients have quality, affordable health insurance, which "is a strong determinant of access to care and health outcomes among patients with cancer in the United States."[37] Facilitating enrollment in health insurance is especially useful for combatting "cancers, such as melanoma, bladder cancer, and thyroid cancer," which "can be detected early through timely evaluation of early symptoms," as might occur at the kind of routine, annual checkup from a primary care provider to which those with insurance are more likely to have access.[38] Indeed, the scientific record is replete with studies showing "that uninsured patients had substantially higher risks of presenting with late-stage cancers at diagnosis, especially for screen-detectable cancers and cancers with early signs and symptoms, for which access to care is critical for early diagnosis."[39] For individuals with breast cancer, for example, "which is a screen-detectable cancer, the percentages of patients

---

[35] *Id.* at 2 (investigating the effect of delayed treatment for bladder, breast, colon, rectum, lung, cervical, and head and neck cancers, which "together represent 44% of all incident cancers globally").

[36] *Id.* at 7.

[37] Jingxuan Zhao et al., *Health Insurance Status and Cancer Stage at Diagnosis and Survival in the United States*, 72 CA: Cancer J. for Clinicians 542, 542 (2022), https://doi.org/10.3322/caac.21732 (collecting studies).

[38] *Id.* at 554 (noting the "large body of research" showing "that lack of health insurance or inadequate health insurance coverage was associated with limited access to routine primary care," which are "associated with early detection" of certain cancers).

[39] *Id.* at 542.

diagnosed at Stages I, II, II, and IV were 50%, 33.9%, 12.2%, and 3.9%, respectively, for the privately insured, . . . and 29.4%, 37.1%, 19.8%, and 13.7% for those who were uninsured."[40]

Later detection and advanced stage diagnoses typically lead to worse outcomes for patients with cancer, of course.[41] Strikingly, however, studies find that, "[c]ompared with privately insured patients, uninsured patients had worse survival across most cancer sites for all stages combined and worse stage-specific survival."[42] For instance, one study found that "for six cancer sites—prostate, colorectal, non-Hodgkin lymphoma, oral cavity, liver, and esophagus—privately insured patients with Stage II cancer had better survival than uninsured patients with Stage I cancer."[43] Put another way, uninsured cancer patients are less likely to find their cancer early and, even when they do, fare worse than insured patients who have more advanced stages of cancer.

Plainly, making quality health insurance affordable—regardless of whether the policy is administered by a government agency or a private company—is an essential first step to improving patient outcomes and public health.

---

[40] *Id.* at 547.

[41] *See, e.g.*, Katriina Whitaker, *Earlier Diagnosis: The Importance of Cancer Symptoms*, 21 Lancet Oncology 6, 6 (2020), https://doi.org/10.1016/S1470-2045(19)30658-8 ("People diagnosed earlier with cancer are not only more likely to survive, but importantly also to have better experiences of care, lower treatment morbidity, and improved quality of life compared with those diagnosed late.").

[42] Zhao et al., *Health Insurance Status and Cancer Stage at Diagnosis and Survival in the United States*, *supra* note 37, at 548.

[43] *Id.*

**B. DACA recipients lack access to quality, affordable health care at disproportionate rates.**

Evidence showing how effectively the ACA has improved access to health care, patient outcomes, and public health strongly validates CMS' choice to revisit its earlier decisions to exclude DACA recipients from accessing health care through the ACA. Indeed, this is a group that desperately needs the assistance the ACA can provide as studies show that, "[y]ear after year, DACA recipients continue to report significant challenges and barriers to health insurance coverage."[44] In a 2023 survey of DACA recipients, for instance, "more than a quarter of survey respondents (27%) indicated that they are not covered by any kind of health insurance or other health care plan," which reflects increased coverage relative to 2022 survey results but nevertheless "shows that DACA recipients are still nearly three times as likely to be uninsured than the general population in the U.S."[45] This disparity is driven by numerous factors, but a significant number of DACA recipients either believe they are not eligible for health insurance because of their immigration status or lack awareness of affordable options.[46]

DACA recipients who do have health insurance predominantly receive it through their employer.[47] That puts DACA recipients in a "precarious situation"

---

[44] NILC 2023 Report at 1.

[45] *Id.*

[46] *See id.* (reporting that "57% of respondents believe they are ineligible" and "51% are not aware of any affordable care or coverage options").

