**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION**

| | |
|---|---|
| The State of KANSAS, *et al.*,<br><br>　*Plaintiffs*,<br><br><br>　　v.<br><br>UNITED STATES OF AMERICA and the<br>CENTERS FOR MEDICARE & MEDICAID<br>SERVICES,<br><br><br>　*Defendants*. | Civil Action No. 1:24-cv-00150-DMT-CRH |

<u>**PLAINTIFFS' REPLY IN SUPPORT OF STAY/PRELIMINARY INJUNCTION**</u>

i

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................... ii

STANDING ............................................................................................................................. 1

A.   Kentucky, Idaho, and Virginia's standing is "self-evident" .................................. 1

B.   Venue is Proper in this Court .................................................................................. 4

C.   All of the States Possess Standing .......................................................................... 5

MERITS .................................................................................................................................. 8

A.   The Final Rule is Contrary to Statute ..................................................................... 8

1.   The Text of the ACA Confers no Such Authority on Defendants ........................... 9

2.   Explanatory Text Concerning a Vacated Rule is not Authority ............................... 9

3.   Defendants' Argument Leads to Absurd Consequences ........................................ 12

B.   The Final Rule is Arbitrary and Capricious .......................................................... 13

BALANCE OF EQUITIES AND SCOPE ............................................................................ 14

CONCLUSION ...................................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*Biden v. Nebraska*, 143 S.Ct. 2355 (2023) ........................................................................1, 5

*California v. Azar*, 911 F.3d 558 (9th Cir. 2018).................................................................6

*Denney v. Deutsche Bank, AG*, 443 F.2d 253 (2d Cir. 2006) ............................................2

*Department of Commerce v. New York*, 588 U.S. 752 (2019) ...........................................8

*Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1 (2020)......................17

*Florida v. United States*, 2024 WL 677713 (N. D. Fla. Feb. 20, 2024) ...........................13

*Gen. Land Office v. Biden*, 2024 WL 1023047 (S. D. Tex. Mar. 8, 2024).........................8

*Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199 (4th Cir. 2020) .................................2

*Maryland v. King*, 567 U.S. 1301 (2012)........................................................................18

*Nat'l Collegiate Athletic Ass'n v. Governor of New Jersey*, 730 F.3d 208 (3d Cir. 2013) ............2

*New York v. Yellen*, 15 F.4th 569 (2d Cir. 2021) ..............................................................8

*Pennsylvania v. New Jersey*, 426 U.S. 660 (1976) ...........................................................5

*Rural & Migrant Ministry v. EPA*, 565 F. Supp. 3d 578 (S.D.N.Y. 2021).......................18

*Sierra Club v. E.P.A.*, 292 F.3d 895 (D.C. Cir. 2002) ......................................................1

*Texas v. Mayorkas*, 2024 WL 455337 (N. D. Tex. Feb. 6, 2024) ...............................8, 13

*Texas v. United States*, 2023 WL 5950808 (Sept. 13, 2023)............................................12

*Texas v. United States*, 50 F.4th 498 (5th Cir. 2022)..................................................13, 15

*Texas v. United States*, 549 F. Supp. 3d 572 (S.D. Tex. 2021) ........................................13

*Texas v. United States*, 691 F. Supp. 3d 763 (S.D. Tex. 2023) ........................................14

*Texas v. United States*, 787 F.3d 733 (5th Cir. 2015) ...................................................2, 5

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015) .....................................................14

*United States v. Texas*, 579 U.S. ___ (2016) ...................................................................7

*United States v. Texas*, 599 U.S. 670 (2023) ................................................................7, 8

**Statutes**

28 U.S.C. § 1391 ...............................................................................................................6

42 U.S.C. § 18041 .............................................................................................................3

42 U.S.C. § 18081 ...........................................................................................................11

45 C.F.R. § 155.205 ..........................................................................................................3

8 U.S.C. § 1154 ...............................................................................................................14

8 U.S.C. § 1229a .............................................................................................................11

8 U.S.C. § 1357 ...............................................................................................................11

8 U.S.C. § 1601 .................................................................................................................9

National Defense Authorization Act for Fiscal Year 2004, Pub. L. No. 108-136, § 1703(c)-(d), 117 Stat. 1392, 1694-95 .............................................................................................14

USA PATRIOT Act of 2001, Pub. L. No. 107-56, § 423(b)(1), 115 Stat. 272, 361..................14

## STANDING

In their efforts to preserve an unlawful and indefensible Final Rule, the Defendants spend more pages on standing and venue than they do the actual merits. They hope that this Court never reaches the substantive legal issues because they know their arguments cannot succeed. Regardless, the Defendants arguments on standing fail because, at an absolute minimum, Plaintiffs Kentucky, Idaho, and Virginia have standing because their states run Affordable Care Act (ACA) exchanges. The Final Rule acknowledges as much. *See* 89 Fed. Reg. 39,424. That ends the standing analysis, as only one plaintiff needs standing for the lawsuit to proceed, allowing the other parties to remain in the case. *See Biden v. Nebraska*, 143 S.Ct. 2355, 2365 (2023). Regardless, all plaintiff states have standing in this case to include Plaintiff North Dakota

### A.  Kentucky, Idaho, and Virginia's standing is "self-evident"

It is beyond cavil that the plaintiff states of Kentucky, Idaho, and Virginia possess standing. The Final Rule itself estimates that the states that run their own state-based exchanges (SBEs) will incur a total cost of $624,142 to process applications for enrollments due to the Final Rule. *See* 89 Fed. Reg. 39,424. In addition, the Final Rule estimates that it would impose costs of $175,185 for SBEs to update their eligibility systems. 89 Fed. Reg. 39,423. As Defendants concede, Kentucky, Virginia, and Idaho all operate their own SBEs. Def. Resp. at 16. Consequently, each of these plaintiff states' standing is self-evident; and there is no need for them to provide evidence outside of the administrative record. *See Sierra Club v. E.P.A.*, 292 F.3d 895, 899-900 (D.C. Cir. 2002) ("In many if not most cases the petitioner's standing to seek review of administrative action is self-evident; no evidence outside the administrative record is necessary to be sure of it.").

