UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

**STATE OF KANSAS,** *et al.*,

                *Plaintiffs*,

**v.**

**UNITED STATES OF AMERICA,** *et al.*,

                *Defendants.*

Case No. 24-cv-150-DMT-CRH

**DEFENDANTS' EXPEDITED MOTION FOR RECONSIDERATION OF THE ORDER FOR SUPPLEMENTAL INFORMATION**

Based on Plaintiffs' request during the recent oral argument, the Court has ordered Defendants to produce personally identifiable information concerning non-parties: the names and addresses of the approximately 130 DACA recipients living in North Dakota. North Dakota intends to use this information to determine how many DACA recipients have obtained driver's licenses and how many of them (or their dependents) are enrolled in public school. This information, however, cannot not cure North Dakota's standing deficiencies. The State has not shown that jurisdictional discovery is appropriate in these circumstances. And the State's intended use of the information raises significant privacy concerns, particularly for U.S. citizen dependents of DACA recipients. The Order for Supplemental Information, ECF No. 87, should accordingly be reconsidered and withdrawn.

BACKGROUND

Plaintiffs challenge a final rule that was published in the Federal Register on May 8, 2024. *See* Am. Compl. ¶ 8, ECF No. 27 (citing 89 Fed. Reg. 39,392). They filed their complaint on August 8, *see* Compl., ECF No. 1, before amending it three weeks later, *see* Am. Compl. Plaintiffs allege that the continued presence of DACA recipients and their children causes them to make social-services expenditures in the form of driver's licenses and K-12

1

public education. Am. Compl. ¶¶ 56-62. They identified no pre-suit efforts to obtain potentially relevant information from the federal government.

On August 30, North Dakota and the other States filed the pending motion for a stay of the final rule and preliminary injunction. ECF No. 35 (Mot.). North Dakota asserted that the continued presence of DACA recipients in the State resulted in additional pupils in North Dakota's K-12 public schools leading to expenditures of $14,174 per additional pupil, *see id.* at 17 (citing 2020-2021 data), and unspecified costs related to issuing driver's licenses, *see id.* at 17-18. After Defendants challenged North Dakota's standing, *see* Opp'n to Mot. for Stay at 10-15, ECF No. 61 (Opp'n), North Dakota again asserted, without submitting further evidence, that it incurred a "pocketbook injury" by issuing driver's licenses at a loss, Reply at 5-6, ECF No. 81 (citing *Texas v. United States*, 787 F.3d 733, 748 (5th Cir. 2015) (determining that Texas had standing based on costs of issuing driver's licenses to DAPA beneficiaries)). The State did not request jurisdictional discovery or suggest it might be necessary.

The Court held oral argument on October 15. *See* ECF No. 84. In their opening, Plaintiffs suggested that they were "certainly willing to find information on drivers' licenses and quantify … K through 12 costs," Tr. 20:15-17, ECF No. 89, and the North Dakota Attorney General stated that they "could put that together this week, in a day or two," *id.* at 21:8. He did not indicate that the State required information from the federal government to show that the Final Rule in fact injures North Dakota. However, on rebuttal, Plaintiffs requested that "the Court direct opposing counsel to provide the names of the 130 [DACA recipients] in North Dakota … to determine if they have drivers' licenses and if they have school-aged children." *Id.* at 51:9-12. North Dakota indicated that it sought this information to determine whether any DACA recipients had obtained driver's licenses or they (or their dependents) were enrolled in K-12 public school. *Id.* at 50:17-51:20. North Dakota specifically indicated that it was interested in such educational costs for even "a child born in the United States," *i.e.*, U.S. citizens. *Id.* at 50:21-22. Defendants objected, particularly to the States obtaining dependent children's names and address. *See id.* at 51:24-52:2, 52:5-6, 52:10-11.

