IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| The State of KANSAS, the State of NORTH DAKOTA, the State of ALABAMA, the State of ARKANSAS, the State of FLORIDA, the State of IDAHO, the State of INDIANA, the State of IOWA, the Commonwealth of KENTUCKY, the State of MISSOURI, the State of MONTANA, the State of NEBRASKA, the State of NEW HAMPSHIRE, the State of OHIO, the State of SOUTH CAROLINA, the State of SOUTH DAKOTA, the State of TENNESSEE, the State of TEXAS, and the Commonwealth of VIRGINIA,<br><br>Plaintiffs,<br>v.<br>UNITED STATES OF AMERICA and the CENTERS FOR MEDICARE & MEDICAID SERVICES,<br><br>Defendants. | CIVIL ACTION NO. 1:24-cv-00150-DMT-CRH |

**PROPOSED INTERVENOR-DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR RECONSIDERATION OF THE ORDER FOR SUPPLEMENTAL INFORMATION**

Proposed Defendant-Intervenors Claudia Moya Lopez, Hyun Kim, Dania Quezada Torres, and CASA Inc. ("Proposed Intervenors") join Defendants' recent motion, ECF No. 90 ("Mot."), to reconsider this Court's order, ECF No. 87 ("Order"), directing Defendants to produce the names and addresses of the approximately 130 DACA recipients that reside in North Dakota. Plaintiffs requested this information at the oral argument held on October 15, 2024 after the Court raised concerns that North Dakota lacked standing and therefore was not a permissible venue for this lawsuit. ECF No. 89 ("Tr.") at 51. The Court granted that request immediately after the hearing. But Proposed Intervenors were not permitted to participate in oral argument, so they lacked any

opportunity to respond to the request before it was granted.[1]  Defendants' Motion for Reconsideration offers persuasive grounds for denying Plaintiffs' request.  Proposed Intervenors write separately to highlight a few additional reasons why the Court should reconsider its order.

*First*, Plaintiffs misconstrue the statistics they use to argue that DACA recipients are leaving the country.  Plaintiffs' primary "evidence" is a CRS report showing that the number of active DACA recipients in the United States declined from 2012 to 2019.  *See* ECF No. 81 ("PI Reply") at 8, nn.7-8 (citing Cong. Res. Serv., *Deferred Action for Childhood Arrivals (DACA): By the Numbers*, 9 (Apr. 14, 2021), https://crsreports.congress.gov/product/pdf/R/R46764 ("CRS Report")); Tr. 50: 3-16.  But as Defendants note, that report "tracks only the number of active DACA recipients—not whether they remain in the country"—and DACA recipients "may not renew for many reasons, including because they obtained another immigration status or lacked financial means to submit the request." Mot. 6.  As a result, the decline in active DACA recipients does not demonstrate that DACA recipients are leaving the country.

 In reality, the evidence is even *less* favorable to Plaintiffs' position than Defendants suggest.  Not only does the evidence fail to link the decline in active DACA recipients to DACA recipients leaving the country—it affirmatively *undercuts* that premise by identifying numerous other reasons why the active DACA population has declined.  The CRS Report explains, for example, that "between August 2012 and July 2019, approximately 89,000 DACA recipients either failed to request renewal of their DACA grants or were denied renewals, and approximately 76,000 DACA recipients became LPRs."  CRS Report 19.  In other words, nearly half of the 165,000 DACA recipients who lost active DACA during that period became lawful permanent residents, rather than leaving the country.[2]  And the remaining 89,000 includes multiple categories of

---

[1] Proposed Intervenors requested leave to participate in oral argument—either as proposed intervenors or as amici, PI's Mot. For Oral Arg., ECF No. 75—but the Court did not rule on that motion before the oral argument.  Counsel for Proposed Intervenors nonetheless traveled to Bismarck for the oral argument at great burden and expense for the opportunity to request in person to participate but were informed by a clerk upon arrival that the Court had denied this request.

[2] Plaintiffs suggest that this category is limited to individuals who "overstayed temporary visas," PI Reply 8 n.8.  But the CRS Reports undercuts this by detailing numerous paths to lawful permanent resident status for DACA recipients who entered without admission rather than overstaying

individuals who ceased to have active DACA for a variety of reasons unrelated to leaving the country. Approximately 17,000 renewal applications were denied between 2012 and 2019. *See id.* at 8. Many other DACA recipients may have lost active DACA temporarily because their applications were filed late or not processed in time. Approximately 11,000 DACA recipients with expired DACA, for example, had renewal applications pending as of June 2019—within one month of the CRS Report. *See* USCIS, *DACA Population Demographic Report*, 2 (Jun, 30, 2019), https://www.uscis.gov/sites/default/files/document/data/DACA_Population_Receipts_since_Injunction_Jun_30_2019.pdf. Countless others may have filed renewal applications within the year after their DACA expired, as permitted by USCIS's late renewal policy. CRS Report 3. And others still may have simply declined or fail to renew their applications for financial or other reasons. There is thus no basis to conclude that DACA recipients are leaving the country in meaningful numbers, or that any of North Dakota's 130 DACA recipients would do the same in the absence of the Final Rule. Without that showing, North Dakota cannot establish standing regardless of the information it is seeking from Defendants, so that request should be denied as futile and irrelevant.

