IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| The State of KANSAS, *et al.*,<br><br>      Plaintiffs,<br><br>   v.<br><br>UNITED STATES of AMERICA and the<br>CENTERS FOR MEDICARE & MEDICAID<br>SERVICES,<br><br>      Defendants. | Civil Action No. 1:24-cv-00150-DMT-CRH |

**PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER**

## INTRODUCTION

Defendants published their Final Rule, Clarifying the Eligibility of Deferred Action for Childhood Arrivals (DACA) Recipients and Certain Other Noncitizens for a Qualified Health Plan through an Exchange, Advance Payments of the Premium Tax Credit, Cost-Sharing Reductions, and a Basic Health Program, 89 Fed. Reg. 39392 (May 8, 2024), on May 8, 2024. The Final Rule is set to take effect on November 1, 2024.

On August 30, 2024, Plaintiffs moved for a preliminary relief, asking the Court to stay the effective date of the Final Rule or, in the alternative, issue a preliminary injunction preventing Defendants from acting upon the Final Rule until the Court can determine whether it is lawful. In response, Defendants filed a motion to dismiss for, among other reasons, improper venue.

On October 15, the Court held a hearing on both motions. Following the hearing, the Court Ordered Defendants to produce the names and addresses of all 130 DACA recipients currently residing in North Dakota by October 29 so that the Court may properly assess the venue issue. Plaintiffs were instructed to provide a breakdown of the costs North Dakota would incur if those recipients remain in the State by November 12, 2024.

Plaintiffs have already provided the costs associated with driver's licenses and will provide the costs associated with public education. In the meantime, Plaintiffs have complied a general breakdown of costs North Dakota could incur from each DACA recipient for public education. If the Court is not yet prepared to rule on Plaintiffs' motion for a preliminary injunction/stay, Plaintiffs also ask the Court to issue a temporary restraining order, preventing Defendants from causing irreparable harm to the States by acting upon the Final Rule while the Court considers the venue issue.

## LEGAL STANDARD

The Court considers the same factors when deciding whether to issue a temporary restraining order as it does a preliminary injunction. *Paradigm Energy Partners, LLC v. Fox*, No. 1:16-CV-304, 2016 WL 8737873, at *3 (D.N.D. Aug. 23, 2016). That is, the movant must show there is a "greater than fifty per cent likelihood that he will prevail on the merits," *id.* (quoting *PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1143 (8th Cir. 2007)); that he will suffer irreparable harm, id. at *5; that the balance of harms favors the order, *id.* at *5–6; and that a temporary restraining order is in the public interest, *id.* at *6; *see also Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 369 (8th Cir. 1991) (court applying the *Dataphase* factors).

A temporary restraining order simply preserves the status quo while for a short period of time. The Court may issue a TRO while it satisfies itself that venue is proper. *See Missouri v. United States Dep't of Educ.*, No. CV 224-103, 2024 WL 4069224, at *2 (S.D. Ga. Sept. 5, 2024) (granting a TRO); *Missouri v. United States Dep't of Educ.*, No. CV 224-103, 2024 WL 4343604 (S.D. Ga. Sept. 19, 2024) (extending the TRO after a hearing on a motion to dismiss for improper venue).

## ARGUMENT

### I.      Plaintiffs are likely to succeed on the merits.

Plaintiffs explained in their motion for a Preliminary Injunction (ECF No. 35) and Reply to Defendants' Response in Opposition (ECF No. 67) that they are likely to succeed on the merits because the Rule is contrary to law (ECF No. 35 at 7–13). In short, CMS is attempting to expand ACA benefits to a group of people who are not lawfully present in the United States in direct defiance to Congress's command that the benefits are only for those who are lawfully present in the United States, *see* 8 U.S.C. § 1611(a).

Plaintiffs are also likely to succeed because the Rule is arbitrary and capricious, (ECF No. 35 at 13–15). CMS did not provide a reasoned explanation for their sharp departure from past practice. Before this year, CMS was adamant that DACA recipients were *not* eligible for ACA benefits. The reason they gave, that DACA receipts would benefit from being covered by the ACA, does not explain why CMS came to a different conclusion earlier. If DACA recipients would benefit today, they would have benefitted ten years ago, but CMS concluded this was not a valid reason to extend ACA benefits to them.

For these reasons, more fully fleshed out in Plaintiffs' motion for a Preliminary Injunction, Plaintiffs are likely to succeed on the merits.

## II.    Plaintiffs have standing and will suffer irreparable harm absent a stay and temporary restraining order.

CMS itself admits that the Final Rule will make 147,000 uninsured DACA recipients newly eligible for subsidized health insurance. 89 Fed. Reg. at 39,425. Expanding eligibility for ACA coverage will impose additional administrative and resource burdens on states that have established their own ACA exchange by allowing additional persons to use such exchanges. *See* 89 Fed. Reg. at 39,424, 39,426; *see also* ECF 35-2 ¶¶ 20–22 (Decl. of Adam Meier). Plaintiffs Idaho, Kentucky, and Virginia administer their own state-run ACA exchange to handle QHP enrollment. These states will face increased administrative and system costs when they are forced to distribute ACA exchange subsidies to a new class of illegal aliens who are disproportionately lower-income. The Final Rule expressly acknowledges these costs will be incurred by the Plaintiff States. *See* 89 Fed. Reg. at 39,424, 39,426. Those Plaintiff States' standing cannot seriously be disputed, and "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006).

