# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NORTH DAKOTA
# WESTERN DIVISION

| | |
|---|---|
| **STATE OF KANSAS, STATE OF NORTH DAKOTA,** *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> **UNITED STATES OF AMERICA,** *et al.*, <br><br> *Defendants*. | Case No. 1:24-cv-00150-DMT-CRH |

### DEFENDANTS' MOTION TO STAY PRELIMINARY INJUNCTION AND REQUEST FOR EXPEDITED RULING

Consistent with Federal Rule of Civil Procedure 62(c)(1) and Federal Rule of Appellate Procedure 8(a)(1), Defendants move for a stay pending appeal of the Court's order granting the motion for preliminary injunction or stay and denying the motion to dismiss or transfer. *See* Order, ECF No. 117. As explained below and in prior briefing, *see* ECF Nos. 61, 90, 96, 107, 108, 112, Defendants are likely to succeed in their appeal because the Court lacks jurisdiction, venue is improper, and Plaintiffs' claims lack merit. A stay of the preliminary injunction is appropriate here because the Court's order—entered in the sixth week of Open Enrollment—will require cancellation of approximately 2,700 enrollments and costly system changes to the Federally-facilitated Exchange (FFE) on an emergency basis, which cannot easily be undone. Given the time-sensitive nature of this request, Defendants request an expedited ruling, and absent relief from this Court, Defendants will seek relief from the United States Court of Appeals for the Eighth Circuit shortly.

### BACKGROUND

The Centers for Medicare & Medicaid Services published the Final Rule in the Federal Register on May 8, 2024. 89 Fed. Reg. 39,392. Plaintiffs waited three months to file suit, ECF

No. 1, and nearly another month to move for a preliminary injunction and to serve Defendants, *see* ECF Nos. 35, 42 ¶ 3. On October 9, the parties finished briefing on the motion for a preliminary injunction, *see* ECF Nos. 61, 81, and the Court held argument on October 15, ECF No. 89. Over Defendants' objections, *see* ECF No. 90, the Court directed Defendants to produce names and addresses of DACA recipients in North Dakota and permitted North Dakota to supplement its submission, which it did on October 31 and November 12, *see* ECF Nos. 103, 111. On November 1, after Open Enrollment began and the Final Rule had gone into effect, Plaintiffs moved for a temporary restraining order. *See* ECF No. 105. Defendants rapidly responded to each submission. *See* ECF Nos. 107, 112.

On December 9, nearly six weeks after DACA recipients started enrolling in health insurance through the Affordable Care Act exchanges—and after coverage for many enrollees had already commenced—the Court granted the motion for preliminary injunction. *See* ECF No. 117. The Court recognized that "North Dakota does not suffer a direct injury from the Final Rule," *id.* at 7, but it accepted the State's attenuated theory of standing and thus found that venue was proper, *id.* at 7-9. It further concluded that Plaintiffs were likely to succeed on their claim that the Final Rule is contrary to law, *see id.* at 11-14; that Plaintiffs had proven irreparable harm in the form of unrecoverable costs and a "Hobson's choice" between "comply[ing] with what they believe to be an unlawful directive or los[ing] federal government support to operate the costly exchanges required under the ACA," *id.* at 14-15; and that the equities favored an injunction because "the agency action is unlawful," *id.* at 16. The Court also granted the motion to stay the final rule and denied Defendants' motion to dismiss for the same reasons. *Id.* at 17-18.[1] It limited relief to the Plaintiff States. *Id.* at 18 (ordering that "Defendants are preliminar[ily] enjoined from enforcing the Final Rule against the 19 Plaintiff States").

---

[1] The order states that "[t]he deadline for Defendants to file a Reply has passed." Order at 2. However, Plaintiffs filed their opposition to the motion to dismiss on November 25, and under *D.N.D. Civ. L. R.* 7.1(A)(1), Defendants had 14 days—until the end of December 9—to file their reply brief. The Court entered its order before Defendants' time to file had elapsed.

