IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| The State of KANSAS *et al.*,<br><br>　　　　　　　Plaintiffs,<br><br>　　v.<br><br>UNITED STATES of AMERICA and the CENTERS FOR MEDICARE & MEDICAID SERVICES,<br><br>　　　　　　　Defendants. | Civil Action No. 1:24-cv-00150-DMT-CRH |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' EXPEDITED MOTION FOR STAY OF PRELIMINARY INJUNCTION AND STAY OF FINAL RULE**

On December 9, 2024, this Court issued a preliminary injunction and stay of Defendants' Final Rule (ECF 117) ("Order"). The Order also denied Defendants' motion to dismiss or transfer.

In their expedited motion for a stay of the Order (ECF 119) ("Mot. to Stay"), Defendants re-litigate their prior arguments opposing Plaintiffs' motion for a preliminary injunction and stay—arguments the Court rejected when it issued the Order. And they introduce new arguments about the equities of a preliminary injunction that they waived by failing to introduce during the initial proceedings. Nothing has changed in the three days since the Order was issued. The Court should deny Defendants' request for a stay.

**LEGAL STANDARD**

In deciding whether to grant a stay of a preliminary injunction, a court reviews "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the

1

public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009). "A stay is not a matter of right, even if irreparable injury might otherwise result… It is instead an exercise of judicial discretion." *Id.* at 433. "The party seeking a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* at 433-34.

## ARGUMENT

I. **Defendants cannot make a strong showing that they are likely to succeed on the merits**

Defendants are not likely to succeed on their appeal. In the Eighth Circuit, a preliminary injunction will be reviewed for "abuse of discretion, though [the Court of Appeals will] review its underlying legal conclusions de novo." *Firearms Regulatory Accountability Coalition, Inc. v. Garland*, 112 F.4th 507, 517 (8th Cir. 2024). "A district court abuses its discretion in denying a preliminary injunction if it rests its conclusion on clearly erroneous factual findings or erroneous legal conclusions." *Id.* (internal quotations omitted). The Court did not come close to abusing its discretion when it issued its Order, so Defendants cannot make a strong showing of likely success.

a. **All Plaintiffs have standing**

Defendants first argue that this Court incorrectly found North Dakota lacks standing and therefore venue is improper. Mot. to Stay at 3, 5. What it really boils down to, though, is that Defendants do not want to litigate in this Court or at the Eighth Circuit. But their arguments fail because (a) at least one state has standing and (b) North Dakota remains a plaintiff. At the outset, it is important to note that Defendants are not contesting that that the pocketbook injuries North Dakota and other states will suffer are legally cognizable but instead challenge the facts Plaintiff States presented as evidence of those harms. They cannot make "a strong showing" they will succeed on appeal unless they demonstrate this Court's factual

2

findings are clearly erroneous. *Nken*, 556 U.S. at 426. For the reasons stated below, they cannot come close to meeting this high burden.

Plaintiffs here include nineteen States. Defendants have challenged the standing of only one: North Dakota. Three States—Kentucky, Idaho, and Virginia—raised alternative theories of harm that Defendants did not address at all in their argument. Plaintiffs Idaho, Kentucky, and Virginia administer their own state-run ACA exchange to handle QHP enrollment.[1] These states will face increased administrative and system costs when they are forced to distribute ACA exchange subsidies to a new class of illegal aliens who are disproportionately lower-income. Defendants do not dispute this at all, let alone make a "strong showing" that these states lack standing. Nor could they; the Final Rule expressly acknowledges these costs will be incurred by the Plaintiff States. *See* 89 Fed. Reg. at 39,424, 39,426.

