# EXHIBIT 4
# Declaration of Doug McKeever

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| STATE OF KANSAS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA, *et al.*,<br><br>Defendants. | Civil Action No. 1:24-cv-150-DMT-CRH<br>Judge Daniel M. Traynor |

**DOUG McKEEVER**

I, Doug McKeever, hereby declare that the following is true and correct:

1. I am the Chief Deputy Executive Director, Program, of Covered California, the State of California's health insurance marketplace exchange. I have held this position since 2017. The facts stated herein are of my own personal knowledge, and I could and would competently testify to them. I submit this declaration in my capacity as Chief Deputy Executive Director, Program, of Covered California, a non-party, in supporter of proposed intervenor, the State of California.

2. I submit this Declaration in support of the Final Rule, Clarifying the Eligibility of Deferred Action for Childhood Arrivals (DACA) Recipients and Certain Other Noncitizens for a Qualified Health Plan through an Exchange, Advance Payments of the Premium Tax Credit, Cost-Sharing Reductions, and a Basic Health Program, 89 Fed. Reg. 39,392 (May 8, 2024), issued by the U.S. Department of Health and Human Services and Centers for Medicare and

Medicaid Services ("CMS") permitting Deferred Action for Childhood Arrivals ("DACA") recipients to enroll in a qualifying health plan through an exchange pursuant to the Affordable Care Act ("ACA").

3. By making DACA recipients eligible for subsidies on Covered California, the Final Rule ensures that more California residents have access to affordable health insurance coverage.

4. Increased access to affordable and adequate health insurance benefits both the State and its residents.

5. Vacatur of the Final Rule on a nationwide basis would harm Covered California and the State of California by causing loss of revenue streams tied to the payment of insurance premiums as well as compliance costs relating to our management of this marketplace.

Covered California

6. Covered California is the state agency that was created pursuant to the ACA to administer a Health Benefit Exchange in California.

7. California built its own state-based exchange, Covered California, for the individual and small group markets. Through Covered California, the public can find affordable, high quality insurance plans from private insurance companies or apply for programs such as Medicaid. With over 1.8 million members, Covered California is the largest state-based health insurance Marketplace.

8. Enrollment of eligible Californians into coverage is central to Covered California's mission. Since passage of the ACA, California has experienced a historic decrease in the number of uninsured residents—the uninsured rate dropped from 17 percent in 2013 to 6.4 percent in 2023— predominantly attributable to the expansion of eligibility in the Medi-Cal program and

the availability of health coverage through Covered California made more affordable through federal premium tax credits and cost-sharing assistance.

9. Covered California has always recognized the need to tailor outreach and education efforts to ensure they meet the needs of eligible immigrants in California. To meet this goal, Covered California has invested substantial financial and administrative resources into targeted marketing campaigns designed to educate communities with high populations of eligible immigrants about the benefits of enrolling in health insurance coverage, including Spanish-speaking and Asian communities. In addition to our robust state-wide marketing campaigns, these targeted campaigns have bolstered eligible immigrant enrollment and built a culture of trust between hard-to-reach populations and Covered California.

10. As the State's official ACA health insurance marketplace, Covered California operates a technology platform and consumer service center consistent with the requirements of State and Federal law.

11. Health plans offered through Covered California cover preventative services, emergency services, prescription drugs, prenatal and pediatric care, as well as other services. No one can be denied coverage due to a pre-existing condition.

12. Financial assistance under Covered California takes several forms, including Advance Premium Tax Credits and cost-sharing reductions. The Premium Tax Credit helps lower monthly premium payments. Cost-sharing reductions help lower out-of-pocket costs like deductibles and co-pays for doctor visits.

13. To be eligible to enroll in Covered California plans, state residents:

    a. Must live in the United States and have a primary residence in California;

    b. Must be considered a resident of the United States and California for tax purposes;

  c. Must be a United States citizen or national or be lawfully present; and

  d. Cannot be currently incarcerated.

14. Covered California generates roughly $455.8 million in operating revenue annually, including participation fee revenue from the individual and small business markets. These revenues are generated through a participation fee charged to participating exchange carriers. Participation fee revenue is a function of enrollment, gross premiums, and Covered California's participation fee rate. The participation fee rate for the individual market was lowered from 3.25% to 2.25% starting in plan year 2025.

<u>Impact of Final Rule</u>

15. Prior to the Final Rule, DACA recipients were not considered lawfully present for purposes of Covered California subsidies. Under the Final Rule, DACA recipients are considered lawfully present for purposes of Covered California subsidies.

16. Covered California welcomed the Final Rule because it created an opportunity to further reduce the rate of uninsured individuals in our state. As the Final Rule indicates, an estimated 40,000 of remaining uninsured Californians are DACA recipients who, thanks to the Final Rule, now qualify for subsidies through Covered California. 89 Fed. Reg. at 39,428-29.

