UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

STATE OF KANSAS, *et al*.,

        Plaintiffs,

     v.

UNITED STATES OF AMERICA, *et al*.,

        Defendants.

Civil Action No. 1:24-cv-150-DMT-CRH
Judge Daniel M. Traynor

---

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO INTERVENE AS DEFENDANTS BY PROPOSED INTERVENORS NEW JERSEY, ARIZONA, CALIFORNIA, COLORADO, DELAWARE, HAWAI'I, ILLINOIS, MARYLAND, ATTORNEY GENERAL DANA NESSEL ON BEHALF OF PEOPLE OF MICHIGAN, MINNESOTA, NEVADA, NEW MEXICO, OREGON, AND VERMONT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION .................................................................................................................... 1

BACKGROUND ..................................................................................................................... 2

ARGUMENT ......................................................................................................................... 3

    I.    MOVANT STATES ARE ENTITLED TO INTERVENE AS OF RIGHT ....................... 4

    II.   ALTERNATIVELY, PERMISSIVE INTERVENTION IS APPROPRIATE. ................ 18

CONCLUSION ...................................................................................................................... 19

## <u>TABLE OF AUTHORITIES</u>

***Cases***

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,
    458 U.S. 592 (1982) .................................................................................. 10, 11

*Arizona v. California*,
    460 U.S. 605 (1983), *decision supplemented*, 466 U.S. 144 (1984) ........................................ 11

*Becker v. N.D. Univ. Sys.*,
    112 F.4th 592 (8th Cir. 2024) ........................................................................... 5

*Berger v. N.C. State Conf. of the NAACP*,
    597 U.S. 179 (2022) ................................................................................. 4, 6

*Biden v. Nebraska*,
    600 U.S. 477 (2023) ................................................................................... 6

*California v. Azar*,
    911 F.3d 558 (9th Cir. 2018) ........................................................................... 7

*California v. Texas*,
    593 U.S. 659 (2021) .................................................................................. 15

*Cameron v. EMW Women's Surgical Ctr., P.S.C.*,
    595 U.S. 267 (2022) .................................................................................. 17

*City & Cty. of San Francisco v. USCIS*,
    981 F.3d 742 (9th Cir. 2020) ........................................................................... 7

*Cook Cnty. v. Texas*,
    37 F.4th 1335 (7th Cir. 2022) ...................................................................... 17, 18

*Ctr. for Biological Diversity v. Haaland*,
    341 F.R.D. 236 (D. Minn. 2022) ......................................................................... 4

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,
    640 F. Supp. 3d 59 (D.D.C. 2022) ....................................................................... 4

*DHS v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020) .................................................................................... 13

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ................................................................................... 6

*Flynt v. Lombardi*,
    782 F.3d 963 (8th Cir. 2015) .......................................................................... 19

*Franconia Mins. (UK) LLC v. United States*,
    319 F.R.D. 261 (D. Minn. 2017)................................................................... 19

*GreenFirst Forest Prods. Inc. v. United States*,
    577 F. Supp. 3d 1349 (Ct. Int'l Trade 2022) ................................................ 6

*Haaland v. Brackeen*,
    599 U.S. 255 (2023)..................................................................................... 11

*Huisha-Huisha v. Mayorkas*,
    No. 22-5325, 2022 WL 19653946 (D.C. Cir. Dec. 16, 2022) ................... 18

*Jones v. Prince George's Cnty.*,
    348 F.3d 1014 (D.C. Cir. 2003) .................................................................... 5

*Kane Cnty. v. United States*,
    928 F.3d 877 (10th Cir. 2019) .................................................................... 17

*Kansas Pub. Emps. Ret. Sys. v. Reimer & Koger Assocs., Inc.*,
    60 F.3d 1304 (8th Cir. 1995) ..................................................................... 13

*Kentucky v. Biden*,
    23 F.4th 585 (6th Cir. 2022) ...................................................................... 10

*Lopez-Aguilar v. Marion Cnty. Sheriff's Dep't.*,
    924 F.3d 375 (7th Cir. 2019) ..................................................................... 17

*Lynch v. Nat'l Prescription Adm'rs, Inc.*,
    787 F.3d 868 (8th Cir. 2015) ..................................................................... 10

*Mandan, Hidatsa & Arikara Nation v. U.S. Dep't of the Interior*,
    66 F.4th 282 (D.C. Cir. 2023)..................................................................... 15

*Massachusetts v. EPA*,
    549 U.S. 497 (2007)..................................................................................... 11

*Massachusetts v. HHS*,
    923 F.3d 209 (1st Cir. 2019)......................................................................... 7

*Massachusetts v. Mellon*,
    262 U.S. 447 (1923)..................................................................................... 11

*Mausolf v. Babbitt*,
    85 F.3d 1295 (8th Cir. 1996) .................................................................. 5, 6

*Melone v. Coit*,
    100 F.4th 21 (1st Cir. 2024)......................................................................... 6

*Mille Lacs Band of Chippewa Indians v. Minnesota,*
    989 F.2d 994 (8th Cir. 1993) ........................................................ 17

*Missouri v. Biden,*
    52 F.4th 362 (8th Cir. 2022) ...................................................... 6, 9

*Missouri v. China,*
    90 F.4th 930 (8th Cir. 2024) ....................................................... 11

*N. Dakota ex rel. Stenehjem v. United States,*
    787 F.3d 918 (8th Cir. 2015) ........................................................ 4

*Nat'l Parks Conservation Ass'n v. EPA,*
    759 F.3d 969 (8th Cir. 2014) .................................................... 6, 13

*New Jersey v. EPA,*
    989 F.3d 1038 (D.C. Cir. 2021) ..................................................... 9

*New York v. DHS,*
    969 F.3d 42 (2d Cir. 2020) ...................................................... 7, 11

*New York v. U.S. Dep't of Lab.,*
    363 F. Supp. 3d 109 (D.D.C. 2019) ................................................. 9

*Pasqua Yaqui Tribe v. EPA,*
    No. 20-2266, 2021 WL 25776939 (D. Ariz., May 5, 2021) ...................... 17

*Planned Parenthood of Minn., Inc. v. Citizens for Cmty. Action,*
    558 F.2d 861 (8th Cir. 1977) ........................................................ 4

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ................................................................. 6

*Swinton v. SquareTrade, Inc.,*
    960 F.3d 1001 (8th Cir. 2020) ....................................................... 4

*Texas v. United States,*
    50 F.4th 498 (5th Cir. 2022) ....................................................... 15