[47] *See id.* at 2 (reporting that "80% of respondents indicate that they are covered through an employer or union"); *see also* 2022 NILC 2022 Report at 2 (noting that only "50 percent of the total population has employer insurance").

because "losing their job means potentially losing their health care coverage."[48] At no point has the fragility of having health care coverage tied to employment been more evident than during the COVID-19 pandemic when "[a]lmost 18 percent of respondents lost their employer provided health coverage,"[49] but, unlike peers who were also lawfully residing in the United States, DACA recipients "did not have a public health insurance system to fall back on."[50] The results of this lack of coverage are predictable: 48 percent of respondents said that they have "delayed getting medical care because of [their] immigration status," and 71 percent reported that they, or someone in their family, has been "unable to pay . . . medical bills or expenses."[51]

CMS' prior decisions to exclude DACA recipients from ACA eligibility drew from the U.S. Department of Homeland Security's reasoning in establishing that program, however, and did not reflect the best interpretation of the ACA.[52] CMS' initial decisions to exclude DACA recipients from ACA coverage also created an inconsistency with CMS' treatment of noncitizens who were subject to other forms of deferred immigration enforcement decisions, as the Final Rule acknowledges.[53] The

---

[48] 2023 NILC Report at 1.

[49] *See* NILC 2022 Report at 2.

[50] *Id.*

[51] NILC 2023 Report at 2.

[52] *See* Clarifying the Eligibility of DACA Recipients, 89 Fed. Reg. at 39394-96.

[53] *See id.* at 39394 (noting that CMS regulations promulgated in 2010 and 2012, when "the DACA policy had not yet been implemented, . . . specified that individuals granted deferred action were considered lawfully present for purposes of eligibility to enroll in a QHP through an Exchange").

Final Rule corrects these past mistakes by establishing that DACA recipients, like other individuals granted deferred action, are eligible to enroll in health insurance plans through ACA exchanges. Interpreting the ACA to allow for that outcome not only corrects a prior inconsistency, but also sets forth the best reading of the ACA, as Defendants explain. *See* Defs.' Opp'n Br. 21-25, ECF No. 61; *see also Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2266 (2024) ("In the business of statutory interpretation, if it is not the best, it is not permissible.").

Moreover, CMS made these earlier decisions without the ability to consider the difficulty that DACA recipients would have accessing health care.[54] As detailed above, however, "new information regarding DACA recipients' access to health insurance coverage has emerged."[55] In light of this new evidence, which illustrates that prior CMS policy was undermining the coverage and access goals at the heart of the ACA, the Final Rule exemplifies reasoned decision-making.[56] Furthermore, the interpretation of the ACA described in the Final Rule should be particularly persuasive to the Court, as it is informed by CMS' careful consideration of newly developed facts over which it has special expertise. *See Loper Bright*, 144 S. Ct. at 2267 (finding an agency's interpretation of a statute it administers "especially informative 'to the extent it rests on factual premises within [the agency's] expertise'" (quoting *Bureau of Alcohol, Tobacco & Firearms v. Fed. Lab. Rels. Auth.*, 464 U.S. 89, 98 n. 8 (1983)).

---

[54] *See id.* at 39395.

[55] *Id.*

[56] *See id.* at 39394-95.

## II. Contrary to Plaintiffs' assertions, removing barriers to health care access for DACA recipients will produce substantial economic benefits to individuals and their communities, including by reducing the cost of uncompensated care.

Plaintiffs principally stake their asserted irreparable injuries on the notion that they will incur substantial costs if CMS is permitted to implement the Final Rule, which allows DACA recipients to purchase private health insurance through ACA exchanges. *See* Pls.' Mot. for Stay and Prelim. Inj. 15-18, ECF No. 35 ("PI Mot."). The problem with Plaintiffs' theory, however, is that—in addition to improving outcomes for patients and public health—expanding coverage under the ACA, as the Final Rule does, economically benefits both individuals and communities, including by reducing the cost of uncompensated care.

On an individual level, the ACA improves financial prospects because it makes seeking treatment for serious illnesses more affordable, which means patients get the care they need while mitigating the risk of financial ruin. Thus, as gaps in coverage between households with incomes below $25,000 and those above $75,000 fell sharply in Medicaid-expansion states,[57] the "medical bills sent to collection [fell] by $3.4 billion," and many patients avoided incurring new debts or becoming delinquent on existing debt.[58] This financial breathing room means that patients with low incomes

---

[57] Kevin Griffith et al., *The Affordable Care Act Reduced Socioeconomic Disparities in Health Care Access*, 36 Health Affs. 1503, 1507-08 (2017), https://doi.org/10.1377/hlthaff.2017.0083.