Contrary to Defendants' mistaken assertion, Plaintiffs Virginia, Kentucky, and Idaho did not rely on "mere allegations." Def. Resp. at 16. They relied on the best evidence available, which was the Defendant agency's own admission that the Final Rule imposes fiscal costs upon such States. Plaintiff Kentucky went one step further by providing a declaration that detailed exactly

how it would suffer economic injury as a result of the Final Rule. Kentucky did not have to provide such evidence, but doing so makes incontestable the evidentiary foundation for its standing.

Defendants also take the thoroughly-discredited approach of trying to turn standing into an accounting exercise, under which a court must attempt to quantify supposed "offsets" created by the federal government's actions and deduct them from the costs suffered by the plaintiff. The Second, Third, Fourth, and Fifth Circuits have all squarely held that standing is not such an accounting exercise. "A plaintiff does not lose standing to challenge an otherwise injurious action simply because he may also derive some benefit from it. Our standing analysis is not an accounting exercise[.]" *Nat'l Collegiate Athletic Ass'n v. Governor of New Jersey*, 730 F.3d 208, 223 (3d Cir. 2013)); *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 212 (4th Cir. 2020), as amended (Aug. 31, 2020); *Texas v. United States*, 787 F.3d 733, 750 n.25 (5th Cir. 2015); *Denney v. Deutsche Bank, AG*, 443 F.2d 253, 265 (2d Cir. 2006). Defendants offer no support for this approach to standing in the Eighth Circuit; that is because it does not exist.

Regardless, even if their "accounting exercise" approach to standing were correct, Kentucky would still have suffered injury in fact, as was thoroughly described by affiant Adam Meier. Defendants argue that Mr. Meier lacks personal knowledge of Kentucky's SBE and is not an expert on SBEs. Dkt 61 at 16. In fact, they argue that *no one* can be an expert on SBEs, because only "facts within the knowledge of [Kentucky's] *current* officers and employees" are "relevant or helpful." This misunderstands SBEs, which are a creation of federal law and remain subject to federal law. *See* 42 U.S.C. § 18041(b). They have the same structure and requirements wherever they are found. Meier's experience gives him specialized knowledge of the operation of an SBE,[1] which helps the Court understand the evidence and determine the injuries that will be suffered by Kentucky as a result of the Final Rule. *See* Fed. R. Evid. 702. Meier's declaration is therefore appropriate evidence for this Court's consideration.

---

[1] Meier Decl. ¶¶ 2, 3.

Defendants next dispute the costs the Final Rule will impose on Kentucky. Dkt. 61 at 17. They even dispute try to impeach their *own* estimate of costs in the Final Rule: "that estimate takes a broad view of 'costs.'" *Id*. Defendants speculate that costs specific to the individual states might be less than what the Final Rule concludes. Kentucky suffers these in the form of ongoing and prospective "eligibility" costs, such as call center customer service and education and outreach, which are federal requirements for exchanges. *See* 45 C.F.R. § 155.205(a), (c). With weeks left before the enrollment period even begins, these costs are already occurring and they will balloon when the Final Rule takes effect; they are not "prior injuries." Defendants also allege Kentucky's enrollment costs do not injure the State. Dkt. 61 at 18. However, they understate the costs to the state by failing to acknowledge the downstream costs of application processing, include costs for call centers and translation, appeals, and fraud enforcement. *See* Meier Decl. at ¶23.

With respect to the supposed "offsets" created by the Final Rule, Defendants exaggerate user fees as a source of "additional revenue" to Kentucky. This is because user fees are paid through premiums only—there is no user fee collected when an application is processed and the applicant is determined to be ineligible. Although the Final Rule assumes all DACA recipients will submit applications, 89 Fed. Reg. at 39,425, it is inevitable not all will be eligible. Individuals are eligible for QHP subsidies only when they earn at least 100% of the Federal Poverty Level;[2] some DACA recipients are likely to apply but never pay a user fee because they earn too little.[3] The costs that they impose on the State will certainly not be "offset" by user fees. In addition, the Defendants have presented no evidence that these offsets would actually outweigh Plaintiffs' injuries; just speculation that they might. But speculation is not evidence;

---

[2] U.S. Internal Revenue Service, *Eligibility for the premium tax credit*, available at https://www.irs.gov/affordable-care-act/individuals-and-families/eligibility-for-the-premium-tax-credit (last visited Oct. 6, 2024).

[3] Individuals whose earnings are below the Federal Poverty Level ordinarily are eligible for Medicaid or CHIP. But the Final Rule did not finalize proposed changes for Medicaid and CHIP that would have extended eligibility for those programs to DACA recipients. *See* 89 Fed. Reg. 39,395.

and the only evidence the court has in front of it is that the Plaintiffs are injured by the Final Rule.