Shortly after the argument, the Court ordered Defendants to "provide the names and addresses of the 130 DACA recipients in the State of North Dakota" to the Attorney General of North Dakota by October 29 at 5:00 p.m. Order ¶ 2.1, ECF No. 87. The Court directed that this information be "provided under seal and used only for the purposes of establishing venue." *Id.* It ordered North Dakota, in turn, to "provide the data and information relating to its direct and indirect costs to the Court by no later than November 12." *Id.* ¶ 2.2.[1]

On October 21, the parties conferred regarding the Order. North Dakota informed Defendants that if it obtains the names and addresses, it will cross-reference them with the North Dakota Department of Transportation's records to determine how many DACA recipients have obtained driver's licenses or ID cards. It also informed Defendants that it would consult the North Dakota Department of Public Instruction's records and, as necessary, those of the individual public-school districts to determine how many DACA recipients and how many of their dependents are enrolled in North Dakota K-12 public schools. As Defendants understand it, North Dakota then intends to calculate the per-license and per-pupil cost, and to multiply the number of individuals by the respective rates to reach a supposed total cost to the State.

On October 23, the parties conferred again. Defendants informed Plaintiffs that the youngest DACA recipient currently residing in North Dakota is 22 years old, *see* Decl. of Katherine Lotspeich ¶ 6 (Exhibit 1), and therefore currently ineligible to attend North Dakota K-12 public school, *see* N.D. Cent. Code § 15.1-06-01(1)(c). The parties also attempted to reach agreement on a stipulation of facts that would negate the need for disclosure of the

---

[1] The Order states that "the parties discussed providing the Court with additional information pertaining to" what it described as "the potential expansion of the [DACA] program from a final rule promulgated by [CMS]." Order ¶ 2. However, the Final Rule challenged in this case does not expand DACA; it merely defines certain terms "for the purpose of determining eligibility" for certain "health programs" and "does not provide any noncitizen relief or protection from removal or convey any immigration status." 89 Fed. Reg. at 39,393-94. The federal government is currently precluded from granting new initial DACA requests. *See* Opp'n at 5 n.3; *accord* Mot. at 4.

personally identifiable information of non-parties to this case. However, those negotiations ended unsuccessfully that evening, necessitating this time-sensitive motion.[2]

The parties were able to agree on an expedited briefing schedule to allow the Court to decide this motion prior to Defendants' production deadline. Plaintiffs will file their response on Friday, October 25, and Defendants will submit a short reply on Saturday, October 26.

## LEGAL STANDARD

Under Rule 54(b), "a non-final order 'is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.'" *Interstate Power Co. v. Kan. City Power & Light Co.*, 992 F.2d 804, 807 (8th Cir. 1993). Whether a district court exercises its inherent power to revise a non-final order is discretionary. *K.C. 1986 Ltd. P'ship v. Reade Mfg.*, 472 F.3d 1009, 1017 (8th Cir. 2007).

## ARGUMENT

**The Court Should Reconsider Its Order For Supplemental Information Because Jurisdictional Discovery Is Not Warranted**

North Dakota has the burden of "clear[ly] showing that [it] is likely to establish each element of standing" before it can obtain a stay of the final rule or a preliminary injunction. *Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024). It has not carried this burden, and therefore, the motion should be denied and the case transferred. *See* Opp'n at 9-15, 20. Its untimely and unsupported request for personally identifiable information regarding non-parties should not have been granted. North Dakota has not shown that this information will cure any jurisdictional or venue defects or that it has met the prerequisites for jurisdictional discovery.

**A.**   Jurisdictional discovery is appropriate only when "certain facts necessary to resolving the jurisdictional inquiry are either unknown or disputed." *Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co.*, 646 F.3d 589, 598 (8th Cir. 2011). A plaintiff must make a

---

[2] The parties have agreed to confer regarding an appropriate protective order in the event the Court requires production of some or all of the DACA recipients' names and addresses and will promptly submit such an order for the Court's approval if necessary.