*Second*, Proposed Defendant-Intervenors agree that Plaintiffs cannot meet their burden of demonstrating harm through the issuance of driver's licenses because they have failed to show that they lose money through this process. Mot. 7. But even if they could make that showing, they would not need any additional information from Defendants to quantify these costs. To the contrary, North Dakota already has the name and address of *every* DACA recipient who has applied for a North Dakota driver's license because each of those individuals has already submitted

---

temporary visas. That includes: (1) individuals granted asylum; (2) individuals with Special Immigrant Juvenile status; (3) successful "T" or "U" visa applications; and (4) individuals who have received advance parole, which permits them to "adjust to LPR" status so long as they have "the requisite family or employment ties" and meet "the other requirements" for adjustment of status. CRS Report at 21-22. Indeed, as more DACA recipients enter the years of their lives where they are likely to be getting married, it stands to reason that an even greater percentage of these individuals have obtained paths to adjust their status. *See* CRS Report 20 (noting that as of 2019, "approximately 66,000 DACA recipients had adjusted status as the immediate relatives of U.S. citizens, the vast majority as the spouses of U.S. citizens").

documentation to the State which, on its face, identified them as a DACA recipient.[3] While Plaintiffs noted at Oral Argument that they were "certainly willing to find information on drivers' licenses," Tr. 20:15-16, and the North Dakota Attorney General stated that they "could put that together this week, in a day or two," *id.* at 21:8, they did not explain why, despite the existing North Dakota Department of Transportation documentary requirements, they could not have already identified the number of DACA recipients who have applied for driver's licenses. Plaintiffs' failure to do so runs afoul of this Circuit's requirements for obtaining discovery on jurisdictional facts. *Johnson v. United States,* 534 F.3d 958, 965 (8th Cir. 2008) (requiring the requesting party to provide an affidavit detailing, in part, what efforts the affiant has made to obtain them and why the affiant's efforts were unsuccessful).

## CONCLUSION

The Court should grant Defendants' Motion to Reconsider and should withdraw its Order directing the disclosure of the names and addresses of North Dakota DACA Recipients.

---

[3] To apply for a driver's license in North Dakota, DACA recipients must present a Valid, Unexpired Employment Authorization Document ("EAD"), issued by USCIS, which indicates the applicant's DACA status on its face with Category Code C33. *See* North Dakota DOT, *North Dakota REAL ID and Driver's License Checklist Requirements*, Item 1, (Jan. 2023) https://www.dot.nd.gov/sites/www/files/documents/Drivers%20-%20documents/real-id-checklist.pdf.

Date: October 25, 2024

Nicholas Espiritu (*pro hac vice*)
espiritu@nilc.org
Gabrielle Lessard (*pro hac vice*)
Lessard@nilc.org
Tanya Broder (*pro hac vice*)
broder@nilc.org
NATIONAL IMMIGRATION LAW CENTER
3450 Wilshire Blvd., Suite 108 – 62
Los Angeles, CA 90010
Telephone: 213.639.3900

Joanna E. Cuevas Ingram (*pro hac vice*)
cuevasingram@nilc.org
Hilda Bonilla (*pro hac vice*)
bonilla@nilc.org
NATIONAL IMMIGRATION LAW CENTER
P.O. Box 34573
Washington, DC 20043
Telephone: 202.216.0261

Respectfully submitted,

*/s/ Matthew S. Rozen*
Matthew S. Rozen (VA Bar No. 85871)
John Matthew Butler (D.C. Bar No. 1721350)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.,
Washington, D.C. 20036
mrozen@gibsondunn.com
mbutler@gibsondunn.com
Telephone: 202.955.8500

Betty X. Yang (TX Bar No. 24088690)
byang@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue Suite 2100
Dallas, Texas 75201
Telephone: 214.698.3100

*Attorneys for Proposed Intervenors*

5

## CERTIFICATE OF SERVICE

I hereby certify that on October 25, 2024, I filed the foregoing Memorandum of Law in Support of Defendants' Motion for Reconsideration of the Order for Supplemental Information using the Court's CM/ECF system, which will send a notice of the filing to counsel for all parties.

/s/ *Matthew S. Rozen*
Matthew S. Rozen