Moreover, in addition to the financial and administrative burdens the Final Rule puts on Plaintiff States who run their own ACA exchanges, subsidized health insurance through the ACA is a valuable public benefit, worth an average of $3,547 per year to each DACA recipient. This public benefit foreseeably encourages alien beneficiaries who are unlawfully present in the United States to remain in the United States. *See* ECF 35-1 ¶¶ 5-6 (Decl. of Steven Camarota). It goes without saying that aliens' immigration decision-making is heavily influenced by the availability of welfare and other public benefits. *Id.* ¶ 9. And for the majority of DACA recipients, who come from countries with healthcare systems that are inferior to what is offered in the United States, ACA eligibility is an even greater inducement to remain. *Id.* ¶ 10.

Therefore, the Final Rule will foreseeably cause all the Plaintiff States to expend more of their limited education, healthcare, law enforcement, public assistance, and other resources on illegally present aliens. *Id.* This harm is far from remote or speculative. Congress itself concluded that "the availability of public benefits" provides an "incentive for illegal immigration," 8 U.S.C. § 1601(5), hence the need to limit the availability of such benefits to those Congress has authorized to be here—that's why PRWORA was enacted. *See id.* § 1601(2)(B).

On October 31, Plaintiff North Dakota submitted information about the costs it incurs due to the 126 identified DACA recipients residing in the state. ECF 103. Currently active non-commercial driver's licenses and identification cards issued to DACA recipients were produced at a total net cost of approximately $584.74. *Id.* ¶ 18. And while North Dakota is in the process of acquiring precise information about public education enrollment by DACA recipients and their dependents, the state knows it spent an average of $14,245.87 on education (*Id.* ¶ 19), $2,041.23 on transportation (*Id.* ¶ 20), and $177 on subsidized school lunches per student in 2022-2023 (*Id.* ¶ 21). These costs are likely to be higher in the current school year, reflecting increased costs of providing services.

North Dakota has standing in this case based on the continued presence of DACA recipients in the state who, as a result of the Final Rule, will remain in the state and cause the state to incur these costs for providing licenses and education. And as North Dakota's standing is established, venue is proper in this district.

### III.     The equities overwhelmingly favor a temporary restraining order

The two final prongs of the TRO inquiry overwhelmingly favor granting relief. The government Defendants will suffer no harm if the Final Rule is stayed or if Defendants are enjoined from enforcing the Final Rule. *See Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994) (agency suffers no harm when it is prohibited from acting "in violation of applicable statutory restraints"); *cf. Dakotans for Health v. Noem*, 52 F.4th 381, 392 (8th Cir. 2022) (state "has no interest in enforcing overbroad restrictions that likely violate the Constitution").

In fact, quite the opposite is true. Congress has already conclusively declared that the nation's "compelling" interest lies in "remov[ing] the incentive for illegal immigration provided by the availability of public benefits," 8 U.S.C. § 1601(6). To *not* suspend the Final Rule would empower CMS to *harm* the federal government's interests. In addition, third-party DACA recipients' have no legally cognizable interest in obtaining public benefits for which they are statutorily ineligible. *See Evanoff v. Minneapolis Pub. Sch., Special Sch. Dist. No. 1*, 11 F. App'x 670, 670–71 (8th Cir. 2001); *cf. Lyng v. Payne*, 476 U.S. 926 (1986) ("We have never held that applicants for benefits, as distinct from those already receiving them, have a legitimate claim of entitlement protected by the Due Process Clause of the Fifth or Fourteenth Amendment.").

Finally, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021). To the contrary, where, as here, a party has demonstrated a strong likelihood of success on the merits, it is "a strong indicat[ion] that a preliminary injunction would serve the public interest." *Id.* As established above, the

Plaintiff States and the public at large have a compelling interest in preventing the expenditure of public funds to those who are not eligible. Because the Final Rule extends public benefits to classes of aliens beyond those identified by Congress, it is contrary to the public interest.

## CONCLUSION

For the foregoing reasons, Plaintiff States asks this Court to temporarily restrain Defendants from implementing the Final Rule pending review of the venue issue.

Respectfully submitted,

KRIS W. KOBACH
**Attorney General of Kansas**

*/s/ James R. Rodriguez*
Abhishek S. Kambli, Kan. SC No. 29788
*Deputy Attorney General*
James R. Rodriguez, Kan. SC No. 29172
*Assistant Attorney General*
Kansas Office of the Attorney General
Topeka, Kansas 66612-1597
Phone: (785) 296-7109
Email: abhishek.kambli@ag.ks.gov
jay.rodriguez@ag.ks.gov
*Counsel for the State of Kansas*