## LEGAL STANDARD

"While an appeal is pending from an interlocutory order," the Court may "suspend" or "modify … an injunction." Fed. R. Civ. P. 62(d). The Court considers four factors in determining whether to grant a stay: "(1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). Federal Rule of Appellate Procedure 8(a)(1) "ordinarily" requires a party seeking a stay to "move first in the district court."

## ARGUMENT

### I. Defendants are likely to succeed on their appeal

The Court erred in granting the motion for a preliminary injunction or stay. Plaintiffs, particularly North Dakota, did not submit evidence establishing their standing, thereby failing to establish this Court's jurisdiction and making venue improper. Plaintiffs' claims also fail on the merits, and the equities strongly weigh against their requested relief. Defendants will therefore likely succeed in their appeal.

**First**, contrary to the Court's decision, North Dakota lacks standing. The Supreme Court has rejected the State's indirect-costs theory of standing. *See United States v. Texas*, 599 U.S. 670, 680 & n.3 (2023); *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 392 (2024). In any event, the Court has made clear that a State has an obligation to establish its standing by "point[ing] to factual evidence"—not "mere allegations" or "guesswork." *Murthy v. Missouri*, 603 U.S. 43, 57-58 (2024). Because North Dakota "does not suffer a direct injury from the Final Rule," Order at 7, that means it needed evidence showing that (1) but for the Final Rule, some number of the approximately 130 DACA recipients in North Dakota would imminently leave the State, and (2) if those individuals left, North Dakota would spend less on issuing driver's licenses or educating children, *see id.* at 8 (citing *Texas v. Mayorkas*, 2024 WL 4355197, at *4 (S.D. Tex. Sept. 30, 2024)). North Dakota did not carry its burden on either point.

3

The State did not present any evidence that any DACA recipients would imminently leave the State if they were not eligible to enroll in qualified health plans on the FFE. The order does not find otherwise; rather, it asserts that "[t]he additional alien presence is easily met as the Final Rule contemplates an additional 147,000 aliens will be eligible to receive benefits, effectively increasing the population." Order at 8.[2] But deeming DACA recipients already present in North Dakota eligible to obtain health insurance does not automatically maintain or increase the number of DACA recipients presently residing in North Dakota. *See* 89 Fed. Reg. at 39,399 (The Final Rule "does not address or revise immigration policy.").

Nor is it "common-sense" that any of the approximately 130 DACA recipients in North Dakota would leave but for the Final Rule. Order at 9. DACA recipients have lived in the United States since 2007, *see* 87 Fed. Reg. 53,152, 53,175 (Aug. 30, 2022), and before the Final Rule, they did so without being able to obtain health insurance through the FFE, *see* 89 Fed. Reg. at 39,394. So far, despite being in the sixth week of Open Enrollment, only one DACA recipient in North Dakota has obtained insurance through the FFE. *See* Declaration of Jeffrey Grant ¶ 16 (Ex. 1). "[N]either logic nor intuition" supports the "inference" that any DACA recipients were about to leave North Dakota and decided to stay only due to the Final Rule. *California v. Texas*, 593 U.S. 659, 676 (2021). Nor does *Department of Commerce v. New York*, 588 U.S. 752, 768 (2019), support the Court's decision. Unlike in that case, North Dakota failed to submit evidence regarding DACA recipients' historical behavior. The State has relied entirely on speculation, and the Court erred in finding it sufficient. *See Texas*, 2024 WL 4355197, at *5; Order at 4, *Indiana v. Mayorkas*, No. 23-cv-106 (D.N.D. Nov. 26, 2024), ECF No. 90 (dismissing case because "the States provide *no evidence* that this particular rule

---

[2] The Court refers to 147,000 DACA recipients who may be eligible to enroll in health insurance through the exchanges as the relevant population. However, "standing is not dispensed in gross," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021), and the relevant population for North Dakota is some portion of the approximately 130 DACA recipients currently residing in its territory.

exception 'demonstrates a realistic danger' of higher numbers of persons released into the United States." (emphasis added)).