It is undisputed that at least three Plaintiff States have standing. Therefore, the Court has jurisdiction. *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006) ("[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement."); *see also Biden v. Nebraska*, 143 S. Ct. 2355, 2368 (2023); *Does 1-11 v. Bd. of Regents of Univ. of Colorado*, 100 F.4th 1251, 1263 (10th Cir. 2024) ("Since at least one plaintiff had standing with respect to each Policy at the time of the Amended Complaint, the Does' suit does not fail for lack of standing." (internal quotation marks omitted)).

b. **Venue is proper in North Dakota because North Dakota is a Plaintiff**

Because the Court has jurisdiction over the case, Defendants will only succeed if they make a strong showing that venue was improper. Venue in the district of North Dakota is

---

[1] *See* The Marketplace in Your State, https://www.healthcare.gov/marketplace-in-your-state/ (last visited Dec. 12, 2024).

proper as long as North Dakota remains a Plaintiff. *See* 28 U.S.C. § 1391(b)(1). And North Dakota remains a Plaintiff unless the Court dismisses it.

Defendants arguments—essentially attempts to relitigate their failed motion to dismiss—fall flat. North Dakota presented evidence of two monetary harms: It costs the State money to issue driver's licenses and identification cards and to educate children. Defendants arguments regarding these harms ignore both the facts and the law and, therefore, do not make a "strong showing" they will succeed on appeal.

First, regarding driver's licenses, Defendants argue the State failed to provide "evidence regarding DACA recipients' historical behavior" to demonstrate that there is a realistic danger this rule will cost the State money. Mot. to Stay at 4-5. This completely ignores the Declaration of Steve Camarota, an expert who analyzed studies of DACA recipients' behavior and summarized his findings by stating, "By reducing emigration, the new regulation will mean more people with DACA will remain in the country than otherwise would be the case, creating more costs for states and local government." Camarota Decl. para. 11 (ECF 35-1). So, North Dakota did in fact present the evidence Defendants claim is lacking.

In the very next paragraph, Defendants fault the State for pointing out *past* costs it has incurred issuing driver's licenses (*i.e.*, historical facts showing DACA recipients' presence in the state costs the state money). *Id.* at 5; *see also* Rehborg Decl. para. 5-14 (ECF 93-1). And because driver's licenses must be renewed if a person remains in the State, the State will continue incurring these costs as long as DACA recipients remain. *Id*. The State thus showed "proof that the harm has occurred in the past and is likely to occur again." *Packard Elevator v. I.C.C.*, 782 F.2d 112, 115 (8th Cir. 1986). Defendants also ask why the State loses money on driver's licenses. Mot to Stay at 5. It is unclear whether Defendants are challenging the State's truthfulness or are

4

simply curious. But to the extent the question is relevant at all, it was helpfully answered in detail in the Rehborg Declaration. Rehborg Decl. para. 5-14 (ECF 93-1).

Second, regarding schools, Defendants do not dispute that there is at least one DACA recipient or child of a DACA recipient enrolling in public school in North Dakota, which will cost the State approximately $15,000 per child per year. *See* Tescher Decl. para. 4 (ECF 103-2); Korsmo Decl. para. 7 (ECF 111-1). Instead, they argue "[a]ny money spent because North Dakota has allowed an ineligible person to attend public school despite state law is a self-inflicted injury." *Id.* But North Dakota is legally required to provide public education for students regardless of their legal status. *Plyler v. Doe*, 457 U.S. 202, 230 (1982). It is not speculative that the State will continue to comply with the law and spend money on this education as long as these students remain in the State.

In short, Defendants bring speculation to a facts-fight. The only way their arguments succeed at all—let alone present a "strong showing" of likely success—is if one completely ignores the evidence in the record. The record is clear that North Dakota is likely to incur monetary harm caused by DACA recipients remaining in the State and that DACA recipients will be encouraged to remain if the Rule is allowed to take effect. North Dakota has standing, and venue is proper.

### c. Defendants' Final Rule is unlawful

This Court determined that Defendants' Final Rule is contrary to law because it violates the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA) (codified at 8 U.S.C. § 1611). And Defendants exceeded their statutory authority by attempting to redefine "lawfully present" in the ACA without authorization. Plaintiffs have demonstrated a high likelihood of success on the basis of these claims that justifies a preliminary injunction of the Final Rule.