17. As of January 11, 2025, a total of 1,868 DACA recipients had enrolled in a Covered California plan. Covered California anticipates that these numbers will increase as the option becomes more widely known and more enrollees effectuate coverage.

18. Between December 2024 and December 2025, Covered California will generate approximately $413,382 in additional operating revenue attributable to the enrollment of DACA recipients for this time period. For the plan year 2025, which includes only 12 months, additional

operating revenue attributable to the enrollment of DACA recipients is forecast to be approximately $409,151.

19. The 1,868 individual DACA recipients who had coverage as of January 11, 2025, had an average gross monthly premium of $437. This premium amount is lower than that of Covered California's overall enrolled population, reflecting the younger relative age of DACA recipients compared to Covered California risk pools generally.

20. The Final Rule allows more California residents to access the state exchange, reducing the number of uninsured individuals in the State.

<u>Invalidation of the Final Rule Would Cause Harm</u>

21. Covered California has incurred significant costs specifically to implement the Final Rule. The Final Rule required technological updates to the California Healthcare Eligibility, Enrollment, and Retention System (CalHEERS) in order to build a new configuration to treat DACA recipients as lawfully present, and to allow electronic verification of lawful presence for these individuals.

22. Implementing these changes to CalHEERS have cost state agencies approximately $550,000 to date. These costs are split between Covered California and the California Department of Health Care Services, according to a CMS-approved cost allocation plan.

23. Covered California has also invested approximately $140,000 to date in advertising and outreach in order to publicize the availability of coverage for DACA recipients under the Final Rule.

24. Invalidating the Final Rule would require Covered California to turn off those technological system changes in which these substantial investments have already been made, and would interfere with existing plans to further modify CalHEERS. It would also require close

coordination with consumer service center staff, carriers, assisters, agents, brokers, navigators, and other community partners in order to mitigate confusion for DACA recipients.

25. If the Final Rule were invalidated, Covered California would likely need to send two additional notices to DACA recipients already enrolled in Covered California plans, first informing them of prospective termination, and then notifying them of their eligibility redetermination. For an estimated 1,000 individual enrollees, the total cost of sending these notices would be $2,200. As more DACA recipients enroll in Covered California plans in 2025, those numbers will increase.

26. If the Final Rule were invalidated, the total overall estimated agency costs to Covered California and the Department of Health Care Services, including communication with impacted individuals and loss of the value of prior technological and advertising investments, would be approximately $692,200.

27. Covered California would incur additional costs in changes to its website, staff training, and community outreach and engagement efforts that cannot be separated from ongoing program administrative budgets, but that would nevertheless divert time and resources from Covered California's core mission of increasing Californians' access to healthcare.

28. Invalidating the Final Rule would likely cause confusion and uncertainty, undercutting Covered California's efforts to promote continued enrollment of all eligible individuals into health insurance coverage.

29. Invalidation of the Final Rule would also cause loss to Covered California's operating budget and harm to the State marketplace. Because Covered California plans receive a monthly premium payment for each individual enrolled, the total monthly premium collected decreases as the number of enrollees decreases. And the total user fee collected by Covered California

correspondingly decreases as the number of enrollees decreases. Thus, for each individual who ceases to be enrolled in a Covered California plan, the State loses user fee revenue.

30. If a court issues an order rendering those DACA recipients who have enrolled in Covered California plans ineligible for participation in ACA exchanges, the State would lose revenue based on insurance premiums under those plans no longer being collected, and carriers no longer being assessed a 2.25% user fee based on those premiums. As described above, this would result in a loss of approximately $409,151 in revenue for plan year 2025.

31. Most often, individuals who purchase insurance on Covered California do so to access subsidies that enable them to afford health insurance coverage that they otherwise could not afford. Indeed, nearly 90% of individuals who purchase insurance on Covered California receive some sort of financial help. For many of those enrollees, losing access to Covered California means not being able to afford private health insurance at all.

32. Furthermore, when noncitizens drop out of coverage, it hurts everyone in the market for individual insurance. Insurance markets ensure efficient protections by pooling risk. While individual medical treatment—especially for those who experience severe health conditions or who need emergency services—can sometimes be costly, the greater the number of healthy enrollees in the insurance market, the more diffuse the costs, which are generally spread out via insurance premium payments.

33. Based on an analysis of hospital discharges and emergency room visits, Covered California estimates that noncitizens are 10 percent less costly to insure compared to the overall population. Having these healthier enrollees in the market (who are less likely to require expensive medical treatments) helps to lower premiums for all Californians.

34. Enrollees must pay the first month's insurance premium before coverage can start. Therefore, to the extent that premiums have already been paid by DACA recipients who have enrolled in plans on Covered California, they will need to be returned. To the extent that DACA recipients have scheduled medical appointments with network providers, these appointments may need to be cancelled or modified due to lack of insurance coverage.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 13th day of January, 2025, in Sacramento, California.

Doug McKeever
Chief Deputy Executive Director, Program
Covered California