*Texas v. United States,*
    No. 18-68, 2018 WL 11226239 (S.D. Tex. June 25, 2018) .................. 11, 15

*Tweedle v. State Farm Fire & Cas. Co.,*
    527 F.3d 664 (8th Cir. 2008) ...................................................... 16

*United Food & Com. Workers Union, Loc. No. 663 v. USDA,*
    36 F.4th 777 (8th Cir. 2022) ...................................................... 15

*United States v. Union Elec. Co.*,
   64 F.3d 1152 (8th Cir. 1995) .................................................................. 4

*Utah Ass'n of Ctys. v. Clinton*,
   255 F.3d 1246 (10th Cir. 2001) ............................................................. 5

*Va. House of Delegates v. Bethune-Hill*,
   587 U.S. 658 (2019) ................................................................................ 6

*West Virginia v. EPA*,
   No. 23-32, 2023 WL 3624685 (D.N.D. Mar. 31, 2023) ...................... 6

*Wyoming v. Oklahoma*,
   502 U.S. 437 (1992) ................................................................................ 9

**Statutes**

Fed. R. Civ. P. 24(a)(2) ............................................................................. 4

**Regulations**

*Deferred Action for Childhood Arrivals*,
   87 Fed. Reg. 53,152 (Aug. 30, 2022) ................................................. 13

*Clarifying the Eligibility of DACA Recipients & Certain Other Noncitizens for a Qualified
   Health Plan through an Exchange, Advance Payments of the Premium Tax Credit, Cost-
   Sharing Reductions, & a Basic Health Prog.*,
   89 Fed. Reg. 39,392 (May 8, 2024) ....................................... 2, 7, 11, 12

**Other**

Emily Baumgaertner & Margot Sanger-Katz,
   *Does Kamala Harris Back Free Health Care for Illegal Immigrants*,
   N.Y. Times (Oct. 30, 2024) ................................................................. 14

*Sen. Vance Blasts Biden Admin. For Providing Taxpayer-Funded Healthcare To Illegal
   Immigrants*, JD Vance (May 3, 2024) ................................................ 14

**<u>INTRODUCTION</u>**

This case challenges a Final Rule authorizing DACA recipients to enroll in a health plan via an ACA exchange. As this Court has recognized, a range of States welcome this Final Rule and believe it is lawful—and filed an amicus brief explaining that the ACA authorizes noncitizens who are "lawfully present," including DACA recipients, to participate in state and federal health insurance exchanges. Because federal defendants can no longer be counted on to defend Movant States' interests or to press these arguments regarding the proper scope of the ACA, and because elimination of the Final Rule would impose significant harms on Movant States and their residents, these 14 Movant States now move to intervene.[1] This Court should grant the motion.

The basis for intervention is straightforward. The challengers seek final relief that would prevent implementation of the Final Rule across the country, whether in the form of vacatur or an injunction. But granting the challengers that relief would harm Movant States in at least four ways. First, Movant States incur costs providing health care to residents without health insurance—and a court order barring DACA recipients from obtaining insurance on ACA exchanges, or stripping DACA recipients of insurance they already obtained, would increase those costs. Second, Movant States assess fees from each enrollment on their ACA exchanges—specific state revenue streams a court order would eliminate. Third, Movant States who run their own exchanges would have to expend funds to implement any court order that vacated the Final Rule, both by updating eligibility criteria and in informing DACA recipients of their loss of insurance and prospective ineligibility. And fourth, Movant States maintain an interest in the health and safety of their residents, including

---

[1] The Movant States seeking to intervene in this action are: New Jersey, Arizona, California, Colorado, Delaware, Hawaiʻi, Illinois, Maryland, Attorney General Dana Nessel on Behalf of People of Michigan, Minnesota, Nevada, New Mexico, Oregon, and Vermont.

the DACA recipients who have resided within their borders for years or decades. Reliable access to health insurance has been shown to improve residents' health outcomes, as well as to improve productivity generally, benefiting DACA recipients, their families, and their States alike.

Given the significant harms that Movant States would incur from an adverse judgment in this case, and the lack of prejudice to the parties at this early stage of the litigation, intervention is appropriate. While federal defendants previously defended the Final Rule, there is little doubt that will change: the President-Elect and Vice President-Elect criticized the Final Rule during the 2024 campaign, and the previous Trump Administration declined to defend both DACA and the ACA. Without intervention, this Court would be deprived of an adequate defense of the Final Rule. That is why, when another district court faced the same situation in the context of DACA, it permitted DACA recipients and New Jersey to participate as intervenors and provide the adequate defense the Federal Government would not. Nor is intervention belated or premature: federal defendants will only now cease their defense of the Final Rule, and DACA recipients and Movant States alike are prepared to litigate. This Court should allow them to do so.

## BACKGROUND

As this Court is already aware, on May 8, 2024, the U.S. Department of Health and Human Services ("HHS") and the Centers for Medicare & Medicaid Service ("CMS") published the Final Rule, *Clarifying the Eligibility of DACA Recipients & Certain Other Noncitizens for a Qualified Health Plan through an Exchange, Advance Payments of the Premium Tax Credit, Cost-Sharing Reductions, & a Basic Health Prog.*, 89 Fed. Reg. 39,392 (May 8, 2024) ("Final Rule"). ECF 1; 89 Fed. Reg. at 39,393. The Final Rule allows recipients of deferred action pursuant to the Deferred Action for Childhood Arrivals ("DACA") policy, including the DACA recipients in Movant States, to purchase qualifying insurance via their state or federal exchanges under the Patient Protection and Affordable Care Act ("ACA").

On August 8, 2024, Plaintiff States challenged the Final Rule, ECF 1, and two days later moved for a preliminary injunction, ECF 35. Many of the Movant States submitted an amicus brief ("States' Amicus Brief") in support of the Final Rule on October 2, 2024, explaining that the Final Rule was consistent with the plain language of the ACA, and emphasizing that this Court should deny the application for a preliminary injunction. ECF 69. The Final Rule took effect on November 1, 2024, and DACA recipients across the country became eligible to purchase health insurance via the ACA exchanges—whether the federal ACA exchange or, in the States that maintain them, state ACA exchanges. *See* ECF 105. On November 4, 2024, Defendants also filed a Motion to Dismiss, arguing this Court lacked jurisdiction and that Plaintiffs failed to state a claim. In the alternative, Defendants asked the court to dismiss or transfer for improper venue. ECF 108.