[58] *See* Kenneth Brevoort et al., *Medicaid and Financial Health* 1 (Nat'l Bureau of Econ. Rsch., Working Paper No. 24002, 2017), https://www.nber.org/system/files/working_papers/w24002/w24002.pdf.

can build credit,[59] stay employed and in school,[60] avoid housing or food insecurity,[61] and sidestep payday lenders.[62] Evidence also suggests that incurring medical debt may "inhibit subsequent care-seeking" and "impair physical and mental health."[63] It is such a powerfully negative force that some researchers consider it to be a social determinant of health (SDOH)[64]—i.e., "the nonmedical factors that influence health outcomes,"[65] thereby potentially creating a downward spiral of worsening health outcomes and associated financial instability. Viewed in this light, it is clear that allowing DACA recipients to access health care through the ACA will enhance, rather than undermine, their financial self-sufficiency, to say nothing of their health.

---

[59] *Id.* at 41; *see also* Kyle J. Caswell & Timothy A. Waidmann, *The Affordable Care Act Medicaid Expansions and Personal Finance*, 76 Med. Care Rsch. & Rev. 538, 562 (2019), https://doi.org/10.1177%2F1077558717725164.

[60] *See* Krystin Racine, *More Evidence that Medicaid Expansion Linked to Employment and Education Gains*, Georgetown Univ. Health Pol'y Inst., Ctr. for Child. & Fams. (Mar. 3, 2021), https://ccf.georgetown.edu/2021/03/03/more-evidence-that-medicaid-expansion-linked-to-employment-and-education-gains/.

[61] *See* Heidi L. Allen et al., *Can Medicaid Expansion Prevent Housing Evictions?*, 38 Health Affs. 1451, 1454-56 (2019), https://doi.org/10.1377/hlthaff.2018.05071; *see also* David U. Himmelstein et al.*, Prevalence and Risk Factors for Medical Debt and Subsequent Changes in Social Determinants of Health in the US*, JAMA Network Open, Sept. 2022, at 1, https://doi.org/10.1001/jamanetworkopen.2022.31898 (finding that medical debt "associated with a significant 1.7-fold to 3.1-fold higher risk of worsening housing and food security").

[62] *See* Heidi L. Allen et al., *Early Medicaid Expansion Associated with Reduced Payday Borrowing in California*, 36 Health Affs. 1769, 1772-75 (2017), https://doi.org/10.1377/hlthaff.2017.0369.

[63] Himmelstein, *supra* note 61.

[64] *Id.*

[65] CDC, *Social Determinants of Health (SDOH)* (Jan. 17, 2024), https://www.cdc.gov/about/priorities/why-is-addressing-sdoh-important.html.

The high quality, affordable health insurance the ACA facilitates promotes economic activity and growth on a broader level, too. As CMS observed in the Final Rule, high quality health coverage not only improves health outcomes but also allows covered individuals to "be even more productive and better economic contributors to their communities and society at large with improved access to health care."[66]

The reasons for the increased productivity of insured workers are simple: insurance (1) "reduces the probability a worker gets sick" in the first place by connecting the worker to preventive health care and (2) "increases the probability a worker recovers from illness" more quickly by reducing cost-related barriers to seeking effective treatment.[67] Indeed, according to a 2016 study, "an insured worker with health coverage misses on average 76.54% fewer workdays than uninsured workers."[68] Even if the "productivity cost" to employers is calculated by simply multiplying the number of employee hours missed by the corresponding hourly wage[69]—a method that likely undercounts the true cost of an employee's illness[70]—it

---

[66] Clarifying the Eligibility of DACA Recipients, 89 Fed. Reg. at 39396.

[67] *See id.*

[68] Dizioli & Pinheiro, *supra* note 13, at 1 (noting that health insurance "reduces the probability that a healthy worker gets sick, missing workdays, and it increases the probability that a sick worker recovers and returns to work").

[69] *Id.* at 2 (finding that, "[i]n 2003, 69 million workers missed a total of 407 million days of work due to illness," and estimating those lost workdays as "equivalent to a loss in output of $48 billion").

[70] *See* Jon M. Jachimowicz, *The Business Case for Providing Health Insurance to Low-Income Employees*, Harv. Bus. Rev. (Apr. 25, 2017), https://hbr.org/2017/04/the-business-case-for-providing-health-insurance-to-low-income-employees (asserting that providing health insurance to low-income employees "is good business" because "it is linked with reduced levels of stress, more long-term decision-making, and increased cognitive ability, as well as . . . increased physical health").

is nevertheless "estimated to be substantial."[71] Consider too that, if the costs of sick employees under normal public health conditions are "substantial," the public health and economic costs of sick DACA recipients—many of whom work jobs rightly recognized during the COVID-19 pandemic as "essential"[72]—must be considered even greater.[73]

The prospect of a labor force with access to affordable health coverage should thus be an especially attractive proposition for state governments, like Plaintiffs, which can market the increased productivity and resiliency of their sufficiently insured labor force to prospective employers and residents and also make use of the revenue generated by their thriving economy.