Finally, Defendants argue that Kentucky's injuries are not caused by the Final Rule because Kentucky chose to operate an SBE. According to Defendants, Kentucky's voluntary act caused their injuries, not the Final Rule redefining "lawfully present" to include unlawfully present DACA recipients. This is wrong. Defendants' citation of *Pennsylvania v. New Jersey*, 426 U.S. 660 (1976) is inapposite. There, the states alleged harms to their own revenue caused by other states enforcing their own tax policy within their own borders. None of the states made, or could have made, changes to other states' law. But that is what the Final Rule does to Kentucky.

The Final Rule's redefinition of "lawfully present" is the cause of Kentucky's harm. Kentucky has no ability to change this definition on its own, and it cannot avoid the harm caused by the redefinition except by eliminating its SBE, which in turn would cause different harms. *See Texas v. United States*, 787 F.3d 733, 749 (5th Cir. 2015) ("Texas's forced choice between incurring costs and changing its laws is an injury because those laws exist for the administration of a state program, not to challenge federal law, and Texas did not enact them merely to create standing.") And the Final Rule acknowledges these costs to SBE-operating states in the section where an agency is required to consider whether the Final Rule "*imposes* substantial direct requirement costs" on states.[4] 89 Fed. Reg. at 39,434 (emphasis added). If the costs are *imposed* by the Final Rule, they cannot logically be considered *self-inflicted* or *voluntary* acts of Kentucky.

**B. Venue is Proper in this Court**

As explained above Kentucky, Virginia, and Idaho have "self-evident" standing. And as noted in more detail below, all States in this matter, including North Dakota, possess standing due to pocketbook harms. That answers any venue question. But there is also no dispute that if

---

[4] "Executive Order 13132 establishes certain requirements that an agency must meet when it issues a proposed rule (and subsequent final rule) that imposes substantial direct requirement costs on State and local governments, preempts State law, or otherwise has federalism implications." 89 Fed. Reg. at 39,434.

even only one state has standing, all other states can remain in the case. *Nebraska*, 143 S.Ct. at 2365. In order to transfer venue, the Court would have to contravene that operative principle and examine standing in a manner beyond what is necessary to establish jurisdiction.

The venue statute makes clear that venue is proper in a court in which at least one of the Plaintiffs resides when the United States is sued. 28 U.S.C. § 1391(e)(1)(C). North Dakota is a plaintiff that resides in this district and the only manner in which this Court can transfer venue is by dismissing North Dakota as a Plaintiff in this case. But the Defendants have not moved to dismiss North Dakota; the Court would have to do it *sua sponte*. In that scenario, the Court would have to accept as true all of the well-pleaded facts in the Complaint and conclude that North Dakota could not establish standing in the future. North Dakota has alleged injury in the Complaint; and in his Declaration supporting Plaintiff's original Motion, Stephen Camorata highlighted how the Final Rule increases costs for states by encouraging those residing illegally to stay in the United States. To put it simply, if the Court accepts these facts as true, North Dakota will have established standing and cannot be dismissed. And if North Dakota is not dismissed from the case, it is still a Plaintiff residing in this district; and venue is proper.[5]

### C.  All of the States Possess Standing

As noted above, because Plaintiffs Kentucky, Idaho, and Virginia have undeniable standing, the Court need not go further and examine the standing of all of the other Plaintiffs States. But if it did, the result would be the same. Contrary to Defendants' assertions, pocketbook injuries to states are a legally cognizable harm. And in a case presenting the same standing question as is presented here, costs in the form of driver's licenses that must be provided to DAPA (a successor program to DACA offering the same benefits to a different group of illegal aliens) beneficiaries were held by the Fifth Circuit to be a form of pocketbook injury

---

[5] If the court were to disagree that District of North Dakota is an appropriate venue, Plaintiffs would request the case be transferred to the Eastern District of Kentucky where venue would also be proper. Plaintiff Kentucky has clear standing resides in that district for venue purposes (*e.g.*, *California v. Azar*, 911 F.3d 558 (9th Cir. 2018)), and the Eastern District of Kentucky is where its state capital is located.

sufficient to confer standing on the State. *See Texas*, 787 F.3d at 748 ("The first requirement is likely satisfied by Texas' proof of the costs of issuing driver's licenses to DAPA beneficiaries"). That holding was not disturbed by the Supreme Court when it affirmed the Fifth Circuit's holding *per curiam* opinion in *United States v. Texas*, 579 U.S. ___ (2016). Had Texas lacked standing, one would expect the Supreme Court would have been obliged to assess its own jurisdiction and find it wanting. But it did not. Similarly, many of the plaintiff States (including North Dakota) incur costs because they must continue issuing driver's licenses to DACA beneficiaries, at a net cost to the relevant States. See Motion for PI at 20; Complt. at 10. Therefore, this harm is legally cognizable.