4

timely request for jurisdictional discovery in a separate motion or in briefing responding to jurisdictional arguments—not wait until the flaws in its submission are made clear during argument on the fully briefed motion. *See Cockrum v. Donald J. Trump for President, Inc.*, 319 F. Supp. 3d 158, 187-88 (D.D.C. 2018); *see also Ricker v. Cretex Co.*, 2021 WL 5083740, at *6 (D.N.D. Jan. 28, 2021) ("Plaintiff's counsel should investigate [jurisdiction] **before** lodging a Complaint."). A lawsuit, after all, "is not a game of darts." *Ricker*, 2021 WL 5083740, at *6.

When faced with a timely motion for jurisdictional discovery, "[c]ourts look to decisions under Rule 56 for guidance in determining whether to allow discovery on jurisdictional facts." *Johnson v. United States*, 534 F.3d 958, 965 (8th Cir. 2008). A party seeking discovery "must file an affidavit describing: (1) what facts are sought and how they are to be obtained; (2) how these facts are reasonably expected to raise a genuine issue of material fact; (3) what efforts the affiant has made to obtain them; and (4) why the affiant's efforts were unsuccessful." *Id.* "[S]peculation and conclusory assertions" are insufficient. *Ricker*, 2021 WL 5083740, at *6; *accord Gipp v. Webb*, 2021 WL 3666276, at *5 n.1 (D.N.D. Apr. 28, 2021).

**B.** Obtaining DACA recipients' names and addresses will not solve North Dakota's standing issues, and therefore these facts are not "necessary to resolving the jurisdictional inquiry." *Viasystems, Inc.*, 646 F.3d at 598. Even if North Dakota's indirect-costs theory of State standing survives the Supreme Court's rejection of an identical effort in *United States v. Texas*, 599 U.S. 670, 680 & n.3 (2023) (*Immigration Priorities*),[3] the State must still demonstrate, as Step One, the presence of *additional* noncitizens in North Dakota because of the Final Rule, and, as Step Two, that those noncitizens' presence would "result[] in *additional*

---

[3] Contrary to Plaintiffs' assertions, *see* Tr. at 17:18-18:1, 48:11-49:12, in *Immigration Priorities*, the Supreme Court did not conclude that Texas lacked standing because of the remedy it sought. In fact, the Court held that Texas had not asserted a "judicially cognizable" injury. *Id.* at 676; *accord id.* at 687, 689 (Gorsuch, J., concurring in the judgment); *id.* at 704-05 (Barrett, J., concurring in the judgment). If remedy or redressability were the issue (as Justices Thomas, Gorsuch, and Barrett believed), there would be little reason for those Justices to concur only in the judgment, or for the unanimous Court to later reject a theory that would allow "[t]eachers in border states" to "challenge allegedly lax immigration policies that lead to overcrowded classrooms," *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 392 (2024).

5

*costs* paid from the [S]tate's treasury," *Texas v. Mayorkas*, 2024 WL 4355197, at *4 (S.D. Tex. Sept. 30, 2024) (*Public Charge*); *accord Texas v. DHS*, 2024 WL 1021068, at *15-16 (S.D. Tex. Mar. 8, 2024) (*CHNV*); *Arizona v. Garland*, --- F. Supp. 3d ---, 2024 WL 1645417, at *11 (W.D. La. Apr. 16, 2024).

    **1.**    North Dakota acknowledges that the DACA recipients' names and addresses will only help it partially satisfy Step Two in the analysis. If it has the names and addresses, it contends it will be able to determine how many of the 130 DACA recipients have obtained driver's licenses and how many of the recipients or their children are in public school, *see* Tr. at 51:6-14. But even if North Dakota came forward with data regarding costs, as in *Public Charge* and *CHNV*, it has not and cannot clear Step One because it lacks any evidence that the number of DACA recipients in the State—or children in its public schools—would change but for the Final Rule. *See* Opp'n at 11-13.