North Dakota also failed to establish that if some DACA recipients left the State, it would spend less on driver's licenses and education. North Dakota has supposedly spent $584.74 on providing driver's licenses to DACA recipients, Order at 8, but past costs are insufficient for prospective injunctive relief, *Murthy*, 603 U.S. at 59. Even if past costs were enough here, neither the State nor the Court has explained why North Dakota issues licenses at a loss when Texas turns a profit on each one, *see Texas v. DHS*, 722 F. Supp. 3d 688, 702 (S.D. Tex. 2024), *appeal filed,* No. 24-40160 (5th Cir. Mar. 12, 2024), or how such a self-inflicted loss could be a cognizable injury, *see Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976). While North Dakota has also claimed that at least one DACA recipient or dependent is enrolled in a K-12 public school, and that the State spends $14,345.87 per pupil annually, Order at 8, this too is insufficient. Defendants submitted uncontradicted evidence that the youngest DACA recipient in North Dakota is 22 years old, *see* ECF Nos. 90 at 3, 90-1 ¶ 6, and thus ineligible to attend K-12 public school, *see* N.D. Cent. Code § 15.1-06-01(1)(c). Any money spent because North Dakota has allowed an ineligible person to attend public school despite state law is a self-inflicted injury. *Pennsylvania*, 426 U.S. at 664. And to the extent North Dakota objects to educating U.S. citizen dependents, it has failed to establish that those individuals would leave North Dakota even if their DACA recipient parent planned to do so or that one student's departure from the public-school system would result in changes to the State's expenditures. Instead, North Dakota has again relied only on speculation, and standing cannot properly be based on such guesswork.

Because North Dakota lacks standing, and it is the only Plaintiff who can establish venue in this district, venue is improper. *See, e.g.*, *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1205 (11th Cir. 2018); *Kansas v. Garland*, 2024 WL 2384611, at *1 (E.D. Ark. May 23, 2024); *Dayton Area Chamber of Comm. v. Becerra*, 2024 WL 3741510, at *8 (S.D. Ohio Aug. 8, 2024).

5

And because venue is improper, the Court erred in granting Plaintiffs' requested relief. *See Maybelline Co. v. Noxell Corp.*, 813 F.2d 901, 907 (8th Cir. 1987).

**Second**, the Court erred in concluding that Plaintiffs have "a fair chance of prevailing" on their claim that the Final Rule's definition of "lawfully present" was contrary to 42 U.S.C. § 18032(f)(3) and 8 U.S.C. § 1611(a). Order at 11-14. At the outset, Plaintiffs must establish likelihood of success, not just a "fair chance of prevailing," in "seek[ing] to enjoin a government regulation that is based on presumptively reasoned democratic processes." *Firearms Regul. Accountability Coal., Inc. v. Garland*, 112 F.4th 507, 517 (8th Cir. 2024).

In addition, the Court determined that DACA recipients cannot be "lawfully present" under the Affordable Care Act because they lack lawful status. *Id.* at 13. But lawful presence and status are not synonymous. *See* 61 Fed. Reg. 47,039, 47,040 (Sept. 6, 1996). The Executive Branch has long considered certain noncitizens who "remain in the United States under a Presidential or administrative policy" to be "lawfully present" even when they lack legal status under the Immigration and Nationality Act (INA). *Id.* Congress has granted the Executive Branch authority to do so. *See, e.g.*, 8 U.S.C. § 1611(b)(2)-(4). And when Congress drafted the Affordable Care Act, it knew well that the Department of Justice and Department of Homeland Security had, for decades, considered deferred action recipients to be "lawfully present" for purposes of receiving certain Social Security benefits regardless of whether they have lawful immigration status under the INA. *See* 8 C.F.R. § 1.3. Similarly, CMS has always interpreted "lawfully present" in 42 U.S.C. § 18032(f)(3) to include non-DACA deferred action recipients. *See* 45 C.F.R. § 152.2 (2012). Congress has never amended that definition, and Plaintiffs do not challenge it here. Neither Plaintiffs nor the Court have identified any statutory basis for requiring DACA recipients to be treated differently than other deferred action recipients under the Affordable Care Act. Doing so would, in fact, be inconsistent with many of Plaintiffs' own laws that define "lawfully present" to include all deferred action recipients without singling out DACA recipients for disfavor. *See, e.g.*, Kan. Stat. Ann. §§ 8-237(i), 8-240(b)(2)(H); Ind. Code §§ 9-13-2-92.3(a)(2)(G), 9-24-11-5(c)(4); S.D. Codified Laws