To be eligible for public benefits under the terms of PRWORA, "qualified aliens" must be lawfully admitted under the Immigration and Nationality Act (INA), or otherwise granted lawful status under a specific provision of United State immigration law. *See* 8 U.S.C. § 1641. Enrollment in DACA does not grant "qualified alien" status for purposes of PRWORA. So DACA recipients cannot receive public benefits under the law. Yet the Final Rule makes DACA recipients eligible for federal subsidies. It thereby violates PRWORA.

Defendants argue that the ACA's "more specific and more recent choice" to give subsidies to "lawfully present" aliens overrides PRWORA's prohibition of subsidies to non-qualified aliens. But this gets the law backwards. In PRWORA, Congress broadly prohibited non-qualified aliens from receiving any federal public benefit "[n]otwithstanding any other provision of law," 8 U.S.C. § 1611(a). Phrases such as this "broadly sweep aside potentially conflicting laws." *United States v. Novak*, 476 F.3d 11 1041, 1046 (9th Cir. 2007); *see also Campbell v. Minneapolis Pub. Hous. Auth. ex rel. City of Minneapolis*, 168 F.3d 1069, 1075 (8th Cir. 1999) ("The phrase, 'notwithstanding any other provision of law,' signals that the [statute] supersedes other statutes that might interfere with or hinder the attainment of this objective." (citations omitted)). The ACA does not provide any textual override of PRWORA, so PRWORA's language is more specific and it controls.

In any case, the ACA also blocks DACA recipients from receiving ACA subsidies and coverage. DACA recipients are not lawfully present in the U.S., and only lawfully present individuals are eligible for Qualified Health Plans under the ACA. *See* 42 U.S.C. § 18032(f)(3). As the Eleventh Circuit explained, DACA recipients are simply "given a reprieve from potential removal; that does not mean they are in any way 'lawfully present' under the [INA]." *Estrada v. Becker*, 917 F.3d 1298, 1305 (11th Cir. 2019) (citation omitted). The Fifth Circuit came to a similar conclusion, upholding a district court decision which found "the INA expressly and carefully

6

provides legal designations allowing defined classes of aliens to be lawfully present, and Congress has not granted the Executive Branch free rein to grant lawful presence to persons outside the ambit of the statutory scheme." *Texas v. United States*, 549 F. Supp. 3d 572, 609–10 (S.D. Tex. 2021) (internal quotes omitted), *aff'd in relevant part*, 50 F.4th 498 (5th Cir. 2022).

Defendants repeatedly insist that DACA recipients can be considered lawfully present. In their arguments opposing a preliminary injunction, and again in their arguments for a stay of the Order, Defendants attempt to conflate DACA—an unlawful regulatory form of deferred action—with other statutory forms of deferred action. The difference is that, of all the forms of deferred action, only DACA has no basis in the INA—or any other statute—and therefore no claim to granting lawful status on anyone.

And DACA recipients are not even the only individuals with unlawful status whom the Final Rule makes eligible for the ACA. The Final Rule also defines as "lawfully present all aliens granted employment authorization under 8 C.F.R. § 274a.12(c). But not even Defendants believe that everyone granted employment authorization is lawfully present. *See* 89 Fed. Reg. 39,408 ("Almost all noncitizens granted employment authorization under 8 CFR 274a.12(c) are already considered lawfully present under existing regulations"). This, too, violates the ACA by making some unlawfully present aliens eligible for coverage that the text of the ACA explicitly prohibits.

The bottom line is that the ACA limited eligibility to lawfully present individuals. Defendants were never authorized to change the definition of "lawfully present." They were only authorized to determine which individuals fit that definition. *See* Order at 14 ("The authority granted to CMS by the ACA is to ascertain whether an individual meets the requirements for lawful status. It by no means allows the agency to circumvent congressional authority and redefine the term "lawfully present."). And there is no plausible argument that individuals

whose *unlawful presence* is tolerated by immigration enforcement (i.e. DACA recipients) are *lawfully present* in the United States.