On December 9, 2024, the Court granted a Preliminary Injunction, found Plaintiffs' request for a temporary restraining order moot, and denied Defendants' Motion to Dismiss. *See* ECF 117. After finding that the Plaintiff States had standing to challenge the Final Rule, the Court concluded that they were entitled to a preliminary injunction and thus enjoined Defendants from enforcing the Final Rule against the 19 Plaintiff States. *Id.* Federal defendants appealed that decision. The Eighth Circuit denied a stay pending appeal, but it expedited appellate briefing. *See* CA8 No. 5466750. Plaintiff States subsequently filed a motion with this Court seeking clarification as to whether the preliminary relief that they obtained applies nationwide. *See* ECF 134.

## **ARGUMENT**

This Court should grant Movant States' motion to intervene. Invalidation of the Final Rule would directly injure Movant States' interests in four different ways. These threatened injuries, individually and together, entitle Movant States to intervene as of right—since federal defendants will no longer adequately represent their interests after the imminent change in administration, and

Movant States' intervention is timely. *See* Fed. R. Civ. P. 24(a)(2). Alternatively, this Court should grant Movant States permissive intervention. *See* Fed. R. Civ. P. 24(b)(1)(B).

## I.    MOVANT STATES ARE ENTITLED TO INTERVENE AS OF RIGHT.

Under Rule 24(a), "a court must permit anyone to intervene who, (1) on timely motion, (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, (3) unless existing parties adequately represent that interest." *Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 190 (2022) (cleaned up); *see N. Dakota ex rel. Stenehjem v. United States*, 787 F.3d 918, 921 (8th Cir. 2015). "Rule 24 is construed liberally," so courts "resolve all doubts in favor of the proposed intervenors," *Ctr. for Biological Diversity v. Haaland*, 341 F.R.D. 236, 239 (D. Minn. 2022) (quoting *United States v. Union Elec. Co.*, 64 F.3d 1152, 1158 (8th Cir. 1995)), and accept "as true all material allegations in the motion to intervene," *Swinton v. SquareTrade, Inc.*, 960 F.3d 1001, 1003-04 (8th Cir. 2020). Each consideration compels granting Movant States a right to intervene: this litigation threatens to impair Movant States' substantial interests; federal defendants no longer adequately represent those interests; and Movant States' motion is swift and timely. Just as another court permitted States to defend DACA absent a federal defense, intervention is proper here.

1. Movant States' interests would be significantly impeded by the invalidation of the Final Rule. To intervene as of right, a litigant must demonstrate significant "interest[s] in the resolution of this lawsuit that may be practically impaired or impeded without [their] participation." *Berger*, 597 U.S. at 191. As long as "the interest identified" is "more than peripheral or insubstantial," *Planned Parenthood of Minn., Inc. v. Citizens for Cmty. Action*, 558 F.2d 861, 869 (8th Cir. 1977), a litigant can establish such interests by demonstrating Article III injury. *See Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 640 F. Supp. 3d 59, 68 (D.D.C. 2022) ("Constitutional

standing sufficiently demonstrates … interest" under Rule 24(a)); *Jones v. Prince George's Cnty.*, 348 F.3d 1014, 1018-19 (D.C. Cir. 2003) (noting that if a movant "has suffered a cognizable injury sufficient to establish Article III standing, she also has the requisite interest under Rule 24(a)(2)"); *Mausolf v. Babbitt*, 85 F.3d 1295, 1301-02 (8th Cir. 1996) (after finding movant had demonstrated Article III injury, concluding same injuries established interests under Rule 24); *accord Utah Ass'n of Ctys. v. Clinton*, 255 F.3d 1246, 1252 n.4 (10th Cir. 2001) (same, and reasoning that "Article III standing requirements are more stringent than those for intervention under Rule 24(a)").

Movant States can easily establish standing here—and thus interests sufficient to warrant intervention—because the final relief the challengers request, including vacatur of the Final Rule or a nationwide injunction, would harm Movant States' interests in at least four ways. *See Becker v. N.D. Univ. Sys.*, 112 F.4th 592, 595 (8th Cir. 2024) (listing elements of Article III standing). First, Movant States have interests in ensuring that DACA recipients within their borders can access affordable health insurance options on the applicable state or federal ACA exchanges to avoid significant expenses for preventive and/or emergency care Movant States otherwise have to shoulder. Second, Movant States have an interest in protecting their revenue streams associated with the payment of insurance premiums—revenue they would lose for each DACA recipient that is forced to go without insurance absent the Final Rule. Third, Movant States who run exchanges will incur compliance costs if the Final Rule is eliminated. Fourth, Movant States have an interest in protecting the health of their residents—both their DACA recipients and their other residents, too. Because any court order or settlement between the current parties invalidating the Final Rule would threaten each interest, Movant States have a right to participate in this challenge.[2]

---

[2] That Movant States plainly have Article III standing allows them to establish interests for purposes of Rule 24(a) intervention. But to be clear, Movant States need not separately establish

a. Movant States' first three Article III injuries in this case are the direct pocketbook harms they would suffer from elimination of the Final Rule. To satisfy Article III, an asserted injury must be "concrete and particularized and actual or imminent." *Missouri v. Biden*, 52 F.4th 362, 368 (8th Cir. 2022) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016)). A State suffers an injury if the action it opposes—a court order invalidating the Final Rule—would cause the States or their instrumentalities "financial harm." *Biden v. Nebraska*, 600 U.S. 477, 490 (2023); *see also FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) (agreeing that the "injury in fact can be a … monetary injury"); *Missouri v. Biden*, 52 F.4th at 368 (confirming that an "[e]conomic injury to a State from increased proprietary costs or reduced tax revenues can … give the State standing to sue"). These injuries suffice to demonstrate Movant States' Article III standing—and, relatedly, confirm harms to their interests sufficient to justify intervention. *See Nat'l Parks*, 759 F.3d at 976 ("economic interests in the lawsuit satisfy Rule 24(a)(2)'s recognized-interest requirement").