Beyond the boost in productivity that can be expected from increased enrollment in ACA-facilitated insurance plans, state and local governments can also look forward to budgetary relief. States that expanded Medicaid, for instance, experienced "increased revenue as well as net state savings," despite having to contribute to the costs of expansion, because they have been able to make corresponding cuts to programs, like substance abuse treatment, that targeted issues now addressed through the availability of Medicaid.[74] Strikingly, there is also evidence suggesting that the increased economic activity and cost savings sparked by

---

[71] *See id.*

[72] *See* Daniela Alulema, Ctr. for Migration Stud., *DACA Recipients are Essential Workers and Part of the Front-line Response to the COVID-19 Pandemic, as Supreme Court Decision Looms* (Mar. 30, 2020), https://cmsny.org/daca-essential-workers-covid/.

[73] *See* Jachimowicz, *supra* note 70.

[74] *See* Guth & Ammula, *supra* note 21, at 9.

the ACA's improvements to patient health outcomes—including reduced mortality—have "offset the entire net cost of expansion."[75] Thus, Plaintiffs' claim that they will be burdened by "technology and staffing expenses" if DACA recipients are allowed to purchase insurance through state-administered exchanges is dubious, at best. *See* PI Mot. at 14.[76]

At a minimum, it is clear that expanded coverage through the ACA has steered individuals toward health insurance—whether Medicaid or plans purchased through an exchange—and away from reliance on emergency care or other safety-net options.[77] Increases in the number of insured individuals has "decreased uncompensated care costs (UCC) overall and for specific types of hospitals, including those in rural areas."[78]

In light of this evidence, one might imagine that Plaintiffs would welcome the Final Rule, given their stated concern with DACA recipients relying on "emergency

---

[75] *See id.*; *see also* Bryce Ward, *Issue Brief: The Impact of Medicaid Expansion on States' Budgets*, The Commonwealth Fund (2020), https://www.commonwealthfund.org/sites/default/files/2020-05/Ward_impact_Medicaid_expansion_state_budgets_ib_final.pdf (concluding that "the net cost of Medicaid expansion to states is different from the 'sticker price.' In some cases, the net cost is negative.").

[76] As Plaintiffs acknowledge, PI Mot. at 14, any such costs would only be incurred, if at all, by Idaho, Kentucky, and Virginia, where collectively fewer than 16,500 DACA recipients reside. *See* U.S. Citizenship & Immigr. Servs., *Count of Active DACA Recipients By Month of Current DACA Expiration*, at 5 (Sept. 30, 2023), https://www.uscis.gov/sites/default/files/document/data/active_daca_recipients_fy23_q4.pdf.

[77] *See* Guth & Ammula, *supra* note 21, at 9.

[78] *Id.* (noting that, although Medicaid expansion reduced the number of annual hospital closures, rural and small hospitals benefitted, in particular, from Medicaid expansion).

care and other public assistance" for their health care. *See* PI Mot. at 18. Plaintiffs' opposite position, which asks the Court to enjoin CMS from implementing the Final Rule for any DACA recipient anywhere in the nation, misapprehends or misconstrues the positive fiscal impacts of this change to state and local governments. Nevertheless, their position would deny those benefits to their sister states as well as, of course, to the individual DACA recipients whose well-being stands to be enhanced and whose communities would be made healthier and more productive by the Final Rule. *See id.* at 18-19.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a stay of the Final Rule and preliminary injunction.

Dated: October 2, 2024                     Respectfully submitted,

                                           */s/ Benjamin Seel*
                                           Benjamin Seel*
                                           Robin F. Thurston*
                                           DEMOCRACY FORWARD FOUNDATION
                                           P.O. Box 34553
                                           Washington, DC 20043
                                           (202) 448-9090
                                           bseel@democracyforward.org
                                           rthurston@democracyforward.org

                                           *Counsel for* Amici Curiae

                                           *Application for admission *pro hac vice*
                                           pending

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the typeface and length requirements set forth in the Court's local rules.

*/s/ Benjamin Seel*
Benjamin Seel

*Counsel for* Amici Curiae

Date: October 2, 2024

21

## CERTIFICATE OF SERVICE

I hereby certify that on October 2, 2024, a true and accurate copy of the
foregoing document was filed electronically via CM/ECF and served on all counsel of
record.

*/s/ Benjamin Seel*
Benjamin Seel

*Counsel for* Amici Curiae

Date: October 2, 2024