Defendants' also argue that *United States v. Texas*, 599 U.S. 670 (2023) (called "*Immigration Priorities*" by Defendants), impairs Plaintiffs' standing. Their reliance on that case is not only misplaced, it is misleading. That case stood for the narrow holding that a state lacks standing to challenge the federal government's immigration arrest priorities when the remedy sought is the arrest of a greater number of aliens who are unlawfully present in the United States. Defendants make the following statement regarding a footnote in that case: "[The Supreme Court] then held that 'none of the various theories of standing asserted by the states ... overcome the fundamental Article III problem.'" Def. Resp. at 10 (quoting *Texas*, 599 U.S. at 680 n.3.) However, Defendants fail to acknowledge what the "fundamental Article III problem" was. The sentence that was footnoted made it quite clear: "[I]n both Article III cases and Administrative Procedure Act cases, this Court has consistently recognized that federal courts are generally not the proper forum for resolving claims that the Executive Branch should make more arrests or bring more prosecutions." *Texas*, 599 U.S. at 680. In no way did the Supreme Court hold that states have no ability to sue in the immigration context when suffering a pocketbook injury stemming from an APA Rule.[6]

---

[6] *See Gen. Land Office v. Biden*, 2024 WL 1023047 (S. D. Tex. Mar. 8, 2024) (*Immigration Priorities* was "narrow and simply maintains the longstanding jurisprudential status quo"), citing 599 U. S. at 686.; *Florida v. United States*, 2024 WL 677713 (N. D. Fla. Feb. 20, 2024); *Texas v. Mayorkas*, 2024 WL 455337 (N. D. Tex. Feb. 6, 2024).

Finally, Defendants are incorrect that these direct pocketbook injuries are speculative and attenuated. The Supreme Court has held that standing exists when it's based on "predictable" actions of third parties. *Department of Commerce v. New York*, 588 U.S. 752, 768 (2019) ("we are satisfied that, in these circumstances, respondents have met their burden of showing that third parties will likely react in predictable ways to the citizenship question, even if they do so unlawfully and despite the requirement that the Government keep individual answers confidential."). The actions of the third-party aliens are *far* more predictable in the instant case than they were in *Department of Commerce v. New York*. Providing a substantial subsidy for healthcare will make it more likely that *at least some* DACA recipients will remain in the Plaintiff States (when they otherwise would have left) and cause financial harm. The Court can (and should) utilize basic economic logic in reaching that conclusion. *See New York v. Yellen*, 15 F.4th 569, 577 (2d Cir. 2021) ("the chain of economic events the Plaintiff States have proffered in this case strike us as realistic, and the challenged action's effect on their residents' decision seems to us entirely predictable.") (internal quotation omitted). Moreover, in the case at bar, Congress has already written that basic logical conclusion *into federal law*, calling it a "Statement[] of national policy concerning welfare and illegal immigration." 8 U.S.C. § 1601. In the words chosen by Congress: "It is a compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits." 8 U.S.C. § 1601(6), Defendants cavalierly disregard this statement of federal law in making their standing argument. But Defendants cannot also ask this Court to ignore it. Congress has already determined that the availability of public benefits (such as ACA subsidies) provides an "incentive" for illegal aliens to come to, and remain in, the United States.

Finally, Defendants argue without support that DACA recipients have stayed in the United States thus far without ACA subsidies, so why would they ever leave the country if the Final Rule were stayed and/or vacated? Dkt. 61 at 15. Defendants' argument fails because it begins with a false premise—that DACA recipients all stay in the United States indefinitely. On the contrary, the number of DACA recipients in the United States has been shrinking steadily

since the Obama Administration first created it (unlawfully) via executive decree in 2012. At the program's inception in 2012, there were approximately 800,000 DACA recipients.[7] By September 2017, when the Trump Administration attempted to rescind the program, the number was down to 689,800;[8] and at the end of 2023, the number was down to 530,110.[9] DACA recipients *are* gradually leaving the United States. The Final Rule, if permitted to go into effect on Nov. 1, 2024, would provide a powerful financial incentive for them to stay.

## MERITS

### A.  The Final Rule is Contrary to Statute

Defendants rely on wafer thin readings of both PRWORA and the ACA in a desperate attempt to find statutory authority for the Final Rule. That support simply does not exist. The principal questions in this case are whether DACA recipients are "lawfully present" in the United States under the ACA and whether DACA recipients are "qualified aliens" under PRWORA. The plain meaning of both statutes makes it abundantly clear that the answer to both questions is no.  Any reasonable reading of the ACA and PRWORA yields the conclusion that both statutes prohibit DACA aliens (as well as unlawfully present aliens with employment authorization) from receiving subsidized healthcare benefits under the ACA.

In their Response, Defendants torture the statutory text in order to claim that they have the extraordinary authority to *redefine* the statutory term "lawfully present" so that it includes classes of aliens who are unlawfully present and removable by DHS at any time. Their strained attempt to find statutory support fails, for four independent reasons.

---

[7] Congressional Research Service, "Deferred Action for Childhood Arrivals (DACA): By the Numbers," Apr. 14, 2021, at 3, available at https://crsreports.congress.gov/product/pdf/R/R46764.

[8] *Id.*; Complt. at 7. These declines cannot be attributed to the DACA aliens changing immigration status. Because they entered unlawfully, most cannot obtain a lawful immigration status. Only a small fraction of DACA recipients—those who overstayed temporary visas—may be able to obtain lawful permanent resident (LPR) status. But only 76,000 DACA recipients were able to do so (as of December 2019). *Id.*

[9] Complt. at 7.