    Plaintiffs have cited federal statistics showing that the DACA population has declined over time, *see* Tr. at 50:3-16, but that data tracks only the number of active DACA recipients—not whether they remain in the country, *see* Cong. Res. Serv., *Deferred Action for Childhood Arrivals (DACA): By the Numbers* at 9 (Apr. 14, 2021), https://crsreports.congress.gov/product/pdf/R/R46764. Noncitizens may not renew for many reasons, including because they obtained another immigration status or lacked financial means to submit the request. *Id.*; *see* Reply at 8 n.8. Regardless, Plaintiffs have not shown that the Final Rule has or will affect the baseline trends, particularly given that the number of DACA recipients in North Dakota has recently remained constant, *see* Opp'n at 12 n.5. Such recipients have remained in North Dakota for years prior to the Final Rule and without any ability to access health insurance through an ACA exchange, making Plaintiffs' speculation that blocking the Final Rule will prompt them to leave the country particularly far-fetched. Congressional statements of policy cannot fill the multiple gaps in Plaintiffs' showing. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 426 (2021) (Congress "may not simply enact an injury into existence."). As a result, even if North Dakota knows the names and addresses of the DACA recipients in its territory, its

efforts to satisfy Step One will still depend on unacceptable speculation and conjecture. *See Public Charge*, 2024 WL 4355197, at *6.

**2.** In any event, just looking at Step Two in isolation, obtaining the names and addresses would not fix North Dakota's issues. The fundamental issue with its driver's license argument is not that it has failed to show a DACA recipient has obtained a license; for purposes of the pending motion, Defendants do not dispute that at least one DACA recipient in North Dakota has obtained a license. The problem is that the State has not shown that it loses money when it issues a license, let alone when it renews one. North Dakota relies on data from nearly a decade ago concerning Texas, Tr. at 52:13-20, but it has not acknowledged more recent findings that Texas, in fact, makes a profit on issuing licenses, *see CHNV*, 2024 WL 1021068, at *10. More to the point, North Dakota has not come forward with any evidence showing its *own* costs to issue or renew a license exceed the fees it charges DACA recipients and other residents. *See* North Dakota Dep't of Transp, *Driver License Requirements* (2024), https://perma.cc/WE33-WXXY (noting $15 fee to obtain license or permit, plus $5.00 fee to take written or road test).

As for K-12 education costs, it is the same story. Plaintiffs have acknowledged that DACA recipients are "[p]robably" no longer in K-12 public school, Tr. at 50:19, and that is correct: the youngest DACA recipient in the State is 22 years old, *see* Lotspeich Decl. ¶ 6. A 22-year-old is ineligible to attend a North Dakota K-12 public school. *See* N.D. Cent. Code § 15.1-06-01(1)(c). Having their name and address (or the other DACA recipients' data) will not help North Dakota show that it would spend more on educating DACA recipients in the future if they remain in the State, particularly when North Dakota's own dashboards show that the State takes in more in revenue per student than it expends. *See* North Dakota Dep't of Public Instruction, *Financial Transparency*, https://perma.cc/QAM7-99CY; *see also* 89 Fed. Reg. at 39,399 (citing findings that DACA recipients nationwide contribute approximately $6.2 billion in federal taxes and $3.3 billion in State and local taxes per year).

The requested data will also not help Plaintiffs establish standing based on their alternative suggestion that they can demonstrate injury by showing the cost of educating DACA recipients' dependents "born in the United States," Tr. 50:21-22. They have pointed to no authority that suggests fulfilling such a universal duty constitutes a cognizable injury. *Cf. FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 392 (2024) (rejecting suggestion that "[t]eachers in border states could sue to challenge allegedly lax immigration policies that lead to overcrowded classrooms"). Such children are not themselves DACA recipients subject to even a speculative likelihood of leaving this country; they are U.S. citizens. The State has no cognizable interest in avoiding the costs of educating them, regardless of who their parents are or where those parents reside. Moreover, North Dakota's apparent plans to search for DACA recipients' dependents throughout the State—even assuming they return accurate information, which would need to be confirmed—represent a significant invasion of privacy for these non-party U.S. citizen children and could lead to unintended harassment or other negative consequences. *See* Fed. R. Civ. P. 26(c).[4]