§ 32-12-1.1(7). The Court's decision nevertheless requiring such disparate treatment of DACA recipients under the Affordable Care Act accounts for none of this history.[3]

The Court's conclusion that the Final Rule conflicts with the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA) is likewise faulty. Congress's more specific and more recent choice in the Affordable Care Act to extend eligibility to those lawfully present, and not just "qualified aliens," controls—not PRWORA. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012); *Dorsey v. United States*, 567 U.S. 260, 274 (2012). Even then, PRWORA itself distinguishes between "qualified aliens" and those "lawfully present," *compare* 8 U.S.C. §§ 1611(a), 1641, *with id.* § 1611(b)(2)-(4). If those terms were meant to be synonymous under PRWORA, there would be no need for Congress to delineate exceptions to the rule that only "qualified aliens" may receive federal public benefits or grant the Executive Branch discretion to determine lawful presence for purposes of such benefits.

**Third**, the Court erred in concluding that the equities favor Plaintiffs. It described Plaintiffs as facing a "Hobson's choice": "comply with what they believe to be an unlawful directive or lose federal government support to operate the costly exchanges required under the ACA." Order at 15. But that is not true for at least the 16 Plaintiff-States that rely on the federal government to operate the exchanges in their States—and they do not claim otherwise. These States do not have to do anything to comply with the Final Rule. Three Plaintiff-States operate their own exchanges, and even assuming that they bore costs to update their eligibility criteria to align with the Final Rule before Open Enrollment began and that these costs are cognizable, *but see* 42 U.S.C. § 18031(d)(5)(A), the Court's order does not provide relief for

---

[3] The Court appears to base its sweeping interpretation of "lawfully present" on two out-of-circuit cases. *See* Order at 11-13 (citing *Estrada v. Becker*, 917 F.3d 1298 (11th Cir. 2019), and *Texas v. United States*, 50 F.4th 498 (5th Cir. 2022)). Neither case cites, let alone interprets, 42 U.S.C. § 18032(f)(3) or meaningfully addresses the longstanding interpretation of "lawfully present" for purposes of 8 U.S.C. § 1611, and the Supreme Court has noted that "lawfully present" does not convey the same meaning in every context, *see DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 26 n.5 (2020). These cases do not answer the statutory question here.

that supposed harm. If anything, it means the three States may incur further costs to revamp their eligibility criteria in the middle of Open Enrollment. *Cf.* Grant Decl. ¶ 19 (detailing costs of updating FFE eligibility engine). To the extent that the Court found irreparable harm based on the cost of processing applications, none of these three States has ever submitted evidence that the marginal costs associated with processing the comparatively small number of DACA recipients' applications outstrips the revenue collected through assessments or surcharges. Regardless, any harms to these three States would be a basis for enjoining the Final Rule only in those three States—not in the other 16. *See Gill v. Whitford*, 585 U.S. 48, 73 (2018).