Finally, Defendants misinterpret the Court's conclusion in its Order regarding Plaintiffs' likelihood of success. They allege the Court "erred in concluding that Plaintiffs have a 'fair chance of prevailing'" and assert that "Plaintiffs must establish likelihood of success, not just a 'fair chance of prevailing.'" Mot. to Stay at 6. But this is no error, and precisely what Plaintiffs did establish: although the Court stated the standard for granting a preliminary injunction is whether Plaintiffs show a "fair chance of prevailing," the Court eventually "concluded Plaintiffs will likely succeed on the merits because CMS acted contrary to law." Order at 14. This conclusion satisfies the Eight Circuit's standard in *Garland*, 112 F.4th at 517.

### d. Plaintiffs are also likely to succeed on the merits because the Final Rule is arbitrary and capricious

Plaintiffs are likely to succeed on the merits because, besides being unlawful, the Final Rule is arbitrary and capricious. The Court did not reach these claims because it was already satisfied of Plaintiffs' likelihood of success due to the Final Rule's unlawfulness. *See* Order at 14. But these claims also establish Plaintiffs' likelihood of success and should be considered by the Court at this stage, since they present an alternative path to success on the merits on appeal. Defendants' motion to stay the Order does not mention Plaintiffs' arbitrary and capricious claims at all. So they cannot make a "strong showing" of success on the merits when they fail to even address more than half of Plaintiffs' claims justifying a preliminary injunction and stay.

Under the APA, a court must also "hold unlawful and set aside agency action" that is "arbitrary, capricious [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). An agency acts arbitrarily and capriciously when it departs sharply from prior practice without reasonable

explanation or fails to consider either alternatives to its action or the affected communities' reliance on the prior rule. *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020).

The Final Rule is arbitrary and capricious for three separate reasons, each of which is sufficient to invalidate it under the APA. First, Defendants did not provide a reasonable explanation for their sharp departure from their prior policy of considering DACA recipients "unlawfully present" for purposes of ACA eligibility. They merely stated the change in definition is consistent with the goals of the ACA (*see* 89 Fed. Reg. at 39,396), without explaining or judging tradeoffs for departing from the prior policy which made DACA recipients ineligible. *See* ECF 35 at 13-14.

Second, the Final Rule's definition of DACA recipients as "lawfully present" is facially irrational: DACA recipients are aliens whose unlawful presence is subject to deferred action; they cannot be considered lawfully present at the same time. *See* ECF 35 at 14. An agency action cannot be upheld if it is "internally inconsistent or not reasonable and reasonably explained." *Garland*, 112 F.4th at 520.

Third, the Final Rule did not consider costs to the States due to increased operating costs for SBE states. *See* Meier Decl. paras. 20-22 (ECF 35-2). And they failed to consider the costs of decreased emigration in all Plaintiff States, including costs for issuing driver's licenses and for public education. *See, e.g.*, ECF 35 at 14-15. By considering only one subset of costs—the costs for "system changes" to SBE states (*see* 89 Fed. Reg. at 39,434)—Defendants failed to consider foreseeable and substantial costs to the Plaintiffs, which is arbitrary and capricious. These arbitrary and capricious claims make Plaintiffs' likelihood of success even stronger.

## II. Defendants will not suffer an irreparable injury if a stay is not granted

Defendants must also show that they will be "irreparably injured absent a stay." *Brady v. Nat'l Football League*, 640 F.3d 785, 789 (8th Cir. 2011) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776

9

(1987)). Defendants argue they are "per se" harmed because their regulation was enjoined. Mot. to Stay at 8. But the case on which they rely *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers), provides no support. *King* says, "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." 567 U.S. at 1303 (brackets in original). Defendants are not "representatives of the people" effectuating a statute. They are an agency promulgating an unlawful rule based on a twisted reading of a statute. If anything, it is the American people who are "per se" harmed by this Rule.