---

standing to intervene as defendants in this Court. Because Movant States ask only that this Court refuse to grant relief on the Plaintiff States' claims, they do not have to demonstrate independent standing in this litigation. *See Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 663 (2019) (defendant-intervenor need not establish standing since its defense of redistricting plan did not "entail[] invoking a court's jurisdiction"); *see e.g.*, *Berger*, 597 U.S. 179 (holding that legislative leaders may intervene to defend law without discussing their standing); *West Virginia v. EPA*, No. 23-32, 2023 WL 3624685, at *2 n.2 (D.N.D. Mar. 31, 2023) (observing proposed defendant intervenors were "not required to independently demonstrate Article III standing" when they are not "assert[ing] any counterclaim" and asked only that the Court refuse to grant relief on "the plaintiff states' claims"); *accord Melone v. Coit*, 100 F.4th 21, 28-29 (1st Cir. 2024) (rejecting argument that intervenor defendant has "to establish independent Article III standing" if it "simply seeks to defend the agency's position"); *GreenFirst Forest Prods. Inc. v. United States*, 577 F. Supp. 3d 1349, 1354 n.4 (Ct. Int'l Trade 2022) (same). To the extent prior Eighth Circuit decisions required putative defendant-intervenors to establish standing, *see Mausolf*, 85 F.3d at 1300; *Nat'l Parks Conservation Ass'n v. EPA*, 759 F.3d 969, 974 (8th Cir. 2014), those decisions are inconsistent with *Bethune-Hill*, which makes clear that a court should not require prospective defendant-intervenors who assert no counterclaims to establish standing. 587 U.S. at 663. This Court should follow *Bethune-Hill*.

First, invalidation of the Final Rule would impose on Movant States expenses associated with providing medical care to uninsured DACA recipients who live in their States. *See New York v. DHS*, 969 F.3d 42, 59-60 (2d Cir. 2020) (approving state standing tied to "increasing overall healthcare costs"); *City & Cty. of San Francisco v. USCIS*, 981 F.3d 742, 754 (9th Cir. 2020) (states had standing where immigrants' avoidance of federal benefits would result in "increased demand for aid supplied by the state," including "overall increase in healthcare costs … borne by public hospitals"); *Massachusetts v. HHS*, 923 F.3d 209, 223 (1st Cir. 2019) (state had standing where policy would cause more women to obtain state-funded contraceptive or prenatal care); *California v. Azar*, 911 F.3d 558, 571-72 (9th Cir. 2018). DACA recipients are over three times more likely than the general U.S. population to be uninsured. 89 Fed. Reg. at 39,395. And as the attached declarations lay out, Movant States incur costs for the care of their uninsured residents. These costs include millions annually in unreimbursed costs for the care of uninsured residents at public hospitals, *see* Ex. 1 at ¶¶ 7-9; Ex. 2 at ¶¶ 10-12, 24-26,[3] and hundreds of millions in annual subsidies to defray the cost of health care services that are provided to uninsured residents, *see* Ex. 1 at ¶¶ 7-9; Ex. 2 at ¶¶ 10-12, 19-20, 25; Ex. 5 at ¶¶ 17-19, 23-25; Ex. 6 at ¶¶ 4-11. Movant States have seen thousands of DACA recipients obtain health insurance under the Final Rule, Ex. 3 at ¶ 17; Ex. 4 at ¶ 17, and the invalidation of the Final Rule risks swiftly sending those residents back to the ranks of the uninsured, requiring Movant States to again incur these additional costs.

New Jersey's health care programs illustrate ways in which States incur costs for health care services provided to uninsured residents, including uninsured DACA recipients. For example, an uninsured resident can visit Federally Qualified Healthcare Centers ("FQHC") to obtain free or low-cost preventive health services. The State's Uncompensated Care Fund ("UCF") subsidizes

---

[3] "Ex. __" are to the exhibits referenced within the Table of Exhibits, filed with this motion.

these services by paying a flat rate from State funds per visit for an uninsured resident: $112 per visit for primary and dental care and $63 per visit for mental health services. New Jersey funds the UCF, so the greater the number of uninsured residents in New Jersey, the more the State spends on preventive care for those who obtain such services. Ex. 2 at ¶¶ 20-24. Similar logic applies to the New Jersey's Charity Care program (which offers annual subsidies to support free or low-cost emergency care services for uninsured residents), and its Supplemental Prenatal and Contraceptive Program (which provides prenatal and family-planning services to residents who do not qualify for Medicaid due to immigration status). For each of these programs, as detailed in the attached declarations, the greater the number of uninsured residents, the more the State spends on health care for uninsured individuals. Ex. 2 at ¶¶ 16-20; Ex. 5 at ¶¶ 10-19. The same is true of programs operated by other Movant States. *See, e.g.*, Ex. 6 at ¶¶ 4-11.

Moreover, because these state-operated programs do not defray all costs of uncompensated care, state-owned acute care hospitals in Movant States also incur significant costs in providing services to uninsured patients, even after federal or state subsidies. *See* Ex. 1 at ¶¶ 8-9 (New Jersey's University Hospital incurred $53 million in uncompensated care costs in Fiscal Year 2022, and $58 million in Fiscal Year 2023). Thousands of DACA recipients have purchased insurance plans through an exchange since open enrollment for the year 2025 began on November 1, 2024. *E.g.*, Ex. 3 at ¶ 17; Ex. 4 at ¶ 17 (over 2,000 DACA-recipient enrollees in California and New Jersey alone). Loss of eligibility would leave those individuals without health insurance and require that Movant States incur expenses when they seek preventive or emergency health care.

Second, not only would elimination of the Final Rule impose new medical expenses upon Movant States, but it would also reduce the specific revenue streams from the assessments levied on the payment of insurance premiums by many Movant States. *See, e.g.*, *Missouri v. Biden*, 52

F.4th at 368 (finding "reduced tax revenues" can support States' showing of standing); *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992) (confirming State may demonstrate Article III standing based on "a direct injury in the form of a loss of specific tax revenues"); *New York v. U.S. Dep't of Lab.*, 363 F. Supp. 3d 109, 125 (D.D.C. 2019) (States have standing based on a financial injury from a decrease in tax revenue derived from a percentage of insurance premiums). Movant States have assessed hundreds of thousands of dollars in fees tied directly to insurance premiums paid by DACA recipients who, under the Final Rule, can access insurance via ACA exchanges. *See*, *e.g.*, Ex. 3 at ¶¶ 19-20; Ex. 4 at ¶¶ 29-30; Ex. 8 at ¶¶ 15-20. As one example, New Jersey's state-run exchange, GetCoveredNJ, generates revenue because insurance carriers pay a 3.5% fee on the total monthly premium collected for each health benefits plan sold in the individual market. *See* Ex. 3 at ¶¶ 19-20. Because over 225 DACA recipients in New Jersey have already purchased health insurance plans through GetCoveredNJ, *id.* at ¶ 17, elimination of the Final Rule would deprive New Jersey of the revenues generated by their premiums.