      1.      The Text of the ACA Confers no Such Authority on Defendants

The text of the ACA simply directs the Secretary of HHS to establish a process for ascertaining whether an individual "meets the requirements of section[] 18032(f)(3) … that the individual be a citizen or national of the United States or an alien lawfully present in the United States." 42 U.S.C. § 18081(a)(1). In other words, HHS must set up a process to confirm aliens' lawful presence with DHS. Presumably, Congress was thinking of the online Systematic Verification for Entitlements (SAVE) program that was set up by DHS in the wake of PRWORA so that other federal agencies, as well as state and local governments, could ensure that unlawfully present aliens did not receive public benefits. Some 1,200 agencies already use the program.[10] But Defendants claim that these simple words actually confer a much greater power on HHS—the power to transform aliens from unlawfully present to lawfully present.

But Defendants seek an even broader power than determining a particular alien's status. They claim the power to redefine what "lawfully present" means, baldly claiming "CMS has reasonably exercised its authority to define 'lawfully present'" Dkt. 61 at 21. The authority to determine *whether* a particular alien is lawfully present does not in any way imply the authority to *redefine* the term lawfully present. Nevertheless, Defendants are trying to redefine this central term of federal statute.[11] The text of the ACA gives them no authority to do so; and Defendants are unable to point to anything in the statute conveying such power.

      2.      Explanatory Text Concerning a Vacated Rule is not Authority

Unable to find any text in a federal statute that gives them this awesome authority, Defendants attempt to rely on words that were published in the federal register in an effort to

---

[10] *See* U.S. Citizenship and Immigration Services, "About SAVE," at https://www.uscis.gov/save/about-save/about-save.

[11] The term "lawfully present" is used pervasively throughout federal immigration law. See, e.g., 8 U.S.C. § 1229a(c)(2) ("the alien has the burden of establishing… by clear and convincing evidence, that the alien is lawfully present in the United States."); 8 U.S.C. § 1357(g)(10) ("for any officer or employee of a State or political subdivision of a State…otherwise to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States.").

justify a federal rule. That is bad enough. Worse, the federal rule in question has been vacated. In other words, another federal court was not persuaded by those words. Specifically, Defendants seize upon the following explanation offered by DHS concerning its DACA rule when it was attempting to justify why DACA aliens should not be considered unlawfully present: "the term [lawful presence] is reasonably understood to include someone who is (under the law as enacted by Congress) subject to removal, … but whose temporary presence in the United States the Government has chosen to *tolerate*." 87 Fed. Reg. at 53,209; quoted in Dkt. 61, at 22 (emphasis added). According to Defendants, the magic word is "tolerate." In their view, as long has DHS chooses to "tolerate" the presence of an alien who is unlawfully present, he magically becomes lawfully present.

The Southern District of Texas vacated the DACA rule and imposed a nationwide injunction against its implementation. *Texas v. United States*, 2023 WL 5950808 (Sept. 13, 2023). The DACA program itself is now unlawful, as it always was. In explaining its vacatur of the DACA rule, the Southern District of Texas referred back to its 2021 decision vacating the DACA program prior to the issuance of the rule. *Id.* In that decision, the court emphatically rejected the claim that DHS's tolerating the presence of an illegal alien somehow confers lawful presence on the alien; only Congress can define which categories of aliens are lawfully present. "Congress's careful plan for the allotment of lawful presence forecloses the possibility that DHS may designate up to 1.5 million people to be lawfully present." *Texas v. United States*, 549 F. Supp. 3d 572, 609 (S.D. Tex. 2021). The Fifth Circuit agreed: "Declining to prosecute does not transform presence deemed unlawful by Congress into lawful presence and confer eligibility for otherwise unavailable benefits based on that change." *Texas v. United States*, 50 F.4th 498, 526 (5th Cir. 2022).[12]

---

[12] *See Gen. Land Office v. Biden*, 2024 WL 1023047 (S. D. Tex. Mar. 8, 2024) (*Immigration Priorities* was "narrow and simply maintains the longstanding jurisprudential status quo"), citing 599 U. S. at 686.; *Florida v. United States*, 2024 WL 677713 (N. D. Fla. Feb. 20, 2024); *Texas v. Mayorkas*, 2024 WL 455337 (N. D. Tex. Feb. 6, 2024).

Only Congress, not executive branch agencies, can enact federal immigration laws. U.S. Const. art. I, §§ 1, 8. And Congress has created an intricate statutory scheme for determining which specific classes of aliens may receive lawful presence, discretionary relief from removal, deferred action, and work authorization. In striking down the DACA program (as it existed prior to the DACA Rule), the Fifth Circuit concluded that:

> Congress's rigorous classification scheme forecloses the contrary scheme in the DACA Memorandum. Entirely absent from those specific classes Congress defined is the group of 1.7 million aliens who would be eligible for lawful presence under DACA. DACA creates a new class of otherwise removable aliens who may obtain lawful presence, work authorization, and associated benefits. Congress determined which aliens can receive these benefits, and it did not include DACA recipients among them.

*Id.* (internal quotations and footnotes omitted). Because DACA recipients are not "lawfully present" in the United States pursuant to legislation enacted by Congress, DHS was prohibited from deeming them to be "lawfully present" through the DACA program. Defendants in the instant case cannot deem any class of unlawfully present aliens—whether it be DACA recipients or employment authorization recipients—to be "lawfully present" either. Defendants also attempt to conflate DACA recipients with other classes of aliens who have been granted deferred action pursuant to legislation enacted by Congress. As the Fifth Circuit recognized in 2015:

> Congress has also identified narrow classes of aliens eligible for deferred action, including certain petitioners for immigration status under the Violence Against Women Act of 1994, immediate family members of lawful permanent residents ("LPRs") killed by terrorism, and immediate family members of LPRs killed in combat and granted posthumous citizenship.