Even on North Dakota's highly speculative prediction that at least one DACA recipient would leave the United States if unable to obtain health insurance on an exchange, which they have never before been able to do, North Dakota's educational-cost theory relies on further speculation that such a recipient would also choose to bring their U.S.-citizen child out of the United States (and thus North Dakota schools), regardless of whether the child's other parent or family members remained in the United States to care for that child in that child's country of birth. And beyond North Dakota's unsupported chain of speculation, its standing theory based on the costs of educating U.S. citizens appears limitless: any federal or (or even another State's) policy that prompts parents to move and either add or remove children from North Dakota schools would inflict an Article III injury according to North

---

[4] The names and addresses of two DACA recipients in North Dakota are additionally protected under 8 U.S.C. § 1367(a)(2), which precludes disclosure except in certain inapplicable circumstances. *See* Lotspeich Decl. ¶ 7. The parties have agreed that Defendants need not disclose these two individuals' data.

Dakota's argument. Nothing supports such an unbounded theory of standing, and it fails as a matter of law. Because the DACA recipients' names and addresses will not affect the facts necessary to conclude North Dakota lacks standing, this jurisdictional discovery is unwarranted. *See Gipp*, 2021 WL 3666276, at *5 n.1 (denying jurisdictional discovery when it "w[ould] not change this Court's analysis").

  **C.**  North Dakota has also failed to meet the procedural requirements for obtaining jurisdictional discovery. The Eighth Circuit requires a party requesting jurisdictional discovery to provide an affidavit describing particular things, including how the requested discovery is material and the efforts Plaintiffs previously took to obtain the information prior to filing suit. *Johnson*, 534 F.3d at 965. Putting aside that North Dakota has not submitted an affidavit and that it waited until rebuttal at oral argument to request the DACA recipients' names and addresses, it has never identified any prior effort to obtain this information through appropriate channels. Nor has it even come forward with the information in its own possession showing that the State incurs a net cost when it issues a driver's license or educates a pupil, which would be necessary to make the number of DACA recipients in the State relevant to the standing analysis. *Cf. CHNV*, 2024 WL 1021068, at *10.

  A proper request for jurisdictional discovery under *Johnson* would have explained pre-suit—or, at least, pre-argument—efforts to obtain this information from the federal government in a non-emergency posture. CMS does not possess the requested data, and specific processes exist for obtaining information from non-party agencies. DHS's *Touhy* regulations require the party to submit a request in writing describing the "nature and relevance of the official information sought," 6 C.F.R. § 5.45(a), and they set forth various factors that the Office of General Counsel considers in evaluating such requests, *see id.* § 5.48. Absent General Counsel approval, no other DHS officer or employee may provide the information. *See id.* § 5.44. The Supreme Court has upheld such regulations. *See United States ex rel. Touhy v. Regan*, 340 U.S. 462, 469-70 (1951). And North Dakota has not offered any sound reason why it should be permitted to ignore them.

Because the DACA recipients' names and addresses are unnecessary to determine that North Dakota lacks standing—and thus that this case is improperly venued—and because North Dakota has not adequately demonstrated it should be permitted jurisdictional discovery, the order requiring the production of supplemental information should be reconsidered and withdrawn.

## CONCLUSION

The Court should withdraw its Order directing the disclosure of the names and addresses of North Dakota DACA Recipients. Given their upcoming production deadline, Defendants respectfully request a ruling on this motion by Monday, October 28. Alternatively, given the privacy concerns noted above, particularly with regard to U.S. citizen children, the Court should stay the deadline to comply with the order for supplemental information until resolution of this motion.

Dated: October 24, 2024                Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ERIC B. BECKENHAUER
Assistant Branch Director
Federal Programs Branch

*/s/ Christopher A. Eiswerth*
Christopher A. Eiswerth (D.C. Bar No. 1029490)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 305-0568
Email: christopher.a.eiswerth@usdoj.gov

*Counsel for Defendants*