The Court also identifies "allowing potential unlawful action" as an "irreparable harm." Order at 15 (citing *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021)). That finding is inconsistent with the Supreme Court's repeated warnings that courts are not "continuing monitors of the wisdom and soundness of government action," *All. for Hippocratic Med.*, 602 U.S. at 383-84, and binding precedent limiting injunctive relief to cases where a movant has demonstrated "certain and great" and "imminent" harm absent equitable relief, *Morehouse Enters., LLC v. ATF*, 78 F.4th 1011, 1017 (8th Cir. 2023).[4] A mere "belie[f] that the government is acting illegally" is not enough to sustain a lawsuit in federal court, much less obtain an injunction. *All. for Hippocratic Med.*, 602 U.S. at 381. If any party will suffer *per se* irreparable harm in this case, it is Defendants who are enjoined from effectuating a federal regulation. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).

Finally, the Court failed to give appropriate weight to the significant countervailing harms that will follow from Plaintiffs' requested relief. As Defendants showed, ECF No. 61 at 27-29, precluding DACA recipients from enrolling in health insurance (even when many are essential workers) will negatively affect their health, leading to more absenteeism in the workplace, more strain on the health care system, and more uninsured children. *See* 89 Fed. Reg. at 39,395-96, 39,402, 39,406. Given Plaintiffs' delay in seeking relief and the timing of

---

[4] *Shawnee Tribe* does not hold to the contrary; the quoted language appears in the D.C. Circuit's discussion of the public interest, not irreparable harm. *See* 984 F.3d at 102.

8

the Court's order, it will also cause significant disruption to Open Enrollment for Defendants, potentially impacting States that operate their own exchanges and individuals seeking to enroll in health insurance through the exchanges as well. *See* ECF No. 61 at 28. While the Court cited a general statement of national policy to deter illegal immigration, *see* Order at 16 (citing 8 U.S.C. § 1601(6)), "no law pursues its purposes at all costs," *Luna Perez v. Sturgis Pub. Sch.*, 598 U.S. 142, 150 (2023) (cleaned up), and it was error not to account for the many harms caused by Plaintiffs' requested relief.

For all of these reasons, Defendants are likely to succeed on appeal.

## II. The equities strongly favor a stay of the preliminary injunction

Open Enrollment began—and the Final Rule went into effect—on November 1. *See* 45 C.F.R. § 155.410(e)(4). The FFE and presumably the State-based Exchanges are programmed to make eligibility determinations based on the law as it existed on November 1—and federal preparations to implement these changes were many months in the making. *See* Grant Decl. ¶¶ 11-12. Absent a stay of the preliminary injunction, Defendants and potentially millions of third parties, including DACA recipients, will be irreparably harmed by the Court's order requiring changes to the exchanges' eligibility engines during Open Enrollment. And none of the Plaintiffs would suffer any substantial harm from a stay, and indeed, Plaintiffs operating State-based Exchanges may avoid incurring further expense of implementing emergency changes to their eligibility engines. The Court should accordingly stay its order pending appeal.

Open Enrollment is when all individuals—not just DACA recipients—may select a new plan or make enrollment changes on the exchanges. These exchanges, particularly the FFE, are complex systems. More than 500 employees and approximately 1,500 contractors maintain the FFE, and last year, more than 16 million people in about 31 different States (including 16 of the 19 Plaintiff-States) used it to enroll in health insurance from more than 400 insurers. Grant Decl. ¶ 3. In the months leading up to November 1, CMS rolls out and tests updates to the FFE, including the Standalone Eligibility Service that reviews age,

location, income, immigration status, and other data to automatically determine whether a consumer can enroll in a plan or obtain premium assistance or cost-sharing reductions. *Id.* ¶ 6; *see id.* ¶¶ 11-12 (noting CMS teams took months studying and implementing the Final Rule's changes to eligibility criteria). CMS also coordinates with stakeholders during that time and prepares supporting materials. *See id.* ¶¶ 6-9, 13. Once Open Enrollment begins and especially as the calendar approaches December 15—the peak of the enrollment season, as it is the deadline for enrolling in coverage that begins January 1—CMS rarely makes any changes to the FFE. *Id.* ¶ 9. Making system changes "could inadvertently cause disruptions and prevent consumers from enrolling in full-year coverage" as has happened before. *Id.*