Defendants' other claim of harm is the administrative costs of complying with the injunction. Mot. for Stay at 10. First and foremost, the court reject this theory because it was not raised before. "The failure to raise an argument -- often but not always to sandbag the district court -- usually results in our declining to exercise discretion to consider the argument." *United States v. Hill*, 31 F.4th 1076, 1090 (8th Cir. 2022), *cert. denied*, 143 S. Ct. 1036 (2023). But to the extent the court considers it, Defendants' newly created theory of irreparable harm fails.

Defendants claim that complying with the preliminary injunction will come with administrative costs. It is unclear whether Defendants (a federal agency) can claim compliance as irreparable harm, because when the Government is subject to an injunction, its interests merge with the public's, *Missouri v. Biden*, 112 F.4th 531, 538 (8th Cir. 2024), and the public's interest is in following the law, *Nken*, 556 U.S. at 436. ("There is always a public interest in prompt execution of removal orders: The continued presence of an alien lawfully deemed removable undermines the streamlined removal proceedings IIRIRA established, and permits and prolongs a continuing violation of United States law." (cleaned up)).

In any event, the district court did not order Defendants to take any action; it only ordered them to refrain from breaking the law. As Defendants admit, the court granted the injunction before coverage for individuals begins on January 1. Mot. for Stay at 10. This Court

issued an injunction before this key deadline occurs since at that point the benefit has been given and the law broken. If Defendants will incur administrative costs to avoid breaking the law, those costs are not legally cognizable.

Defendants' alleged harms are also entirely self-inflicted. First, Defendants were warned at the outset that the Rule was unlawful. When Defendants first proposed the Rule, Seventeen States submitted a comment letter spelling out the very same legal issues in this lawsuit.[2] Defendants could have changed course here and reconsidered the Rule's legality. They did not. They plunged ahead. At that point, they bear the burden of their lawless actions.

Once the lawsuit was filed, Defendants could have also exercised their authority under the APA to stay the effective date of the Rule and wait for litigation to play out. *See* 5 U.S.C. § 705. As another court recently put it when dealing with an unlawful Rule promulgated by the Department of Education:

> Suffice it to say that, to the extent Defendants are concerned about the difficulties in managing patchwork enforcement in compliance with the preliminary injunction, this is a problem of DoE's own making … Congress has given DoE at least one tool to mitigate the hardships that its new rule imposes on those who are subject to it while the judicial review process plays out in courts across the country. Under 5 U.S.C. § 705, Congress gave DoE the authority to postpone the effective date of the Final Rule pending judicial review. Maybe DoE should use that authority.

*Kansas v. United States Dep't of Educ.*, No. 24-4041-JWB, 2024 WL 3471331, at *4 (D. Kan. July 19, 2024). Other agencies have taken this path to avoid the very administrative costs of which Defendants now complain. *See Kansas v. United States Dep't of Lab.*, No. 2:24-CV-76, 2024 WL 3938839, at *4 (S.D. Ga. Aug. 26, 2024 ("[A]fter Plaintiffs filed the motion presently before the

---

[2] *See generally* Office of the Kan. Attorney Gen. et al, Comment on Docket ID No. CMS-9894-P (June 23, 2023), available at https://www.regulations.gov/comment/CMS-2023-0068-0525.

Court, the DOL opted to extend the effective date of the Final Rule to August 29, 2024."). That Defendants chose not to is their own fault.

Finally, at a minimum, after oral argument Defendants were put on notice that there was at least a reasonable possibility that a preliminary injunction might be granted. What action did they take in preparation of that? Apparently, none. Instead of coming up with a plan to address a potential injunction, Defendants pressed ahead. Now they complain about the costs associated with the injunction and want this Court to bail them out. The Court should decline this request.

Ultimately, Defendants' evidence shows they are already complying with the injunction. When the injunction was entered, "We immediately complied." Grant Decl. para. 15 (ECF 119-1). They also already have their next steps outlined, promulgating guidance and informing customers about their eligibility. *Id.* This demonstrates that although they may have to take some steps to avoid breaking the law that they would prefer not to, they are ultimately capable of compliance. The Court should not bail them out of this obligation based on a novel theory of harm raised only after an injunction was issued.