Third, elimination of the Final Rule would directly impose compliance costs on Movant States that operate their own state ACA exchanges. *Cf. New Jersey v. EPA*, 989 F.3d 1038, 1046 (D.C. Cir. 2021) (recognizing "exacerbated administrative costs and burdens imposed by the Rule" upon States "constitute a concrete and particularized injury"). If this Court were to ultimately grant the challengers' request and prevent implementation of the Final Rule nationwide, Movant States that maintain state exchanges would incur compliance costs, including to implement changes to technology platforms, retrain their staff, update websites and publications, conduct advertising and outreach, and send notices to participating DACA recipients. *See, e.g.*, Ex. 4 at ¶¶ 21-27 (detailing over $600,000 in compliance costs incurred by California and describing additional costs that would be incurred if the Final Rule were invalidated); Ex. 3 at ¶¶ 23-27 (describing New Jersey's

compliance costs); Ex. 7 at ¶¶ 16-17, 20-22 (describing Illinois's compliance costs);[4] *see also* ECF 119-1 at ¶¶ 19-21 (declaration filed by federal defendants estimating that CMS will need to "spend approximately 1500 hours at a cost of about $200,000 to make the emergency update to the [Federally-facilitated Exchange] eligibility criteria due to this [Court's] injunction," incur over $14,000 in costs to notify affected DACA recipients, and incur further costs to inform agents and brokers, other consumers, and plan issuers of the relevant eligibility changes).

b. <u>Fourth</u>, Movant States satisfy Article III because the elimination of the Final Rule would harm their interests in the health and welfare of their residents—which would be gravely impaired if their residents lose access to federally subsidized health insurance. Courts have recognized that, in addition to the vindication of their own pocketbook injuries, "[S]tates have a variety of … quasi-sovereign interests that they validly may seek to vindicate in litigation." *Kentucky v. Biden*, 23 F.4th 585, 598 (6th Cir. 2022); *see Lynch v. Nat'l Prescription Adm'rs, Inc*., 787 F.3d 868, 872 (8th Cir. 2015). This includes the States' "quasi-sovereign interest in the health and well-being—both physical and economic—of [their] residents in general." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982) ("*Snapp*"); *see also, e.g.*, *Lynch*, 787 F.3d at 872 (quoting *Snapp* for its endorsement of the quasi-sovereign interest in residents' health); *Missouri*

---

[4] Although the United States has previously argued that the three Plaintiff States that maintain their own state exchanges lack standing based on compliance costs, their principal arguments have no applicability to Movant States' distinct harms. *See* ECF 61 at 16-19 (emphasizing that two States did not submit any actual evidence of expenditures, that the remaining State identified only costs it *previously* incurred to comply with the Final Rule and not prospective costs that could be redressed by an injunction, and that all three States' compliance costs would be offset by revenues generated by new enrollees). Here, Movant States have introduced actual evidence—in the form of declarations—spelling out their compliance costs. And these costs *are* prospective, as Movant States would incur them if this Court vacates or otherwise enjoins the Final Rule on a nationwide basis, which therefore justifies intervention in order to oppose that relief. Nor could these costs be offset by revenues generated by new enrollees, as vacatur would doubly harm Movant States by depriving them of such revenue from DACA recipients too.

*v. China*, 90 F.4th 930, 940 n.2 (8th Cir. 2024) (State sufficiently alleged Article III standing based in part on the health "harms [residents] suffered" from China's alleged hoarding of PPE during the COVID-19 pandemic); *New York*, 969 F.3d at 59-60 (approving of state standing based in part on "increasing overall healthcare costs, and … general economic harm" within the State's borders). Such interests also suffice to demonstrate an interest under Rule 24. *See Arizona v. California*, 460 U.S. 605, 615 (1983), *decision supplemented*, 466 U.S. 144 (1984) (permitting tribes to intervene in environmental "litigation critical to the[] welfare" of members); *Texas v. United States*, No. 18-68, 2018 WL 11226239, at *1 (S.D. Tex. June 25, 2018) (permitting New Jersey to intervene in DACA challenge in light of NJ's interests in, inter alia, "maintaining public health").[5]

Without the Final Rule, New Jersey's interest in its residents' health and welfare will be injured. Should the Final Rule be invalidated, their DACA recipient residents would lose access to federally subsidized health insurance, which for many means they cannot afford such insurance at all. *See* 89 Fed. Reg. at 39,425 (estimating that the Final Rule makes 147,000 residents eligible for coverage). As explained in the States' Amicus Brief and the declarations accompanying this motion, depriving DACA recipients of access to affordable health insurance on the exchanges will undermine short-term and long-term health outcomes—including because these residents will be less likely to seek salutary preventive care, especially the many services not covered by state programs. *See* ECF 69 at 4-5 (collecting sources, including findings in the Final Rule, confirming

---

[5] Although Movant States acknowledge that "[a] State does not have standing as *parens patriae* to bring an action *against* the Federal Government" based upon these interests, *Haaland v. Brackeen*, 599 U.S. 255, 295 (2023) (emphasis added) (quoting *Snapp*, 458 U.S. at 610, n.16 (in turn citing *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923))), the so-called "*Mellon* bar" is no obstacle to a State's assertion of standing to *defend* federal action based on its quasi-sovereign interests in the health and well-being of its residents. *Cf. Massachusetts v. EPA*, 549 U.S. 497, 520 n.17 (2007) (explaining "critical difference between allowing a State to protect her citizens from the operation of federal statutes (which is what *Mellon* prohibits) and allowing a State to assert its rights under federal law (which it has standing to do)" (citations omitted)).

that "[i]ndividuals without health insurance are less likely to receive preventive or routine health screenings and may delay necessary medical care," such as "DACA recipients who may be victims of child abuse, domestic violence, sexual assault, and human trafficking" (quoting 89 Fed. Reg. at 39,396, 39,405)); Ex. 2 at ¶¶ 41-44. And beyond the harms to their health, loss of insurance can result in increased medical debt, reduced spending power, lost work productivity, and absenteeism—since DACA recipients, now less likely to seek preventive care, would be more likely to get sick and be absent from work as a result. *See* ECF 69 at 5-6, 8 (citing *Final Rule*, 89 Fed. Reg. at 39,396); Ex. 2 at ¶ 43; Ex. 4 ¶ 31; Ex. 7 ¶¶ 26-28.