*Texas v. United States (DAPA)*, 809 F.3d 134, 179 (5th Cir. 2015) (footnotes omitted) (citing 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV) (defining classes of aliens who are eligible for deferred action and work authorization); USA PATRIOT Act of 2001, Pub. L. No. 107-56, § 423(b)(1), 115 Stat. 272, 361 (making family members of LPRs killed by terrorism eligible for deferred action and work authorization); National Defense Authorization Act for Fiscal Year 2004, Pub. L. No. 108-136, § 1703(c)-(d), 117 Stat. 1392, 1694-95 (making immediate family members of lawful permanent

residents killed in combat and granted posthumous citizenship eligible for deferred action, advance parole, and work authorization). In contrast, DACA attempted to confer deferred action upon aliens who were unlawfully present in the United States without any authorization from Congress. DHS's attempt to confer "lawful presence" upon DACA recipients has been described as the "epitome of 'the Executive seizing the power of the Legislature.'" *Texas v. United States*, 691 F. Supp. 3d 763, 788 (S.D. Tex. 2023) (quoting *Nebraska*, 600 U.S. at 503). Defendants' effort to equate the unlawful conferral of deferred action in DACA with congressional conferral of deferred action via statute must be rejected.

### 3.  Defendants' Argument Leads to Absurd Consequences

To believe Defendants' argument, one would have to conclude that those aliens who are here unlawfully who were given deferred enforcement (also unlawfully) can be suddenly deemed lawfully present for the purpose of receiving subsidized healthcare under the ACA (when Congress prohibited those unlawfully present from receiving public benefits). This argument is without merit.  That DACA recipients' temporary presence must be "tolerated" reveals that their presence is anything but "lawful." As the Fifth Circuit put it, "Declining to prosecute does not transform presence deemed unlawful by Congress into lawful presence." *Texas*, 50 F.4th at 526 (5th Cir. 2022). Defendants' argument knows no limits. The executive branch could effectively transform any group of aliens it selected (perhaps by country of origin or by duration of unlawful presence in the United States) into "lawfully present" aliens simply by publishing a memorandum or promulgating a rule.

### 4.  Defendants' Argument Conflicts with Legislative History

The legislative history of the ACA demonstrates that it was never intended to expand the universe of those who are "lawfully present" for the purpose of the subsidy. Nor are Defendants correct in their illogical assertion that there is some conflict between the PRWORA's limitation of federal public benefits only to "eligible aliens" (a designation that excludes those unlawfully present) and the ACA's limitation of benefits only to "lawfully present" aliens. In the House debate at the time the ACA was passed, Congressman Rush Holt Jr. (D.-N.J.) stated:

> Another myth is that health reform would provide federal benefits for
> undocumented aliens. Undocumented immigrants *currently may not receive any*
> *federal benefits* except in specific emergency medical situations. There are *no*
> *provisions* in the House health reform bill that would *change* this policy. In fact, the
> legislation *explicitly* states that federal funds for insurance *would not be available to*
> *any individual who is not lawfully present* in the United States.

155 Cong. Rec. H12876 (daily ed. Nov. 7, 2009) (statement of Rep. Holt) (emphases added). The

policy that Representative Holt was referring to was PRWORA's prohibition of federal public

benefits to unlawfully present aliens. As he said, "There are no provisions in the House health

reform bill that would change this policy." *Id.* The two statutes are perfectly consistent and

perfectly clear. Indeed, the ACA (which passed the Senate with no votes to spare) never would

have been enacted if its subsidies were extended to unlawfully present aliens. It is precisely that

concern that Representative Holt was seeking to address. Any argument that unlawfully present

aliens such as DACA recipients were intended by Congress to be beneficiaries of ACA subsidies

is entirely without merit.

B.  **The Final Rule is Arbitrary and Capricious**

The Final Rule is the very definition of arbitrary and capricious rulemaking. An agency

declares by executive fiat that those who were unlawfully present are now lawfully present. And

that declaration capriciously contradicts the agency's (correct) statement in 2012 that DACA

aliens are not lawfully present. 77 Fed. Reg. 52,614, 52,615-52,616. Defendants must provide a

reasonable explanation for their sharp departure from past practice. Like the CMS explanation

for the Final Rule, Defendants' Response offers no newly discovered facts. Defendants state that

giving DACA recipients subsidized health insurance would "create stability for [those]

noncitizens." Dkt. 61 at 26. Of course it would. So would giving them each a $4,000 check. That

was obvious in 2012, just as is it is now. Stating the obvious does not suffice as providing a

reasoned explanation for a 180-degree shift. The *only* thing that changed since the agency's past

position is that the DACA program has been deemed unlawful by courts. But Defendants have

decided for political reasons to confer ACA benefits upon DACA recipients nonetheless.