Complying with the Court's order in the middle of Open Enrollment will impose significant costs on Defendants. As the Grant Declaration explains, updating eligibility criteria ordinarily takes months of planning and testing, and there is no history of introducing such updates during the highest traffic period of Open Enrollment. *Id.* ¶¶ 9, 11-12. Making emergency changes by December 22—the earliest possible date—will require contractors to work approximately 1,500 hours at a cost of about $200,000. *Id.* ¶ 19. On top of that, CMS will have to revise HealthCare.gov further to explain the consequences of the Court's order to consumers, promulgate new guidance for third parties assisting consumers in obtaining insurance, cancel 2025 plan year coverage for the nearly 2,700 DACA recipients who have already enrolled in insurance through the FFE during Open Enrollment, stop renewals of coverage for the more than 800 DACA recipients who obtained coverage starting December 1, and provide notice to FFE stakeholders and DACA recipients of such cancellation. *Id.* ¶¶ 14-21. All of this will add to CMS's existing burdens during Open Enrollment, and if the preliminary injunction is reversed on appeal, further costs would be incurred to unwind these changes to the FFE. *See id.* ¶ 21.

In States where individuals obtain insurance through the FFE, including non-Plaintiff-States, the Court's order drastically increases the risk of disruptions to Open Enrollment. Introducing technical changes to eligibility criteria, during Open Enrollment and on an

emergency basis, creates a significant risk of technical errors that could lead to system downtime and affect consumers' ability to enroll by the various deadlines, and that may deter some consumers from enrolling at all. *Id.* ¶¶ 9, 18. The Final Rule set November 1 as an effective date to provide CMS and SBE-operating States sufficient time to make these changes before Open Enrollment began and avoid these risks. The Court's order makes these disruptions much more likely—to all consumers' detriment.

For DACA recipients in the 19 Plaintiff-States, the Court's order will have certain and irreversible negative consequences. Approximately 2,700 DACA recipients in the 16 Plaintiff-States covered by the FFE, and an unknown number of DACA recipients in the three Plaintiff-States that operate SBEs, have enrolled in health insurance starting January 1, 2025. *Id.* ¶ 16. That insurance must now be canceled, and unless those individuals obtain alternative coverage before December 15, they are unlikely to have coverage at the start of the year. *Id.* ¶ 17. Nearly 900 DACA recipients in the 16 FFE-covered Plaintiff-States, and an unknown number of DACA recipients in the three SBE Plaintiff-States, have already obtained coverage starting December 1. *Id.* ¶ 20. That insurance will not be renewed as of January 1, even though these individuals may have already started treatment or scheduled appointments relying on the existence of this coverage. *Id.* And those individuals' ability to obtain immediate alternative coverage may be limited. *See id.* Termination of insurance will further exacerbate the harms that the Final Rule aimed to address.

The Plaintiff-States will, in contrast, suffer no substantial harm from a stay of the preliminary injunction. The Final Rule does not require the 16 FFE Plaintiff-States that do not operate an exchange to take any action at all, and they have submitted no evidence that the injunction will imminently reduce their spending on driver's licenses or education. As for the three Plaintiff-States with SBEs, they claimed (without supporting evidence) that they incurred real costs to update their eligibility engines prior to Open Enrollment to comply with the Final Rule. *See* ECF No. 35 at 16. A stay may save them the cost of implementing emergency changes to the exchanges and any resulting disruptions. In sum, the balance of

11

harms strongly favors Defendants, and the Court should stay its order granting a preliminary injunction.

## CONCLUSION

For the foregoing reasons, the Court should stay pending appeal its order granting a preliminary injunction or stay of the Final Rule.

Dated: December 11, 2024                    Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ERIC B. BECKENHAUER
Assistant Branch Director
Federal Programs Branch

*/s/ Christopher A. Eiswerth*
Christopher A. Eiswerth (D.C. Bar No. 1029490)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 305-0568
Email: christopher.a.eiswerth@usdoj.gov

*Counsel for Defendants*