### III. A stay would substantially harm Plaintiffs

The harms alleged by Defendants, which they allege will suffer absent a stay, are minimal in comparison with the harms Plaintiffs will suffer if the preliminary injunction is stayed. Some of these harms were admitted in the Final Rule, as SBE states—Kentucky, Idaho, and Virginia—would be required to update their state-based exchange eligibility systems. *See* 89 Fed. Reg. at 39,424-26 (describing costs to SBE states). Those same states are harmed by their participation in Defendants' illegal act and face a loss of federal funding if they refuse. *See* Order at 15-16. The Court already considered these harms sufficient to establish that Plaintiffs would suffer irreparable harm in the absence of a preliminary injunction. But those costs likely understate the costs to SBE states, as they fail to include the foreseeable direct costs of providing additional

customer service related to applications for health plans, not all of which are recoverable and for investigations and complaints. *See* Meier Decl. para. 20 (ECF 35-2)

But there are other harms to the States, not acknowledged in the Final Rule, which are due to predictable decreased emigration from Plaintiff States as a result of the substantial financial benefit Defendants are offering to unlawfully present individuals. *See* Camarota Decl. paras. 5-6 (ECF 35-1); *see also* ECF 35 at 16-18. Plaintiff States are home to an estimated 158,906 DACA recipients (*see* ECF 35 at 6-7), and the continuing presence of each one imposes costs on the States. For example, North Dakota is home to at least 126 DACA recipients, who are issued driver's licenses and identification cards at a net cost to the state of $584.74. *See* ECF 103 at 5. And some DACA recipients or their dependents enroll in public education in the state at an annual cost of $14,345.87. *See* ECF 111 at 3. These costs are typical of all the State costs for education. *See, e.g.*, Kan. State Dep't of Educ., Expenditures Per Pupil: 2020-2021 at 8 (Jan. 2021), available at https://shorturl.at/bIUXY (noting 2020-2021 school year expenditures per pupil were approximately $15,869). The States also will incur costs for the use of other public services, including for emergency and hospital services and the administration of the criminal justice system. *See* ECF 35 at 18.

IV. **A stay would harm the public interest**

This Court's Order already correctly assessed the public interest when it preliminarily enjoined and stayed the Final Rule. To start, Congress' statement of the public interest is definitive: "It is a compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits." 8 U.S.C. § 1601(6). A stay of the Order would encourage Defendants to distribute even more public benefits to illegal aliens and encourage more illegal aliens to immigrate and to remain in the United States. A stay therefore undermines that compelling government interest in discouraging illegal immigration.

Second, there is no public interest in an unlawful administrative action. This Court already determined that the public did not have any interest in the Final Rule. Order at 16. That determination is correct. Further, Plaintiffs' strong likelihood of success on the merits supports a finding that a stay is not in the public interest. "A party's likelihood of success on the merits is a strong indicator that a preliminary injunction would serve the public interest because there is generally no public interest in the perpetuation of unlawful agency action." *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021) (internal quotations omitted).

## CONCLUSION

Because Defendants have not met the standard for obtaining a stay pending appeal, the Court should deny their motion.

Respectfully submitted,

KRIS W. KOBACH
**Attorney General of Kansas**

*/s/ James Rodriguez*
James R. Rodriguez, Kan. SC No. 29172
*Assistant Attorney General*
Abhishek S. Kambli, Kan. SC No. 29788
*Deputy Attorney General*
Kansas Office of the Attorney General
Topeka, Kansas 66612-1597
Phone: (785) 296-7109
Email: abhishek.kambli@ag.ks.gov
jay.rodriguez@ag.ks.gov
*Counsel for the State of Kansas*

## CERTIFICATE OF SERVICE

This is to certify that on this 12th day of December, 2024, I electronically filed the above and foregoing document with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ James R. Rodriguez*
James R. Rodriguez, Kan. SC No. 29172
*Assistant Attorney General*
*Counsel for the State of Kansas*