Not only would Movant States' own interests in the health and welfare of DACA recipient residents be harmed, but their interest in the health and welfare of non-DACA residents would also be impacted. For one, residents who participate in Movant States' own exchanges or in the federal exchange also benefit from the inclusion of DACA recipients in insurance pools; because DACA recipients are generally younger and healthier than the overall population who participates in the exchanges, eliminating them from insurance pools could weaken those pools and increase costs across the board. *See* ECF 69 at 7 (citing *Final Rule*, 89 Fed. Reg. at 39,398); Ex. 4 ¶¶ 32-33; Ex. 7 at ¶¶ 24-26; Ex. 8 at ¶¶ 23-24. For another, given the nature of communicable diseases, and because individuals without insurance have worse access to preventive care and are more likely to get sick, any court order that increases the number of residents in Movant States who lack insurance could increase health risks statewide. *See* ECF 69 at 6 (citing studies that communities with lower rates of insurance had exacerbated outbreaks of COVID-19); Ex. 2 at ¶ 4. And perhaps most fundamentally, "[m]ore than 250,000 children have been born in the United States with at least one parent who is a DACA recipient"—and those children, too, count on having healthy parents to care for them. *Deferred Action for Childhood Arrivals*, 87 Fed. Reg. 53,152 (Aug. 30,

2022); Ex. 5 at ¶¶ 30-32 (noting that increased access to healthcare improves child health and welfare). Elimination of the Final Rule would thus injure Movant States' quasi-sovereign health interests, another reason Movant States have standing to defend against that result.[6]

2. Because there are no longer parties likely to adequately defend Movant States' interests, this Court should allow Movant States to take their place. Potential intervenors bear "a 'minimal' burden" to show that no party is adequately protecting their interests. *National Parks*, 759 F.3d at 976; *accord Kansas Pub. Emps. Ret. Sys. v. Reimer & Koger Assocs., Inc.*, 60 F.3d 1304, 1309 (8th Cir. 1995). While this low bar is higher "when one of the existing parties is a governmental agency," *National Parks*, 759 F.3d at 976, Movant States clear it easily. After all, while federal defendants were previously defending their Final Rule on the merits, there is little doubt that will now change: the President-Elect and Vice President-Elect both criticized the Final Rule during the presidential campaign, and the prior Trump Administration declined to defend both DACA and the ACA. As to the former, at a campaign event in 2024, President-elect Trump criticized the Final Rule, albeit inaccurately, asserting that it "giv[es] Obamacare and all free government health care

---

[6] In addition to these four Rule 24 interests, this Court's own prior decision in this case supports a fifth interest for Movant States. This Court preliminarily accepted North Dakota's argument that if the Final Rule is vacated, some DACA recipients who currently reside in North Dakota would leave the State and thereby save North Dakota money it currently expends on those recipients. *See* ECF 117 at 9. As explained in the States' Amicus Brief, that premise is contrary to the record and to real-world experience. *See* ECF 69 at 9-11; *see also* 89 Fed. Reg. at 39,399 (observing that it is not "reasonable to conclude" that DACA recipients who have been residing in the United States for at least 17 years without access to the ACA exchanges would suddenly leave without the Final Rule). If, however, the Court believes DACA recipients will leave this country absent the Final Rule, that would harm Movant States profoundly. *Cf. DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 31 (2020) (observing loss of DACA recipients from lawful labor force would "radiate outward" not only to the recipients' 250,000 U.S.-children but also to "the schools where DACA recipients study and teach," "the employers who have invested time and money in training them," and the state and local governments that could "could lose $1.25 billion in tax revenue each year"); *DACA*, 87 Fed. Reg. at 53,172-74 (noting that the States would suffer if they lost DACA recipients from colleges, government workplaces, and tax bases, and finding—after engaging in a cost-benefit analysis—that DACA does not impose net economic harm to any State).

to illegal aliens." Emily Baumgaertner & Margot Sanger-Katz, *Does Kamala Harris Back Free Health Care for Illegal Immigrants*, N.Y. Times (Oct. 30, 2024), https://tinyurl.com/ymb3wrs7. The Vice President-Elect likewise issued a release criticizing the Final Rule as "giv[ing] your hard-earned money away to illegal immigrants in the form of taxpayer-funded healthcare," called it a "slap in the face to every hardworking American who plays by the rules," said that "it would never happen if Donald Trump were president," and promised to "exclude DACA recipients and bar the use of any federal taxpayer dollars through ACA waivers for providing health insurance coverage for illegal aliens." *Sen. Vance Blasts Biden Admin. For Providing Taxpayer-Funded Healthcare To Illegal Immigrants*, JD Vance (May 3, 2024), https://tinyurl.com/54sxcbvw.

Nor is there a doubt that, given the incoming Administration's express hostility to the Final Rule, federal defendants will decline to defend it on the merits. When President-Elect Trump was last in office, federal defendants refused to defend against a challenge to DACA, specifically agreeing with the plaintiffs there (who overlap considerably with Plaintiff States here) that "DACA is unlawful." *Texas v. United States*, No. 18-68 (S.D. Tex.), ECF 71 (Response to PI Motion), at 1 ("The United States agrees with the State of Texas and other Plaintiffs that the policy known as [DACA] is unlawful."), 13-15 ("Plaintiffs and Federal Defendants agree—DACA is unlawful."). And they likewise refused to defend the constitutionality of the ACA, instead filing a brief at the U.S. Supreme Court contending that the ACA should be invalidated. *See California v. Texas*, No. 19-840 (U.S.), Br. of United States (May 13, 2020) at 11-13 (arguing for wholesale invalidation of the ACA). It is thus clear federal defendants will no longer argue that DACA recipients satisfy the definition of "lawful presence" under the ACA's plain text—or advance the interests the Final Rule serves in expanding access to ACA exchanges. Given this opposition to the Final Rule and the President-elect's history of declining to defend both DACA and the ACA, federal defendants—

despite "having started out as … all[ies]"—will now be Movant States' "adversar[ies]," rather than "faithful representative[s] of [Movant States'] interest in this lawsuit." *Mandan, Hidatsa & Arikara Nation v. U.S. Dep't of the Interior*, 66 F.4th 282, 285 (D.C. Cir. 2023).