In addition, when an agency changes positions, it must consider the reliance interests. *Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1, 33 (2020) ("DHS...*was* required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns."). But Defendants only considered reliance costs concerning states that operated SBEs. Defendants' Response concedes that they did not consider any of the other costs suffered by all of the Plaintiff States when formulating the Final Rule—including the costs of issuing driver's licenses, providing K-12 education to beneficiaries and their dependents, and law enforcement costs imposed by DACA aliens remaining in Plaintiff States. Dkt. 61 at 27. Defendants assert that "there was no need for CMS to address the issue." *Id.* Why not? According to Defendants, Plaintiffs did not "establish[] the factual predicate that States will experience decreased emigration or increased immigration due to the rule." *Id.* But Congress had already established the factual predicate, recognizing "the incentive for illegal immigration provided by the availability of public benefits." 8 U.S.C. § 1601(6). Defendants should have known that federal law already established that factual predicate. Perhaps they did know, but simply chose to ignore it. Either way, they failed to assess these reliance interests, as required by the APA.

BALANCE OF EQUITIES AND SCOPE

The balance of equities plainly weighs in favor of injunctive relief. In this matter, Congress has already conclusively declared where the public interest lies: "It is a *compelling government interest* to remove the incentive for illegal immigration provided by the availability of public benefits." *Id.* (emphasis added). Moreover, there can be no public interest in extending ACA benefits to aliens who are unlawfully present, when Congress expressly excluded such aliens from ACA benefits.

Strangely, Defendants cite *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)—a case that strongly supports Plaintiffs. When the government "is enjoined from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Id.* Quite right; and when an executive agency attempts to nullify two statutory

14

provisions barring unlawfully present aliens from receiving public benefits, the same is true. Defendants are acting contrary to federal statutes. Plaintiffs are seeking Defendants' compliance with federal statutes. To the extent that is an injury that weighs in the balance, it favors Plaintiffs.

The appropriate remedy is a stay of the Final Rule that allows the court to "issue all necessary and appropriate process to postpone the effective date of an agency action." 5 U.S.C. § 705. This plain statutory language speaks broadly and does not cabin the relief in terms of the parties before a court. Section 705 "is a corollary to that in Section 706 of Title 5 which provides that when agency action is found to be 'arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law,' the appropriate remedy is for the court to hold the agency action unlawful and to set it aside." *Rural & Migrant Ministry v. EPA*, 565 F. Supp. 3d 578, 605 (S.D.N.Y. 2021) (quoting 5 U.S.C. § 706(2)(A)). Therefore, a stay operates on the Final Rule itself and not the parties. It would hit the pause button and allow time for the Court to reach a final judgment on the case before it is inappropriately applied to anyone. A stay is the most prudent approach this court can take. In the alternative, it can also issue a nationwide preliminary injunction in light of the facts of this case. With respect to Defendants' request that relief be limited to the Plaintiff States, that would be unworkable and result in extraordinary confusion, as relevant aliens in some states but not in other states would be eligible for ACA benefits during open enrollment. Further, a narrower injunction would not fully redress Plaintiffs' injuries because incentives to remain in the country would still exist, and DACA recipients may freely move from State to State. The *status quo* must be preserved everywhere, not in just half of the country.

CONCLUSION

For the foregoing reasons, the Court should stay the effective date of the Final Rule or in the alternative grant a nationwide preliminary injunction.

KRIS W. KOBACH

**Attorney General of Kansas**

*/s/ Abhishek S. Kambli*
Abhishek S. Kambli, Kan. SC No. 29788
*Deputy Attorney General*
James R. Rodriguez, Kan. SC No. 29172
*Assistant Attorney General*
Kansas Office of the Attorney General
Topeka, Kansas 66612-1597
Phone: (785) 296-7109
Email: abhishek.kambli@ag.ks.gov
jay.rodriguez@ag.ks.gov
*Counsel for the State of Kansas*

**DREW H. WRIGLEY**
**North Dakota Attorney General**

*/s/ Philip Axt*
Philip Axt
*Solicitor General*
Office of Attorney General
600 E. Boulevard Ave Dept. 125
Bismarck, North Dakota 58505
Phone: (701) 328-2210
Email: pjaxt@nd.gov
*Counsel for the State of North Dakota*

**STEVE MARSHALL**
**Alabama Attorney General**

*/s/ Robert M. Overing*
Robert M. Overing
*Deputy Solicitor General*
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Phone: (334) 242-7300
Fax: (334) 353-8400
Email: Robert.Overing@alabamaag.gov
*Counsel for the State of Alabama*

**TIM GRIFFIN**
**Arkansas Attorney General**

*/s/ Nicholas J. Bronni*
Nicholas J. Bronni
*Solicitor General*
Dylan L. Jacobs
*Deputy Solicitor General*
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
Phone: (501) 682-2007
Email: Nicholas.bronni@arkansasag.gov
*Counsel for the State of Arkansas*

**ASHLEY MOODY**
**Florida Attorney General**

*/s/ Natalie Christmas*
Natalie Christmas
*Senior Counselor*
Florida Attorney General's Office
PL-01 The Capitol
Tallahassee, FL 32399
Phone: (850) 414-3300
Fax: (850) 487-2564
Natalie.christmas@myfloridalegal.com
*Counsel for the State of Florida*

16

**RAÚL R. LABRADOR**
**Attorney General of Idaho**

/s/ Alan Hurst
Alan Hurst
*Solicitor General*
Matthew L. Maurer*
*Deputy Attorney General*
Office of the Attorney General
PO Box 83720,
Boise, Idaho 83720
Phone: (208) 334-2400
Email: Alan.Hurst@ag.idaho.gov
Matthew.Maurer@ag.idaho.gov
*Counsel for the State of Idaho*