Intervention provides the precise solution for this problem. This case requires parties who are willing and situated to defend the Final Rule, and to ensure appropriate adversarial presentation on the standing, venue, merits, and equities questions implicated here. Without intervention, this Court would be deprived of an adequate defense of the Final Rule—or even of Article III adversity between the parties. That is why, when another district court faced the same situation in the context of DACA, it permitted DACA recipients and New Jersey to participate as intervenors and provide the adequate defense federal defendants would not. *See Texas v. United States*, 2018 WL 11226239, at *1 (finding New Jersey's "interests are inadequately represented by the existing parties" in challenge to DACA and permitting New Jersey to intervene to defend DACA); *Texas v. United States*, 50 F.4th 498, 510-11 (5th Cir. 2022) (describing how New Jersey intervened as of right because the prior Trump Administration "determined that DACA was … unlawful"). Indeed, for six years, New Jersey has defended DACA in district court and on appeal, including for four years when federal defendants declined to do so—and continues to do so today. And similarly, because the Trump Administration "took the side of the plaintiffs" in the challenge to the ACA, the courts allowed a group of States—including California and a number of other Movant States—to "intervene[] in order to defend the Act's constitutionality." *California v. Texas*, 593 U.S. 659, 668 (2021). To ensure an adequate defense and proper adversity between the parties, this Court should likewise recognize Movant States' right to intervene here.

2. Further, Movant States' motion is timely. *See United Food & Com. Workers Union, Loc. No. 663 v. USDA*, 36 F.4th 777, 780 (8th Cir. 2022) (for "timeliness, courts consider four factors:

(1) the extent the litigation has progressed at the time of the motion to intervene; (2) the prospective intervenor's knowledge of the litigation; (3) the reason for the delay in seeking intervention; and (4) whether the delay in seeking intervention may prejudice the existing parties"); *Tweedle v. State Farm Fire & Cas. Co.*, 527 F.3d 664, 671 (8th Cir. 2008) (noting courts assess "all surrounding circumstances" in assessing timeliness, including "the reason for the delay in seeking intervention, and any possible prejudice to the parties already in the litigation"). Movant States are intervening swiftly and diligently, and their intervention will not prejudice any party.

Movant States have acted swiftly and diligently at every stage in this case. Initially, many of the Movant States indicated their interest in this litigation from the beginning, submitting an amicus brief in support of federal defendants within the first two months of this lawsuit—spelling out their view of the law and the impacts the Final Rule has on them. *Compare* ECF 1 (complaint filed August 8, 2024), *with* ECF 69 (States' Amicus Brief filed on October 2, 2024).[7] At that time, Movant States had no reason to intervene because their interest in defending the Final Rule was aligned with federal defendants' interests—which bears on the adequacy inquiry discussed above. But because that will change after Inauguration on January 20, 2025—in light of the President-Elect's hostility to the Final Rule and prior decisions not to defend DACA and the ACA, *supra* at pp. 13-15—Movant States have swiftly filed their intervention papers, so that there will be a seamless transition from one sovereign's defense of the Final Rule (federal defendants) to other sovereigns that support and benefit from it (Movant States). Since federal defendants' adequate defense of the Final Rule will cease as of Inauguration Day, "the timeliness of [Movants States']

---

[7] Indeed, even earlier, many of the Movant States filed a comment letter in the underlying notice-and-comment rulemaking process supporting the Final Rule on June 23, 2023. *See* Ex. 9.

motion should be assessed in relation to that point in time," when the "need to seek intervention … ar[o]se." *Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 280 (2022).

Further, permitting Movant States' intervention would not prejudice the existing parties. Federal defendants' answer is not due until January 22, 2025, ECF 132, and Plaintiffs' motions for preliminary relief have been resolved, *see* ECF 117. Movant States' participation in the district court proceedings will also not slow the pending appeal of the preliminary injunction, which will not be fully briefed until February 19, 2025, CA8 No. 5466750, and Movant States are prepared to litigate summary judgment once those appellate proceedings have concluded. *See Kane Cnty. v. United States*, 928 F.3d 877, 896-97 (10th Cir. 2019) (approving of intervention following change in presidential or agency administration); *Pasqua Yaqui Tribe v. EPA*, No. 20-2266, 2021 WL 25776939, at *1 (D. Ariz., May 5, 2021) (same). Nor can Plaintiff States or federal defendants object that Movant States would "oppose[] [their] position" on the merits and be "unwilling to settle" the litigation on terms federal defendants may not embrace—after all, "Rule 24(a) protects precisely this ability to intervene in litigation to protect one's interests," including to prevent such settlements. *Mille Lacs Band of Chippewa Indians v. Minnesota*, 989 F.2d 994, 999 (8th Cir. 1993); *see Lopez-Aguilar v. Marion Cnty. Sheriff's Dep't.*, 924 F.3d 375, 375, 390 (7th Cir. 2019) (agreeing "burden to the parties of reopening the litigation and resuming settlement negotiations" does not constitute prejudice undermining timeliness where that alleged burden "would have been the same" had the movants been parties from the case's inception).

The timeliness of this intervention motion contrasts sharply with the cases in which States' motions to intervene to defend federal policies were denied as untimely. *See, e.g.*, *Cook Cnty. v. Texas*, 37 F.4th 1335, 1337, 1342 (7th Cir. 2022) (affirming denial of intervention motion filed over six months after district court had vacated federal regulation being challenged, four months

after President Biden took office, and two months after Biden Administration dismissed appeals defending the rule in other courts across the country); *Huisha-Huisha v. Mayorkas*, No. 22-5325, 2022 WL 19653946, at *1-2 (D.C. Cir. Dec. 16, 2022) (States not permitted to intervene in defense of federal policy where district court already vacated the policy and movants had been submitting filings in other courts for more than a year indicating they could not rely on federal defendants to defend the policy). Unlike those cases, here there is no ruling on the merits, and up until now, Movant States had reasonably relied on federal defendants to represent their interests. *Cf. Cook Cnty.*, 37 F.4th at 1342 ("States were justified in relying on DHS's continued defense of the … Rule at least through the November 2020 election"). This motion is timely, and granting it would allow Movant States to provide a fulsome defense—as they did for DACA and the ACA.[8]

## II. ALTERNATIVELY, PERMISSIVE INTERVENTION IS APPROPRIATE.

Because Movant States satisfy the standard for mandatory intervention, this Court need not consider permissive intervention under Rule 24(b). But to the extent this Court reaches that issue, it should allow intervention under Rule 24(b). Such intervention is appropriate when the proposed intervenor can show "(1) an independent ground for jurisdiction, (2) timeliness of the motion, and (3) that the applicant's claim or defense and the main action have a question of law or fact in