**BRENNA BIRD**
**Attorney General of Iowa**

/s/ Eric H. Wessan
Eric H. Wessan
*Solicitor General*
1305 E. Walnut Street
Des Moines, Iowa 50319
Phone: (515) 823-9117
Email: Eric.Wessan@ag.iowa.gov
*Counsel for the State of Iowa*

**ANDREW BAILEY**
**Attorney General of Missouri**

/s/ Joshua M. Divine
Joshua M. Divine
*Solicitor General*
Office of the Missouri Attorney General
Supreme Court Building
207 West High Street
Jefferson City, Missouri 65102
Phone: (573) 751-8870
Email: Josh.Divine@ago.mo.gov
*Counsel for the State of Missouri*

**THEODORE E. ROKITA**
**Attorney General of Indiana**

/s/ James A. Barta
James A. Barta
*Solicitor General*
Indiana Attorney General's Office
IGCS – 5th Floor
302 W. Washington St.
Indianapolis, IN 46204
Phone: (317) 232-0709
Email: james.barta@atg.in.gov
*Counsel for the State of Indiana*

**RUSSELL COLEMAN**
**Attorney General of Kentucky**

/s/ Zachary M. Zimmerer
Zachary M. Zimmerer
*Assistant Attorney General*
Kentucky Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky
Phone: (502) 696-5617
Email: Zachary.zimmerer@ky.gov
*Counsel for the Commonwealth of Kentucky*

**AUSTIN KNUDSEN**
**Attorney General of Montana**

/s/ Peter M. Torstensen, Jr.
Peter M. Torstensen, Jr.
*Deputy Solicitor General*
Christian B. Corrigan
*Solicitor General*
Montana Department of Justice
215 North Sanders
P.O. Box 201401
Helena, Montana 59620-1401
Phone: (406) 444.2026
Email: peter.torstensen@mt.gov
*Counsel for the State of Montana*

17

**MICHAEL T. HILGERS**
**Attorney General of Nebraska**

/s/ *Zachary B. Pohlman*
Zachary B. Pohlman
*Assistant Solicitor General*
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, Nebraska 68509
Phone: (402) 471-2682
Email: Zachary.Pohlman@Nebraska.gov
*Counsel for the State of Nebraska*

**DAVE YOST**
**Attorney General of Ohio**

/s/ *T. Elliot Gaiser*
T. Elliot Gaiser
*Ohio Solicitor General*
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
Phone: (614)466-8980
Fax: (614) 466-5087
Email: thomas.gaiser@ohioago.gov
*Counsel for the State of Ohio*

**MARTY J. JACKLEY**
**Attorney General of South Dakota**

/s/ *Clifton Katz*
Clifton Katz
*Assistant Attorney General*
Office of the Attorney General
State of South Dakota
1302 E. Hwy. 14, Suite #1
Pierre, South Dakota 57501
Phone: (605) 773-3215
Email: Clifton.katz@state.sd.us
*Counsel for the State of South Dakota*

**JOHN M. FORMELLA**
**Attorney General of New Hampshire**

/s/*Brandon F. Chase*
Brandon F. Chase
*Assistant Attorney General*
New Hampshire Department of Justice
1 Granite Place – South
Concord, New Hampshire 03301
Phone: (603) 271-3650
Email: brandon.f.chase@doj.nh.gov
*Counsel for the State of New Hampshire*

**ALAN WILSON**
**Attorney General of South Carolina**

/s/ *Joseph D. Spate*
Joseph D. Spate
*Assistant Deputy Solicitor General*
Office of the South Carolina Attorney General
1000 Assembly Street
Columbia, South Carolina 29201
Phone: (803) 734-3371
Email: josephspate@scag.gov
*Counsel for the State of South Carolina*

**JONATHAN SKRMETTI**
**Attorney General and Reporter of Tennessee**

/s/ *Brian Daniel Mounce*
Brian Daniel Mounce
*Strategic Litigation Counsel &*
*Assistant Solicitor General*
Office of Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee  37202
Phone: 615-741-1400
Email: Brian.mounce@ag.tn.gov
*Counsel for the State of Tennessee*

KEN PAXTON
**Attorney General of Texas**

Brent Webster
*First Assistant Attorney General*
Ralph Molina
*Deputy First Assistant Attorney General*
Austin Kinghorn
*Deputy Attorney General, Legal Strategy*
Ryan D. Walters
*Chief, Special Litigation Division*

<u>/s/ David Bryant</u>
David Bryant
*Senior Special Counsel*
Munera Al-Fuhaid
*Special Counsel*
Office of Attorney General of Texas
P.O. Box 12548
Austin, Texas 78711
Phone: (512) 936-1700
Email: David.Bryant@oag.texas.gov
          Munera.Al-Fuhaid@oag.texas.gov
*Counsel for the State of Texas*

JASON S. MIYARES
**Attorney General of Virginia**

<u>/s/ Kevin M. Gallagher</u>
Kevin M. Gallagher
*Principal Deputy Solicitor General*
Virginia Office of the Attorney General
202 North 9th Street
Richmond, Virginia 23219
Phone: (804) 786-2071
Fax: (804) 786-1991
Email: kgallagher@oag.state.va.us
*Counsel for the Commonwealth of Virginia*

19