---

[8] Just as Movant States have not brought this motion to intervene too late (for timeliness purposes), Movant States have also not filed too early (for adequacy purposes), because they are not required to wait until the incoming Administration in fact terminates its defense of this Final Rule. For one, Movant States acted swiftly to avoid any risk that this Court would find their motion came too late. *Compare Cook Cnty.*, 37 F.4th at 1342. For another, Movant States would likely have no formal advance notice from federal defendants that they are ceasing the defense of the Final Rule, and may learn of that development only when federal defendants and Plaintiff States settle the case—a result Movant States are intervening to avoid. *Compare id.* Finally, though Movant States may be justified in waiting to ascertain what new position federal defendants will take after the change in administration before intervening in some other cases, federal defendants' forthcoming position on the merits in *this* case—in light of the President-Elect's statements on the Final Rule and the prior nondefense of DACA and the ACA—is already clear. *See supra* at pp. 13-15.

common." *Flynt v. Lombardi*, 782 F.3d 963, 966 (8th Cir. 2015); *see also Franconia Mins. (UK) LLC v. United States*, 319 F.R.D. 261, 268 (D. Minn. 2017) (common questions of law and fact exist where a movant "seeks to uphold" the "same actions that Plaintiffs seek to overturn"). That standard is easily met here: Movant States have standing to intervene, establishing an independent ground for jurisdiction, *see supra* at pp. 4-13; the motion is timely, *see supra* at pp. 15-17; and common questions of law and fact exist because Movant States seek to defend the same agency action that the challengers here attack (the Final Rule), and their defenses will be "directly responsive" to the claims' merits. *Franconia*, 319 F.R.D. at 268. Without intervention of additional defendants, this Court would lose the benefit of adversarial presentation on the merits. As prior courts have found in adjudicating DACA and the ACA, intervention provides the solution to that problem.

## **CONCLUSION**

This Court should grant Movant States' motion to intervene as defendants.

Dated: January 15, 2025

Respectfully submitted,

**MATTHEW J. PLATKIN**
Attorney General, State of New Jersey

*/s/ Joshua P. Bohn*

JOSHUA P. BOHN
Deputy Attorney General
New Jersey Attorney General's Office
25 Market Street
Trenton, NJ 08625
(609) 376-3377
Joshua.Bohn@law.njoag.gov

*Attorneys for State of New Jersey*

**KRISTIN K. MAYES**
Attorney General of Arizona

By /s/ *Joshua D. Bendor*

Joshua D. Bendor*
Office of the Arizona
Attorney General
2005 N. Central Ave.
Phoenix, AZ 85004
(602) 542-3333
Joshua.Bendor@azag.gov

*Attorneys for State of Arizona*

**PHILIP J. WEISER**
Attorney General of Colorado

By: /s/ *Shannon Stevenson*

Shannon Stevenson*
Solicitor General
Office of the Colorado
Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
Shannon.stevenson@coag.gov

*Attorneys for State of Colorado*

**ANNE E. LOPEZ**
Attorney General of Hawaiʻi

By: /s/ *Kalikoʻonālani D. Fernandes*

Kalikoʻonālani D. Fernandes*
Solicitor General
Department of the Attorney General,
State of Hawaiʻi
425 Queen Street, Honolulu, Hawaiʻi, 96813
Phone: (808) 586-1393
Email: kaliko.d.fernandes@hawaii.gov

*Attorneys for State of Hawaiʻi*

**ROB BONTA**
Attorney General of California

By: /s/ *Kathleen Boergers*

Kathleen Boergers*
Deputy Attorney General Supervisor
1515 Clay Street
20th Floor
Oakland, California 94612
Kathleen.Boergers@doj.ca.gov
510-879-0011

*Attorneys for State of California*

**KATHLEEN JENNINGS**
Attorney General of Delaware

By: /s/ *Vanessa L. Kassab*

Vanessa L. Kassab*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Attorneys for State of Delaware*

**KWAME RAOUL**
Attorney General of Illinois

By: /s/ *Rebekah Newman*

Rebekah Newman*
Assistant Attorney General
Special Litigation Bureau
115 S. LaSalle. St., Floor 35
Chicago, IL 60603
(312) 814-3659
Rebekah.Newman@ilag.gov

*Attorneys for State of Illinois*

**ANTHONY G. BROWN**
Attorney General of Maryland

By: */s/ Jessica M. Finberg*

Jessica M. Finberg*
Assistant Attorney General
200 Saint Paul Place
20th Floor
Baltimore, Maryland 21202
jfinberg@oag.state.md.us
410-576-6921

*Attorneys for State of Maryland*

**KEITH ELLISON**
Attorney General of Minnesota

By: */s/ Rebecca Stillman*

Rebecca Stillman*
Assistant Attorney General
445 Minnesota Street, Suite 1200
St. Paul, Minnesota 55101-2130
(651) 300-7564
rebecca.stillman@ag.state.mn.us

*Attorneys for State of Minnesota*

**RAÚL TORREZ**
Attorney General of New Mexico

By: */s/ Aletheia V.P. Allen*

Aletheia V.P. Allen*
Solicitor General
New Mexico Department of Justice
201 Third St. NW Suite 300
Albuquerque, NM 87102
(505) 527-2776
aallen@nmdoj.gov

*Attorneys for State of New Mexico*

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Jason R. Evans*

Jason R. Evans* (MI Bar No. 61657)
Assistant Attorney General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, Michigan 48909
(517) 335-7632
evansj@michigan.gov

*Attorneys for Attorney General Dana Nessel
on behalf of People of Michigan*

**AARON D. FORD**
Attorney General of Nevada

By: */s/ Heidi Parry Stern*

Heidi Parry Stern* (Bar. No. 8873)
Solicitor General
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov

*Attorneys for State of Nevada*

**DAN A. RAYFIELD**
Attorney General of Oregon

By: */s/ Thomas H. Castelli*

Thomas H. Castelli* (OSB NO. 226448)
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880
thomas.castelli@doj.oregon.gov

*Attorneys for State of Oregon*

21

**CHARITY R. CLARK**
Attorney General of Vermont

By: */s/ Jonathan T. Rose*

Jonathan T. Rose*
Solicitor General
109 State Street
Montpelier, VT 06509
(802) 828-3171
jonathan.rose@vermont.gov

*Attorneys for State of Vermont*

* *Pro hac vice motion forthcoming*